```
OCEAN COUNTY SUPERIOR COURT
OCEAN COUNTY COURTHOUSE
CIVIL LAW DIVISION
TOMS RIVER      NJ 08754                     TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (732) 929-2016
COURT HOURS  8:30 AM - 4:30 PM


                    DATE:    JANUARY 04, 2017
                    RE:      NJ DEPARTMENT BANKING & INSURANCE VS BANDY
                    DOCKET:  OCN L -000019 17

    THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

    DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.

    THE MANAGING JUDGE ASSIGNED IS:  HON CRAIG L. WELLERSON

    IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      002
AT:  (732) 929-4771 EXT 4771.

    IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
    PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:

                            ATT: RICHARD E. WEGRYN
                            ATTORNEY GENERAL LAW
                            NEW JERSEY TRANSIT
                            ONE PENN PLAZA EAST 4TH FL
                            NEWARK            NJ 07105
JUAMH6
```



# CIVIL CASE INFORMATION STATEMENT
## (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**

| | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|
| PAYMENT TYPE: | ☐ CK  ☐ CG  ☐ CA |
| CHG/CK NO. | |
| AMOUNT: | |
| OVERPAYMENT: | |
| BATCH NUMBER: | |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Michael A. Malia, Esq./Richard E. Wegryn, Jr., Esq. | (732) 280-2400/(609) 777-3733 | Ocean |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
|---|---|
| Pringle Quinn Anzano, P.C. / Rebecca Ricigliano, Acting Attorney General of New Jersey | 219-17 |

| OFFICE ADDRESS | DOCUMENT TYPE |
|---|---|
| 701 Seventh Avenue   / R.J. Hughes Justice Complex, 25 Market Street, Belmar, NJ 07719   / Trenton, New Jersey 08625 | Complaint |
| | JURY DEMAND  ☐ YES   X NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| Plaintiffs Allstate New  / Plaintiff Richard J. Jersey Ins. Co. and  / Badolato, Commissioner Encompass Ins. Co.,  / of the N.J. Dept. of et al.  / Banking & Ins. | Allstate New Jersey Ins. Company, et als. v. Anhuar Bandy, et als. |

| CASE TYPE NUMBER (See reverse side for listing) 514 | HURRICANE SANDY RELATED? ☐ YES  X NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES  X NO |
|---|---|---|
| | | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? ☐ Yes  X No | IF YES, LIST DOCKET NUMBERS |
|---|---|

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? X Yes  ☐ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known) ☐ NONE    X UNKNOWN |
|---|---|

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ☐ YES  X NO | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain) ☐ FAMILIAL   ☐ BUSINESS |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? | X YES  ☐ NO |
|---|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

Complex litigation with numerous defendants.

RECEIVED & FILED
JAN - 3 2017

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ Yes  X No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED? ☐ Yes  X No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
- 151  NAME CHANGE
- 175  FORFEITURE
- 302  TENANCY
- 399  REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
- 502  BOOK ACCOUNT (debt collection matters only)
- 505  OTHER INSURANCE CLAIM (including declaratory judgment actions)
- 506  PIP COVERAGE
- 510  UM or UIM CLAIM (coverage issues only)
- 511  ACTION ON NEGOTIABLE INSTRUMENT
- 512  LEMON LAW
- 801  SUMMARY ACTION
- 802  OPEN PUBLIC RECORDS ACT (summary action)
- 999  OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
- 305  CONSTRUCTION
- 509  EMPLOYMENT (other than CEPA or LAD)
- 599  CONTRACT/COMMERCIAL TRANSACTION
- 603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
- 603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
- 605  PERSONAL INJURY
- 610  AUTO NEGLIGENCE – PROPERTY DAMAGE
- 621  UM or UIM CLAIM (includes bodily injury)
- 699  TORT – OTHER

**Track III - 450 days' discovery**
- 005  CIVIL RIGHTS
- 301  CONDEMNATION
- 602  ASSAULT AND BATTERY
- 604  MEDICAL MALPRACTICE
- 606  PRODUCT LIABILITY
- 607  PROFESSIONAL MALPRACTICE
- 608  TOXIC TORT
- 609  DEFAMATION
- 616  WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
- 617  INVERSE CONDEMNATION
- 618  LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
- 156  ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
- 303  MT. LAUREL
- 508  COMPLEX COMMERCIAL
- 513  COMPLEX CONSTRUCTION
- 514  INSURANCE FRAUD
- 620  FALSE CLAIMS ACT
- 701  ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 271 | ACCUTANE/ISOTRETINOIN | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 291 | PELVIC MESH/GYNECARE |
| 278 | ZOMETA/AREDIA | 292 | PELVIC MESH/BARD |
| 279 | GADOLINIUM | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 282 | FOSAMAX | 296 | STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 299 | OLMESARTAN MEDOXOMIL MEDICATIONS/BENICAR |
| 287 | YAZ/YASMIN/OCELLA | 300 | TALC-BASED BODY POWDERS |
| 288 | PRUDENTIAL TORT LITIGATION | 601 | ASBESTOS |
| 289 | REGLAN | 623 | PROPECIA |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

**Please check off each applicable category**    ☐ Putative Class Action    ☐ Title 59

Kenneth E. Pringle, Esq. - NJ Atty ID #039351983
Michael A. Malia, Esq. – NJ Atty ID #019492000
**PRINGLE QUINN ANZANO, P.C.**
701 Seventh Avenue
P.O. Box 420
Belmar, New Jersey 07719
(732) 280-2400
Attorneys for Plaintiffs Allstate New Jersey
Insurance Company, et al.

Rebecca Ricigliano
ACTING ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 117
Trenton, New Jersey 08625
Attorney for Plaintiff Richard J. Badolato, Commissioner of the New Jersey Department
of Banking & Insurance
By:    Richard E. Wegryn, Jr. – NJ Atty ID# 048361993
       Deputy Attorney General
       609-777-3733
       Kevin J. McGowan – NJ Atty ID# 103102014
       Deputy Attorney General
       609-292-6123

RECEIVED & FILED

JAN - 3 2017

SUPERIOR CT., OCEAN

---

ALLSTATE NEW JERSEY INSURANCE COMPANY,
ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY AND
CASUALTY INSURANCE COMPANY, ALLSTATE
NEW JERSEY PROPERTY AND CASUALTY
INSURANCE COMPANY, ALLSTATE FIRE &
CASUALTY INSURANCE COMPANY, ENCOMPASS
INSURANCE COMPANY OF NEW JERSEY,
ENCOMPASS PROPERTY AND CASUALTY
COMPANY OF NEW JERSEY,

RICHARD J. BADOLATO, COMMISSIONER OF THE
NEW JERSEY DEPARTMENT OF BANKING &
INSURANCE

        Plaintiffs,

vs.

**SUPERIOR COURT OF
NEW JERSEY**

**LAW DIVISION
OCEAN COUNTY**

DOCKET NO.
*19·17*
Civil Action

**COMPLAINT**

ANHUAR BANDY; KARIM BANDY; EDWARD P.
FORMISANO, D.C.; LOUIS S. BROWN, D.C.; MONICA
JOHNSON, D.C.; GERALD H. ROTH, D.C.; RICHARD
STARK, JR., D.C.; SERGEY LIPSHITZ, L.A.C.; IRINA
ROYTMAN, L.A.C.; ALEXANDRA GALLEGOS; DAVID
WALKER, ESQ.; KARIM ARZADI, ESQ.; JOWORISAK
& ASSOCIATES, LLC f/k/a ARZADI, JOWORISAK &
ASSOCIATES, LLC; EUGENE S. WISHNIC, ESQ.;
EUGENE S. WISHNIC, P.C.; BRAD S. SCHENERMAN
ESQ.; BRAD S. SCHENERMAN, ESQ., LLC;
YANKOWITZ & SCHENERMAN, LLC;
CHIROPRACTIC SPINE CENTER, LLC; ECLIPSE
CHIROPRACTIC CENTER, LLC; ELMORA
WELLNESS CENTER, LLC; GOOD HEALTH
CENTER, LLC; LAKEWOOD CHIROPRACTIC
CENTER, LLC; LIBERTY CHIROPRACTIC CENTER,
LLC; NEW CENTURY CHIROPRACTIC CENTER,
LLC; PENNSAUKEN CHIROPRACTIC CENTER, LLC;
PLATINUM CHIROPRACTIC, LLC; TRUE HEALING
AND WELLNESS CENTER, LLC; WELLSPRING
REHABILITATION CENTER, LLC; MILLENIUM
CHIROPRACTIC, LLC, a/k/a MILLENNIUM
CHIROPRACTIC, LLC, f/k/a SPINE CHIROPRACTIC
OF NEW JERSEY, LLC; RIOTTO FAMILY
CHIROPRACTIC, LLC; ANTHONY M. RIOTTO, D.C.;
MICHAEL M. BAER, D.C.; CHI ACUPUNCTURE, LLC;
KEKK MARKETING GROUP, LLC; PRECISION
MANAGEMENT ASSOCIATES, LLC; FIRST CHOICE
MANAGEMENT, LLC; KARKIS, LLC; VIP
MANAGEMENT SERVICES, LLC; PALMER HILLS
HOLDINGS, LLC; SORFAM PARTNERSHIP, LP;
KARLALY, LLC; 243 LIVINGSTON AVENUE
ASSOCIATES, LLC (a/k/a "243 Livingston Associates,
LLC"); QUALITY MANAGEMENT SERVICES, LLC;
GOLDEN FLOWER ACUPUNCTURE, P.C.; GOLDEN
LOTUS ACUPUNCTURE, P.C.; MLS MEDICAL
GROUP, LLC; MARK L. SCHWARTZ, D.O.; LISA M.
EMBER; PERRY SCOTT a/k/a "Perry Scott Lipson";
BRETT LIQUORI; KIMBERLY GILL; MLS MEDICAL
GROUP, LLC, a Florida limited liability company; MLS
EDX MEDICAL GROUP, LLC (d/b/a "Neuro Diagnostic
Associates, LLC"); MLS EDX MEDICAL GROUP, LLC,
a Florida limited liability company; MSAR, LLC, a
Florida limited liability company; KENNETH M.

2

GROSS, D.C., MICHELLE DUBNOFF, D.C.;
CHIROPRACTIC PHYSICIANS GROUP, LLP;
CHRISTOPHER MONTANA, D.C., FERNANDO
BARRESE, D.C.; OLEG GORODETSKY;
CHIROPRACTIC CENTRE OF ELIZABETH, LLC;
CHIROPRACTIC CENTER OF JERSEY CITY, LLC;
CHIROPRACTIC CENTER OF NEWARK, LLC;
WALLINGTON CHIROPRACTIC CENTER, P.C.;
MASSIMO REHABILITATION CENTER, LLC;
MASSIMO CHIROPRACTIC, LLC; HANOVER
CHIROPRACTIC, LLC; HANOVER REHABILITATION
CENTER, LLC; ESTEFANIA (a/k/a "Stephanie") FRIAS;
LILIAN FRIAS; CESAR HUAMAN; RENE LACOTERA;
ALBERT LEE HUGHES; ANALI G. RIVERA; MARTA A.
PEREZ; BERNARDO (a/k/a "Benny") NEIMAN;
SERGIO C. MORENO; JOHN DOE 1-50 (a/k/a
"Gabriel"); JOHN DOE 1-50 (a/k/a "Rakeisha"); JOHN
DOE 1-50 (a/k/a "Jaxson Washington"); JOHN DOE 1-
50 (a/k/a "Tony Hernandez"); JOHN DOE 1-50 (a/k/a
"Elizabeth"); JOHN DOE 1-50 (a/k/a "Yolanda"); JOHN
DOE 1-50 (a/k/a "Corea"); JOHN DOE 1-50 (a/k/a
"Tano"); JOHN DOE 1-50 (fictitious names); JOHN
ROE 1-50 (fictitious names); ABC CORP. 1-50
(fictitious names); and XYZ, P.C. 1-50 (fictitious
names),

Defendants.

18

Plaintiffs Allstate New Jersey Insurance Company, Allstate Insurance Company,

Allstate Indemnity Company, Allstate Property and Casualty Insurance Company,

Allstate New Jersey Property and Casualty Insurance Company, Allstate Fire &

Casualty Insurance Company, Encompass Insurance Company of New Jersey,

Encompass Property and Casualty Company of New Jersey (also referred to herein as

the "Allstate Plaintiffs" or "Allstate"), and Richard J. Badolato, Commissioner of the New

Jersey Department of Banking & Insurance (also referred to herein as "Commissioner"),

collectively "Plaintiffs," by way of Complaint in the above-captioned matter, state the

3

following:

## THE PARTIES

The Plaintiffs .................................................................................... 14

Venue Statement ............................................................................. 14

The Defendants

*Individual Defendants* ....................................................................... 14

*The Defendant Bandy/Riotto Chiropractors* ...................................... 15

*The Bandy Clinic Staff Defendants* .................................................. 19

*The Riotto Clinic Staff Defendants* ................................................... 20

The Defendant Bandy/Riotto Chiropractic Clinics

*The Defendant Bandy-Controlled Chiropractic Clinics* ....................... 20

*The Defendant Riotto Chiropractic Clinics* ....................................... 24

Defendant Bandy Management Companies ....................................... 25

The Acupuncture Defendants

*The Defendant Acupuncture Entities* ............................................... 33

*The Defendant Acupuncture Professionals* ...................................... 34

The Law Firm Defendants .................................................................. 35

Referee Provider Defendants ............................................................ 40

*The Other Referee Provider Defendants* .......................................... 41

*The MLS Medical Defendants* .......................................................... 41

The Referring Defendants .................................................................. 45

*The MLS Medical Referring Defendants* ........................................... 46

The Chiropractic Physicians Group Defendants .................................................47

The Montana/Barrese Defendants ...................................................................48

The Runner Defendants ...................................................................................53

The Patient Broker Defendants .......................................................................60

The Check Casher Defendants ........................................................................61

Fictitiously-Named Defendants .......................................................................62

FACTUAL INTRODUCTION AND BACKGROUND ...........................................64

Overview of the Schemes that Are the Subject
    of this Complaint .......................................................................................65

Overview of the Bandy Concealed Ownership Scheme,
    the Bandy Chiropractic Fee-Splitting Scheme and
    the Bandy Acupuncture Fee-Splitting Scheme ..........................................70

Overview of the Bandy Runner Scheme............................................................73

Overview of the Bandy Attorney Kickback Scheme...........................................75

Overview of the Bandy Provider Kickback Scheme............................................78

The Relationship of the Bandy Schemes to Previous
    Fraud Schemes Engaged in by Defendant Anhuar Bandy ...........................80

Anhuar and Karim Bandy's Admissions and Statements
    to Allstate Representatives Concerning
    the Prior Bandy Schemes ...........................................................................81

Anhuar and Karim Bandy's Admissions and Statements
    to Allstate Representatives Following
    Anhuar Bandy's 2004 Conviction................................................................83

Factual Allegations Relating to the Bandy Concealed
    Ownership Scheme ....................................................................................88

Allegations Relating to Defendants Chi Acupuncture,
    LLC, True Healing, Monica Johnson, D.C. and
    Louis S. Brown, D.C. ..................................................................................88

Defendants Wellspring Rehabilitation and
   Louis Brown, D.C. ............................................................. 92

Defendants Brown, New Century Chiropractic Center,
   LLC and Edward P. Formisano, D.C. .................................. 93

Defendants Roth and Good Health Center ...................... 95

Defendants Formisano, Eclipse Chiropractic,
   Chiropractic Spine, Lakewood Chiropractic,
   Liberty Chiropractic and Pennsauken Chiropractic ......... 96

Defendants Elmora Wellness, LLC and Richard
   Stark, Jr., D.C. ................................................................. 102

Allegations Relating to the Bandy Runner Scheme. ........ 104

Mechanics of the Bandy Runner Scheme ...................... 105

Competitors Who Were Being Hurt by the Bandy Schemes
   Provide Information to Allstate and/or its Counsel
   Either Directly or Through Anonymous Letters .............. 107

Anonymous Letters ....................................................... 110

Complaints to Insurers and Law Enforcement About the
   Conduct of the Bandy Runners and Defendant Law
   Firms from Competing Chiropractors and Law Firms ....... 115

Information About the Actions of Defendant Anhuar Bandy
   and the Runner Defendants Obtained from Undercover
   OIFP Investigations ....................................................... 117

The Defendant Bandy Runners' Use of Business Cards ...... 120

The Role of the Runner Defendants in Steering Accident
   Victims to the Defendant Bandys, Riotto, the Defendant
   Bandy/Riotto Chiropractic Clinics, the Montana/Barrese
   Defendants and to the Law Firm Defendants ................... 121

Allegations Regarding the Specific Actions of Runner
   Defendants in Soliciting Allstate Claimants in Violation
   of Section 4(e) of the IFPA ............................................. 123

6

*Allegations Regarding the Role of Defendants Wishnic and Eugene S. Wishnic, P.C. in Furtherance of the Bandy Attorney Kickback Scheme and the Bandy Runner Scheme* .................................................................. 181

*Allegations Regarding the Role of Defendant Schenerman and the Schenerman Law Firm Defendants in the Bandy Attorney Kickback Scheme and Other Provider Kickback Schemes* ............................................................. 186

*Defendant Schenerman's Role in the Greenberg Schemes* ................... 187

*Defendant Schenerman's Role with the Montana/Barrese Element of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme* ....................................... 188

*Allegations Regarding the Mechanics of Cross-Referrals and Other Changes in Client Representation Between the Law Firm Defendants in Furtherance of the Bandy Attorney Kickback Scheme and the Bandy Runner Scheme* .................... 190

*Allegations Regarding the Roles of the Bandy Law Firm Defendants in Furtherance of the Bandy Provider Kickback Scheme* .................................................................. 194

**Allegations Regarding the Bandy Provider Kickback Scheme** ............ 196

*Background of the Bandy Provider Kickback Schemes* .......................... 198

*The Golden Acupuncture Scheme* ...................................................... 199

*The MLS Medical Kickback Scheme* ................................................... 208

*Defendants Gross and/or Dubnoff Introduces the Defendant Bandys to the MLS Medical Defendants* ...................... 215

*MLS Medical Fraudulent Billing and Record Scheme* .......................... 217

**The Allstate Plaintiffs' Payment of PIP Benefits to Defendants on Behalf of the Allstate PIP Claimants** ......................................... 220

**The Allstate Plaintiffs' Payments of Liability Claims for Alleged Bodily Injuries to Allstate BI Claimants Related to the Bandy Schemes** ............................................................... 221

FIRST COUNT (Declaratory Judgment- Bandy Concealed Ownership
Scheme and Golden Acupuncture Concealed Ownership Scheme)..............222

SECOND COUNT (Unjust Enrichment- Bandy Concealed Ownership
Scheme and Golden Acupuncture Concealed Ownership Scheme)..............238

THIRD COUNT (Insurance Fraud Prevention Act,
N.J.S.A. 17:33A-1, et seq- Bandy Concealed Ownership Scheme
and Golden Acupuncture Concealed Ownership Scheme)................241

FOURTH COUNT (Declaratory Judgment – Bandy Chiropractic
Fee-Splitting Scheme)..................................................253

FIFTH COUNT (Unjust Enrichment – Bandy Chiropractic
Fee-Splitting Scheme)..................................................261

SIXTH COUNT (Violation of N.J.S.A. 17:33A-1, et seq. –
Bandy Chiropractic Fee-Splitting Scheme).............................264

SEVENTH COUNT (Declaratory Judgment – the Bandy
Acupuncture Fee-Splitting Scheme)....................................276

EIGHTH COUNT (Unjust Enrichment – the Bandy Acupuncture
Fee-Splitting Scheme)..................................................290

NINTH COUNT (Violation of N.J.S.A. 17:33A-1, et seq.
(the "IFPA")- the Bandy Acupuncture Fee-Splitting
Scheme)................................................................293

TENTH COUNT (The Bandy Runner Scheme and the Bandy
Attorney Kickback Scheme- Violations of the IFPA).....................306

ELEVENTH COUNT (Declaratory Judgment – MLS Medical
Kickback Scheme and the MLS Medical Fraudulent Billing
and Record Scheme)....................................................325

Applicable Laws and Regulations Governing the Performance of
Diagnostic Testing and Billing for Same Under
the No Fault Statute..................................................325

The Electrodiagnostic Testing Billed by the MLS Defendants
Is Not Reimbursable Under the No Fault Law............................330

The MLS Medical Defendants Billed for Electrodiagnostic
Testing They Did Not Perform As Described in the CPT
Codes Used ...................................................................... 346

The Electrodiagnostic Testing Allegedly Performed by the
MLS Medical Defendants Played No Genuine Role in the
Treatment the Allstate Claimants Received ............................. 348

Defendants MLS Medical Group and Schwartz Submitted
False Reports to the Allstate Plaintiffs Ascribing Complaints
to the Allstate Claimants That they Did Not Have ..................... 352

Allstate Claimant C.A. 204354039-04 .................................. 353

Allstate Claimant H.D. 234165966-01 .................................. 354

Allstate Claimant J.B. 189127798-08 ................................... 355

Allstate Claimant A.S. 216211896-03 ................................... 356

Allstate Claimant M.V. 237014717-09 .................................. 357

Allstate Claimant P.B. 193382561-01 ................................... 358

Allstate Claimant R.P. 224817668-01 ................................... 360

Allstate Claimant A.D. 253951347-04 .................................. 360

Allstate Claimant A.C. 253951347-05 .................................. 362

Defendants MLS Medical Group and Schwartz Falsely
Billed the Allstate Plaintiffs for Comprehensive Physical
Examinations that Either Did Not Occur or Were Not Performed
By Defendant Schwartz ..................................................... 363

Allstate Claimant C.A. 204354039-04 .................................. 363

Allstate Claimant G.A. 241374339-03 .................................. 364

Allstate Claimant A.L. 251723797-03 ................................... 364

Allstate Claimant J.H. 244169918-03 ................................... 365

Allstate Claimant A.C. 253951347-05 .................................. 365

*Allstate Claimant A.D. 253951347-04* ............................................................... 365

*Allstate Claimant J.B. 189127798-08* ............................................................... 366

*Allstate Claimant J.S. 240519355-03* ............................................................... 366

*Allstate Claimant C.P. 249183286-03* ............................................................... 367

*Allstate Claimant J.M. 209937480-03* ............................................................... 367

*Defendants MLS Medical Group and Schwartz Submitted*
*Invoices to the Allstate Plaintiffs that*
*Misrepresented the Locations Where the Patient Examinations*
*and Electrodiagnostic Testing Were Performed* ............................................. 368

*Allstate Claimant C.A. 204354039-04* ............................................................... 369

*Allstate Claimant H.D. 234165966-01* ............................................................... 369

*Allstate Claimant A.C. 253951347-05* ............................................................... 369

*Allstate Claimant J.B. 189127798-08* ............................................................... 370

*Allstate Claimant M.T. 214803884-03* ............................................................... 370

*Allstate Claimant A.S. 216211896-03* ............................................................... 371

*Allstate Claimant P.B. 193382561-01* ............................................................... 371

*Allstate Claimant E.V. 175005339-03* ............................................................... 372

*Allstate Claimant J.M. 209937480-03* ............................................................... 372

*Allstate Claimant R.P. 224817668-01* ............................................................... 372

*Each and Every Referral of an Allstate Claimant by the*
*Referring Defendants to the Defendants Schwartz and*
*MLS Medical Violated N.J.A.C. 13:44E3.9* ..................................................... 373

*Each and Every Referral of an Allstate Claimant by the*
*Referring Defendants to the Defendants Schwartz and*
*MLS Medical Violated N.J.A.C. 13:35-6.17* ..................................................... 374

*Self Referrals in Violation of N.J.S.A. 45:9-22.5,
et seq* ............................................................................ 375

*Practice Structure Violations and/or Unlawful Fee-
Splitting With Non-Licensees in Violation of
N.J.A.C. 13.35-6.16 and N.J.A.C. 13:35-6.17(c)* .................... 376

TWELFTH COUNT (Unjust Enrichment – MLS Medical Kickback
Scheme and MLS Medical Fraudulent Billing and Record
Scheme) .............................................................. 379

THIRTEENTH COUNT (Violation of N.J.S.A. 17:33A-1, et seq.
(the "IFPA")- the MLS Medical Kickback Scheme and MLS
Medical Fraudulent Billing and Record Scheme) ........................ 383

FOURTEENTH COUNT (Declaratory Judgment – Bandy-Other
Referee Provider Kickback Schemes and the Other Referee
Provider Kickback Schemes in Violation of N.J.A.C.
13:35-6:17 and 13:44E-2.6) ............................................ 396

*Allegations Relating to the Bandy-Other Referee
Provider Kickback Schemes* ............................................ 396

*The Role of the Patient Broker Defendants in the Other
Referee Provider Kickback Schemes* .................................. 398

*Other Non-Monetary Kickbacks* ...................................... 399

FIFTEENTH COUNT (Unjust Enrichment – Bandy-Other
Referee Provider Kickback Schemes and the Other Referee
Provider Kickback Schemes in Violation of N.J.A.C.
13:35-6.17 and 13:44E-2.6) ............................................ 404

SIXTEENTH COUNT (Violation of N.J.S.A. 17:33A-1, et seq.
(the "IFPA")— Bandy-Other Referee Provider Kickback Schemes
and the Other Referee Provider Kickback Schemes in
Violation of N.J.A.C. 13:35-6.17 and 13:44E2.6) ...................... 408

Trial Counsel Designation .............................................. 420

Certification of Counsel for the Allstate Plaintiffs Pursuant to Rule 4:5-1 .......... 420

Certification of Counsel for the Commissioner Pursuant to Rule 4:5-1 ............. 423

13

THE PARTIES

The Plaintiffs

1.    At all relevant times, the Allstate Plaintiffs have been, and remain, authorized to issue policies of automobile insurance in New Jersey and conduct business in Ocean County and throughout the State of New Jersey. Venue is proper in Ocean County because the Allstate Plaintiffs have been actually doing business in Ocean County at all times relevant to this litigation and up to the present time; and because causes of action arose in Ocean County.

2.    At all relevant times, the Allstate Plaintiffs have been, and remain, insurance companies as defined by the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 *et seq.* (also referred to herein as "the IFPA" or the "Fraud Act").

3.    At all relevant times, the Commissioner has been, and remains, authorized under the Fraud Act to institute suit for the payment of civil penalties, attorneys' fees, costs, and other relief against any person who violates the provisions of the Fraud Act.

The Defendants

*Individual Defendants*

4.    Defendant Anhuar Bandy resides at 141 Crine Road, Colts Neck, New Jersey 07722, and is a "person" as defined by the IFPA. On or about April 28, 2014, a State Grand Jury handed up an indictment of Defendant Anhuar Bandy, his brother Defendant Karim Bandy, and ten others in connection with a large-scale automobile injury insurance fraud network scheme. This indictment, which was presented by the

14

New Jersey Attorney General, Division of Criminal Justice, Office of the Insurance Fraud Prosecutor (the "OIFP"), is referred to herein as the "2014 Bandy Indictment." On July 7, 2015, Defendant Anhuar Bandy pleaded guilty to one count of insurance fraud in the second degree, and is awaiting sentencing.   Defendant Anhuar Bandy was previously convicted on October 15, 2004 on charges of criminal racketeering, conspiracy, health care claims fraud, and theft brought by the OIFP related to automobile insurance fraud schemes similar to those for which he pleaded guilty on July 7, 2015.  He served 4 years in prison on those charges.

5.     Defendant Karim Bandy resides at 141 Crine Road, Colts Neck, New Jersey 07722, and is a "person" as defined by the IFPA.  On July 7, 2015, Defendant Karim Bandy pleaded guilty to one count of insurance fraud in the second degree, and is awaiting sentencing.  Defendant Karim Bandy is the brother of Defendant Anhuar Bandy.  They are collectively referred to herein as the "Bandys," the "Bandy Brothers," the "Bandy Defendants" or the "Defendant Bandys."

### The Defendant Bandy/Riotto Chiropractors

6.     Defendant Edward P. Formisano, D.C. (also referred to herein as "Formisano") resides at 14 Phyllis Drive, Succasunna, New Jersey 07876, is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA. Defendant Formisano acted as the owner on paper, or "paper owner," of several chiropractic clinics which were at all times relevant to this litigation under the *de facto* control of the Defendant Bandy Brothers.  These chiropractic clinics included Defendants Eclipse Chiropractic Center, LLC, Chiropractic Spine Center, LLC,

Lakewood Chiropractic Center, LLC, Liberty Chiropractic Center, LLC, Pennsauken Chiropractic Center, LLC, and XYZ, P.C. 1-50.   Prior to acting as the "paper owner" of these clinics, Defendant Formisano was an employee of Defendant New Century Chiropractic, LLC.  In the 2014 Bandy Indictment, Defendant Formisano was charged with racketeering in the second degree and four counts of conspiracy in the third degree.  He is awaiting trial on these charges.

7.     Defendant Louis S. Brown, D.C. (also referred to herein as "Brown") resides at 1082 Maurice Avenue, Rahway, New Jersey and maintains an office at 195 Livingston Avenue, New Brunswick, New Jersey.  Defendant Brown is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA.  Defendant Brown acted as the owner on paper, or "paper owner," of several chiropractic clinics which were at all times relevant to this litigation under the *de facto* control of the Defendant Bandys. These chiropractic clinics included Defendants New Century Chiropractic Center, LLC; Wellspring Rehabilitation Center, LLC; and True Healing and Wellness, LLC.  In the 2014 Bandy Indictment, Defendant Brown was charged with racketeering in the second degree and three counts of conspiracy in the third degree.  He pleaded guilty on November 2, 2015 to one count of using runners in the 3rd degree and is awaiting sentencing.

8.     Defendant Monica Johnson, D.C. (also referred to herein as "Johnson") resides at 110 Somerset Street, Apt. 2312, New Brunswick, New Jersey 08901. Defendant Johnson is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA.  At times relevant hereto,

Defendant Johnson acted for a time as the paper owner of, and provided chiropractic services at, Defendant True Healing and Wellness Center, and acted as the paper owner of Defendant Chi Acupuncture, LLC.

9.     Defendant Gerald H. Roth, D.C. (also referred to herein as "Roth") resides at 325-B Crowells Rd, Highland Park, New Jersey, is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA. At times relevant hereto, Defendant Roth acted as the paper owner of Defendant Good Health Center, LLC, and provided chiropractic services at that facility.  On or about May 13, 2014, having waived indictment, Defendant Roth pleaded guilty in the Superior Court of New Jersey, Union County, to an accusation charging him with one count of the criminal use of runners in the third degree.  He is awaiting sentencing.

10.     Defendant Richard Stark, Jr., D.C. (also referred to herein as "Stark") resides at 725 Villa Avenue West, Somerdale, New Jersey, is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA.  At times relevant hereto, Defendant Stark acted as the "paper owner" of Defendant Elmora Wellness, LLC.  Defendants Formisano, Brown, Johnson, Roth, Stark and John Roe 1-50 are collectively referred to herein as the "Defendant Bandy Chiropractors."

11.     Defendant Anthony M. Riotto, D.C. (also referred to herein as "Riotto") resides at 15 Lexington Lane, Montvale, New Jersey, 07645, is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA. At all times relevant hereto, Defendant Riotto was the owner of Defendant

Riotto Family Chiropractic, LLC.  At times relevant to this litigation, Defendant Riotto acted as the paper owner of Defendant Millenium Chiropractic, LLC a/k/a Millennium Chiropractic, LLC f/k/a Spine Chiropractic of New Jersey, LLC.

12.     Defendant Michael M. Baer, D.C. (also referred to herein as "Baer") resides at 45 Hansen Drive, Edison, New Jersey 08820, is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA.  At certain times relevant hereto, Defendant Baer was an employee of Defendants Riotto Family Chiropractic, LLC and Millenium Chiropractic, LLC a/k/a Millennium Chiropractic, LLC f/k/a Spine Chiropractic of New Jersey and also provided chiropractic services at Defendant Good Health Center, and later served as the purported owner of Defendant Platinum Chiropractic.  On or about January 30, 2004, Defendant Baer was convicted of health care claims fraud and the use of a runner in his chiropractic practice for which he was sentenced to a three-year jail term and his license to practice suspended for a period of 5 years. Defendant Baer's license to practice chiropractic in the State of New Jersey was reinstated on February 4, 2009. Defendants Riotto, Baer and John Roe 1-50 are collectively referred to herein as the "Defendant Riotto Chiropractors."

13.     Defendants John Roe 1-50 are "persons" and "practitioners" as defined by the IFPA, whose identities are not known to Plaintiffs at this time.  Upon information and belief, Defendants John Roe 1-50 are individuals who hold a chiropractic license and who have served as independent contractors and/or employees of one or more of the Defendant Bandy/Riotto Chiropractic Clinics, who have knowingly participated in one or

18

more of the schemes described herein and/or have participated in the preparation of false or misleading medical bills, records and/or reports to be submitted to the Allstate Plaintiffs or other insurers, or who have otherwise assisted and/or conspired with one or more of the Defendants herein to knowingly commit acts or conceal information in violation of the IFPA as described herein, or who have knowingly benefitted from one or more violations of the IFPA as described herein.

*The Bandy Clinic Staff Defendants*

14.    Defendants John Doe 1-50 are "persons" as defined by the IFPA, whose identities are not known to Plaintiffs at this time.   Upon information and belief, Defendants John Doe 1-50 are individuals who do not hold a healthcare license and who are or were agents, servants, independent contractors and/or employees, of one or more of the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Bandy Management Companies, who have knowingly participated in one or more of the schemes described herein and/or have participated in the preparation of false or misleading medical bills, records and/or reports to be submitted to the Allstate Plaintiffs or other insurers, or who have otherwise assisted and/or conspired with one or more of the Defendants herein to knowingly commit acts or conceal information in violation of the IFPA as described herein, or who have knowingly benefitted from one or more violations of the IFPA as described herein.   These Defendants, as well as Defendant Anali G. Rivera, who is also one of the Bandy Runner Defendants, are "persons" as defined by the IFPA and are collectively referred to as the "Bandy Clinic Staff Defendants."

19

*The Riotto Clinic Staff Defendants*

15.    Defendants John Doe 1-50 are "persons" as defined by the IFPA, whose identities are not known to Plaintiffs at this time.   Upon information and belief, Defendants John Doe 1-50 are individuals who do not hold a healthcare license and who are or were agents, servants, independent contractors and/or employees, of one or more of the Defendant Riotto Chiropractic Clinics and/or the Defendant Bandy Management Companies, who have knowingly participated in one or more of the schemes described herein and/or have participated in the preparation of false or misleading medical bills, records and/or reports to be submitted to the Allstate Plaintiffs or other insurers, or who have otherwise assisted and/or conspired with one or more of the Defendants herein to knowingly commit acts or conceal information in violation of the IFPA as described herein, or who have knowingly benefitted from one or more violations of the IFPA as described herein.   These Defendants are "persons" as defined by the IFPA, and are collectively referred to as the "Riotto Clinic Staff Defendants."

## The Defendant Bandy/Riotto Chiropractic Clinics

*The Defendant Bandy-Controlled Chiropractic Clinics*

16.    Defendant Chiropractic Spine Center, LLC (also referred to herein as "Chiropractic Spine" or "Chiropractic Spine Center") is a New Jersey limited liability company that was formed on May 4, 2010, and is a "person" as defined by the IFPA. Its main business address was 278 Hobart Street, Perth Amboy, New Jersey.   Its

20

registered agent and address is Defendant Formisano at 14 Phyllis Drive, Succasunna, New Jersey 07876.

17.    Defendant Eclipse Chiropractic Center, LLC (also referred to herein as "Eclipse Chiropractic") is a New Jersey limited liability company that was formed on May 2, 2010, and is a "person" as defined by the IFPA.  Its main business address was 200 E. 2nd Street, Plainfield, New Jersey, but upon information and belief, it also did business at 120 Depot Park, Plainfield, New Jersey.  Its registered agent and address is Defendant Formisano at 14 Phyllis Drive, Succasunna, New Jersey 07876.

18.    Defendant Elmora Wellness Center, LLC (also referred to herein as "Elmora Wellness") is a limited liability company that was formed under the laws of the State of New Jersey on or about July 22, 2013, and is a "person" as defined by the IFPA.    At all times relevant hereto, the registered agent and address of this Defendant is Defendant Stark at 521 Oaklawn Avenue, Oaklyn, New Jersey 08107.  Defendant Elmora Wellness' principal place of business was 701 Newark Avenue, Elizabeth, New Jersey, and took over the space previously occupied by Defendant Good Health Center.

19.    Defendant Good Health Center, LLC (also referred to herein as "Good Health Center") is a New Jersey limited liability company which was formed on October 11, 2010, and is a "person" as defined by the IFPA.  Its registered agent and address is Gerald Roth, at 325-B Crowells Road, Highland Park, New Jersey.  Upon information and belief, Defendant Good Health's principal place of business is 701 Newark Avenue, Elizabeth, New Jersey.

20.     Defendant Lakewood Chiropractic Center, LLC (also referred to herein as "Lakewood Chiropractic") is a New Jersey limited liability company that was formed on April 19, 2011, and is a "person" as defined by the IFPA. Its main business address was 1200 River Avenue, Suite 2D, Lakewood, New Jersey. Its registered agent and address is Defendant Formisano at 14 Phyllis Drive, Succasunna, New Jersey 07876.

21.     Defendant Liberty Chiropractic Center, LLC (also referred to as "Liberty Chiropractic") is a New Jersey limited liability company that was formed on February 7, 2012, and is a "person" as defined by the IFPA. Its main business address is 253 Academy Street, Jersey City, New Jersey. Its registered agent and address is Defendant Formisano at 14 Phyllis Drive, Succasunna, New Jersey 07876.

22.     Defendant New Century Chiropractic Center, LLC (also referred to herein as "New Century Chiropractic") is a New Jersey limited liability company that was formed on October 20, 2009, and is a "person" as defined by the IFPA. Its registered agent and address is Defendant Louis S. Brown at 25-27 Dickerson Street, Suite 201, Dover, New Jersey. Defendant New Century Chiropractic's principal place of business was 25-27 Dickerson Street, Suite 201, Dover, New Jersey.

23.     Defendant Pennsauken Chiropractic Center, LLC (also referred to herein as "Pennsauken Chiropractic") was formed on September 26, 2012, and is a "person" as defined by the IFPA. Its main business address was listed as 5824 Westfield Avenue, Pennsauken, New Jersey. Its registered agent and address is Defendant Formisano at 14 Phyllis Drive, Succasunna, New Jersey.

24.    Defendant True Healing and Wellness Center, LLC (also referred to herein as "True Healing") was formed on November 24, 2008, and is a "person" as defined by the IFPA. Its main business address was 195 Livingston Avenue, New Brunswick, New Jersey. Its registered agent and address is Defendant Monica Johnson at 195 Livingston Avenue, New Brunswick.

25.    Defendant Wellspring Rehabilitation Center, LLC (also referred to herein as "Wellspring Rehabilitation") is a limited liability company formed on or about December 4, 2008, and is a "person" as defined by the IFPA. Its main address was 490 Somerset Street, Suite B, North Plainfield, New Jersey 07060. Defendant Wellspring Rehabilitation's registered agent and address are Defendant Louis S. Brown at 1082 Maurice Avenue, Rahway, New Jersey 07065.

26.    Defendants ABC Corp. 1-50 and XYZ, P.C. 1-50 are limited liability companies or professional service corporations that were formed for the purpose of providing chiropractic services and that are unknown to Plaintiffs at this time, and that like Defendants Chiropractic Spine, Eclipse Chiropractic, Elmora Wellness, Good Health Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Pennsauken Chiropractic, True Healing and Wellness and Wellspring Rehabilitation, were under the *de facto* ownership or control of Defendants Anhuar Bandy and/or Karim Bandy, and that assisted, conspired with, participated in or otherwise took actions in furtherance of one or more of the Bandy Schemes described herein, or otherwise committed or conspired to commit, assisted or benefited from the violations of the IFPA described herein. They are "persons" as defined by the IFPA. Defendants

23

Chiropractic Spine, Eclipse Chiropractic, Elmora Wellness, Good Health Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Pennsauken Chiropractic, True Healing and Wellness, Wellspring Rehabilitation, ABC Corp. 1-50 and XYZ, P.C. 1-50 are collectively referred to herein as the "Defendant Bandy-Controlled Chiropractic Clinics."

### The Defendant Riotto Chiropractic Clinics

27.     Defendant Riotto Family Chiropractic, LLC (also referred to herein as "Riotto Family Chiropractic") is a limited liability company that was formed on or about June 4, 2008, and is a "person" as defined by the IFPA.   Its business addresses during times relevant to this litigation have been 128 Kinderkamack Road, Park Ridge, New Jersey 07656 and 521-523 South Broad Street, Suite 2, Trenton, New Jersey 08611. Its registered agent and address are Defendant Riotto at 128 Kinderkamack Road, Park Ridge, New Jersey 07656.

28.     Defendant Millenium Chiropractic, LLC a/k/a Millennium Chiropractic, LLC f/k/a Spine Chiropractic of New Jersey, LLC (also referred to herein as "Millennium Chiropractic") is a limited liability company formed on or about October 3, 2012, and is a "person" as defined by the IFPA.   Its registered agent and address is Nicholas C. Ponzini, Esq., at 193 Route 17 South, Suite 202, Paramus, New Jersey 07652.

29.     Defendant Platinum Chiropractic, LLC (also referred to herein as "Platinum Chiropractic") is a limited liability company formed on or about June 26, 2013, and is a "person" as defined by the IFPA.   Its main business address was 132 Market

24

Street, Perth Amboy, New Jersey. Its registered agent and address is Defendant Michael Baer, D.C., at 45 Hansen Drive, Edison, New Jersey 08820

30.    Defendants ABC Corp. 1-50 and XYZ, P.C. 1-50 are limited liability companies or professional service corporations that were formed for the purpose of providing chiropractic services that are unknown to Plaintiffs at this time, and that like Defendants Riotto Family Chiropractic, Millennium Chiropractic and Platinum Chiropractic were under the ownership and/or control of Defendant Riotto, John Roe 1-50, John Doe 1-50, and assisted, conspired with, participated in or otherwise took actions in furtherance of one or more of the Bandy Schemes described herein, or otherwise committed or conspired to commit, assisted or benefited from the violations of the IFPA described herein. They are "persons" as defined by the IFPA. Defendants Riotto Family Chiropractic, Millenium Chiropractic, Platinum Chiropractic, ABC Corp. 1-50 and XYZ, P.C. 1-50 are collectively referred to herein as the "Defendant Riotto Chiropractic Clinics."

31.    The Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics are collectively referred to herein as the "Defendant Bandy/Riotto Chiropractic Clinics."

### Defendant Bandy Management Companies

32.    Defendant KEKK Marketing Group, LLC (also referred to herein as "KEKK Marketing") is a New Jersey limited liability company which was formed on November 22, 2009, and is a "person" as defined by the IFPA. Defendant KEKK Marketing's principal place of business is at 141 Crine Road, Colts Neck, New Jersey. Defendant

25

KEKK Marketing's registered agent is Defendant Karim Bandy at 141 Crine Road, Colts Neck, New Jersey. At all times relevant hereto, Defendant KEKK Marketing's director and principal shareholder is and has been Defendant Karim Bandy. At times relevant hereto, Defendant KEKK Marketing has been the management company for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and has been a conduit for the payment of illegal kickbacks to the Runner Defendants and to or from various individuals and entities and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitimate "management," "consulting," "billing and collection," "advertising," "marketing" and/or other services in furtherance of the Bandy Schemes.

33.    Defendant Precision Management Associates, LLC (also referred to herein as "Precision Management") is a New Jersey limited liability company which was formed on March 8, 2011, and is a "person" as defined by the IFPA. Its registered agent and address is Defendant Karim Bandy at 195 Livingston Avenue, New Brunswick, New Jersey. Upon information and belief, at times relevant hereto, Defendant Precision Management has been a management company for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and has been a conduit for the payment of illegal kickbacks to the Runner Defendants and to or from various individuals and entities and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitime "management," "consulting," "billing and collection," "advertising," "marketing" a other services in furtherance of the Bandy Schemes.

34.    Defendant First Choice Management, LLC (hereinafter also referred to as "First Choice Management") is a New Jersey limited liability company formed on November 15, 2007, and is a "person" as defined by the IFPA. Its main business address is 195 Livingston Avenue, New Brunswick, New Jersey 08901. Its registered agent and address are Defendant Karim Bandy at 152 Livingston Avenue, New Brunswick, New Jersey 08901. Upon information and belief, at times relevant hereto, Defendant First Choice Management has been a management company for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and has been used by the Defendant Bandys and Riotto, through leases of office space used by certain of the Defendant Bandy/Riotto Chiropractic Clinics and through the employment of most if not all of the individuals who worked at the Defendant Bandy/Riotto Chiropractic Clinics and used by the Defendant Bandys to control the Defendant Bandy/Riotto Chiropractic Clinics, and has been a conduit for the payment of illegal kickbacks to the Runner Defendants and to or from various other individuals and entities, including certain of the Law Firm Defendants and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitimate "management," "employee leasing," "consulting," "billing and collection," "advertising," "marketing" and/or other services in furtherance of the Bandy Schemes.

35.    Defendant VIP Management Services, LLC (also referred to herein as "VIP Management") is a New Jersey limited liability company formed on August 24, 2012, and is a "person" as defined by the IFPA. Its registered agent and address are

Defendant Karim Bandy at 141 Crine Road, Colts Neck, New Jersey 07722. Upon information and belief, at times relevant hereto, Defendant VIP Management has been a management company for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and has been a conduit for the payment of illegal kickbacks to the Runner Defendants and to or from various individuals and entities and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitimate "management," "consulting," "billing and collection," "advertising," "marketing" and/or other services in furtherance of the Bandy Schemes.

36.     Defendant Karlaly, LLC (also referred to herein as "Karlaly") is a New Jersey limited liability company formed on May 1, 2013, and is a "person" as defined by the IFPA. Its registered agent and address are Defendant Karim Bandy at 141 Crine Road, Colts Neck, New Jersey 07722. At times relevant hereto, Karlaly operated from 243 Livingston Avenue, New Brunswick, New Jersey 08901. Upon information and belief, at times relevant hereto, Defendant Karlaly has been a management company for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and has been a conduit for the payment of illegal kickbacks to the Runner Defendants and to or from various individuals and entities and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitimate "management," "consulting," "billing and collection," "advertising," "marketing" and/or other services in furtherance of the Bandy Schemes.

28

37    Defendant Karkis, LLC (also referred to herein as "Karkis") is a New Jersey limited liability company formed on December 12, 2006, and is a "person" as defined by the IFPA.  Its registered agent, registered address and main business address is Defendant Karim Bandy at 141 Crine Road, Colts Neck, New Jersey.  Upon information and belief, Defendant Karim Bandy caused this entity to be formed for the specific purpose of attempting to place his assets beyond the reach of creditors.  On May 1, 2007, in furtherance of this purpose, Defendant Karim Bandy executed a quitclaim deed for $10 transferring to Karkis his entire interest in 141 Crine Road, Colts Neck, New Jersey, where he has lived at all times relevant to this litigation. This property is referred to herein as the "Crine Road Property."  At all times relevant hereto, the Defendant Bandys have also used Defendant Karkis as a management and/or holding company for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and as a conduit for the payment of illegal kickbacks to the Runner Defendants and to or from various individuals and entities and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitimate "management," "consulting," "billing and collection," "advertising," "marketing" and/or other services in furtherance of the Bandy Scheme.

38.    Defendant Palmer Hills Holdings, LLC (also referred to herein as "Palmer Hills Holdings") is a Missouri limited liability company that was formed on January 23, 2007, and is a "person" as defined by the IFPA.  Its registered agent and address is Incorp Services, Inc., at 2847 South Ingram Mill Road, Suite A100, Springfield, Missouri, 65101.  Defendant Palmer Hills Holdings was organized by Tim Costello of 3434 E.

Bengal Blvd., Suite No. 260, Salt Lake City, Utah, 84121. Upon information and belief, Defendant Palmer Hills Holdings was formed as an asset protection vehicle at the direction of Defendant Karim Bandy and Defendant John Doe 1-50, and with the assistance and at the urging of Defendant John Roe 1-50, for the purpose of assisting Defendant Karim Bandy and John Doe 1-50 in Defendant Bandy's scheme to place his assets, including both his interest and any statutory interest that his then spouse may have had in the Crine Road Property, beyond the reach of creditors, including Plaintiffs. On or about April 13, 2007, Defendant Karim Bandy executed a mortgage in favor of Defendant Palmer Hills Holdings in the amount of $1,485,000.00 at a rate of 10% interest. The note provides for no payment terms, and no loan in any amount was given to Defendant Karim Bandy in consideration of the note or mortgage.  Upon information and belief, neither the promissory note, nor the mortgage nor the management agreement referenced in the promissory note, served any legitimate purpose, and the sole purpose of these documents and the transaction they reference was to place the Crine Road Property beyond the reach of creditors or to otherwise minimize its value as an asset to creditors.

39.    Defendant 243 Livingston Avenue Associates, LLC a/k/a "243 Livingston Associates, LLC" and "243 Livingston Ave Associates, LLC" (collectively referred to herein as "243 Livingston Avenue Associates") is a limited liability company that was formed in the State of Delaware on May 25, 2011, and is a "person" as defined by the IFPA. Defendant 243 Livingston Avenue Associates was formed by Defendants Karim Bandy and/or John Doe 1-50 for the purpose of acquiring the property at 243 Livingston

30

Avenue, New Brunswick, New Jersey. This property is referred to herein as the "243 Livingston Avenue Property." Defendant 243 Livingston Avenue Associates purchased the 243 Livingston Avenue Property from Prestigious Holdings, LLC on August 16, 2011. On or about August 14, 2013, 243 Livingston Associates, LLC deeded the property for $1 to 243 Livingston Ave Associates, LLC. Upon information and belief, both the buyer and seller in that transaction were Defendant 243 Livingston Avenue Associates. The 243 Livingston Avenue Property was used as Defendant Karlaly's main business address. On March 30, 2012, Defendant 243 Livingston Associates purchased the property at 152 Livingston Avenue, New Brunswick, New Jersey from AJB Residential Realty Enterprises. This property is referred to herein as the "152 Livingston Avenue Property" and is the same property that was formerly used by Defendant Karim Bandy to operate Right Touch Chiropractic until in or about late 2008, and was used thereafter by the Defendant Bandys as an office in furtherance of the Bandy Schemes.

40.    Defendant Quality Management Services, LLC (also referred to herein as "Quality Management") is a limited liability company that was formed on or about December 10, 2013, and is a "person" as defined by the IFPA. At all times relevant hereto the registered agent and office is Karim Bandy at 195 Livingston Avenue, New Brunswick, New Jersey 08901. Upon information and belief, at times relevant hereto, Defendant Quality Management has been a management company for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and has been a conduit for the payment of illegal kickbacks to the Runner Defendants

31

and to or from various individuals and entities and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitimate "management," "consulting," "billing and collection," "advertising," "marketing" and/or other services in furtherance of the Bandy Schemes.

41.     Defendant Sorfam Partnership, LP (also referred to herein as "Sorfam"), is a limited partnership formed on or about September 18, 1997, and is a "person" as defined by the IFPA.  At all times relevant hereto, the registered agent and office is Soraya Bandy at 141 Crine Road, Colts Neck, New Jersey 07722.

42.     Defendants ABC Corp. 1-50 are corporations or limited liability companies that are "persons" as defined by the IFPA and that are unknown to Plaintiffs at this time. Upon information and belief, at times relevant hereto, Defendants ABC Corp. 1-50 have been management companies for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and have been a conduit for the payment of illegal kickbacks to the Runner Defendants and to or from various individuals and entities and the Defendant Bandys and/or the other Defendants who conspired with them under the guise of providing legitimate "management," "consulting," "billing and collection," "advertising," "marketing," "employee staffing services," "real estate holding," and/or other services in furtherance of the Bandy Schemes. Defendants KEKK Marketing, Precision Management, Karkis, First Choice Management, VIP Management, Karlaly, 243 Livingston Avenue Associates, Quality Management, Palmer Hills Holdings, Sorfam and ABC Corp. 1-50 are referred to collectively herein as the "Defendant Bandy Management Companies."

The Acupuncture Defendants

*The Defendant Acupuncture Entities*

43.   Defendant Chi Acupuncture, LLC (also referred to herein as "Chi Acupuncture"), is a New Jersey limited liability company that was formed on August 4, 2008, and is a "person" as defined by the IFPA.  The registered address and agent for this Defendant is Defendant Johnson at 908 Oak Tree Road, Suite O, South Plainfield, New Jersey 07080.

44.   Defendant Golden Lotus Acupuncture, P.C. (also referred to herein as "Golden Lotus") is a New Jersey Professional Corporation that was formed on May 11, 2010, and is a "person" as defined by the IFPA.   Defendant Golden Lotus listed its principal place of business on its corporate records as being at 25 Kilmer Drive, Building No. 3, Morganville, New Jersey, but at all times since its formation, it has operated from offices controlled by or affiliated with the Defendant Bandys.  Its registered agent is Eric H. Melzer, Esq. at 25 Kilmer Drive, Morganville, New Jersey.  Its initial Director and purported owner was Defendant Irina Roytman.  Its current president is Defendant Lipshitz at 25 Kilmer Drive, Building No. 3, Morganville, New Jersey.

45.   Defendant Golden Flower Acupuncture, P.C. (also referred to herein as "Golden Flower") is a New Jersey Professional Corporation which was incorporated on January 10, 2011, and is a "person" as defined by the IFPA. Although its main business is listed on its corporate filings as 27 Kingfisher Court, Marlboro, New Jersey, at all times since its formation, it has operated from offices controlled by or affiliated with the Defendant Bandys. Its registered agent and address is Defendant Lipshitz at 27

33

Kingfisher Court, Marlboro. Defendant Lipshitz is also Defendant Golden Flower Acupuncture's alleged director and purportedly its sole member. Defendants Golden Lotus and Golden Flower are referred to collectively herein as the "Defendant Golden Acupuncture Entities." Defendants Golden Lotus, Golden Flower and Chi Acupuncture are collectively referred to as the "Defendant Acupuncture Entities."

*The Defendant Acupuncture Professionals*

46.    Defendant Sergey Lipshitz, L.A.C. (also referred to herein as "Lipshitz") resides at 27 Kingfisher Court, Marlboro, New Jersey, is licensed by the State of New Jersey as an acupuncturist, and is a "person" and "practitioner" as defined by the IFPA. At all times relevant hereto, Defendant Lipshitz, and/or certain of the Defendant entities that Defendant Lipshitz purportedly owns, allegedly performed acupuncture services at the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics. On or about May 9, 2014, having waived indictment, Defendant Lipshitz pleaded guilty in the Superior Court of New Jersey, Union County, to an accusation charging him with one count of insurance fraud in the third degree, and admitted that he submitted fraudulent records to the Allstate Plaintiffs indicating that a patient had been referred to him for acupuncture services by a chiropractor, when in fact the patient was referred by Defendants Anhuar Bandy and Karim Bandy in exchange for kickbacks he paid to them. Upon information and belief, Defendant Lipshitz had previously entered into a cooperation agreement with the OIFP and provided information and/or other assistance in the criminal investigation that led to the 2014 Bandy Indictment.

34

47.    Defendant Irina Roytman, L.A.C. (also referred to herein as "Roytman") resides at 27 Kingfisher Court, Marlboro, New Jersey, is licensed by the State of New Jersey as an acupuncturist, and is a "person" and "practitioner" as defined by the IFPA. At all times relevant hereto, Defendant Irina Roytman allegedly performed acupuncture services at the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics and/or otherwise conspired with and assisted Defendant Lipshitz and the other Defendants with the Bandy Schemes described herein.

48.    Defendants Lipshitz, Roytman, Johnson, and the acupuncturists and other individuals who were employed by them and the other entities that assisted or conspired with them and the Defendant Acupuncture Entities in furtherance of the Bandy Schemes as described herein, including Defendants John Doe 1-50 and John Roe 1-50 all of whom are "persons" and/or "practitioners" as defined by the IFPA, are collectively referred to herein as the "Defendant Acupuncture Professionals". The Defendant Golden Acupuncture Entities, Defendant Chi Acupuncture and the Defendant Acupuncture Professionals are collectively referred to herein as the "Acupuncture Defendants."

The Law Firm Defendants

49.    The term "Law Firm Defendants" collectively refers to attorneys, law firms, law firm employees and other individuals and entities, who are named herein or are unknown to Plaintiffs at this time, and who have participated in the Bandy Attorney Kickback Scheme, as described herein, by knowingly engaging in conduct that violated Section 4(e) of the IFPA, including by making or receiving client referrals in exchange

35

for kickbacks directly or indirectly in the form of money, services or for other referrals, or by otherwise knowingly assisting or conspiring with anyone who committed these or other violations of the IFPA, or by knowingly benefiting from any such violations. The "Law Firm Defendants" collectively refer to Defendants David Walker, Esq.; Alexandra Gallegos; Karim Arzadi, Esq.; Joworisak & Associates, LLC; Eugene Wishnic, Esq.; Eugene S. Wishnic, P.C.; Brad S. Schenerman, Esq.; Brad S. Schenerman, Esq., LLC; Yankowitz & Schenerman, LLC; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50 and/or XYZ, P.C. 1-50.

50.      Defendant David Walker, Esq. (also referred to herein as "Walker") is an attorney at law licensed to practice in New Jersey, and is a "person" and "practitioner" as defined by the IFPA. Defendant Walker resides at 48 Valley View Drive, Rockaway, New Jersey and has offices at 705 Park Avenue, Plainfield, New Jersey. In the 2014 Bandy Indictment, Defendant Walker was charged with racketeering in the second degree, conspiracy in the third degree and criminal use of runners in the third degree.

51.      Defendant Alexandra Gallegos (also referred to herein as "Gallegos") resides at 8 Pearl Street, North Plainfield, New Jersey 07060, and is a "person" as defined by the IFPA. Defendant Gallegos is not and has never been an attorney. At all relevant times, Defendant Gallegos purported to be Defendant Walker's paralegal and employee, but in fact was Walker's de facto partner in the Walker Law Firm. On July 23, 2015, Defendant Gallegos pleaded guilty to one count of conspiracy in the third degree and one count of criminal use of a runner in the third degree, and is awaiting sentencing.

52.    Defendant Karim Arzadi, Esquire (also referred to herein as "Arzadi") resides at 263 Barclay Street, Perth Amboy New Jersey 08861, is licensed to practice law in the State of New Jersey, and is a "person" and "practitioner" as defined by the IFPA. At all times relevant hereto, Defendant Arzadi operated a personal injury practice under the trade names of the Law Offices of Karim Arzadi and Arzadi and Associates at 163 Market Street, Perth Amboy, New Jersey 08861 and 103 Bayard Street, New Brunswick, New Jersey 08901. Upon information and belief, Defendant Arzadi formed Arzadi, Joworisak & Associates, LLC on or about October 31, 2013, in anticipation that his license to practice law would be suspended by the Supreme Court of New Jersey, and to take over his law practice, including the matters of clients that either were referred to him in furtherance of the Bandy Attorney Kickback Scheme or that he referred for treatment at one or more of the Defendant Bandy/Riotto Chiropractic Clinics as an "in-kind" kickback in furtherance of that scheme. Defendant Arzadi's license to practice law was suspended by The Supreme Court of New Jersey Office of Attorney Ethics effective January 3, 2014 for misconduct that was not related to the Bandy Schemes.

53.    Defendant Joworisak & Associates, LLC, which was formerly known as Arzadi, Joworisak & Associates, LLC (also referred to herein as "Joworisak & Associates") is a limited liability company formed on or about October 31, 2013, and is a "person" as defined by the IFPA.  Effective November 3, 2014, and following the reinstatement of his license to practice law, Defendant Arzadi caused a Certification of Amendment to the Certification of Formation of Defendant Joworisak & Associates to be

37

filed with the State Treasurer stating that the Law Office of Karim Arzadi is the managing member of Joworisak & Associates with a 99% membership interest and that Donald T. Joworisak and Associates, LLC has a 1% membership interest. At all times relevant to this litigation the registered agent and office of this Defendant has been Defendant Arzadi at 163 Market Street, Perth Amboy, New Jersey 08861. Defendants Arzadi and Joworisak & Associates are collectively referred to herein as the "Arzadi Law Firm Defendants."

54.    Defendant Eugene S. Wishnic, Esq. (also referred to herein as "Wishnic") resides at 406 Valentine Street, Highland Park, New Jersey 00075, is licensed to practice law in the State of New Jersey, and is a "person" and "practitioner" as defined by the IFPA. At times relevant hereto, Defendant Wishnic was the owner of Defendant Eugene S. Wishnic, P.C.

55.    Defendant Eugene S. Wishnic, P.C. (also referred to herein as the "Wishnic Law Firm") is a domestic professional corporation formed under the laws of the State of New Jersey on or about January 7, 1998, and is a "person" as defined by the IFPA. At all times relevant hereto, the registered agent and office of this Defendant was Defendant Wishnic at 313 State Street, Suite 408, Perth Amboy, New Jersey 08861. Defendants Wishnic and the Wishnic Law Firm are collectively referred to herein as the "Wishnic Law Firm Defendants."

56.    Defendant Brad S. Schenerman, Esq. (also referred to herein as "Schenerman") resides at 93 Addison Drive, Short Hills, New Jersey 07078, is licensed to practice law in the State of New Jersey, and is a "person" and "practitioner" as

defined by the IFPA. At times relevant hereto, Defendant Schenerman was the owner of Defendants Brad S. Schenerman, Esq., LLC and Law Office and Yankowitz & Schenerman, LLC.

57.    Defendant Brad S. Schenerman, Esq., LLC (also referred to herein as the "Schenerman Law Office") is a limited liability company that was formed on or about October 11, 2011, and is a "person" as defined by the IFPA. At all times relevant hereto, its registered agent and office has been Defendant Schenerman, at 50 Park Place, Newark, New Jersey 07102.

58.    Defendant Yankowitz & Schenerman, LLC (also referred to herein as "Yankowitz & Schenerman") is a domestic limited liability company formed on or about March 19, 2010, and is a "person" as defined by the IFPA. At all times relevant hereto, the registered agent and office of this Defendant has been Defendant Yankowitz & Schenerman, at 50 Park Place, Suite 925, Newark, New Jersey 07102. Defendants Schenerman, Schenerman Law Office and Yankowitz and Schenerman are referred to herein collectively as the "Schenerman Law Firm Defendants."

59.    Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50 are "persons" and/or "practitioners" as defined by the IFPA who are attorneys, paralegals, law firms and/or related individuals and entities who are unknown to Plaintiffs at this time, but who, like Defendants Walker, Gallegos, Arzadi, Joworisak & Associates, the Wishnic Law Firm Defendants and the Schenerman Law Firm Defendants paid kickbacks to one or more of the Runner Defendants, to the Defendant Bandys, Defendant Riotto and/or to one or more of the Defendant Patient Brokers, in

39

exchange for the referrals of prospective clients and/or for being allowed to sign up clients at the locations of the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, or who made "in-kind" kickbacks in furtherance of the Bandy Attorney Kickback Scheme by causing existing clients to be referred to one or more of the Defendant Bandy-Controlled Chiropractic Clinics and/or to the Defendant Riotto Chiropractic Clinics in exchange for referrals of individuals recruited by the Runner Defendants or solicited through the efforts of the Defendant Patient Brokers.

### Referee Provider Defendants

60.    The "Referee Provider Defendants" collectively refer to the healthcare providers, entities, employees and other individuals and entities, that are named herein, referenced in the Allstate Plaintiffs' R. 4:5-1 Certification, or who are unknown to Plaintiffs at this time and are "persons" and/or "practitioners" as defined by the IFPA, and who have participated in the Bandy Provider Kickback Scheme and/or Other Referee Provider Kickback Schemes, as described herein, by knowingly engaging in conduct that has violated applicable regulations and/or statutes governing the provision of healthcare and Sections 4(a)-(c), (e) of the IFPA, including by making or receiving patient referrals in exchange directly or indirectly for kickbacks in the form of money or in exchange for reciprocal referrals, by submitting false or misleading bills, records or reports, or by otherwise knowingly assisting or conspiring with anyone who committed these or other violations of the IFPA, or by knowingly benefiting from any such

40

violations. The term, the "Referee Provider Defendants," as used herein, includes the "MLS Medical Defendants" and the "Other Referee Provider Defendants."

61.     The term, "Other Referee Provider Defendants," as used herein, includes those who are identified in the Allstate Plaintiffs' R. 4:5-1 Certification and who have been or are anticipated will be named by Plaintiffs in other litigation, and other referee providers or who are unknown to Plaintiffs at this time, but who engaged in the Bandy Provider Kickback Scheme and/or Other Referee Provider Kickback Schemes, as well as additional individuals and entities who are unknown to Plaintiffs at this time, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, and who directly or indirectly through the Patient Broker Defendants caused kickbacks to be given to the Bandy Defendants and/or Other Referring Defendants.

*The MLS Medical Defendants*

62.     The term "MLS Medical Defendants," as used herein, collectively refers to Mark L. Schwartz, D.O.; Anthony M. Riotto, D.C.; Lisa M. Ember; Perry Scott a/k/a Perry Scott Lipson; Brett Liquori; Kimberly Gill; MLS Medical Group, LLC; MLS Medical Group, LLC, a Florida limited liability company; MLS EDX Medical Group, LLC (d/b/a "Neuro Diagnostic Associates, LLC"); MLS EDX Medical Group, LLC, a Florida limited liability company; MSAR, LLC, a Florida limited liability company; and other individuals and entities who are unknown to Plaintiffs at this time, and who knowingly assisted, conspired with, or urged these Defendants to commit the violations of the IFPA described herein in furtherance of the MLS Medical Kickback Scheme, or otherwise benefited from those violations, including Defendants John Doe 1-50, John Roe 1-50,

41

ABC Corp. 1-50 and/or XYZ, P.C. 1-50. The Commissioner has settled his claims against Defendants Schwartz and MLS Medical Group, LLC, and does not seek relief against Defendants Schwartz, MLS Medical Group, LLC, MLS Medical/Florida, MLS EDX Medical, MLS EDX Medical/Florida, MSAR, Ember, Scott, Liquori, or Gill in this litigation.

63.    Defendant Mark L. Schwartz, D.O. (also referred to herein as "Schwartz") resides at 308 Chelsea Manor, Park Ridge, New Jersey 07656, is licensed by the States of New York, New Jersey and Florida as a Doctor of Osteopathic Medicine, and is a "person" and "practitioner" as defined by the IFPA. On or about April 24, 2012, Defendant Schwartz was reprimanded by the NJ Board of Medical Examiners (also referred to herein as the "Medical Board") for improper prescribing practices and failure to maintain professional treatment records and ordered to cease and desist from prescribing Anabolic Steroids or HGH to any patient. The State of NY Department of Health responded with censure and reprimand. At times relevant hereto, Defendant Schwartz was an owner of Defendants MLS Medical, MLS EDX Medical and MSAR. At times relevant hereto, Defendant Schwartz was also an owner of, and the registered agent of, Turn Key Neurodiagnostic Services, LLC (also referred to herein as "Turn Key Neurodiagnostic"), a domestic limited liability company that was formed under the laws of the State of New Jersey on or about January 11, 2009. Also at times relevant hereto, Defendant Schwartz was an owner of, and the registered agent of, Neuro Diagnostic Associates, LLC (also referred to herein as "Neuro Diagnostic Associates"), a domestic limited liability company that was formed under the laws of the State of New Jersey on

42

or about May 28, 2010   Defendant Schwartz was charged in the 2014 Bandy Indictment with racketeering in the second degree, health care claims fraud in the second degree, insurance fraud in the second degree, conspiracy in the second and third degree and criminal use of runners in the third degree.   On July 20, 2016, Defendant Schwartz was arrested and charged by the Passaic County Prosecutor's office with two counts of second-degree healthcare claims fraud, two counts of third-degree healthcare claims fraud and one count of falsifying medical records.

64.    Defendant Lisa M. Ember (also referred to herein as "Ember') is, upon information and belief, the sister of Defendant Schwartz, and resides at 15983 Mataro Bay Court, Delray Beach, Florida 33446, and is a "person" as defined by the IFPA.  At times relevant hereto, Defendant Ember was a Member of Defendants MLS Medical and MLS EDX Medical.  At times relevant hereto, Defendant Ember was also a Member of Neuro Diagnostic Associates.

65.    Defendant Perry Scott a/k/a Perry Scott Lipson (also collectively referred to herein as "Scott') resides at 9471 West McNab Road, Tamarac, Florida 33321, and is a "person" as defined by the IFPA.  At times relevant hereto, Defendant Scott was a Member of Defendant MLS EDX Medical and Managing Member of Defendants MLS Medical/Florida and MLS EDX Medical/Florida.   Also at times relevant hereto, Defendant Scott was a Member of Neuro Diagnostic Associates; and Managing Member of, and the registered agent of, Neuro Diagnostic Associates, LLC (also referred to herein as "Neuro Diagnostic Associates/Florida"), a limited liability company that was formed under the laws of the State of Florida on or about August 16, 2010.

43

66.     Defendant Kimberly Gill (also referred to herein as "Gill") resides at 9471 West McNab Road, Tamarac, Florida 33321, and is a "person" as defined by the IFPA. At times relevant hereto, Defendant Gill was a Member of Defendant MLS EDX Medical Group, LLC. At times relevant hereto, Defendant Gill was also a Member of Neuro Diagnostic Associates, LLC; and Medical Holdings, LLC (also referred to herein as "Medical Holdings"), a limited liability company that was formed under the laws of the State of Florida on or about June 29, 2009.

67.     Defendant Brett Liquori (also referred to herein as "Liquori") resides at 1139 Inwood Terrace, Fort Lee, New Jersey 07024, and is a "person" as defined by the IFPA. At times relevant hereto, Defendant Liquori was a Member of Defendant MLS EDX Medical. At times relevant hereto, Defendant Liquori was also a Member of Neuro Diagnostic Associates.

68.     Defendant MLS Medical Group, LLC (also referred to herein as "MLS Medical" or "MLS Medical Group") is a limited liability company that was formed on or about August 15, 2006. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and office of this Defendant has been Defendant Schwartz at 308 Chelsea Manor, Park Ridge, New Jersey 07656.

69.     Defendant MLS Medical Group, LLC (also referred to herein as "MLS Medical/Florida") is a limited liability company that was formed under the laws of the State of Florida on or about August 16, 2010. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and office of this Defendant is Defendant Scott at 9471 West McNab Road, Tamarac, Florida 33321.

44

70.   Defendant MLS EDX Medical Group, LLC d/b/a Neuro Diagnostic Associates, LLC (also referred to herein as "MLS EDX Medical") is a domestic limited liability company that was formed under the laws of the State of New Jersey on or about July 17, 2009.  It is a "person" within the meaning of the IFPA.  At all times relevant hereto, the registered agent and office of this Defendant has been Defendant Schwartz at 128 Kinderkamack, Park Ridge, New Jersey 07656.

71.   Defendant MLS EDX Medical Group, LLC (also referred to herein as "MLS EDX Medical/Florida") is a limited liability company that was formed under the laws of the State of Florida on or about August 16, 2010.  It is a "person" within the meaning of the IFPA.  At all times relevant hereto, the registered agent and office of this Defendant has been Defendant Scott at 9471 West McNab Road, Tamarac, Florida 33321.

72.   Defendant MSAR, LLC (also referred to herein as "MSAR") is a limited liability company that was formed under the laws of the State of Florida on or about June 29, 2009.  It is a "person" within the meaning of the IFPA.  At all times relevant hereto, the registered agent and office of this Defendant has been Jeffrey A. McCann, Esq. at 4371 Northlake Boulevard, Palm Beach Gardens, Florida 33410.

### The Referring Defendants

73.   The term, "Referring Defendants," as used herein, refers collectively to the Defendant Bandys, Riotto, the Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Chiropractic Physicians Group Defendants, and other Defendants, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, and those who are unknown to Plaintiffs at this time who are "persons"

45

and/or "practitioners" as defined by the IFPA, and who referred or caused patients, including certain of the Allstate Claimants, to be referred for healthcare services to the MLS Medical Defendants or one or more of the Other Referee Provider Defendants in exchange directly or indirectly for kickbacks in furtherance of the Bandy Referee Provider Kickback Schemes or the Other Referee Provider Kickback Schemes that are the subject of this Complaint. The term "Referring Defendants" includes in addition to the healthcare professionals and provider entities named herein, unlicensed individuals who own or control those provider entities, personal injury attorneys who refer clients to those healthcare providers as part of a kickback scheme, and those acting as patient brokers in connection with such referrals, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50.

### The MLS Medical Referring Defendants

74. The term, "MLS Medical Referring Defendants," as used herein refers collectively to those healthcare providers and other sources of patients, including unlicensed individuals who control those providers, personal injury attorneys who refer clients to those providers in furtherance of a kickback scheme and those acting as patient brokers, who referred or caused patients, including certain of the Allstate Claimants, to be referred to Defendant MLS Medical Group for healthcare services in exchange directly or indirectly for kickbacks, and who are or unknown to Plaintiffs at this time. The MLS Medical Referring Defendants include the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the

46

Chiropractic Physicians Group Defendants, and other healthcare providers, entities and individuals who are unknown to Plaintiffs at this time, including Defendants John Doe 1-50; John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50 who are "persons" and/or "practitioners" as defined by the IFPA.

### The Chiropractic Physicians Group Defendants

75.   The term, "Chiropractic Physicians Group Defendants," as used herein includes Defendants Gross, Dubnoff, Chiropractic Physicians Group, LLP, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50.

76.   Defendant Chiropractic Physicians Group, LLP (also referred to herein as "Chiropractic Physicians Group") is a Limited Liability Partnership formed under the laws of the State of New Jersey on or about March 21, 2001, and is a "person" as defined by the IFPA.  The registered agent and address of this Defendant is Defendant Gross at 293 Passaic Street, Passaic, New Jersey 07055.  At all times relevant hereto, the partners in Defendant Chiropractic Physicians Group have been Defendants Gross and Dubnoff.

77.   Defendant Kenneth M. Gross, D.C. (also referred to herein as "Gross") resides at 333 Provincial Drive, Morganville, New Jersey 07751, is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA.  At times relevant hereto, Defendant Gross is and has been an owner of Defendant Chiropractic Physicians Group.  Defendant Gross is the husband of Defendant Dubnoff.   On September 19, 2016, Defendant Gross pleaded guilty to

47

healthcare claims fraud in violation of N.J.S.A. 2C:21-4.3 in the third degree brought by the Passaic County Prosecutor's Office.

78.     Defendant Michelle Dubnoff, D.C. (also referred to herein as "Dubnoff") resides at 333 Provincial Drive, Morganville, New Jersey 07751, is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA. At times relevant hereto, Defendant Dubnoff is and has been an owner of Defendant Chiropractic Physicians Group.     At all times relevant to this litigation, Defendant Dubnoff has been the wife of Defendant Gross.   On October 3, 2016, Defendant Dubnoff pleaded guilty to healthcare claims fraud in violation of N.J.S.A. 2C:21-4.3 in the third degree brought by the Passaic County Prosecutor's Office.

### The Montana/Barrese Defendants

79.     The term, "Montana/Barrese Defendants," as used herein, includes Defendants Montana, Barrese, Gorodetsky, Chiropractic Centre of Elizabeth, Chiropractic Center of Newark, Chiropractic Center of Jersey City, Wallington Chiropractic, Massimo Chiropractic, Massimo Rehabilitation, Hanover Chiropractic, Hanover Rehabilitation, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50.

80.     Defendant Fernando Barrese, D.C. (also referred to herein as "Barrese") resides at 346 Walnut Street, Washington Twp., New Jersey, 07676 is licensed by the State of New Jersey as a Doctor of Chiropractic, and is a "person" and "practitioner" as defined by the IFPA.  At times relevant hereto, Defendant Barrese was an owner of

48

Defendants Chiropractic Centre of Elizabeth, Chiropractic Center of Newark, Chiropractic Center of Jersey City and Wallington Chiropractic. On or about November 28, 2012, Defendant Barrese pleaded guilty to two counts of criminal use of runners in the third degree and one count of filing a false tax return in the third degree, for which he was sentenced to two consecutive and one concurrent three and a half year jail terms and his license to practice suspended for a period of 18 months. Defendant Barrese surrendered January 2, 2013 and was released into the Department of Corrections' Intensive Supervisory Probation program ("ISP") on May 7, 2013. On or about September 17, 2015, Defendant Barrese entered into a Consent Order, agreeing that pursuant to his guilty plea, his license to practice chiropractic was suspended effective June 19, 2014 and was to expire on August 16, 2015. Defendant Barrese consented to an additional active suspension of his chiropractic license from August 16, 2015 until February 16, 2016. Following the active period of license suspension, an additional three year license suspension would be stayed and served as a period of probation. Defendant Barrese was assessed an administrative penalty of $750 and State costs of $250. Defendant Barrese's license to practice chiropractic has been reinstated by the New Jersey Board of Chiropractic Examiners.

81. Defendant Christopher Montana, D.C. (also referred to herein as "Montana") resides at 24 Cowie Road, Chester, New Jersey, 07930, was at all times relevant hereto, licensed by the State of New Jersey as a Doctor of Chiropractic, and a "person" and "practitioner" as defined by the IFPA. At times relevant hereto, Defendant Montana was an owner of Defendants Chiropractic Centre of Elizabeth, Chiropractic

49

Center of Newark and Chiropractic Center of Jersey City.  Notwithstanding that he was not an owner of Defendant Wallington Chiropractic, at all times relevant to this litigation, Defendant Montana shared in the profits of Defendant Wallington Chiropractic with Defendant Barrese.  On or about November 28, 2012, Defendant Montana pleaded guilty to two counts of criminal use of runners in the third degree and one count of filing a false tax return in the third degree, for which he was sentenced on December 19, 2012, to two consecutive and one concurrent three and a half year jail terms and his license to practice suspended for a period of 18 months.  Defendant Montana surrendered in December 19, 2012 and was released into the Department of Corrections' Intensive Supervisory Probation program ("ISP") on May 7, 2013.  On or about January 21, 2016, Defendant Montana entered into a Consent Order, agreeing that pursuant to his guilty plea, his license to practice chiropractic was suspended effective December 19, 2012 and expired on or about June 18, 2014.  He did not thereafter seek reinstatement of his license, and has not been practicing chiropractic in the State of New Jersey.  Defendant Montana consented to an additional active suspension of his chiropractic license from June 30, 2015 until June 30, 2016.  Following the active period of license suspension, an additional three year license suspension would be stayed and served as a period of probation.  Defendant Montana was assessed an administrative penalty of $750 and State costs of $250.  Defendan[t] Montana's license to practice chiropractic is still currently suspended.

82.    Defendant Oleg Gorodetsky (also referred to herein as "Gorode[tsky") resides at 71 Bayside Lane, Apt. 5, Staten Island, NY 10309, and is a "per[son"



50

defined by the IFPA. At all times relevant hereto, Defendant Gorodetsky was the office manager of Defendant Chiropractic Center of Jersey City, LLC. Defendant Gorodetsky pleaded guilty to conspiracy in the third degree and was sentenced on December 9, 2013 to sixty days in jail and three years conditional probation.

83.   Defendant Chiropractic Centre of Elizabeth, LLC (also referred to herein as "Chiropractic Centre of Elizabeth") is a limited liability company that was formed on or about November 21, 2002. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and address of this Defendant was Defendant Montana at 24 Cowie Road, Chester, New Jersey 07930.

84.   Defendant Chiropractic Center of Newark, LLC (also referred to herein as "Chiropractic Center of Newark") is a limited liability company formed on or about December 5, 2005. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and address of this Defendant was Defendant Barrese at 509 Orange Street, Newark, New Jersey 07107.

85.   Defendant Chiropractic Center of Jersey City, LLC (also referred to herein as "Chiropractic Center of Jersey City") is a limited liability company that was formed on or about April 30, 2007. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and address of this Defendant was Defendant Montana at 2770 Kennedy Blvd., Jersey City, New Jersey 07306.

86.   Defendant Wallington Chiropractic Center, PC d/b/a Wallington Chiropractic & Rehabilitation Center d/b/a Wallington Pain & Rehabilitation Center (also referred to herein as "Wallington Chiropractic") is a professional corporation that was

formed on or about July 11, 2002. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and address of this Defendant was Defendant Barrese at 436 Main Avenue, Wallington, New Jersey 07057. Defendants Chiropractic Centre of Elizabeth, Chiropractic Center of Jersey City, Chiropractic Center of Newark and Wallington Chiropractic are referred to collectively herein as the "Montana/Barrese Chiropractic Clinics."

87.    Defendant Massimo Chiropractic, LLC (also referred to herein as "Massimo Chiropractic") is a limited liability company formed on or about June 17, 2008. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and office was Defendant Barrese at 346 Walnut Street, Washington Twp., New Jersey 07676.

88.    Defendant Massimo Rehabilitation Center, LLC (also referred to herein as "Massimo Rehabilitation") is a limited liability company formed on or about November 18, 2008, and cancelled effective October 27, 2010. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and address of this Defendant has been Defendant Barrese at 346 Walnut Street, Washington Twp., New Jersey 07676.

89.    Defendant Hanover Chiropractic, LLC (also referred to herein as "Hanover Chiropractic") is a limited liability company formed on or about May 9, 2005. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and office of this Defendant was Defendant Montana at 24 Cowie Road, Chester, New Jersey 07930.

90.    Defendant Hanover Rehabilitation Center, LLC (also referred to herein as "Hanover Rehabilitation") is a limited liability company formed on or about November 18, 2008, and cancelled effective October 27, 2010. It is a "person" within the meaning of the IFPA. At all times relevant hereto, the registered agent and office of this Defendant has been Defendant Montana at 24 Cowie Road, Chester, New Jersey 07930. Defendants Massimo Chiropractic, Massimo Rehabilitation, Hanover Chiropractic and Hanover Rehabilitation are collectively referred to herein as the "Montana/Barrese Holding Companies."

### The Runner Defendants

91.    Defendant Cesar Huaman (also referred to herein as "Huaman" or "Cesar Huaman") resides at 7903 Clubhouse Estates Drive, Orlando, FL 32819, and is a "person" as defined by the IFPA. At all times relevant hereto, Defendant Huaman acted as a runner for the Defendant Bandys and the Defendant Bandy-Controlled Chiropractic Clinics and for certain of the Law Firm Defendants, including the Wishnic Law Firm Defendants. On May 23, 2016, Defendant Huaman pleaded guilty to one count of conspiracy in the third degree and one count of criminal use of a runner in the third degree. On July 8, 2016, Defendant Huaman was sentenced to two years of probation.

92.    Defendant Estefania a/k/a "Stephanie" Frias (also referred to herein as "Estefania Frias") resides at 437 Grove Street, North Plainfield, New Jersey 07060, and is a "person" as defined by the IFPA. At all times relevant hereto, Defendant Estefania Frias acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner

Scheme and the Bandy Attorney Kickback Scheme. In her September 14, 2015 guilty plea to one count of criminal use of a runner in the third degree, Defendant Estefania Frias admitted to acting in the capacity as a runner to procure a patient for Defendant Riotto Family Chiropractic. Defendant Estefania Frias admitted to procuring the patient, identified as R.R., by visiting his house on May 15, 2012 at the direction of Defendants Karim and/or Anhuar Bandy, who were the operators of Defendant Riotto Family Chiropractic. R.R. was an Allstate Claimant with claim number 246028369-01.

93. Defendant Lilian Frias (also referred to herein as "Lilian Frias") resides at 754 E. Front Street, Apt. 4, Plainfield, New Jersey 07062, and is a "person" as defined by the IFPA. At various times relevant hereto, Defendant Lilian Frias acted as a runner for certain of the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme. In the 2014 Bandy Indictment, Defendant Lilian Frias was charged with conspiracy in the third degree and with the criminal use of runners in the third degree.

94. Defendant Anali G. Rivera (also referred to herein as "Rivera") resides at 37 North Gaston Avenue, Somerville, New Jersey 08876, and is a "person" as defined by the IFPA. At times relevant hereto, Defendant Rivera was the office manager for Defendants Eclipse Chiropractic and New Century Chiropractic, and also at various times acted as a runner, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme. Although Defendant Rivera was not named as a Defendant in the 2014 Bandy Indictment, she was referenced in Count Two as having

been recruited and trained between June 5, 2009 and on or about August 1, 2009 by Defendant Cesar Huaman as a runner for clinics managed, owned and/or controlled by Defendants Anhuar Bandy and Karim Bandy.

95.     Defendant Rene Lacotera a/k/a "Rene G. Cotera" and "Rene la Cotera" (also referred to herein as "Lacotera") resides at 1600 NW 33rd Street, Lot 13, Pompano Beach, Florida 33064, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto, Defendant Lacotera acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme. In the 2014 Bandy Indictment, Defendant Lacotera was charged with criminal use of runners. He is currently a fugitive.

96.     Defendant Albert Lee Hughes (also referred to herein as "Hughes") resides at 637 Grove Street, Elizabeth, New Jersey 07202, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto, Defendant Hughes acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme. In the 2014 Bandy Indictment, Defendant Hughes was charged with conspiracy in the third degree, and two counts of criminal use of runners in the third degree.

97.     Defendant Marta A. Perez (also referred to herein as "Marta Perez") resides at 310 Susan Court, North Plainfield, New Jersey 07060, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto,

55

Defendant Perez acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

98.     Defendant Bernardo (a/k/a "Benny") Neiman resides at 777 East 3rd Avenue, Apt. A, Roselle, New Jersey 07203, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto, Defendant Neiman acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and Defendant Chiropractic Centre of Elizabeth, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.  As part of Defendant Neiman's May 5, 2014 guilty plea to one count of criminal running in the third degree, he admitted that between January 1, 2011 and August 1, 2012, he acted as a runner in the city of Elizabeth, Union County, obtaining a pecuniary benefit by procuring or attempting to procure clients or patients or customers at the direction and request of the Bandy Defendants.  He further admitted that he received $1,000 for each customer or client.

99.     Defendant Sergio C. Moreno (also referred to herein as "Moreno"), resides at 127 Ripley Place, Elizabethport, New Jersey, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto, Defendant Moreno acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and Defendant Chiropractic Centre of Elizabeth, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

100.    Defendant John Doe 1-50 (a/k/a "Gabriel") (also referred to herein as "Gabriel") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA.

Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

101. Defendant John Doe 1-50 (a/k/a "Rakeisha") (also referred to herein as "Rakeisha") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

102. Defendant John Doe 1-50 (a/k/a "Jaxson Washington") (also referred to herein as "Washington") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

103. Defendant John Doe 1-50 (a/k/a "Tony Hernandez") (also referred to herein as "Tony Hernandez") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA. Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

104.   Defendant John Doe 1-50 (a/k/a "Elizabeth") (also referred to herein as "Elizabeth") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA.  Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

105.   Defendant John Doe 1-50 (a/k/a "Yolanda") (also referred to herein as "Yolanda") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA.  Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or the Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

106.   Defendant John Doe 1-50 (a/k/a "Corea") (also referred to herein as "Corea") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA.  Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or Defendant Riotto Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

107.   Defendant John Doe 1-50 (a/k/a "Tano") (also referred to herein as "Tano") is unknown to Plaintiffs at this time, and is a "person" as defined by the IFPA.  Upon information and belief, at all times relevant hereto, this Defendant acted as a runner for the Defendant Bandy-Controlled Chiropractic Clinics and/or Defendant Riotto

58

Chiropractic Clinics, and otherwise in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

108.    Defendants John Doe 1-50 are "persons" as defined by the IFPA, whose identities are not known to Plaintiffs at this time.    Upon information and belief, Defendants John Doe 1-50 are individuals who may or may not hold a healthcare license or be admitted to the practice of law, and who may not be shareholders, partners, agents, servants, independent contractors and/or employees, of one or more of the Defendant entities named herein, and/or of Defendants ABC Corp. 1-50 or XYZ, P.C. 1-50, and have knowingly participated in exchange for pecuniary gain for themselves and/or others directly or indirectly solicited individuals, including certain of the Allstate Claimants, to (a) retain or otherwise engage one or more of the Law Firm Defendants to assert claims or causes of action for negligence; (b) to make a claim for damage for personal injuries, and/or (c) to make a claim for personal injury protection ("PIP") benefits, or have otherwise assisted, urged and/or conspired with one or more of the Defendants herein in furtherance of the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme to knowingly commit acts or conceal information in violation of the IFPA as described herein, or who have knowingly benefitted from one or more violations of the IFPA as described herein.   Defendants Estefania Frias; Lilian Frias; Lacotera; Hughes; Anali Rivera; Marta Perez; Bernardo (a/k/a "Benny") Neiman; Moreno; Huaman; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth"); John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50

59

(a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano") and John Doe 1-50 are collectively referred to herein as the "Runner Defendants," the "Defendant Runners" or the "Bandy Runner Defendants." Each of the Runner Defendants is a "person" as defined by the IFPA.

The Patient Broker Defendants

109. The "Patient Broker Defendants," as that term is used herein, refers collectively to those individuals and entities who are unknown to Plaintiffs at this time, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50 and are "persons" as defined by the IFPA who have participated in or otherwise assisted any of the kickback schemes described herein in the role of a "patient broker," pursuant to which in exchange for kickbacks given by the Patient Broker Defendants in the form of money, defrayed expenses or in kind, in the form referrals of new patients or clients, or other unlawful consideration of any kind, the Referring Defendants referred or caused patients, including certain of the Allstate Claimants, to be referred to Referee Provider Defendants or Law Firm Defendants as designated by the Patient Broker Defendants. These kickbacks include without limitation payments made by cash and/or by check under the guise of payments for "marketing," "advertising," "consulting," "management fees," "rent" or for some other seemingly legitimate purpose. Upon information and belief, at various times relevant to this litigation, the proceeds of the kickback payments paid by the Referee Provider Defendants were used by certain of the Patient Broker Defendants to finance, subsidize or otherwise defray the costs of the Law Firm Defendants, the Runner Defendants and/or the Bandy Defendants to solicit or

60

recruit clients, including certain of the Allstate Claimants in furtherance of the Bandy Schemes.

110.   It was also at various times relevant to this litigation an element of the schemes engaged in by certain of the Patient Broker Defendants that new prospective clients/patients, including certain of the Allstate Claimants, generated as a result of their solicitation efforts would be referred or caused to be referred to the Referring Defendants on the condition and with the understanding that the Referring Defendants would make a reciprocal referral of these new clients/patients and/or other patients/clients to one of the other Defendants as directed by a Patient Broker Defendant or the Bandy Defendants in furtherance of the Kickback Scheme.

*Same as 93*

### The Check Casher Defendants

111.   The term, the "Check Casher Defendants," as that term is used herein, refers collectively to certain individuals and entities who are unknown to Plaintiffs with certainty at this time, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50 and who are "persons" as defined by the IFPA, who upon information and belief include other individuals and entities, including both licensed and unlicensed check cashing facilities, and who have directly or indirectly participated in or otherwise assisted the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme as described herein and other similar schemes engaged in by the Montana/Barrese Defendants by cashing checks for and/or on behalf of certain of the Montana/Barrese Defendants under the guise of providing purportedly legitimate "factoring" services, when in fact the Check Casher Defendants at all times knew they were not providing

*Same as 93*

any legitimate services, but instead in exchange for an unlawful fee or "gratuity" were negotiating checks written from and to a variety of entities and individuals and returning cash to one or more of the Montana/Barrese Defendants, Defendant John Doe 1-50 and/or Defendant John Roe 1-50 for the purpose of assisting these Defendants in concealing the sources and/or ultimate recipients of the said cash in furtherance of the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and other schemes in violation of Section 4(b) of the IFPA, and/or who knowingly benefited from the violations of the IFPA by the other Defendants named in this Complaint in violation of Section 4(c) of the Fraud Act.

### Fictiously-Named Defendants

112.   Defendants John Doe 1-50 are "persons" as defined by the IFPA, whose identities are not known to Plaintiffs at this time. Upon information and belief, Defendants John Doe 1-50 are individuals who do not hold a healthcare license and who are not admitted to the practice of law, and are shareholders, partners, agents, servants, independent contractors and/or employees, of one or more of the Defendant entities named herein, and/or of Defendants ABC Corp. 1-50 or XYZ, P.C. 1-50, who have knowingly participated in the preparation and submission of medical bills, records and/or reports to the Allstate Plaintiffs or have otherwise assisted and/or conspired with one or more of the Defendants herein to knowingly commit acts or conceal information in violation of the IFPA as described herein, or who have knowingly benefitted from one or more violations of the IFPA as described herein.

113.   Defendants John Roe 1-50 are "persons" and "practitioners" as defined by the IFPA, whose identities are not known to Plaintiffs at this time.  Upon information and belief, Defendants John Roe 1-50 are individuals who hold a healthcare license or who are admitted to the practice of law, and/or who are shareholders, partners, agents, servants, independent contractors and/or employees, of one or more of the Defendant entities named herein, and/or of Defendants ABC Corp. 1-50 or XYZ, P.C. 1-50, who have knowingly participated in the preparation and submission of medical bills, records and/or reports to the Allstate Plaintiffs or have otherwise assisted and/or conspired with one or more of the Defendants herein to knowingly commit acts or conceal information in violation of the IFPA as described herein, or who have knowingly benefitted from one or more violations of the IFPA as described herein.

114.   Defendants ABC Corp. 1-50 are business corporations incorporated in the State of New Jersey, or in any other state, and are "persons" as defined within the meaning of the IFPA and have committed one or more of the violations of the IFPA as described herein, and/or have "persuaded" one or more of the Defendants herein to knowingly commit acts in violation of the IFPA, and/or have "assisted or conspired" with one or more of the Defendants herein to violate the IFPA as described herein, and/or have knowingly benefitted from such violations of the IFPA, and have taken assignments of PIP benefits in violation of N.J.S.A. 39:6A-4.

115.   Defendants XYZ, P.C. 1-50 are professional corporations incorporated in the State of New Jersey or in one or more other states, and are "persons" as defined within the meaning of the IFPA who have committed one or more of the violations of the

IFPA as described herein, and/or have "persuaded" one or more of the Defendants herein to knowingly commit acts in violation of the IFPA, and/or have "assisted or conspired" with one or more of the Defendants named herein to violate the IFPA as described herein, and/or who have otherwise knowingly benefitted from such violations of the IFPA.

## FACTUAL INTRODUCTION AND BACKGROUND

116.   On April 28, 2014, a State Grand Jury handed up the 2014 Bandy Indictment, a 45-count, 111 page indictment against Defendants Anhuar Bandy and Karim Bandy (also referred to herein as the "Bandys") and 10 other Defendants named herein, including Defendants Mark Schwartz, D.O.; Louis Brown, D.C.; Edward Formisano, D.C.; David Walker, Esq.; Walker's purported paralegal, Alexandra Gallegos, and several runners, including Defendant Cesar Huaman, who had recruited other runners to participate in the schemes. The 2014 Bandy Indictment alleges that the runners obtained police accident reports from police departments pursuant to the Open Public Records Act ("OPRA") and used the information contained on those reports to solicit accident victims — often with offers of payments for undergoing treatments — to treat at a series of chiropractic facilities the Bandys controlled. The 2014 Bandy Indictment also alleges that the patients solicited by the runners through the scheme were encouraged to engage participating attorneys, who paid kickbacks to the Bandys for the client referrals they received through the scheme.

Overview of the Schemes that Are the Subject of this Complaint

117.   At all times relevant to the allegations of this Complaint, the Defendant Bandys, acting in concert with the other Defendants named herein, and others who will be named herein as discovery proceeds or in separate litigations as described in the Allstate Plaintiffs' R. 4:5-1 Certification, have engaged in a series of inter-related and overlapping schemes, which through the use of runners and through kickback relationships with lawyers, healthcare providers and others, were designed to facilitate the solicitation and recruitment of individuals who had been involved in automobile accidents, including the Allstate Claimants, who were encouraged or urged – sometimes with inducements of cash and invariably with the hope or expectation of a bodily injury award -- to engage one of the Law Firm Defendants for the purpose of making bodily injury claims and to undergo treatment at the Defendant Bandy-Controlled Chiropractic Clinics or the Defendant Riotto Chiropractic Clinics (collectively referred to herein as the "Defendant Bandy/Riotto Chiropractic Clinics"), and in turn referred to other Defendants, including the Defendant Golden Acupuncture Entities, the MLS Medical Defendants and the Other Referee Provider Defendants, for diagnostic testing and other procedures.   It was at all times the intent of these Defendants to profit unlawfully from the procedures performed on those patients, from the bodily injury settlements and awards obtained and from the kickbacks paid and received for causing those clients and patients to be referred in furtherance of the schemes described herein. The schemes engaged in by the Defendant Bandys and/or Defendant Riotto with the other Defendants include the "Bandy Concealed Ownership Scheme," the "Golden

65

Acupuncture Concealed Ownership Scheme," the "Bandy Chiropractic Fee-Splitting Scheme," the "Bandy Acupuncture Fee-Splitting Scheme," the "Bandy Runner Scheme," the "Bandy Attorney Kickback Scheme," and the "Bandy Provider Kickback Scheme." These schemes are collectively referred to herein as the "Bandy Schemes." Unless otherwise stated herein, the Bandy Schemes continued up to the time of the 2014 Bandy Indictment.

118. At times relevant to this litigation, and as described herein, the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and the Bandy Provider Kickback Scheme, overlapped and intersected with similar, broader schemes involving other Defendants named herein, as well as those of other defendants who have been named by Plaintiffs, or who Plaintiffs anticipate they will be naming, in other litigations as set forth in the Allstate Plaintiffs' R. 4:5-1 Certification. For example, Plaintiffs contend that the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme overlapped and/or intersected with runner and attorney kickback schemes engaged in by the Law Firm Defendants and the Montana/Barrese Defendants, with other similar schemes they have engaged in with others before, during and/or after their participation in these Bandy Schemes.

119. Plaintiffs similarly contend that the Bandy Provider Kickback Scheme also overlapped and/or intersected with referral, kickback and/or fraudulent healthcare billing schemes engaged in by the MLS Medical Defendants and the Other Referee Provider Defendants, who have been named by Plaintiffs, or who Plaintiffs anticipate they will be naming as discovery proceeds, in other litigation as set forth in the Allstate Plaintiffs' R.

66

4.5.1 Certification, before, during and/or after their participation in the Bandy Provider Kickback Scheme. These Defendants are collectively referred to herein as the "Referee Provider Defendants." The kickback schemes they engaged in are collectively referred to as the "Referee Provider Kickback Schemes." Plaintiffs use the term, "Referee Provider Kickback Schemes," to refer to provider kickback schemes that involve elements of those schemes that extend beyond the Bandy Provider Kickback Scheme. The Referee Provider Kickback Schemes include the "MLS Medical Kickback Scheme" and the "Other Referee Provider Kickback Schemes." The term "MLS Medical Kickback Scheme" as used herein refers to the broader kickback scheme engaged in by the MLS Medical Defendants with all MLS Medical Referring Defendants, and the term, "Bandy-MLS Medical Kickback Scheme," refers to that element of the MLS Medical Kickback Scheme that involved referrals of Allstate Claimants by the Bandy Defendants and other Defendants named herein in furtherance of the Bandy Provider Kickback Scheme. The term "Other Referee Provider Kickback Scheme" as used herein refers to the broader kickback scheme engaged in by the Other Referee Provider Defendants with all Other Referring Defendants, and the term, "Bandy-Other Referee Provider Kickback Scheme" refers to that element of the Other Referee Provider Kickback Scheme that involved referrals of Allstate Claimants by the Bandy Defendants and other Defendants named herein in furtherance of the Bandy Provider Kickback Scheme.

120.    Each of these Referee Provider Kickback Schemes involved the payments of kickbacks by or on behalf of the Referee Provider Defendants in exchange for referrals from other patient sources in addition to the Defendant Bandys, Defendant

Riotto, the Defendant Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors and the Law Firm Defendants, who are collectively referred to herein as the "Bandy Referring Defendants." The other patient sources who participated in the broader Referee Provider Kickback Schemes, including those who are unknown to Plaintiffs at this time, are collectively referred to herein as the "Referring Defendants." The term, "Other Referring Defendants," refers to all patient sources who participated in the Other Referee Provider Kickback Schemes, including those who are unknown to Plaintiffs at this time. The Bandy Schemes and broader schemes described above are collectively referred to as the "Schemes."

121.   To date, as a result of and pursuant to these Schemes, individuals have submitted claims to the Allstate Plaintiffs relating to alleged injuries purportedly caused by automobile "accidents," as defined by N.J.S.A. §39:6A-1, et seq. (the "No -Fault Law") relating to the Bandy Schemes. These individuals are referred to collectively herein as the "Allstate Claimants." The Allstate Claimants, as defined herein, include those who have allegedly received healthcare services, testing and/or medical supplies from one or more of the Defendants named herein pursuant to Personal Injury Protection ("PIP") coverage afforded under a policy of insurance issued by the Allstate Plaintiffs, and who have allegedly executed agreements purporting to assign to one or more of the Defendants herein their rights for the collection of PIP medical expense benefits and for which, so-called "first-party claims" have been made against the Allstate Plaintiffs. These Allstate Claimants are referred to herein as the "Allstate PIP Claimants." The Allstate Claimants, as defined herein, also include those who as a

result of these Schemes, or in furtherance thereof, have claimed to have incurred bodily injuries and other damages arising from an automobile accident as the result of: (1) the negligence of an individual insured by the Allstate Plaintiffs and who have made so-called "third-party claims" against the casualty or other liability coverage afforded under a policy of insurance issued by the Allstate Plaintiffs; (2) the negligence of an individual having no insurance coverage or lower insurance coverage limits giving rise to a claim for so-called "first-party claims" for Uninsured Motorist Coverage ("UM") or Underinsured Motorist Coverage ("UIM") afforded under a policy of insurance issued by the Allstate Plaintiffs. These Allstate Claimants are collectively referred to herein as the Allstate BI Claimants. The Plaintiffs will be unable to identify with specificity the identities of the Allstate BI Claimants until discovery in this litigation is completed.

122.   In connection with the aforementioned first-party and third-party claims, the Defendants herein have engaged in a broad, multi-faceted scheme to defraud the Allstate Plaintiffs, as well as other insurance companies that provide automobile liability insurance coverage and PIP medical expense benefits pursuant to N.J.S.A. §39:6A-1, et seq., in violation of the IFPA, and applicable law, statutes, and/or administrative regulations governing the provision of healthcare services and the practice of law in this State by, among other things, using runners and otherwise paying kickbacks for patient and/or client referrals in violation of Section 4(e) of the IFPA, providing and billing for healthcare services through practice structures and relationships that are designed to enable the unlawful splitting of fees paid by the Allstate Plaintiffs for PIP medical services allegedly rendered to the Allstate Claimants; engaging in and concealing

69

prohibited self-referrals and assignments of PIP medical benefits to non-providers of healthcare benefits, submitting false and misleading statements to the Allstate Plaintiffs on invoices, reports and other medical records, and other fraudulent schemes and practices as described herein.

123.   The conduct and actions engaged in by each of the Defendants herein in furtherance of the Schemes were at all times part of a common conspiracy knowingly engaged in by each and every one of the other Defendants to violate the IFPA.

124.   The conduct and actions engaged in by each of the Defendants in furtherance of the Schemes were knowingly performed for the purpose of assisting each and every one of the violations of the IFPA engaged in by the other Defendants.

125.   Each of the Defendants knowingly benefited from the violations of the IFPA committed by each of the other Defendants in furtherance of the Schemes.

126.   Each of the Defendants is jointly and severally liable for the damages and costs incurred by the Allstate Plaintiffs in connection with the claims asserted by and/or on behalf of the Allstate Claimants as a result of the actions and conduct engaged in by each of the others in furtherance of the Schemes, and for each and every violation of the IFPA alleged herein.

*Overview of the Bandy Concealed Ownership Scheme, the Bandy Chiropractic Fee-Splitting Scheme and the Bandy Acupuncture Fee-Splitting Scheme*

127.   At all times relevant to this Complaint, the Bandys, acting in concert with the other Defendants, have operated a criminal enterprise at the center of which has been a group of chiropractic facilities, including since their formation each of the

70

Defendant Bandy-Controlled Chiropractic Clinics, which the Bandys have unlawfully controlled either directly or indirectly through one or more of the Defendant Bandy Management Companies, and with the assistance of Defendant Riotto, the Defendant Bandy/Riotto Chiropractors, and the Bandy Clinic Staff Defendants and many others who are either named herein or are unknown to Plaintiffs at this time. The Bandys caused the Defendant Bandy-Controlled Chiropractic Clinics to be set up in the names of certain of the Defendant Bandy/Riotto Chiropractors, including Defendants Brown, Formisano, Johnson, Roth, Stark and John Roe 1-50, in order to create the false appearance that these Defendant clinics were owned and operated in compliance with the Corporate Practice of Medicine rule and N.J.A.C. 13:44E-2. At all times relevant to this litigation, and since the formation of the Defendant Bandy-Controlled Chiropractic Clinics, their purported ownership by the foregoing Defendant chiropractors has been a sham. Defendants Karim Bandy and Anhuar Bandy have at all times been the *de facto* owners of the Defendant Bandy-Controlled Chiropractic Clinics.

128. The Defendant Bandys have also at all times been the *de facto* owners and/or have otherwise controlled the Defendant Golden Acupuncture Entities, and the purported ownership of these entities by Defendants Lipshitz and/or Roytman has at all times been a sham.

129. Similarly, the Defendant Bandys have also at all times been the *de facto* owners and/or have otherwise controlled Defendant Chi Acupuncture, and the purported ownership of this entity by Defendant Johnson has at all times been a sham.

130.   This scheme, pursuant to which the Defendant Bandys, acting both directly and through the Defendant Bandy Management Companies, and with the assistance of the Defendant Bandy/Riotto Chiropractors, the Bandy Clinic Staff Defendants and others named herein, have at all times unlawfully controlled and effectively owned the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Acupuncture Entities by using certain of the Defendant chiropractors and acupuncturists named herein as "paper owners," is referred to herein as the "Bandy Concealed Ownership Scheme."   The Bandy Concealed Ownership Scheme is the subject of the First through Third Counts.

131.   In addition to Plaintiffs' allegations regarding the Bandy Concealed Ownership Scheme, and in the alternative, Plaintiffs allege that the foregoing Defendants, together with Defendant Riotto, the Defendant Riotto Chiropractic Clinics and the Riotto Clinic Staff Defendants, have engaged in the "Bandy Chiropractic Fee-Splitting Scheme," pursuant to which those Defendant chiropractors who purportedly owned the Defendant Bandy-Controlled Chiropractic Clinics agreed to split the fees these Defendants received with non-licensees in exchange for patient referrals in violation of applicable laws.   The Bandy Chiropractic Fee-Splitting Scheme is the subject of the Fourth through Sixth Counts of this Complaint.

132.   Plaintiffs also allege that these same Defendants, together with the Acupuncture Defendants, have engaged in the "Bandy Acupuncture Fee-Splitting Scheme," pursuant to which Defendants Lipshitz, Roytman and Johnson agreed to split the fees the Acupuncture Defendants received with non-licensees in exchange for

72

patient referrals in violation of applicable laws. The Bandy Acupuncture Fee-Splitting Scheme, which encompasses the Chi Acupuncture Fee-Splitting Scheme and the Golden Acupuncture Fee-Splitting Scheme, is the subject of the Seventh through Ninth Counts.

### Overview of the Bandy Runner Scheme

133.   At all times relevant to the allegations of this Complaint, the Bandys have engaged in the Bandy Runner Scheme, pursuant to which they paid the Runner Defendants to visit the homes of individuals who had been involved in recent motor vehicle accidents, or to otherwise solicit prospective patients, including certain of the Allstate Claimants, for the purpose of urging them to undergo treatment at one of the Defendant Bandy-Controlled Chiropractic Clinics and of referring them to one of the Law Firm Defendants for the purpose of making claims for Personal Injury Protection ("PIP") benefits and/or for damages for claims for bodily injury against one or more applicable policies of automobile insurance provided by the Allstate Plaintiffs and/or by other insurers, in violation of Section 4(e) of the IFPA.

134.   The Defendant Bandys would cause the Runner Defendants to be provided with and to use business cards that falsely identified them as "accident investigators," which the Runner Defendants would provide to persons recently involved in automobile accidents when they visited them, or leave for them in hope for a call back. Those Runner Defendants who were bi-lingual would be provided by the Bandys with a separate set of business cards so they could leave a Spanish-language business card for recent accident victims who had Latino surnames.

135.   When asked, the Runner Defendants would state that they worked for one of the Law Firm Defendants and/or would provide the name and phone number of one of the Law Firm Defendants, who in turn would refer the person to one of the Defendant Bandy-Controlled Chiropractic Clinics or to one of the Defendant Riotto Chiropractic Clinics.

136.   In the case of certain of these prospective clients/patients, including those who were Allstate Claimants, the Runner Defendants offered immediate cash payments to induce the prospective clients/patients to go to one of the Law Firm Defendants and to one of the Defendant Bandy/Riotto Chiropractic Clinics or the Montana/Barrese Chiropractic Clinics, with the promise of future additional payments once the person had undergone a certain number of treatments.

137.   In some cases, in lieu of or in addition to a cash inducement, the prospective clients/patients were given or offered other compensation, including by way of example, free repairs of collision damage to the vehicles involved in the accidents.

138.   The payments made to the Runner Defendants for soliciting recent accident victims and the money offered and paid to or on behalf of recent accident victims to induce them to go to one of the Defendant Bandy/Riotto Chiropractic Clinics and to sign up with one of the Law Firm Defendants was provided to the Runner Defendants by the Defendant Bandys and/or Defendant Riotto, either directly or through one or more of the Defendant Bandy Management Companies, using funds that were generated through one or more of the Bandy Schemes, including from payments made

74

directly or indirectly by the Referee Provider Defendants, the Law Firm Defendants and/or the Defendant Bandy/Riotto Chiropractic Clinics.

139.   The Bandy Runner Scheme, as alleged herein, also encompassed a period of time when Defendant Anhuar Bandy acted as a runner, together with Defendant Bernardo Nieman (a/k/a "Benny"), and certain of the other Runner Defendants, and solicited Allstate Claimants on behalf of and in concert with the Montana/Barrese Defendants directly or indirectly for kickbacks paid to the Defendant Bandys by one or more of the Montana/Barrese Defendants in violation of N.J.S.A. 17:33A-4(e).

140.   The conduct and actions of the Runner Defendants, the Bandys, Riotto, the Law Firm Defendants, the Defendant Bandy/Riotto Chiropractic Clinics, the Montana/Barrese Defendants, the Patient Broker Defendants, the Defendant Bandy/Riotto Chiropractors, and the Referee Provider Defendants, as described herein, have at all times been in violation of, *inter alia*, Section 4(e) of the IFPA and were engaged in in furtherance of the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and the other Bandy Schemes.

*Overview of the Bandy Attorney Kickback Scheme*

141.   At all times relevant to the allegations of this Complaint, the Bandys and Riotto have engaged in the Bandy Attorney Kickback Scheme, pursuant to which the Bandys and Riotto have referred patients, including certain of the Allstate Claimants, or caused them to be referred to the Law Firm Defendants in exchange for unlawful compensation, also referred to herein as "kickbacks," given in various forms, including

75

without limitation in the form of cash, or by check in payment of expenses of or otherwise on behalf of the Law Firm Defendants which were disguised as payment for another purpose. This scheme is referred to herein as the "Bandy Attorney Kickback Scheme.".

142. In addition to payments of cash or by checks for referrals, the Bandy Attorney Kickback Scheme also encompassed the use of "in-kind" kickbacks in the form of referral exchanges on a "one-for-one" or other agreed upon basis, pursuant to which the Bandys and Riotto would cause a patient or patients to be referred to one of the Law Firm Defendants for representation in bringing a bodily injury claim in exchange for the reciprocal referral by that Law Firm Defendant of an agreed upon number of clients to one of the Defendant Bandy/Riotto Chiropractic Clinics for treatment.

143. The Bandy Attorney Kickback Scheme also relied upon the use of kickbacks in the form of indirect or delayed payments. Pursuant to this element of the scheme the Defendant Bandys and Riotto would give the Law Firm Defendants a kickback for patients, including certain of the Allstate Claimants, whom they caused to be referred to the Defendant Bandy/Riotto Chiropractic Clinics, either indirectly through payments made to or on behalf of the Law Firm Defendants by one more of the Referee Provider Defendants or the Patient Broker Defendants, or through a delayed payment in the form of the proceeds of the Law Firm Defendant's attorney trust check in payment of a co-pay and/or deductible amount owed to the Defendant Chiropractic Clinic, that is cashed and paid over to the Law Firm Defendant or otherwise used in furtherance of one or more of the Bandy Schemes.

76

144.   Upon information and belief, it was also at certain times an element of the Bandy Attorney Kickback Scheme that the Defendant Bandys and Defendant Riotto would participate in client/patient solicitation and referral network schemes operated by third-parties, including certain of the Patient Broker Defendants, pursuant to which the Patient Broker Defendants would cause patients to be referred to the Defendant Bandy/Riotto Chiropractic Clinics in exchange for the Defendant Bandys and Riotto causing patients of the Defendant Bandy/Riotto Chiropractic Clinics, including certain of the Allstate Claimants, to be referred to Referee Provider Defendants designated by the Patient Broker Defendants,  who were receiving kickbacks directly or indirectly from the Patient Broker Defendants.   As part of these client/patient solicitation and referral network schemes, the Patient Broker Defendants would use a portion of the kickback payments received from the Referee Provider Defendants to finance, subsidize or otherwise defray the cost of client solicitation efforts, including direct mail, billboard and other forms of advertising on behalf of certain of the Law Firm Defendants, as a kickback to induce them to encourage their clients to undergo treatment, diagnostic testing and/or procedures with the Bandy/Riotto Chiropractic Clinics and the participating Referee Provider Defendants.

145.   Upon information and belief, certain of the Law Firm Defendants have their own kickback relationships with Referee Provider Defendants, typically specialists such as pain management providers and orthopedic surgeons. These Law Firm Defendants cause their clients to be referred to these Referee Provider Defendants in exchange for kickbacks paid by them either directly to the Law Firm Defendants or

indirectly through friends or family members of the Law Firm Defendants or entities they control, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, or through one or more of the Patient Broker Defendants. These kickbacks were used by the Law Firm Defendants to generate clients, including certain of the Allstate Claimants that were referred to the Defendant Bandy/Riotto Chiropractic Clinics in furtherance of the Bandy Attorney Kickback Scheme and other Bandy Schemes.

146. The conduct and actions of the Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy Management Companies, the Runner Defendants, the Law Firm Defendants, the Referee Provider Defendants, the Patient Broker Defendants, and Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50 as described herein have at all times been in violation of Sections 4(a)-(c), (e) of the IFPA, and were engaged in by these Defendants in furtherance of the Bandy Attorney Kickback Scheme and the other Bandy Schemes.

*Overview of the Bandy Provider Kickback Scheme*

147. At all times relevant to the allegations of this Complaint, the Bandys and Riotto, acting in concert with each other and the other Defendants herein, have engaged in the Bandy Provider Kickback Scheme. Pursuant to this scheme, the Bandys and Riotto have caused patients of the Defendant Bandy/Riotto Chiropractic Clinics, including certain of the Allstate Claimants, to be referred to the MLS Medical Defendants and the other Referee Provider Defendants, who have been named by Plaintiffs, or who the Allstate Plaintiffs anticipate they will be naming in other litigation as set forth in the Allstate Plaintiffs' R. 4:5-1 Certification using one or more of the various

kickback methods described herein, including kickbacks given directly or indirectly through the Patient Broker Defendants.

148.   Upon information and belief, it was at all times an element of the Bandy Provider Kickback Scheme that the Bandys and Riotto would participate in client/patient solicitation and referral schemes operated by third-party networks, including the Patient Broker Defendants, pursuant to which the Patient Broker Defendants would pay kickbacks to the Bandys and Riotto or would provide "in kind" kickbacks to them in the form of referrals by causing patients, including certain of the Allstate Claimants, to be referred to the Defendant Bandy/Riotto Chiropractic Clinics they controlled, respectively, in exchange for causing patients of the Defendant Bandy/Riotto Chiropractic Clinics, which patients included certain of the Allstate Claimants, to be referred to the Referee Provider Defendants who were giving kickbacks to the Bandys and/or Riotto directly or indirectly through the Patient Broker Defendants in furtherance of this element of the Bandy Provider Kickback Scheme.

149.   The conduct and actions of the Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Law Firm Defendants, the Referee Provider Defendants, and the Patient Broker Defendants as previously described herein have at all times been in violation of Sections 4(a)-(e) of the IFPA, and were engaged in by these Defendants in furtherance of the Bandy Provider Kickback Scheme and the other Bandy Schemes.

150.   As set forth at greater length below, the Bandy Provider Kickback Scheme overlaps and is inter-related with a series of separate kickback and other fraud schemes

79

that were being engaged in by the Referee Provider Defendants acting in concert with the Referring Defendants, as described herein, some of whom are unknown to Plaintiffs at this time.

*The Relationship of the Bandy Schemes to Previous Fraud Schemes Engaged in by Defendant Anhuar Bandy*

151. The Bandy Schemes as described herein are extensions of, and to some extent reflect improvements upon, a similar large-scale automobile insurance fraud scheme that Defendant Anhuar Bandy and several of the other Defendants named herein engaged in more than a decade ago. That scheme resulted in Defendant Anhuar Bandy's conviction on October 15, 2004, after a trial in Union County Superior Court, of Racketeering in the second degree, Health Care Claims Fraud in the second degree, Theft by Deception in the third degree, Conspiracy to Commit Racketeering in the second degree, and Conspiracy to Commit Health Care Claims Fraud in the second degree, in violation of N.J.S.A. 2C:41-1(c), 2C:2-6 and 2C:5-2.

152. Following that conviction, Defendant Anhuar Bandy was sentenced to a twenty-nine year prison term. In imposing this stiff sentence, the Hon. John S. Triarsi, J.S.C. found the existence of aggravating factors, writing in his statement of reasons,

> [T]his was a highly organized criminal enterprise and ... this Defendant was the principle [sic] organizer and mover of the criminal enterprise. That is to say, the scheme that occurred was the result of this Defendant's own thought process. It was his determination to begin the process of staging auto accidents and then from those accidents submitted fraudulent claims for people who were no injured [sic] ... The extent of the Defendant's involvement was made clear in several [wiretap] intercepts played at the trial by the State in which members of the conspiracy identified this Defendant as "El Jeffe" (the boss) of this entire enterprise... This case is one that cries out for consecutive sentences. The crime of racketeering was supported by the State by proof of eight predicate

80

*felonies plus approximately twenty-five more staged automobile accidents submitted to the jury.*

153.   The underlying indictment, State Grand Jury No. SGJ 456-02-8(9), Superior Court Docket No. 02-4-0050-S, filed May 16, 2002 (referred to herein as the "2002 Bandy Indictment"), described Defendant Anhuar Bandy's scheme in conducting a racketeering enterprise engaged in insurance fraud.  Although those charges arose from a scheme that included paying runners to stage automobile accidents and to recruit individuals to participate in those accidents, other elements of that scheme have much in common with the Bandy Schemes that are the subject of this litigation.

154.   On June 12, 2008, Defendant Anhuar Bandy was released from state prison on parole after serving approximately 4 years of his 29-year sentence for his involvement in the Prior Bandy Schemes.

### *Anhuar and Karim Bandy's Admissions and Statements to Allstate Representatives Concerning the Prior Bandy Schemes*

155.   Defendants Anhuar and Karim Bandy have each made a number of admissions and declarations against interest to representatives of the Allstate Plaintiffs with respect to their involvement with, and knowledge of, sophisticated insurance fraud conspiracies.

156.   These admissions and declarations against interest are relevant to the Defendant Bandys' state of mind and knowledge, and help explain the evidence, both circumstantial and direct, of their control of and participation in the automobile injury fraud network that is the subject of this litigation and their execution of the Bandy Schemes.

81

157.   On April 22, 1998, Defendant Karim Bandy was deposed in the matter of Parkway Insurance Co. v. Hector Hernandez, et. al., Docket No. MRS-L-961-97 (Law Div.) (referred to herein as the "*Parkway Litigation*").

158.   The *Parkway Litigation* alleged a wide-ranging insurance fraud conspiracy, and ultimately included Anhuar Bandy and Karim Bandy as Defendants.

159.   During his deposition in the Parkway Litigation, Defendant Karim Bandy testified that he owned several professional corporations that provided healthcare services.

160.   Among these corporations were Accident Therapy Center, which provided chiropractic services, and which was owned by Karim Bandy and Adrian Jacobs.

161.   Neither Karim Bandy nor Jacobs were chiropractors, or any other type of health care professional.

162.   Defendant Karim Bandy also admitted during his deposition that he, along with his brother, Defendant Anhuar Bandy and their two sisters, jointly owned Injury Treatment Center of New Brunswick, which also provided chiropractic services.

163.   Neither Anhuar and Karim Bandy, nor their sisters, were chiropractors, or had any other type of health care license.

164.   Because none of the individuals who shared ownership of Accident Therapy Center or Injury Treatment Center were chiropractors, or any other type of licensed health care provider, their ownership of those facilities was violative of New Jersey law, including, but not limited to, prohibitions against fee splitting and the corporate practice of medicine doctrine.

165.   Karim Bandy testified in his deposition in the *Parkway Litigation* that Accident Therapy Center, under his and Jacobs' lay ownership, had a verbal agreement with Defendant Louis Brown pursuant to which Karim Bandy paid Brown twenty-five percent of revenues collected at Accident Therapy Center in exchange for Brown's provision of chiropractic services at that facility, or for supplying other chiropractors to provide services at that facility.

166.   According to Karim Bandy, Brown had no ownership interest in Accident Therapy.

167.   Similarly, Karim Bandy admitted that Injury Treatment Center of New Brunswick, under Anhuar and Karim Bandy's ownership, had an agreement with Dr. Harry Schick, D.C.,[1] to supply chiropractors who treated patients at the chiropractic facilities he and his brother owned.

168.   Dr. Harry Schick's participation in a complex insurance fraud scheme was described by the Hon. Charles E. Villanueva, J.A.D. (t/a on recall) in the matter of Allstate v. Schick, *et. al.*, 328 N.J.Super. 611 (Law Div. 1999)(referred to herein as "the Schick Litigation").

*Anhuar and Karim Bandy's Admissions and Statements to Allstate Representatives Following Anhuar Bandy's 2004 Conviction*

169.   Beginning in 2008, while he was still incarcerated in connection with his 2004 conviction for Racketeering and Health Care Claims Fraud, Defendant Anhuar

_____

[1] As discussed below, Defendant Roth testified that he eventually replaced Dr. Schick as the supplier of chiropractors to Injury Treatment Center.

Bandy made a number of admissions to representatives of Allstate concerning his knowledge of, and long-running participation in, sophisticated insurance fraud schemes.

170.   In his post-conviction statements to Allstate representatives, Anhuar Bandy admitted that he had owned or controlled, either outright or surreptitiously through the use of straw owners, a number of chiropractic clinics, and acknowledged his then current awareness that it was illegal for him to do so, whether directly or indirectly.

171.   On February 20, 2008, while Defendant Anhuar Bandy was still incarcerated, he described in detail to representatives of Allstate the economic model for large-volume automobile insurance fraud networks.  In substance, he stated that owners of chiropractic clinics must pay runners for patients, typically at a cost of up to $2,000.00 per patient.  Because of the relatively narrow profit margins that can be generated from chiropractic services under New Jersey's PIP fee schedule, the owners of such clinics must recoup those payments through kickback monies received in exchange for causing the chiropractic patients bought from runners to be referred to other health care providers, such as MRI, neurodiagnostic testing and physical rehabilitation facilities, and to personal injury attorneys.

172.   Defendant Anhuar Bandy further explained to Allstate representatives that to facilitate payments of kickbacks, individuals he described as "kickback brokers" sometimes act as middlemen to facilitate and disguise the transfer of money from healthcare providers, such as MRI, neurodiagnostic testing and physical rehabilitation facilities to the owners of chiropractic facilities in exchange for the referrals of patients.

84

173.   Defendant Anhuar Bandy further explained that in order to keep track of which patients were being referred to other health care providers, clerical staff of such clinics must maintain books and records identifying which patients were being sent for outside testing.

174.   Defendant Anhuar Bandy further admitted that the chiropractors who worked at his facilities were often knowledgeable about the scheme.   By way of example, Anhuar Bandy described how the chiropractors at his facilities would treat the same patient under two separate losses under two different names.

175.   On October 15, 2008, after Anhuar Bandy had been released on parole from prison, he told representatives of Allstate that it was common for owners of chiropractic clinics who control the primary care of patients, to receive a kickback of around $500.00 from attorneys in exchange for the referral of the patient to that attorney.

176.   On January 28, 2009, Defendants Karim Bandy and Anhuar Bandy made several admissions to Allstate representatives.

177.   Among other things, both Defendants Anhuar and Karim Bandy made several statements at that time evincing their awareness and inside knowledge of automobile injury fraud network schemes then being perpetrated by Dr. Scott Greenberg, D.C. (referred to herein as the "Greenberg Schemes.")

178.   The information related by Defendants Anhuar Bandy and Karim Bandy regarding the Greenberg Schemes was accurate.

85

179.   Dr. Greenberg was arrested for insurance fraud by agents of the Office of the Insurance Fraud Prosecutor (referred to herein as the "OIFP") on July 27, 2011, along with Defendants Montana, Barrese and Gorodetsky, and a number of their runners. These arrests capped off a multi-year investigation by the OIFP, during which Defendants Greenberg, Montana, Gorodetsky and dozens of others, were captured on tape paying kickbacks to a personal injury attorney who was acting as a Confidential Witness (hereinafter referred to as "C.W." or "Confidential Witness C.W.").

180.   On January 11, 2013, Dr. Greenberg pleaded guilty in the Superior Court of the State of New Jersey to, *inter alia*, second degree theft by deception, third degree conspiracy and third degree criminal running activity in connection with the kickback payments he made to C.W. for referring motor vehicle accident patients to his chiropractic offices between 2009 and 2011.

181.   In January, 2009, more than two years before Dr. Greenberg's arrest, Defendant Anhuar Bandy complained to representatives of Allstate that Dr. Greenberg was then paying $3,000 per patient, thereby "killing the market" for others who wanted to buy patients from runners.

182.   Defendant Anhuar Bandy also identified several runners who were bringing patients to Dr. Greenberg in exchange for money.

183.   Defendant Karim Bandy also demonstrated detailed knowledge of the Greenberg Schemes, telling Allstate representatives that he knew that Greenberg controlled several chiropractic facilities and hired other chiropractors to run each office.

86

184.   Defendant Karim Bandy stated that all of Greenberg's patients were getting epidurals and MRI testing within the first ten days[2] of treatment and further speculated, in substance, that maybe Greenberg owns all of the testing.

185.   Defendant Karim Bandy further told representatives of Allstate that increased prosecution of insurance fraud, including that of his brother, Defendant Anhuar Bandy, had driven up the street price for the referral of patients, analogizing the increased risks from engaging in insurance fraud to the risks from narcotics trafficking in light of heightened anti-narcotics enforcement.

186.   Defendant Karim Bandy then criticized the brazenness of the Greenberg Schemes, stating that one must always be conscious of surveillance to avoid detection. He observed that someone could just film outside all day long and ask for the sign-in sheets. Karim Bandy opined that if the sign-in sheets reveal 50 patients and surveillance revealed that only 30 people came in, how hard can that be to prove fraudulent conduct?

187.   Unbeknownst to the Allstate Plaintiffs at the time of the October 15, 2008 meeting, the Defendant Bandys were already planning to open Defendant True Healing and Wellness, which they formed on November 24, 2008 and Defendant Wellspring Rehabilitation, which they formed on December 4, 2008, and to develop an automobile

---

[2] Defendant Karim Bandy's reference to "the first ten days" refers to the definition of "Personal injury protection coverage" in the No-Fault Law at N.J.S.A. §39:6A-4(a) which mandates that, "no precertification requirement shall apply within 10 days of the insured event." Thus, by performing epidurals and MRI testing within the first ten days of treatment, those procedures would evade the precertification requirements that would otherwise apply.

injury fraud network similar to that of the Prior Bandy Schemes and the Greenberg Schemes, and to engage in the Bandy Schemes, as described herein.

188.   Upon information and belief, among the reasons that Defendants Anhuar Bandy and Karim Bandy provided this information to representatives of Allstate regarding the then active Greenberg Schemes and other schemes was to encourage the Allstate Plaintiffs to investigate and disrupt the operations of those who were participating in automobile injury fraud schemes they knew would be competing with them as they opened clinics and recruited runners in the course of developing, operating and expanding their own automobile injury fraud network in furtherance of the Bandy Schemes.

**Factual Allegations Relating to the Bandy Concealed Ownership Scheme**

189.   Beginning within months after Defendant Anhuar Bandy's parole from state prison on his conviction of racketeering and violation of the runner statute in connection with the Prior Bandy Schemes, Defendants Karim Bandy and Anhuar Bandy began planning to resume their participation in automobile insurance fraud schemes and to plan and execute the Bandy Schemes.

*Allegations Relating to Defendants Chi Acupuncture, LLC; True Healing,
Monica Johnson, D.C. and Louis S. Brown, D.C.*

190.   On August 4, 2008, less than two months after Defendant Anhuar Bandy was paroled, the Defendant Bandys, acting in concert with Defendant Johnson, caused Defendant Chi Acupuncture to be formed.

191.   The Defendant Bandys' purpose in forming Chi Acupuncture in Johnson's

88

name was to earn additional revenue from acupuncture services rendered to patients that were being treated at Right Touch Chiropractic, a chiropractic clinic located at 152 Livingston Avenue, New Brunswick, New Jersey, which Defendant Karim Bandy had set up and had been operating in the name of a "paper owner" chiropractor, which he at all times unlawfully owned and/or controlled.

192.   On November 24, 2008, the Defendant Bandys caused Defendant True Healing to be formed in the name of Defendant Monica Johnson, D.C. to take the place of Right Touch Chiropractic.

193.   Defendant True Healing's initial registered agent was Defendant Johnson, and its office was located at 195 Livingston Avenue, New Brunswick, New Jersey.

194.   This 195 Livingston Avenue, New Brunswick location is the same address where Defendant Precision Management has its registered office and main business address.

195.   Defendant Precision Management's registered agent is Defendant Karim Bandy.

196.   Previously, in 2004, Defendant Monica Johnson admitted that she had acted as a "paper owner" of a Passaic county chiropractic facility on behalf of an unlicensed individual who could not legally own a chiropractic clinic.

197.   On January 27, 2009, two months after Defendant True Healing was formed, an investigator for Allstate visited the office of Defendant True Healing.

89

198.   Defendant True Healing was located in a rundown converted residence with a bare minimum of office furniture and signage announcing its presence as a chiropractic facility.

199.   Defendant Johnson spoke to an Allstate investigator for a brief time, but appeared nervous.

200.   The investigator observed a number of then-current magazines in Defendant True Healing's waiting room.  Those magazines were addressed to Karim Bandy at his residence, 141 Crine Road, Colts Neck, New Jersey.

201.   Three months later, on March 10, 2009, Defendant Louis S. Brown, D.C., replaced Defendant Johnson as Defendant True Healing's managing member and registered agent.

202.   As outlined above, Defendant Brown has a long, documented history of providing chiropractic services at chiropractic facilities that were in fact owned by Defendant Karim Bandy and other individuals without healthcare licenses.

203.   Twelve years earlier, in September 1997, an Allstate investigator visited a chiropractic facility known as Accident Therapy Center, Inc., located at 199 Smith St., Perth Amboy, New Jersey.  At that facility, an investigator for Allstate met with Defendant Brown, who admitted that although he worked at that facility, it was owned by Defendant Karim Bandy and Adrian Jacobs, neither of whom was authorized to own a chiropractic facility.

204.    Later, in April, 1998, Defendant Karim Bandy testified at a deposition that he and Adrian Jacobs owned Accident Therapy Center and that Defendant Brown worked at that facility as a chiropractor.

205.    Defendant True Healing was at all times relevant to this litigation in fact owned and controlled by Defendants Karim Bandy and/or Anhuar Bandy through one or more of the Defendant Bandy Management Companies, and Defendants Johnson and Brown posed as the paper owners of the Defendant True Healing facility in order to give the false and misleading appearance that Defendant True Healing was properly organized and operated in accordance with all applicable laws and regulations.

206.    Defendants Anhuar and Karim Bandy have historically used, and continue to use so-called "management companies" such as Defendant Precision Management, which is located at the same address as Defendant True Healing, and other entities, including KEKK Marketing, First Choice Management, VIP Management Services and the other Defendant Bandy Management Companies, to exercise surreptitious control over, and funnel revenue from, chiropractic facilities that they were not legally authorized to own or control, by charging excessive "management fees" and other fees and charges to those Defendant chiropractors who posed as the "paper owners" of these entities, including at various times relevant to this litigation, Defendants Johnson, Brown, Roth, Formisano, Stark, and John Roe 1-50, and in furtherance of the Bandy Concealed Ownership Scheme, as well as the other Bandy Schemes.

91

*Defendants Wellspring Rehabilitation and Louis Brown, D.C.*

207.   On December 4, 2008, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Brown and John Doe 1-50, caused Defendant Wellspring Rehabilitation to be formed in the name of Defendant Brown and listing him and his home address as the entity's registered agent and address, for the purpose of giving the false and fraudulent appearance that Defendant Wellspring Rehabilitation was owned by a chiropractor.

208.   Defendants Karim Bandy, Anhuar Bandy and/or John Doe 1-50, acting directly or through one or more of the Defendant Bandy Management Companies, made arrangements to lease office space for Defendant Wellspring Rehabilitation at 490 Somerset Street, North Plainfield, New Jersey 07060.

209.   At times relevant to this litigation, Defendants Karim Bandy, Anhuar Bandy and/or John Doe 1-50, acting directly or through one or more of the Defendant Bandy Management Companies, exercised *de facto* ownership and control over Defendant Wellspring Rehabilitation and the revenue it generated, and used that revenue and Defendant Wellspring Rehabilitation in furtherance of the Bandy Schemes.

210.   Upon information and belief, when Defendant Wellspring Rehabilitation, which was purportedly owned by Defendant Brown, stopped operating at 490 Somerset Street, North Plainfield its mail was forwarded to the offices of Defendant Chiropractic Spine at 278 Hobart Avenue, Perth Amboy, New Jersey, which was purportedly owned by Defendant Formisano.

92

211.   At all times that Defendant Wellspring Rehabilitation operated it was in fact owned and controlled by the Defendant Bandys with the assistance of Defendants Brown, John Doe 1-50 and one or more of the Defendant Bandy Management Companies, and operated in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

> *Defendants Brown, New Century Chiropractic Center, LLC and Edward P. Formisano, D.C.*

212.   On October 20, 2009, almost eight months after Defendant Brown purportedly replaced Defendant Johnson as True Healing's owner, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Brown and John Doe 1-50, caused Defendant New Century Chiropractic to be formed.  Defendant Brown, of 1082 Maurice Avenue, Rahway, New Jersey was identified on the corporate records as New Century's managing member.   Defendant Brown was also identified as New Century's registered agent, with offices at 25-27 Dickerson Street, Suite 201, Dover, New Jersey.

213.   About four months later, on February 22, 2010, an investigator for Allstate visited the office of Defendant New Century Chiropractic at 25-27 Dickerson Street, Suite 201, Dover, New Jersey and spoke to Defendant Formisano.

214.   Defendant Formisano told the investigator that he had been working full time at New Century Chiropractic for the past four months, that he did not own the practice and that he was being paid to work there on a *per diem* basis.

215.   Defendant Formisano told the investigator in substance that he had no knowledge about the management of Defendant New Century and "that was the way he

wanted it" and that all he wanted to do was "to leave at the end of the day and go home."

216.   Defendant Formisano also told the investigator that he did not know how Defendant New Century got its patients, *i.e.* whether it was by word of mouth, attorney referrals, *etc.*

217.   Finally, Defendant Formisano admitted that Defendant Brown, who was purportedly New Century Chiropractic's owner, had never come to New Century Chiropractic's offices during the previous four months that Defendant Formisano had been working there.

218.   At the time of this February 22, 2010 visit, the office manager of Defendant New Century Chiropractic was Defendant Anali Rivera.  Although Defendant Formisano claimed not to know how Defendant New Century Chiropractic got its patients, Defendant Anali Rivera had already been working as a runner for the Defendant Bandys and Defendant New Century Chiropractic since the summer of 2009.

219.   Defendant Brown's purported ownership of Defendant New Century Chiropractic was at all times a sham, and at all times relevant to this litigation Defendant New Century Chiropractic was under the *de facto* and unlawful control of Defendants Anhuar Bandy and Karim Bandy.

220.   Defendants Karim Bandy, Anhuar Bandy, Brown, Formisano, New Century Chiropractic, in concert with and with the assistance of each other, the Defendant Bandy Management Companies, and with Defendants John Doe 1-50, John

94

oe 1-50, ABC Corp. 1-50, operated Defendant New Century Chiropractic and used its

evenue in furtherance of the Bandy Schemes.

*Defendants Roth and Good Health Center*

221.   On or about October 11, 2010, Defendants Karim Bandy and/or Anhuar

Bandy, acting in concert with Defendants Roth, John Doe 1-50 and/or John Roe 1-50,

caused Defendant Good Health Center to be formed.  Its main business address was at

701 Newark Avenue, Suite 101, Elizabeth, New Jersey 07208.  Defendant Roth, of 325-

B Crowells Road, Highland Park, New Jersey 08904, was identified on the corporate

documents as its registered agent and authorized representative for the purpose of

giving the false and fraudulent appearance that Defendant Good Health was owned by

a chiropractor.

222.   Upon information and belief, Defendants Karim Bandy, Anhuar Bandy

and/or John Doe 1-50, acting directly or through one or more of the Defendant Bandy

Management Companies, made arrangements to lease office space for Defendant

Good Health Center at 701 Newark Avenue, Suite 101, Elizabeth, New Jersey 07208.

223.   Defendant Roth's purported ownership of Defendant Good Health Center

was at all times a sham, and at all times relevant to this litigation Defendant Good

Health Center was under the *de facto* and unlawful control of Defendants Anhuar

Bandy, Karim Bandy and/or John Roe 1-50.

224.   At all times since its formation, Defendants Karim Bandy, Anhuar Bandy

and/or John Doe 1-50, with the assistance of Defendants Roth, John Doe 1-50 and

acting  directly  or  through  one  or  more  of  the  Defendant  Bandy  Management

95

Companies, exercised *de facto* ownership and control over Defendant G

Center and the revenue it generated, and used Defendant Good Health Center

revenue in furtherance of the Bandy Concealed Ownership Scheme and the

Bandy Schemes.

> *Defendants Formisano, Eclipse Chiropractic, Chiropractic Spine,*
> *Lakewood Chiropractic, Liberty Chiropractic and Pennsauken*
> *Chiropractic*

225.    Beginning in or about April or May of 2010, Defendants Anhuar Bandy,

Karim Bandy, John Doe 1-50 and/or John Roe 1-50, recruited Defendant Formisano,

who had been working as a chiropractor at Defendant New Century Chiropractic, to

serve as the paper owner of the next group of clinics they intended to open in

furtherance of the Bandy Concealed Ownership Scheme and the other Bandy

Schemes.

226.    At the time Defendant Formisano was recruited to participate as a paper

owner in furtherance of the Bandy Concealed Ownership Scheme, he was suffering

financial distress.

227.    On, or about, June 20, 2008, more than a year before Defendant

Formisano was interviewed at New Century Chiropractic, Wells Fargo Bank filed a

Notice of Lis Pendens and a complaint to foreclose on its $247,000.00 mortgage upon

Defendant Formisano's residence at 14 Phyllis Drive, Roxbury, New Jersey under

Morris County, Docket No. F-22410-08.

228.    That Lis Pendens was not discharged until on or about January 6, 2011.

96

229    In spite of Defendant Formisano's admissions that he was merely a *per diem* employee at Defendant New Century Chiropractic; that he had no knowledge or interest in Defendant New Century Chiropractic's management, operations or the source of its patients; and his documented financial problems between 2008 and 2011, beginning in May, 2010, Defendant Formisano purportedly began to form and open a series of chiropractic clinics in diverse locations across New Jersey in rapid fashion, as follows:

a.  On May 2, 2010, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Formisano and John Doe 1-50, caused Defendant Eclipse Chiropractic Center, LLC to be formed.  Its main business address was at 200 E. 2nd Street, Plainfield, New Jersey.  Edward P. Formisano, of 14 Phyllis Drive, Succasunna, New Jersey 07876, was identified on the corporate documents as its managing member and registered agent;

b.  Two days later, on May 4, 2010, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Formisano and John Doe 1-50, caused Defendant Chiropractic Spine Center, LLC to be formed.  Its main business address was at 278 Hobart Street, Perth Amboy, New Jersey.  Defendant Formisano, of 14 Phyllis Drive, Succasunna, was identified on the corporate documents as its managing member and registered agent;

c.  On April 19, 2011, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Formisano and John Doe 1-50 caused Defendant Lakewood Chiropractic Center, LLC to be formed.  Its main business address

was at 1200 River Avenue, Suite 2D, Lakewood, New Jersey. Defendant Formisano, of 14 Phyllis Drive, Succasunna, New Jersey, was identified on the corporate documents as its authorized representative and registered agent;

d. On February 7, 2012, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Formisano and John Doe 1-50, caused Defendant Liberty Chiropractic Center, LLC to be formed. Its main business address was 253 Academy Street, Jersey City, New Jersey. Defendant Formisano, of 14 Phyllis Drive, Succasunna, was identified on the corporate documents as its managing member and registered agent;

e. On September 26, 2012, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Formisano and John Doe 1-50, caused Defendant Pennsauken Chiropractic Center, LLC to be formed. Its main business address was at 5824 Westfield Avenue, Pennsauken, New Jersey. Defendant Formisano, of 14 Phyllis Drive, Succasunna, was identified on the corporate documents as its authorized representative and registered agent.

230. On September 2, 2010, the same investigator for Allstate who had spoken to Defendant Formisano on February 22, 2010, visited the offices of Defendant Eclipse Chiropractic for the purpose of conducting a facility inspection and speaking to the owner of the practice. Defendant Anali G. Rivera, who had been the office manager at Defendant New Century Chiropractic, was present and identified herself as the office manager of Eclipse Chiropractic. Defendant Rivera advised Allstate's investigator that

she had to call her "boss" first for permission to let him perform an inspection.  When Allstate's investigator asked her who her boss was, she stated "Dr. Formisano." According to Defendant Rivera, Defendant Formisano asked that Allstate's investigator return on September 7, 2010, because Defendant Formisano wanted to be present for the inspection.

231.  Defendant Anali Rivera had been instructed by Defendants Karim Bandy, Anhuar Bandy, John Doe 1-50 and/or John Roe 1-50, to identify Defendant Formisano as her "boss," and to refuse to answer any questions by representatives of insurance companies regarding Defendant Eclipse Chiropractic.  When identifying Defendant Formisano as her "boss," Defendant Anali Rivera was acting in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

232.  At all times relevant to this litigation, Defendant Rivera knew that Defendant Formisano was not the genuine owner of Defendant New Century Chiropractic, and she at all times took her instructions from the Defendant Bandys.

233.  When Allstate's investigator returned on September 7, 2010, Defendant Formisano, who during their prior meeting on February 22, 2010 had denied any ownership interest in Defendant New Century or any desire to have such an interest in owning the clinic, now stonewalled Allstate's investigator when he attempted to ask questions about Defendant Eclipse Chiropractic.  Defendant Formisano advised him that he would let him in "to take a look around," but he's "not answering any questions" and no photos would be allowed.

234.  Upon information and belief, Defendant Formisano or Defendant Rivera

99

instructed the other staff members who were present that day not to speak to Allstate's investigator.

235.   Defendant Formisano refused to answer any questions from Allstate's investigator on the instructions of the Defendant Bandys and/or their attorneys, John Roe 1-50 and/or XYZ, P.C. 1-50, and because he knew he would not be able to explain to Allstate's investigator how it was he had been financially able to form and open the offices of Defendants Eclipse Chiropractic and Chiropractic Spine Center since their prior meeting, seven months earlier.

236.   At the time of the inspection by Allstate's investigator, there was no licensee name of any chiropractor or acupuncturist on the exterior building sign, or on the windows or door, which was a violation of N.J.A.C. 13:35-6.1.

237.   Allstate's investigator was also not allowed to speak to the acupuncturist who was present, even though she was purportedly employed by Defendant Golden Lotus Acupuncture, which was purportedly owned by Defendants Roytman and/or Lipshitz.

238.   When Allstate's investigator advised that he would need to speak to the attorney for Defendant Golden Lotus Acupuncture, Defendant Rivera used her cell phone and spoke to an individual she addressed as, "Serge," who upon information and belief was Defendant Lipshitz, and who told her that he would have to get back to her with the attorney's name and number.   When asked if "Serge" was the owner of Defendant Golden Lotus, Defendant Rivera stated that he was, but stated that she did not know his last name.   Defendant Formisano walked back during this exchange and

100

repeated that they were not answering questions.

239.   Defendant Formisano put up none of the money required to form Defendants Chiropractic Spine Center, Eclipse Chiropractic, Lakewood Chiropractic, Liberty Chiropractic and Pennsauken Chiropractic, lease space for their offices, or to commence their operations, and exercised no genuine control over them.   Rather, substantially all of the costs of forming these entities and operating them were borne by Defendants Anhuar Bandy, Karim Bandy and/or John Doe 1-50, either directly or through one or more of the Defendant Bandy Management Companies and/or Defendant ABC Corp. 1-50.

240.   Defendant Formisano's purported ownership of Defendants Chiropractic Spine Center, Eclipse Chiropractic, Lakewood Chiropractic, Liberty Chiropractic and Pennsauken Chiropractic was at all times a sham, and at all times relevant to this litigation these Defendants were under the *de facto* and unlawful control of Defendants Anhuar Bandy and Karim Bandy.

241.   At all times since the formation of Defendants Chiropractic Spine Center, Eclipse Chiropractic, Lakewood Chiropractic, Liberty Chiropractic and Pennsauken Chiropractic, Defendants Karim Bandy, Anhuar Bandy and/or John Doe 1-50, with the assistance of Defendants Roth, Formisano and John Doe 1-50 and acting directly or through one or more of the Defendant Bandy Management Companies, exercised *de facto* ownership and control over these Defendants and the revenue they generated, and used Defendants Chiropractic Spine Center, Eclipse Chiropractic, Lakewood Chiropractic, Liberty Chiropractic and Pennsauken Chiropractic and that revenue in

101

furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

242.   Defendants Karim Bandy, Anhuar Bandy, Brown, Formisano, Rivera, in concert with and with the assistance of each other, the Defendant Bandy Management Companies, and with Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, operated these Defendants and used their revenue in furtherance of the Bandy Schemes.

*Defendants Elmora Wellness, LLC and Richard Stark, Jr., D.C.*

243.   On or about July 22, 2013, Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with Defendants Stark, John Doe 1-50 and/or John Roe 1-50, caused Defendant Elmora Wellness to be formed in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes, and in anticipation of having Defendant Elmora Wellness take over the operations of Defendant Good Health Center at the same 701 Newark Avenue, Suite 101 address in Elizabeth, New Jersey.

244.   This transition occurred during the first week of August of 2013.  The last date of service for an Allstate Claimant billed by Defendant Good Health was August 1, 2013.  The first date of service for an Allstate Claimant billed in the name of Defendant Elmora Wellness followed within days after.

245.   Upon information and belief, this transition was prompted by the arrests by the OIFP on or about June 27, 2013 of Defendants Estefania Frias, Lilian Frias and Anali Rivera on charges of criminal running.

102

246. Upon further information and belief, Defendant Roth became rattled by news of these arrests and quit Defendant Good Health Center. Because the Defendant Bandys needed a chiropractor to pose as the paper owner of this clinic in furtherance of the Bandy Concealed Ownership Scheme, and to be the signatory on checks and the bank account, they needed to form a new entity in the name of a replacement paper owner, and they approached Defendant Stark for that purpose.

247. Although at all times relevant to this litigation he had lived in Camden County, Defendant Stark was available to serve as the paper owner of Defendant Elmora Wellness and to provide chiropractic services at its 701 Newark Avenue, Suite 101, Elizabeth office because in March of 2013 the Defendant Bandys had shut down Defendant Pennsauken Chiropractic, where Stark had previously been working.

248. Defendant Stark's purported ownership of Defendant Elmora Wellness was at all times a sham, and at all times relevant to this litigation Defendant Elmora Wellness was under the *de facto* ownership and unlawful control of Defendants Anhuar Bandy, Karim Bandy, John Doe 1-50 and/or John Roe 1-50.

249. At all times since the formation of Defendant Elmora Wellness, Defendants Karim Bandy, Anhuar Bandy and/or John Doe 1-50, with the assistance of Defendants Roth, John Doe 1-50 and acting directly or through one or more of the Defendant Bandy Management Companies, exercised *de facto* ownership and control over Defendant Elmora Wellness and the revenue it generated, and used Defendant Elmora Wellness and that revenue in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

Allegations Relating to the Bandy Runner Scheme

250.   At all times relevant to this Complaint, the Defendant Bandys, Defendant Riotto, and the Defendant Bandy/Riotto Chiropractic Clinics, acting in concert with the Runner Defendants and the Law Firm Defendants, engaged in the Bandy Runner Scheme, as described herein, pursuant to which they paid cash to the Defendant Runners, who acted as "runners" and who solicited and steered individuals who had been involved in automobile accidents, including certain of the Allstate Claimants, to treat at one of the Defendant Bandy/Riotto Chiropractic Clinics and submitted bills to the Allstate Plaintiffs and other insurers seeking to fraudulently recover PIP benefits for the services they rendered to those patients, and to engage the Law Firm Defendants, who made claims to the Allstate Plaintiffs and other insurers for damages for bodily injuries in furtherance of the Bandy Schemes.

251.   As the term is used in this Complaint, and as it is commonly understood, a "runner" is a person who is paid to solicit or recruit a person who has been involved in an automobile accident and to steer that person to a personal injury attorney and/or healthcare provider for the purpose of making a claim against an insurance company. See also N.J.S.A. § 2C:21-22.1(a)(defining a "runner" as "a person who, for a pecuniary benefit, procures or attempts to procure a client, patient or customer at the direction of, request of or in cooperation with a provider whose purpose is to seek to obtain benefits under a contract of insurance or assert a claim against an insured or an insurance carrier for providing services to the client, patient or customer, or to obtain benefits under or assert a claim against a State or federal health care benefits program or

104

scription drug assistance program"). Additionally, pursuant to N.J.S.A. § 2C:21-2.1(b), "a person is guilty of a crime of the third degree if that person knowingly acts as a runner or uses, solicits, directs, hires or employs another to act as a runner."

252. At all times relevant to this litigation, the Defendant Bandys and Defendants Riotto, the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics, acting in concert with the Law Firm Defendants, including Defendants Walker, Gallegos, Arzadi, Joworisak & Associates, Wishnic, Eugene C. Wishnic, P.C. and the Schenerman Law Firm Defendants, have conspired with individuals, including but not limited to Defendants Cesar Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Anali Rivera; Marta Perez; Bernardo (a/k/a "Benny") Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth"); John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); and John Doe 1-50 (collectively referred to herein as the "Runner Defendants") in furtherance of the Bandy Runner Scheme.

*Mechanics of the Bandy Runner Scheme*

253. It was at all times an element of the Bandy Runner Scheme that the Defendant Bandys, Defendant Riotto and the Runner Defendants, acting at the behest of and for the benefit of each other, would use OPRA requests to obtain copies of police reports in furtherance of the Bandy Runner Scheme with the knowledge that they would be used for the purpose of unlawfully soliciting the Allstate Claimants in violation of Section 4(e) of the Fraud Act to make claims for PIP benefits and damages for alleged

bodily injuries.

254.   The Defendant Bandys, Riotto and the Runner Defendants, in furtherance of the Bandy Runner Scheme, used the information derived from reports to directly or indirectly solicit the individuals who were involved in the accidents, including certain of the Allstate Claimants, in person or by telephone, to refer or otherwise direct or steer them to the Defendant Bandy/Riotto Chiropractic Clinics, and/or certain of the Law Firm Defendants to make claims for PIP benefits and bodily injury damages in violation of Section 4(e) of the IFPA.

255.   For a time during 2010, the Defendant Bandys, Riotto and the Runner Defendants also used information from the police reports to solicit and refer people, including certain of the Allstate Claimants to Defendant Chiropractic Centre of Elizabeth to make claims for PIP benefits and bodily injury damages, and for which they made kickback payments directly or indirectly through one or more of the Montana/Barrese Defendants, all in violation of Section 4(e) of the IFPA.

256.   The effectiveness of the Defendant Bandys and the Runner Defendants in obtaining police reports quickly and aggressively soliciting the individuals listed on those reports was a source of consternation and frustration on the part of even those competing chiropractors and lay owners who were also resorting to the use of runners to unlawfully solicit individuals who had recently been involved in accidents to make PIP and bodily injury claims.

257.   For example, during the OIFP's investigation of Christopher Montana, D.C., C.W. acted as a cooperating witness and recorded his conversations with various

106

individuals, including Scott Greenberg, D.C. and Defendants Montana and Gorodetsky. Through discovery in *Allstate, et al. v. Lajara, et. al.*, Docket No. UNN-L-4091-08 (*also referred to herein as* the "*Lajara Litigation*"), Allstate obtained copies of tapes and/or transcripts of certain of these recorded conversations, as well as of certain of the conversations C.W. had with runners. During a conversation with C.W. on January 25, 2011, Defendant Montana related a story about a prior occasion on which he got police reports at 1:00 p.m. only to find out that Defendant Anhuar Bandy had already obtained copies of the reports, made copies of them and handed them out "to each guy and they're just going out like an army, knocking on doors."

> *Competitors Who Were Being Hurt by the Bandy Schemes*
> *Provide Information to Allstate and/or Its Counsel Either Directly or*
> *Through Anonymous Letters*

258. On or about August 27, 2009, Allstate SIU representative Matthew Telliho (referred to herein as "Telliho") took a recorded statement from a claimant in connection with a separate investigation at the law offices of Garces & Grabler in New Brunswick, New Jersey (referred to herein as the "Garces Law Firm"). Following that statement, Ric Garces (referred to herein as "Garces"), the brother of William Garces, Esq., one of the owners of the law firm, asked to speak to Telliho regarding Defendant Anhuar Bandy. Garces asked Telliho if Allstate was aware that Anhuar Bandy had opened a new clinic in North Plainfield called Wellspring Rehabilitation Center. Telliho responded that he was not aware of this facility.

259. Garces proceeded to tell Telliho that runners for Anhuar Bandy had been approaching some of his clients and offering them money if they would switch from the

Garces Law Firm and the Greenberg chiropractic clinic where they had started treating, and instead retain Defendants Eugene Wishnic, Esquire and Eugene S. Wishnic, P.C (collectively referred to herein as the "Wishnic Law Firm Defendants").

260.   Garces also told Telliho at that time that he "had a file on Bandy" and that some of the clients of the Garces Law Firm said they had been offered $500 to go to Wellspring Rehabilitation or another clinic controlled by the Defendant Bandys and if they would retain the Wishnic Law Firm Defendants.

261.   Upon information and belief the runners described by the clients of the Garces Law Firm were certain of the Runner Defendants.

262.   Garces told Telliho that his clients were also told by these Runner Defendants that they would also be paid $300 for each prospective PIP claimant they found and referred to them.

263.   Garces told Telliho that his brother, William Garces, had contacted the New Jersey Office of Attorney Ethics to complain that the Wishnic Law Firm Defendants were using unlawful means to steal the clients of the Garces Law Firm.

264.   At the time of this conversation, Garces provided Telliho with copies of several business cards that were provided to clients of the Garces Law Firm by the Runner Defendants when they solicited these clients of the Garces Law Firm.  These cards included the following:

    a.   A business card for Defendant Wellspring Rehabilitation with handwriting on the back that stated: "Anali (908) 922-2883". Upon information and belief, this business card was provided by Defendant

Anali Rivera to clients of the Garces Law Firm, while she was acting in concert with and on behalf of the Defendant Bandys, Defendant Wellspring Rehabilitation and the Wishnic Law Firm Defendants in furtherance of the Bandy Schemes and in violation of, *inter alia*, N.J.S.A. 17:33A-4(e).

b. A business card for Defendant Wishnic with handwriting on the back that stated "cesar 732-3474782 DR 195 livingston Av. New Brunswick." Upon information and belief, this business card was provided by Defendant Cesar Huaman to clients of the Garces Law Firm, while he was acting in concert with and on behalf of the Defendant Bandys, one or more of the Defendant Bandy-Controlled Chiropractic Clinics, and the Wishnic Law Firm Defendants in furtherance of the Bandy Schemes and in violation of, *inter alia*, N.J.S.A. 17:33A-4(e).

c. Business cards for Monica Johnson, DC and another business card for the Wishnic Law Firm Defendants with nothing written on the back. Upon information and belief, this business card was provided by Defendant John Doe 1-50 to clients of the Garces Law Firm, while he or she was acting in concert with and on behalf of the Defendant Bandys, Defendants True Healing and Chi Acupuncture, and the Wishnic Law Firm Defendants in furtherance of the Bandy Schemes and in violation of, *inter alia*, N.J.S.A. 17:33A-4(e).

d. A business card for the Wishnic Law Firm Defendants with handwriting

109

on the back of the card that stated, "Tony 732-6645172." Upon
information and belief, this business card was provided by Defendant
John Doe 1-50 (a/k/a "Tony Hernandez") to clients of the Garces Law
Firm, while he was acting in concert with and on behalf of the
Defendant Bandys, one or more of the Defendant Bandy-Controlled
Chiropractic Clinics, and the Wishnic Law Firm Defendants in
furtherance of the Bandy Schemes and in violation of, *inter alia*,
N.J.S.A. 17:33A-4(e).

265.   Upon information and belief, at all times relevant to this litigation, the
Wishnic Law Firm Defendants were fully aware that the Defendant Bandys, the Runner
Defendants and the Defendant Bandy/Riotto Chiropractic Clinics were paying kickbacks
for patients.

*Anonymous Letters*

266.   The aggressive patient solicitation and recruiting tactics being used by the
Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Runner
Defendants and the Defendant Law Firms in furtherance of the Bandy Runner Scheme
and the Bandy Attorney Kickback Scheme also led one or more individuals associated
with competing chiropractic clinics and automobile injury fraud networks to send a
series of anonymous letters by mail or facsimile to the Allstate New Jersey Insurance
Company and/or its retained law firm, Pringle Quinn Anzano, P.C. (referred to herein as
the "Pringle Law Firm"), and presumably to other insurers and law enforcement
agencies, accusing Defendant Anhuar Bandy of using chiropractors as fronts to open

110

chiropractic clinics, and of paying runners to recruit patients, and paying those patients to undergo treatments at Bandy's clinics. These anonymous letters are referenced collectively herein as the "Anonymous Bandy Letters."

267.    Upon information and belief, the author of at least some of the Anonymous Bandy Letters was long-time runner Pedro Gonzalez, who also unlawfully owned and controlled chiropractic clinics located in Plainfield, New Jersey that were competing – apparently unsuccessfully – for patients with the Defendants.  Upon further information and belief, Gonzalez knew to send the letters to Allstate and the Pringle Law Firm, and also at times specifically to Kenneth E. Pringle, Esq., Thomas Mulvihill, Esq. and Steven Berkowitz, Esq., who were all attorneys for the Pringle Law Firm, because Gonzalez, the chiropractic clinics he unlawfully controlled, and the management company he used to control the clinics, were at that time defendants in the *Lajara Litigation*, in which the Pringle Law Firm represented the Allstate Plaintiffs.  The *Lajara Litigation* concluded with a June 29, 2016 verdict in favor of the Allstate Plaintiffs and co-plaintiff the Commissioner of the New Jersey Department of Banking & Insurance after a six-month bench trial before the Honorable James Hely, J.S.C. who found Gonzalez, through his management company, to be the unlawful lay owner of two chiropractic clinics and an acupuncture entity which Gonzalez used in furtherance of his conspiracy with others to violate the IFPA.

268.    In order to divert suspicion from himself, and to give the false and misleading impression that the source of the information in the Anonymous Bandy Letters was another competitor of the Defendant Bandys, Gonzalez resorted to the

111

tactic of using as the return address on the envelope for one of these letters, the address of a clinic owned by chiropractor Scott Greenberg.

269.   Because certain of the allegations in the Anonymous Bandy Letters about which the Plaintiffs have knowledge are corroborated by other evidence, Plaintiffs believe and aver herein that the allegations contained in those letters are also accurate and true.

270.   One of the first Anonymous Bandy Letters that the Pringle Law Firm received was postmarked July 12, 2010 (referred to herein as the "July 12, 2010 Anonymous Bandy Letter"). This letter identified certain of the Runner Defendants who visited people with police reports and offered them money to attend therapy at the Defendant Bandy/Riotto Chiropractic Clinics. The July 12, 2010 Anonymous Bandy Letter also alleged that some of the automobile accidents involving the Defendant Bandy-Controlled Chiropractic Clinics were "phony."

271.   The July 12, 2010 Anonymous Bandy Letter identified as runners in addition to Defendant Anhuar Bandy, Defendants Marta Perez, Jose Fernandez and "Cesar," who upon information and belief is Defendant Cesar Huaman, and stated they were paying "BIG MONEEY4 ACCIDENTS$$$$ 1,500," suggesting that the Runner Defendants were being paid $1,500 per claimant they recruited.

272.   The July 12, 2010 Anonymous Bandy Letter also stated that Defendants Anhuar Bandy, Perez, Fernandez and "Cesar," who upon information and belief was Defendant Cesar Huaman, were "working with" the law firm of Garces and Grabler and with Defendants Walker and Gallegos.

112

273. The July 12, 2010 Anonymous Bandy Letter also included copies of business cards for Defendant Wellspring Rehabilitation Center and Defendants Walker and Gallegos, as well as that of Defendant Marta Perez, who was referred to on the card as "Investigadora de Accidentes," which is Spanish for accident investigator.

274. On or about July 28, 2010, Thomas Mulvihill, Esq. of the Pringle Law Firm received an anonymous letter informing him that Defendant Bandy was back in business in Perth Amboy. The letter is referred to herein as the "July 28, 2010 Anonymous Bandy Letter." According to the letter, Defendant Formisano was "working for [Anhuar Bandy] at 278 Hobart Street Perth Amboy, NJ," an apparent reference to the office of Defendant Chiropractic Spine Center. The letter stated this office is referring patients to Defendant Eugene Wishnic, Esquire. The letter stated that Defendant Anhuar Bandy has other offices in Trenton and Plainfield, and that he drives a Black Range Rover. The Attorney General's office seized a Black Range Rover that was registered to KEKK Marketing from Defendant Anhuar Bandy. See Verified Complaint of State of New Jersey v. Assets Owned or Held Individually or Jointly by Anhuar Bandy, et al., MON-L-000812-14, page 6, paragraph 11, which is referred to herein as the "Bandy State Forfeiture Filing."

275. On or about August 18, 2010, an anonymous letter was sent by facsimile to Thomas Mulvihill, Esq. and Steven Berkowitz, Esq. of the Pringle Law Firm as information that "should help your investigation." This letter is referred to herein as the "August 18, 2010 Anonymous Bandy Letter." This letter referenced Defendants Anhuar Bandy, Chiropractic Spine Center, Formisano, Walker and Gallegos, and helpfully

113

enclosed an article from the "Fraud Digest" detailing the charges in the 2002 Bandy Indictment.

276.   On or about September 21, 2010, Kenneth Pringle, Esq. and Steven Berkowitz, Esq., received an anonymous flyer which was addressed, "TO WHOM IT MAY CONCERN."   This flyer is referred to herein as the "September 21, 2010 Anonymous Bandy Letter."   This letter included images of the business cards for Defendant Wellspring Rehabilitation in North Plainfield and Defendant Eclipse Chiropractic Center in Plainfield, and indicated that these clinics had been opened by Defendant Anhuar Bandy.

277.   The September 21, 2010 Anonymous Bandy Letter indicated that the Runner Defendants were being paid $1,200 per person; and that everyone treating at Defendant Eclipse Chiropractic received money.   The letter also identified Defendant Walker as one of the attorneys working with Defendant Anhuar Bandy, but indicated that Defendant Gallegos was really running his office.   The September 21, 2010 Anonymous Bandy Letter also identified several of the Runner Defendants, including Defendants Anhuar Bandy, Marta Perez, and "Cesar," which upon information and belief referred to Defendant Cesar Huaman, and provided their cell phone numbers.

278.   On or about October 22, 2010, Allstate received a copy of an anonymous letter entitled "FRIENDLY WARNING," that was addressed to Defendant Formisano at Defendant Eclipse Chiropractic.   This letter is referred to herein as the "October 22, 2010 Anonymous Bandy Letter."   This letter stated that its author was aware from "very credible sources" that Defendant Formisano was only a name with a license, who was

114

being used by Defendant Anhuar Bandy. The letter informed Defendant Formisano that the author was considering taking "serious action" against him and Defendant Anhuar Bandy. The author also referenced Runner Defendants, including "marta, nancy, Sergio, karin, Oscar, and many others." Upon information and belief, the reference to "Sergio" in this letter was to Defendant Sergio Moreno.

279. The October 22, 2010 Anonymous Bandy Letter alleged that Defendants Formisano and Anhuar Bandy were paying runners up to $1,000 for patients to treat at the Defendant Bandy/Riotto Chiropractic Clinics, and were submitting claims for fictitious accidents to insurers in order to make PIP claims. The author of this letter indicated that it was giving Defendant Formisano 30 days to close any facility in which Defendant Anhuar Bandy was the actual owner or Defendant Formisano would be reported to the Chiropractic Board and the Attorney General, among others. The October 22, 2010 Anonymous Letter included images of business cards for Defendants Eclipse Chiropractic Center, Wellspring Rehabilitation and Marta Perez.

280. The Anonymous Bandy Letters were not sent solely to Allstate and the Pringle Law Firm. Copies were also sent to others who were known or thought to be involved with paying runners, in an effort to dissuade runners from doing business with the Defendant Bandys, the Runner Defendants and the Defendant Bandy/Riotto Chiropractic Clinics.

*Complaints to Insurers and Law Enforcement About the Conduct of the Bandy Runners and Defendant Law Firms from Competing Chiropractors and Law Firms*

281. Complaints to Allstate, other insurers and their law firms about the actions

115

of the Defendant Bandys, Riotto and the Bandy Runner Defendants were not limited to anonymous authors.  Allstate and other insurers, and presumably the OIFP and the Bureau of Fraud Deterrence, also received complaints from a number of chiropractors and law firms whose practices were being adversely affected by the aggressive efforts of the Bandy Runners in stealing their patients and clients.

282.   According to the complaints, these efforts included offering money to the clients/patients to induce them to switch to the Defendant Bandy/Riotto Chiropractic Clinics and the Law Firm Defendants.

283.   For example, one Lakewood chiropractor wrote to Allstate to complain about Defendant Lakewood Chiropractic, which had opened nearby in the prior 12 months, and who he alleged were paying patients to treat there.  "Not only are they paying patients to come and sign up with an attorney, but they are paying patients to attend visits on a weekly basis creating a noncompetitive environment and conducting chiropractic treatment under the umbrella of insurance fraud."

284.   He specifically cited a minor patient of his, who was an Allstate Claimant, who in exchange for payments of cash from a Bandy runner and without his parents' knowledge or consent began treating with Defendant Lakewood Chiropractic and signed up with Defendant Gallegos to be represented by Defendant Walker.

285.   According to this same chiropractor, certain of the Runner Defendants, including Defendant John Doe 1-50 (a/k/a "Gabriel") and Defendant Frias, regularly relied upon accident reports obtained from local police departments, which they would typically obtain on Thursdays, and use them to solicit automobile accident claimants at

116

their homes over the following weekends, offering them between $400 and $800 to undergo treatment at Defendant Lakewood Chiropractic Center, or offering an initial payment of $250 with $50 weekly payments on Friday as an inducement to continue treating.

286.    Defendant Frias and the other Bandy Runner Defendants used similar tactics throughout the areas where the Defendant Bandy/Riotto Chiropractic Clinics were located to unlawfully solicit individuals who had been involved in automobile accidents and refer them to one of the Defendant Bandy/Riotto Chiropractic Clinics and the Law Firm Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

287.    As discussed above, in the context of allegations relating to the Wishnic Law Firm Defendants, Allstate received similar complaints about the actions of the Bandy Runner Defendants from a representative of the Garces & Grabler law firm.

*Information About the Actions of Defendant Anhuar Bandy and the Runner Defendants Obtained from Undercover OIFP Investigations*

288.    While acting as a Confidential Witness for the OIFP in their investigation of the automobile injury fraud networks involving Greenberg, Montana and Barrese, C.W. secretly recorded numerous conversations in which there were discussions of Anhuar Bandy, the amounts he paid his runners for patients, and the aggressive means used by his runners to not only solicit and recruit individuals who had been recently involved in accidents, but also their willingness to steal those patients from other chiropractors and law firms.

289.    Through discovery in the *Lajara Litigation*, the Allstate Plaintiffs obtained

117

copies of many of those tapes and/or transcripts thereof   These tapes and/or transcripts are collectively referred to herein as the "C.W. OIFP Tapes."

290.   Over the course of four different taped conversations, and during a period that he was not working as a runner for Defendant Anhuar Bandy, Jimmy Tovar ("JT") discussed with C.W. how Bandy was harassing him, how he and Defendant Anhuar Bandy competed for claimants, and how he stole claimants from Bandy.

291.   On July 14, 2010 C.W. taped a similar discussion in which Greenberg described how Defendant Anhuar Bandy was back in business and was using runners, including Jimmy a/k/a "Fatboy" Tovar:

SG     Because there's always stuff

C.W.   Of course, yeah.

SG     that falls through, you know? Did you, and so Jim, what was Jimmy doing? What was the FatBoy doing?

C.W.   He came here yesterday. I haven't seen him for a month. And, uh,

SG     And he hasn't sent anything.

C.W.   He hasn't sent anything.

SG     Right, right.

C.W.   So, and, and you know he blows smoke. He said he was going to do this Atlantic City thing with Brian Siegal. I said,

118

that sounds great. And he says he wants me to join and, you know, I, I don't say any, I don't say yes or no. Then he comes in here yesterday and he was texting me for about five days. And I kind of ignored him and cut out the bullshit. I'm coming to your office. He shows up and I said I don't have anything for you. I want to talk to you in private. He comes in here and says, uh, I got, um, I'm now working with Anhuar Bandy, that's, that's his flavor of the week.

SG    I'm sure he is.

C.W.   And uh, Anhuar's open

SG    They've been trying to get him for awhile.

C.W.   Yeah, so I hear. And, uh, he's filling up Anhuar's offices, uh, then asks me to be the exclusive lawyer for Bandy's offices. Just, just what I need. And, uh, and I have to pay him five hundred dollars a case. Uh, within like four days after he brings them in. So, and I kind of politely

SG    Listen, I

C.W.   said, mmm, I don't want Bandy cases.

292.    During the same conversation about Defendant Anhuar Bandy and his runners, C.W. and Greenberg discussed how aggressive Defendant Anhuar Bandy's runners are:

SG    I told you those guys are very, very aggressive.

119

C.W.   Yeah.

SG     I mean, very aggressive. And, our guys are aggressive but these guys are giving out cards, you know? Like, you saw, I show you the Cesar card? You saw the Cesar card, right?

C.W.   No, I don't think I did.

SG     There's a guy running around in Plainfield with a Cesar card. That says Cesar and it says a, you know? It's a card. I mean, who's stupid enough to give out a, a card?

C.W.   I know, right.

SG     You know what I mean? And they're doing the same thing down in Plainfield.   Another guy, I mean, in Trenton. With another guy. You know?

293.    The Bandy runners C.W. and Greenberg were referring to were the Defendant Bandy Runners, and the individual named "Cesar" that Greenberg and C.W. discussed was Defendant Cesar Huaman, who at various times relevant to this litigation acted as a supervisory runner in furtherance of the Bandy Runner Scheme.

*The Defendant Bandy Runners' Use of Business Cards*

294.   While Greenberg viewed the use of business cards by the Defendant Bandys and the Bandy Runners as "stupid," they are an example of the overall effort the Bandy Defendants put into centrally managing and systematizing the Bandy Runner Scheme, and the other Bandy Schemes.

295.   The Defendant Bandys, with the assistance of Defendants John Doe 1-50,

120

designed and/or created business cards for the Runner Defendants to use while soliciting automobile accident victims, in order to give the false and misleading impression to insurers, including the Allstate Plaintiffs, and to regulatory and law enforcement agencies, that the Runner Defendants were engaged in legitimate activities.

296. These cards demonstrate that the Bandy Runner Scheme was a centralized conspiracy.   All of these business cards used the same font, as well as the same medical and legal symbols.  The cards were printed in both English and Spanish for those of the Runner Defendants who were bi-lingual. The English version of the business cards identified the runner as an "Accident Investigator," while the Spanish version of the cards provided to at least the Runner Defendants who speak Spanish, identified them as an "Ivestigador de Accidente."

297.   Those Defendant Runners who were bi-lingual were given and instructed to carry both sets of cards and used the card appropriate to the solicited claimant's apparent nationality as reflected on each police report.   Upon further information and belief, the Runner Defendants who carried such cards included Runner Defendants Cesar Huaman, Estefania Frias, Lacotera, Hughes, Marta Perez, Bernardo (a/k/a "Benny") Neiman, John Doe 1-50 (a/k/a "Jaxson Washington"), and John Doe 1-50.

*The Role of the Runner Defendants in Steering Accident Victims to the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Montana/Barrese Defendants and to the Law Firm Defendants*

298.   In consideration for each individual the Runner Defendants directed to one of the Defendant Bandy/Riotto Chiropractic Clinics, the Runner Defendants were paid

directly by the Defendant Bandys, and/or Riotto, or indirectly by them through Defendants Estefania Frias and John Doe 1-50 with funds provided to them by the Bandy Defendants, Defendant Riotto, the Acupuncture Defendants, the Law Firm Defendants and/or the Referee Provider Defendants.

299.   The Runner Defendants were paid at least between $500 and $1,000 per patient, usually in cash, although as set forth in certifications filed in connection with the Bandy State Forfeiture Filing, they were sometimes paid by check.   Upon further information and belief, on occasion some of the Runner Defendants were paid as much as $1,500 or more for claimants they successfully solicited to undergo treatment at one of the Defendant Bandy/Riotto Chiropractic Clinics and to retain one of the Law Firm Defendants to make a bodily injury claim.

300.   According to the Bandy State Forfeiture Filing, the civil and criminal investigation of the New Jersey Attorney General's Office revealed that the Defendant Bandys and Frias, who were identified as the "targets" of its investigation, "engaged in a pattern and practice of depositing proceeds from the illegal scheme -- insurance company payments -- into" bank accounts owned and/or controlled by the Bandy Defendants or Defendant Frias.  Id. at page 6, paragraph 10.  Thereafter, "[a] portion of these proceeds were then distributed to runners as cash payments".  Id.

301.   The Runner Defendants include all of the "runners" referred to in the Bandy State Forfeiture Filing.

302.   The Runner Defendants not only unlawfully directed individuals, including certain of the Allstate Claimants, to the Defendant Bandy/Riotto Chiropractic Clinics, but

122

also frequently accompanied them to the clinics, or met them there. It was common for patients to see the Defendant Runner who initially solicited them at the office of the Defendant Bandy/Riotto Chiropractic Clinic where they were treating, meeting with other patients who they had recruited in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme. It was also common for the Defendant Runners to encourage or otherwise refer the Allstate Claimant to retain one of the Law Firm Defendants in order to pursue a claim for bodily injuries.

303. There were two reasons the Runner Defendants often either accompanied the claimants they successfully solicited to the Defendant Bandy/Riotto Chiropractic Clinics or met them there. First, the Runner Defendants wanted to make sure that the individual attended the initial treatment visit, particularly with respect to those claimants to whom they had offered money to begin treating. Second, the Runner Defendants wanted to ensure that he or she received credit for recruiting these claimants, so they would receive payment for soliciting and recruiting the individual.

*Allegations Regarding the Specific Actions of Runner Defendants in Soliciting Allstate Claimants in Violation of Section 4(e) of the IFPA*

304. With very few exceptions, if any, every patient, including every Allstate Claimant, who underwent treatment at one of the Defendant Bandy/Riotto Chiropractic Clinics was referred there in exchange for a kickback that was given pursuant to the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme. Set forth below, and in the section following, are some specific examples of incidents in which the Defendant Runners solicited Allstate Claimants and steered them to the Defendant Bandy/Riotto Chiropractic Clinics.

*Allstate Claimant M.E. 220540165-01 Was Referred to Defendants Riotto Family Chiropractic and Arzadi by Defendant Runner Hughes*

305.   Allstate Claimant M.E. 220540165-01 testified during an Examination Under Oath on May 11, 2012 that she first met Defendant Albert Hughes about a week after her September 29, 2011 automobile accident (referred to herein as the "September 29, 2011 Accident") when he approached her on her front porch.

306.   Defendant Hughes recommended that Claimant M.E. 220540165-01 treat at Defendant Riotto Family Chiropractic and told her where it was located.

307.   Defendant Hughes later met Claimant M.E. 220540165-01 outside of Defendant Riotto Family Chiropractic, and showed her where to go in the office.

308.   Defendant Hughes also told Claimant M.E. 220540165-01 about Defendant Arzadi while she was at the office of Defendant Riotto Family Chiropractic, and recommended that she retain him.

309.   Claimant M.E. 220540165-01 testified that she saw Defendant Hughes at Defendant Riotto Family Chiropractic on other occasions when he was there meeting with other people.

310.   Upon information and belief, the other people Defendant Hughes was meeting with at the time M.E. saw him on those occasions were also patients he unlawfully solicited following automobile accidents in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

311.   Claimant M.E. 220540165-01 believed that Defendant Hughes recommended Defendant Riotto Family Chiropractic because he was working with the

124

chiropractor there

*Allstate Claimant F.S. 220540165-10 Was Referred to
Defendant Riotto Family Chiropractic and the Arzadi Law
Firm Defendants by Defendant Runner Hughes*

312.   Allstate Claimant F.S. 220540165-10 was a passenger in a car operated

by Claimant M.E. 220540165-01 at the time of the September 29, 2011 Accident.

313.   Claimant F.S. 220540165-10 testified during an Examination Under Oath

on May 11, 2012 that Defendant Hughes initially came to his house and then

approached him and Claimant M.E. 220540165-01 at M.E.'s house.  Defendant Hughes

provided a card with his name on it.

314.   Defendant Hughes told them to go to the chiropractor, and met them on

their first day at the chiropractor's office, showing them where to go.  The chiropractic

office Defendant Hughes referred Claimant F.S. 220540165-10 to was Defendant Riotto

Family Chiropractic.

315.   Defendant   Hughes   also   referred   Claimant   F.S.   220540165-10   to

Defendant Arzadi's law office in furtherance of the Bandy Attorney Kickback Scheme.

*Allstate Claimant M.D. 218718401-01 Was Referred to
Defendant Riotto Family Chiropractic and Walker/Gallegos
by Defendant Runner Frias*

316.   Allstate   Claimant   M.D.   218718401-01   was   involved   in   an   automobile

accident that occurred on September 14, 2011.   During an Examination Under Oath

that was taken on May 17, 2012, Claimant M.D. 218718401-01 testified that a girl

named "Stephanie," who upon information and belief was Defendant Estefania Frias,

came to her house within two weeks, gave her a copy of the police report and a letter

from an attorney.

317.   Claimant M.D. 218718401-01 testified that the attorney letter she was given was not from the same attorney who was representing her at the EUO, who was Defendant Brad Schenerman, Esquire.

318.   Defendant Frias gave Claimant M.D. 218718401-01 a letter from Defendant Walker that was provided to her by Defendant Gallegos, as Claimant M.D. 218718401-01's name was included on a ledger the Allstate Plaintiffs obtained in the *Lajara Litigation* that was maintained by Defendant Gallegos and listed every client who was referred to an attorney she worked with, including Defendant Walker, as well as the source of each such referral.  This ledger is referred to herein as the "Gallegos/Walker Ledger".   According to the Gallegos/Walker Ledger, Claimant M.D. 218718401-01 retained Defendant Walker within approximately a month after the accident, and the Gallegos/Walker Ledger noted that Defendant Anhuar Bandy was the referral source.

319.   Defendants Gallegos and Walker paid a kickback for this referral to the Defendant Bandys, either directly or through one of the Defendant Bandy Management Companies, in furtherance of the Bandy Attorney Kickback Scheme and the other Bandy Schemes.

320.   Claimant M.D. 218718401-01 testified that when "Stephanie" first came to her house, she referred M.D. for chiropractic treatment at Defendant Riotto Family Chiropractic, and met her there for M.D.'s first visit.

*Allstate Claimant S.P. 227506557-01 Was Referred to Defendant Riotto Family Chiropractic by Defendant Hughes and to Defendant Schenerman by Runner Defendant John Doe 1-50 or Riotto Clinic Staff Defendant John Doe 1-50.*

321.    Allstate Claimant S.P. 227506557-01 was involved in an automobile accident that occurred on November 30, 2011. During an Examination Under Oath that was taken on December 12, 2012, Claimant S.P. 227506557-01 testified that Defendant Hughes came to her apartment, gave her a copy of the police report and directed her to Defendant Riotto Family Chiropractic.

322.    Claimant S.P. 227506557-01 further testified that on the next day, Defendant Hughes accompanied her to her first visit at Defendant Riotto Family Chiropractic. Claimant S.P. 227506557-01 never met with Defendant Hughes again, but on other occasions saw him meeting with, and bringing in, new people to Defendant Riotto Family Chiropractic.

323.    The other people Defendant Hughes was meeting with, and bringing in to the offices of Riotto Family Chiropractic, at the time S.P. saw him on those occasions were also patients he unlawfully solicited following automobile accidents in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

324.    Someone from Defendant Riotto Family Chiropractic referred Claimant S.P. 227506557-01 to Defendant Brad Schenerman. Upon information and belief, this person was Runner Defendant John Doe 1-50 or Riotto Clinic Staff Defendant John Doe 1-50.

127

*Allstate Claimant S.P. 243587003-01 Was Referred to
Defendant Riotto Family Chiropractic by Defendant John
Doe 1-50 (a/k/a Rakeisha), Who Was Acting In Concert with
Defendant Hughes*

325.   Allstate Claimant S.P. 243587003-01 (who is a different person than Claimant S.P. 227506557-01), was involved in an automobile accident on April 12, 2012.   Claimant S.P. 243587003-01 provided the Allstate Plaintiffs with a recorded statement on June 19, 2012 in which she stated that she was approached by a "private investigator" named, "Rakeisha," who came to her house within one to two weeks after the accident.   Rakeisha had a copy of the police report of the accident that Claimant S.P. 243587003-01 was involved in, and referred her to Defendant Riotto Family Chiropractic.

326.   Claimant S.P. 243587003-01 believed Rakeisha worked for the chiropractor.   Rakeisha told Claimant S.P. 243587003-01 she would be meeting Defendant Hughes at the chiropractor's office.

327.   When Claimant S.P. 243587003-01 went for her first visit to Defendant Riotto Family Chiropractic, she met Defendant Hughes, who reviewed the police report and her insurance information, and set her up with treatment.   Claimant S.P. 243587003-01 met Defendant Hughes on four occasions, and he gave her his telephone number.

*Allstate Claimant S.H. 274716983-01 Was Referred to
Defendant Riotto Family Chiropractic by Defendant John
Doe 1-50 (a/k/a Jaxson Washington)*

328.   Allstate Claimant S.H. 274716983-01 was involved in an automobile accident that occurred on January 24, 2013.

329.   During an Examination Under Oath that was taken on September 26, 2013, and at which time he was represented by Carmine Caruso, Esquire, Claimant S.H. 274716983-01 testified that after the accident, a man named "Jaxson Washington" came to his door with the police report.

330.   Upon information and belief "Jaxson Washington" was an alias used by Defendant John Doe 1-50 (a/k/a "Jaxson Washington") because the conduct being engaged in by Defendant John Doe 1-50 (a/k/a "Jaxson Washington") was a felony.

331.   Defendant John Doe 1-50 (a/k/a "Jaxson Washington") gave Claimant S.H. 274716983-01 his business card, which included a medical symbol on the left, a legal symbol on the right, and stated "Jaxson Washington" "Accident Investigator" "I'm here to help you" and provided a cell phone number.

332.   Defendant John Doe 1-50 (a/k/a "Jaxson Washington") gave Claimant S.H. 274716983-01 the address for Defendant Riotto Family Chiropractic and told S.H. to meet him there.  When S.H. met him there, Defendant John Doe 1-50 (a/k/a "Jaxson Washington") signed him up as a patient.

333.   Claimant S.H. 274716983-01 saw John Doe 1-50 (a/k/a "Jaxson Washington") at Defendant Riotto Family Chiropractic a few other times.

334.   Defendant John Doe 1-50 (a/k/a "Jaxson Washington") and/or John Doe 1-50 referred S.H. to Carmine Caruso, Esquire.

*Allstate Claimant S.M. 260311527-03 Was Referred to Defendant Good Health Center by Defendant John Doe 1-50*

335.   Allstate Claimant S.M. 260311527-03 was involved in an automobile accident on September 22, 2012.

129

336.   Claimant S.M. 260311527-03 testified in an Examination Under Oath taken on January 31, 2014 that a few days after the accident, a female "representative" came to her home, gave her a business card and a copy of the police report of her accident.   Upon information and belief, this "representative" was Defendant Runner John Doe 1-50.

337.   Defendant Runner John Doe 1-50 told Claimant S.M. 260311527-03 that the accident was the other driver's fault and recommended that S.M. go to Defendant Good Health Center so she could open up a case.

338.   Defendant Runner John Doe 1-50 drove Claimant S.M. 260311527-03 to Defendant Good Health Center in the representative's car, which S.M. believed was similar to a Lincoln Navigator and was whitish or cream in color.

339.   Claimant S.M. 260311527-03 saw Defendant John Doe 1-50 on two other occasions at Defendant Good Health, one time when she was introducing other people to become new patients.

340.   When asked if Defendant John Doe 1-50 recommended an attorney to handle her case, Claimant S.M. 260311527-03 replied, "it belongs to them".   When asked to explain what that meant, S.M. replied, "I don't know, I guess, a lot of lawyers work for them.   She said that the lawyer will be there to talk to you about the case.   And she also gave me a card, but it is within that little card packet."   S.M. was referring to her business card holder, which she stated that she had lost.

341.   Defendant John Doe 1-50 told Claimant S.M. 260311527-03 that the attorney would meet S.M. at the doctor's office.   At the doctor's office, S.M. met with the

130

lawyer's secretary, a representative of the lawyer she was assigned to by the Bandy Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

342. S.M. was referred to Defendant Schenerman and the Schenerman Law Firm Defendants by the Bandy Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

> *Allstate Claimant K.R. 265619163-01 Was Referred to Defendant Good Health Center by Defendant John Doe 1-50 (a/k/a "Yolanda")*

343. Allstate Claimant K.R. 265619163-01 was involved in an automobile accident that occurred on October 14, 2012.

344. Claimant K.R. 265619163-01 provided an Examination Under Oath on May 8, 2013, at which she was represented by the law firm of Santoro and Santoro. Claimant K.R. testified that after the accident a friend called her and told her about "Yolanda." Claimant K.R. spoke with "Yolanda" by telephone, who directed her to Defendant Good Health Center.

345. "Yolanda" is Runner Defendant John Doe 1-50 (a/k/a "Yolanda").

346. Claimant K.R. 265619163-01 also testified that an individual at Defendant Good Health recommended lawyers, including the law firm she selected. Upon information and belief, this individual was Runner Defendant John Doe 1-50. The lawyer and law firm to whom this individual referred K.R. is unknown to Plaintiffs at this time, but upon information and belief is one of the Law Firm Defendants named herein or Defendants John Roe 1-50 and XYZ, P.C. 1-50.

131

*Allstate Claimant L.H. 248370918-01 Was Referred to Defendant Good Health Center by Defendant John Doe 1-50 (a/k/a "Elizabeth")*

347.   Allstate Claimant L.H. 248370918-01 was involved in an automobile accident that occurred on June 5, 2012.

348.   During an Examination Under Oath that occurred on February 5, 2013, Claimant L.H. testified that a person she never met named "Elizabeth" came to her house and referred her to Defendant Good Health.

349.   "Elizabeth" is Runner Defendant John Doe 1-50 (a/k/a "Elizabeth").

350.   Claimant L.H. testified that Runner Defendant John Doe 1-50 (a/k/a "Elizabeth") also accompanied her to her first visit at Defendant Good Health Center.

*Allstate Claimant A.C. 228340881-04 Was Referred to Defendant Lakewood Chiropractic by Runner Defendant John Doe 1-50 (a/k/a "Gabriel")*

351.   Allstate Claimant A.C. 228340881-04, a 17-year-old minor, was involved in an automobile accident on November 6, 2011.

352.   Following this accident, Claimant A.C. 228340881-04 began treating with a chiropractor in Lakewood who is not otherwise related to this litigation.  One day after he began his treatment with that chiropractor, Claimant A.C. was solicited at his home by a runner who identified himself as "Gabriel," and who offered to pay him $400 if he retained the lawyer that Gabriel represented and switched his treatment to Defendant Lakewood Chiropractic Center.

353.   "Gabriel" is Defendant John Doe 1-50 (a/k/a "Gabriel").  The next day, Gabriel took A.C. to Defendant Lakewood Chiropractic Center.  The chiropractor at

132

Defendant Lakewood Chiropractic Center began treating A.C., a minor, without first obtaining parental consent.

354.   A.C. was either taken to Defendant David Walker's office or, more likely, signed up by Defendant Gallegos or John Doe 1-50 at the office of Defendant Lakewood Chiropractic. Neither Walker, Gallegos nor John Doe 1-50, obtained parental consent before undertaking representation of A.C.

355.   The Gallegos/Walker Ledger lists the name of Claimant A.C. 228340881-04 as having been referred by Defendant Anhuar Bandy.

356.   Defendants Gallegos and Walker paid a kickback to the Defendant Bandys for this referral, either directly or through one of the Defendant Bandy Management Companies, in furtherance of the Bandy Attorney Kickback Scheme and the Bandy Runner Scheme.

357.   After A.C.'s mother learned that he was treating at Defendant Lakewood Chiropractic Center and had been given money to do so, she returned him to the chiropractor he had originally undergone treatment with to continue his treatment there.

*Allstate Claimant M.R.162602411-18 Was Referred to*
*Defendant True Healing and Wellness and to Defendants*
*Walker and Gallegos by Runner Defendant John Doe 1-50*

358.   Allstate Claimant M.R. 162602411-18 was involved in an automobile accident on February 8, 2010.

359.   Allstate Claimant M.R. 162602411-18 testified during an Examination Under Oath on July 26, 2010 that a friend referred him to the chiropractor. Claimant M.R.'s friend knew a gentleman who picked up Claimant M.R. 162602411-18, brought

133

him to Defendant Walker's law office, and then on the same day brought Claimant M.R. to Defendant True Healing and Wellness.   Claimant M.R. could not identify the gentleman.

360.   The individual who picked up Claimant M.R. 162602411-18 and took him to Defendant Walker's office and to Defendant True Healing and Wellness was Runner Defendant John Doe 1-50 and was acting in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

361.   Defendant John Doe 1-50 was paid for this referral by one of the Defendant Bandys or by John Doe 1-50, who was acting on their behalf in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

362.   The Gallegos/Walker Ledger lists the name of Claimant M.R. 162602411-18 as having been referred by Defendant Anhuar Bandy.

363.   Defendants Gallegos and Walker paid a kickback for this referral to the Defendant Bandys, either directly or through one of the Defendant Bandy Management Companies, in furtherance of the Bandy Attorney Kickback Scheme.

> *Allstate Claimant V.C. 233362870-01 Was Referred to Defendant True Healing and Wellness and to Defendants Walker and Gallegos by Runner Defendant John Doe 1-50 (a/k/a "Corea")*

364.   Allstate Claimant V.C. 233362870-01 was involved in an automobile accident on January 9, 2012.

365.   Claimant V.C. 233362870-01 testified during an Examination Under Oath on February 11, 2013 that a friend named "Corea" referred him to Defendant True Healing and Wellness and accompanied him on his first visit there.

134

366.   "Corea" is Runner Defendant John Doe 1-50 (a/k/a "Corea"), who took Claimant V.C. 233362870-01 to Defendant True Healing and Wellness in furtherance of the Bandy Runner Scheme.

367.   Defendant John Doe 1-50 (a/k/a "Corea") was paid for this referral by one of the Defendant Bandys or by John Doe 1-50, who was acting on their behalf in furtherance of the Bandy Runner Scheme.

> *Allstate Claimant J.B. 262743792-01 Was Referred to Defendant Pennsauken Chiropractic Center by Runner Defendant John Doe 1-50 (a/k/a "Tano")*

368.   Allstate Claimant J.B. 262743792-01 was involved in an automobile accident on October 16, 2012.

369.   Claimant J.B. 262743792-01 testified during an Examination Under Oath taken on August 2, 2013 that "Tano" came to his house the day after the accident. At that time, "Tano," who worked as a driver for Defendant Pennsauken Chiropractic, gave Claimant J.B. a business card and told him to go there for treatment.

370.   "Tano" is Runner Defendant John Doe 1-50 (a/k/a "Tano") who took Claimant J.B. 262743792-01 to Defendant Pennsauken Chiropractic in furtherance of the Bandy Runner Scheme.

371.   Defendant John Doe 1-50 (a/k/a "Tano") was paid for this referral by one of the Defendant Bandys or by John Doe 1-50, who was acting on their behalf in furtherance of the Bandy Runner Scheme.

135

*Allegations Regarding the Role of the Montana/Barrese Defendants in the Bandy Runner Scheme*

372    As part of his deal with Defendants Montana and Barrese, Defendant Anhuar Bandy retained the right to refer the individuals his runners solicited in the Elizabeth area to lawyers of his own choosing in exchange for kickbacks in the same way as described herein in connection with the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

373.    For example, in the course of Allstate's post loss investigation of an automobile accident that allegedly occurred on June 25, 2010, an Allstate SIU representative obtained a recorded statement from Allstate Claimant Z.M. 171630312-01 (also referred to herein as "Claimant Z.M.") who owned the vehicle and had been driving it when the accident occurred.  There were four passengers in the vehicle at the time of the accident.  Claimant Z.M. told the Allstate SIU Representative that after the accident an individual identified as "Benny" came to Claimant Z.M.'s residence and offered her $250.00 to treat with a chiropractor on Morris Avenue in Elizabeth. According to Claimant Z.M., "Benny" told Z.M. that after Z.M. treated with the chiropractor on Morris Avenue in Elizabeth fifteen times, Z.M. would receive an additional $250.00.

374.    "Benny" was Defendant Bernardo Neiman.

375.    Defendant Neiman also referred Claimant Z.M. to his "partner, Anhuar," who was Defendant Anhuar Bandy.  When Bandy met with Claimant Z.M., he offered to have her car repaired at no cost because she had no collision coverage.  Anhuar also

136

gave Claimant Z.M. his cell phone number, which was 732-877-6351. Claimant Z.M. said that Anhuar directed her to go to Defendant David Walker's office.

376. The phone number Defendant Bandy provided to Claimant Z.M. is the same phone number that was ascribed to Anhuar Bandy in the Anonymous Bandy Letters.

377. When Claimant Z.M. went to Defendant Walker's office, she met with Defendant Gallegos. Defendant Gallegos declined to take her case because Claimant Z.M.'s driver's license was listed as suspended on the records of the New Jersey Motor Vehicle Commission as of the date of the accident.

378. The Gallegos/Walker Ledger does not list the name of Claimant Z.M. It does, however, list the names of the four passengers in Claimant Z.M.'s vehicle at the time of the accident, and reflects that all four were referred to Defendants Walker and Gallegos by Defendant Anhuar Bandy.

379. Allstate's records reflect that Claimant Z.M. treated briefly at Defendant Chiropractic Centre of Elizabeth, and that the four passengers in Claimant Z.M.'s vehicle treated at Defendant Chiropractic Centre of Elizabeth for a longer period of time.

380. In addition to being corroborated by the entries in the Gallegos/Walker Ledger, Claimant's Z.M.'s account of Defendant Anhuar Bandy's role as a runner and the offer that Defendant Bernardo "Benny" Neiman made to pay her to treat at Defendant Chiropractic Centre of Elizabeth was also corroborated by statements that Montana made during a January 25, 2011 recorded conversation that he had with OIFP

Confidential Witness C.W., during which Montana acknowledged that Defendant Anhuar

Bandy worked for him for a time:

MONTANA:   I don't even want to mention names, but there was a guy that

passed through, he was a short stint for a lot of patients, and then

he moved on.


C.W.:   Uh-huh.


MONTANA:   The guy Anhuar, I had never met him in my life. I met him through

an MRI guy.   He came in, he kinda – but then his stuff started

getting weird.


C.W.:   Uh, he's –


MONTANA:   It got weird.


C.W.:   Yeah. Yeah.


MONTANA:   Patients are asking my doctors when are they getting their stuff,

like, whoa. Slow down with that, that gets me nervous.

381  Defendant Montana was referring to requests by those patients of his, like Claimant Z.M. and her passengers, who had been recruited by Defendant Anhuar Bandy and/or his runners, including Defendants Neiman and Moreno, to treat at Defendant Chiropractic Centre of Elizabeth, and who had been offered money to begin treating at that clinic.

382.  Upon information and belief, by "stuff," Defendant Montana was using a euphemism or code word to refer to the promise Defendant Bandy and his runners, including Defendant Neiman, had made to make an additional payment to the claimants if they treated at least 15 times at Defendant Chiropractic Centre of Elizabeth.

383.  Defendants Anhuar Bandy, Neiman and Moreno offered Claimant Z.M. and other prospective patients they solicited on behalf of the Montana/Barrese Defendants in furtherance of the Bandy Runner Scheme a second payment for treating 15 times because, upon information and belief, Defendants Montana and Barrese and/or the Bandy Law Firm Defendants who paid kickbacks for these patients, would insist upon receiving a "credit" from Defendant Anhuar Bandy in the case of any patient for which they paid a kickback and who treated less than 15 times at one of the Defendant Montana/Barrese Chiropractic Clinics.

384.  During a proffer session on April 4, 2012, Defendant Montana told representatives of the OIFP that in all Bandy and his two runners had brought to Defendant Chiropractic Centre of Elizabeth "like 70 something patients I paid him for. . .

139

385.   Upon information and belief, the two Bandy Runners that Defendant Montana described to the representatives of the OIFP during the proffer sessions were Defendants Neiman and Moreno.

*Allegations Regarding the Sources of Payments Used by the Montana/Barrese Defendants to Pay Kickbacks in Furtherance of the Bandy Runner Scheme*

386.   During taped conversations with OIFP Confidential Witness C.W., Defendant Montana described or suggested numerous methods he and the other Montana/Barrese Defendants used to generate cash for the payments of kickbacks to lawyers and runners to avoid detection.

387.   These methods included the following:

a.   he would cash checks that lawyers would write to him in payment of a "phony final payment on a lien" with a reference to a fictitious patient;

b.   he would cash checks from lawyers in payment of co-pay and deductible amounts owed by PIP patients;

c.   he would cash checks from smaller insurance companies, but not from larger insurers such as the Allstate Plaintiffs;

d.   he would write checks to "friends with cash businesses. . . like I'm

---

[3] The Plaintiffs are not using any information obtained from any "proffer" referenced in this Complaint against the person giving the proffer, but rather are using the information against other Defendants in this case. For example, Defendant Montana's admissions in his April 4, 2012 proffer session are not being used against him, but are being used against other Defendants, including, but not limited to in this instance the Bandy Defendants and Runner Defendants.

buying a ton of meat for a party."

388   In addition to the foregoing methods of generating cash for paying kickbacks to Defendant Anhuar Bandy and the Bandy Runner Defendants, in attachment A to their New Jersey Judiciary Plea Forms, Defendants Montana and Barrese admitted to engaging in identical, but parallel schemes between 2002 to 2010 to divert checks for hundreds of thousands of dollars owed to the Defendant Montana/Barrese Chiropractic Clinics by depositing them into the accounts of the Defendant Montana/Barrese Holding Companies, and failing to pay taxes on those funds.

389.   At all times relevant to this litigation, the Montana/Barrese Defendants also generated cash for use in paying kickbacks to Defendant Anhuar Bandy, the Bandy Runner Defendants and other runners and attorneys, by cashing checks with several individuals and entities who held themselves out as factors, but who in fact were unlicensed check cashers, including the Check Casher Defendants.   Through subpoenas issued on the bank accounts of three of the Montana/Barrese Defendants in separate litigation, the Allstate Plaintiffs have discovered that, under the false and misleading guise of making payments to these purported factors, the Montana/Barrese Defendants cashed more than $850,000 in checks they wrote from the accounts of Defendants Chiropractic Centre of Elizabeth, Chiropractic Center of Newark, and Massimo Rehabilitation Center, and made payable to other Montana/Barrese Defendants, including Defendants Massimo Chiropractic, Hanover Chiropractic, Wallington Chiropractic, Chiropractic Centre of Elizabeth, and Chiropractic Center of

Jersey City, as well as to third-party entities. One purported factor entity alone received checks totaling nearly $700,000.

*Allegations Regarding the Sources of the Payments Used to Pay*
*Kickbacks in Furtherance of the Bandy Runner Scheme*

390.   The Defendant Bandys and Defendant Riotto paid the kickback amounts to the Runner Defendants, along with any additional amounts that were paid to induce certain of the Allstate Claimants and others to undergo treatment, by check or in cash directly or indirectly from the accounts of the Defendant Bandy/Riotto Chiropractic Clinics or from the accounts of the Defendant Bandy Management Companies, or from the accounts of other affiliated corporations owned or controlled by the Defendant Bandys and Defendant Riotto, and/or others associated with them, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50.

391.   Upon information and belief, the Defendant Bandys and Defendant Riotto also paid the kickback amounts to the Runner Defendants, along with any additional amounts that were paid to certain of the Allstate Claimants and others to induce them and others to undergo treatment, from the proceeds of cashed checks from insurers or from attorneys, including attorney trust checks in payment of co-pay and deductible amounts or in payment of medical bills, attorney business checks in payment for report or other fees or payments owed to the Defendant Bandy/Riotto Chiropractic Clinic, and from payments from or on behalf of the Law Firm Defendants, the Golden Acupuncture Defendants, Defendant Chi Acupuncture, the Referee Provider Defendants, the Patient Broker Defendants and/or from third parties, including Defendants John Doe 1-50 and/or ABC Corp. 1-50, in the form of checks or in cash. The various methods used by

142

the Defendant Bandys and Defendant Riotto to generate cash and otherwise pay kickbacks in furtherance of the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme are referred to herein as the "Bandy Kickback Methods."

392.   The Bandy Kickback Methods are not limited to the methods described above.   Evidence obtained by the Allstate Plaintiffs in the *Lajara Litigation* reveals the challenges that clinic owners like the Defendant Bandys and Riotto and the Montana/Barrese Defendants, who are involved in large volume automobile injury fraud schemes, face in generating large sums of cash to pay kickbacks to runners.   Upon information and belief, the Bandy Kickback Methods include the same methods described by Defendant Montana to OIFP Confidential Witness C.W.

393.   During a covertly recorded conversation on July 21, 2011 with OIFP Confidential Witness C.W., Defendant Christopher Montana stated: "Because next week, if they're going to be busy again, it's going to be tight.  With the economy, I've got to -- . . . . it's hard to cough up ten, fourteen grand a f--ing *[expletive deleted]* week.  I don't know how (indiscernible) do bigger numbers.  You guys do this number out there and stuff.  I have no clue."

394.   In this and other recorded conversations with OIFP Confidential Witness C.W., Defendant Montana revealed a number of different ways in which he and the other Montana/Barrese Defendants generated cash to be used for paying kickbacks to lawyers and runners, as well as non-cash methods for receiving payments of kickbacks from lawyers.

143

395.   For example, during a taped conversation on July 21, 2011, after C.W. told Defendant Montana that it was very hard for him to put together cash to give him to pay for the referrals of clients, Defendant Montana suggested to him: "You could . . . pick a name.  You could say, like, it was -- you could write down that it's a phony final payment on a lien.  I'd be happy. . . .If you send me a check for 8,000 (indiscernible) . . . (indiscernible) final payment for a lien.  Make up a f--ing name [expletive deleted]. Jose Suarez.  Send me the f--ing check [expletive deleted]. . . . I don't care."

396.   During the same July 21, 2011 conversation, Defendant Montana also told C.W. that he cashes checks that he receives from personal injury lawyers:  "when checks, lien checks, from you guys for co-pays and deductibles, those are the ones I can cash."

397.   By "lien checks" and "you guys" Defendant Montana was referring to payments made by personal injury attorneys from the proceeds of a personal injury settlement for a non-PIP patient. In such cases, the Montana/Barrese Defendants would provide treatment to the patient in exchange for a "letter of protection" or a verbal agreement or other understanding with the attorney, pursuant to which the attorney would acknowledge the Montana/Barrese Defendants' lien on the patient's personal injury claim.

398.   By checks for "co-pays and deductibles," Defendant Montana was referring to claims of PIP patients, which are subject to deductibles and co-pays pursuant to N.J.S.A. 39:6A-4.  Specifically, this provision prescribes a $250 deductible and a co-pay amount that is 20% of the difference between $250 and the first $5,000.00

144

of medical costs, for a maximum co-pay of $950.00.  The combined deductible and maximum co-pay is therefore $1,200.  These amounts are deducted by the PIP insurer from the payments they make on each PIP claim from the bills the insurer receives from health care providers in the order in which they are paid.  These deductions are reflected on the Explanation of Benefits ("EOBs") provided by the PIP insurer to each claimant.

399.   Before disbursing the proceeds of a personal injury settlement for a client with a PIP claim, or for a client with a claim that was subject to a lien pursuant to a letter of protection, the attorney deducts from the client's share of the personal injury award the amounts owed for the applicable deductible, co-pay or pursuant to a lien, as the case may be, and issues a check to the healthcare provider drawn against the attorney's attorney trust account in payment of that amount.

400.   Upon information and belief, it was at various times an element of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme that certain of the Law Firm Defendants would issue checks in payment of the co-pay, deductible and/or lien amounts owed with respect to patients of the Defendant Bandy/Riotto Chiropractic Clinics and/or of Defendant Chiropractic Centre of Elizabeth, including the Allstate Claimants, they would make the checks out to the provider in his or her individual name, rather than in the name of the provider entity, and that the check would then be cashed.

401.   When issuing checks in this way, the Law Firm Defendants would at all times know that the reason they were asked to issue the checks in this way was to facilitate the ability of the Defendant Bandys, Riotto and/or the Montana/Barrese

Defendants to cash checks or otherwise divert the funds so that they could be converted to cash or otherwise used in furtherance of the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme.

402.   Alternatively, or in addition, it was at all times an element of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme that certain of the Law Firm Defendants would issue checks in payment of the co-pay, deductible and/or lien amounts owed with respect to patients of the Defendant Bandy/Riotto Chiropractic Clinics and/or of Defendant Chiropractic Centre of Elizabeth, including the Allstate Claimants, they would make the checks out in the name of the clinic and it would be cashed by the Defendant Bandys, Riotto and/or Defendants Montana and Barrese, or deposited by them into an account other than of the Defendant Bandy/Riotto Chiropractic Clinics or Defendant Chiropractic Center of Elizabeth and the proceeds thereof would be used in furtherance of the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme as described herein.

403.   During the July 21, 2011 Undercover Conversation, Defendant Montana revealed to OIFP Confidential Witness C.W., that he would also cash checks from smaller insurance companies:

| | |
|---|---|
| MONTANA: | . . . . If I get a big check from an off-company --- |
| C.W.: | Um-hum |
| MONTANA: | -- like -- |
| C.W.: | Access General or -- |

| | |
|---|---|
| MONTANA: | -- like some I don't even f—ing know their name, I can cash one of those.  But I would never go near -- which is the bulk of my work, State Farm, Allstate – |
| C.W.: | Right. |
| MONTANA: | -- Travelers, GEICO. |
| C.W.: | Right. |
| MONTANA: | There's nothing I can do when it's any of those. |

404.   The reason Defendant Montana stated that he would not cash checks from major insurance companies, such as Plaintiff Allstate, is that he knew those companies have well-staffed and well-trained Special Investigation Units and would therefore be more likely to examine the backs of the canceled checks they wrote to the Defendant Montana/Barrese Chiropractic Clinics.   Conversely, the reason Defendant Montana was willing to cash checks from smaller, lesser known insurance companies was that he thought they were less likely to have well-staffed Special Investigation Units and would therefore not examine the backs of the canceled checks they paid to him.

405.   In attachment A to their New Jersey Judiciary Plea Forms, Defendants Montana and Barrese both admitted to engaging in identical, but parallel schemes to divert payments owed to the Defendant Montana/Barrese Chiropractic Clinics, by depositing checks made payable to those Defendants into the accounts of other corporations they owned.   Defendant Barrese also admitted to under-reporting hundreds of thousands of dollars in income to Wallington Chiropractic Center, which he owned separately from Defendant Montana, in the years between 2002 and 2010.

147

406    Defendant Montana formed Hanover Rehabilitation on November 18, 2008. On the same date, Defendant Barrese formed Massimo Rehabilitation. During the succeeding months and years, they diverted more than $1.5 million in checks made payable to the Defendant Montana/Barrese Chiropractic Clinics and/or from other sources into these accounts, and then filed tax returns for those entities falsely stating they had no income.

407.    Defendants Montana and Barrese engaged in this scheme involving the Hanover Rehabilitation and Massimo Rehabilitation accounts for the purpose of not only evading income taxes, which they did, but also to create a fund from which they could pay kickbacks, thereby concealing those payments from their staffs, accountants and from discovery from those insurers, such as the Allstate Plaintiffs, who were most likely to file suit against them.

408.    In or about the fall of 2010, apparently concerned that their scheme to divert revenue owed to the Defendant Montana/Barrese Chiropractic Clinics would be uncovered, and/or because they had developed alternative routes for generating cash and/or patient referrals, including through kickback and referral schemes involving patient brokers, Defendants Montana and Barrese decided to cancel Hanover Rehabilitation and Massimo Rehabilitation, respectively, and filed or caused to be filed Certificates of Cancellation with respect to both these entities on and effective October 27, 2010.

409.    In the course of their Montana/Barrese investigation, the OIFP identified only a portion of the income diverted and/or under-reported by the Montana and

Barrese Defendants in furtherance of the Bandy Runner Scheme and the other Montana/Barrese Schemes.

410. The amount of income due to the Defendant Montana/Barrese Chiropractic Clinics that Defendants Montana and Barrese diverted to other accounts or cashed during the period relevant to this litigation vastly exceeds the amounts they admitted concealing and/or otherwise under-reporting in connection with their November 28, 2012 guilty pleas.

411. The actions of Defendants Montana and Barrese in diverting revenue owed to the Defendant Montana/Barrese Chiropractic Clinics to Defendants Hanover Rehabilitation and Massimo Rehabilitation, respectively, and in cashing insurance company, co-pay, deductible, attorney trust and business account checks and checks from other sources, and otherwise under-reporting income due to the Defendant Montana/Barrese Chiropractic Clinics were made in coordination and consultation with each other, and were made not only for the purpose of evading taxes, but also for the purpose of concealing from potential discovery the methods the Montana/Barrese Defendants were using to pay kickbacks and other unlawful compensation in furtherance of the Montana/Barrese Schemes, including their participation in the Bandy Runner Scheme and Bandy Attorney Kickback Scheme, and for generating the cash and other proceeds that they used in connection with the payment of those kickbacks and other unlawful compensation in furtherance of the Montana/Barrese Schemes.

412. In addition to generating cash and secreting funds by cashing and diverting checks owed for services purportedly rendered and billed in the name of the

Defendant Montana/Barrese Chiropractic Clinics, the Montana/Barrese Defendants also funneled funds out of the accounts of the Defendant Montana/Barrese Chiropractic Clinics through payments to entities and/or for purposes that were designed to appear to be for legitimate business purposes and therefore tax deductible when at all times they knew they were not, and rather were made in furtherance of the Montana/Barrese Schemes.

413.    During a taped undercover conversation that occurred on July 21, 2011, Defendant Montana revealed to OIFP Confidential Witness C.W. that one of the methods he used to funnel money out of the accounts of the Defendant Montana/Barrese Chiropractic Clinics was to write checks to friends with cash businesses for seemingly legitimate business purposes and for which he would receive cash in return.

414.    Specifically, during the July 21, 2011 recorded conversation, Defendant Montana told C.W.: "And then I have a friend, a couple of friends with some cash businesses and they'll let me write a check like I'm buying a ton of meat for a party and they get (indiscernible). . . . That's how I do it." The friends and/or associates referred to by Defendant Montana include Defendants John Doe 1-50 and ABC Corp. 1-50.

415.    Despite Defendant Montana's complaints to OIFP Confidential Witness C.W. regarding the difficulties of generating cash to pay runners, the Montana/Barrese Defendants nevertheless managed to generate large sums of cash for their use in paying kickbacks to runners, including the Defendant Bandys and certain of the Runner Defendants as described herein.

150

416    In November of 2011, the Office of the Insurance Fraud Prosecutor filed a Verified Complaint against Defendants Montana and Barrese and certain of the Montana/Barrese Chiropractic Clinics (referred to herein as the "Montana/Barrese Forfeiture Complaint"), seeking the forfeiture of the property they used in the commission of the crimes with which they were charged, including large amounts of cash that were seized from the homes of Defendants Montana and Barrese pursuant to search warrants executed at the time of their arrests on July 27, 2011. As set forth in paragraph 16 of the Montana/Barrese Forfeiture Complaint, $50,270 in currency was seized from Defendant Montana's home at the time of his arrest, while $272,281 in currency was seized from Defendant Barrese's home.  These amounts were generated through the methods described by Defendant Montana and were obtained from kickbacks paid to the Montana/Barrese Defendants by the Defendant Referee Providers to whom they referred their patients, and were maintained and used by the Montana/Barrese Defendants to pay kickbacks to runners in furtherance of the Bandy Runner Scheme, and other runner schemes engaged in by the Montana/Barrese Defendants.

417.    The various methods of diverting checks, generating cash and patient referrals, and paying and receiving kickbacks described by Defendant Montana, or otherwise revealed by the OIFP's Montana/Barrese investigation are referred to herein collectively as the "Montana/Barrese Kickback Methods."

418.    As described at greater length below in the context of the Referee

151

Provider Schemes, the Montana/Barrese Kickback Methods also include several kickback schemes that involve non-cash elements or in-kind reciprocal referrals of clients for patients. These include schemes involving patient brokers and law firms and a scheme that Defendant Montana described to OIFP Confidential Witness C.W. and through which the Montana/Barrese Defendants subsidized attorney solicitation mailings and/or other advertising for personal injury law firms in exchange for their agreeing to refer all of their clients to the Defendant Montana/Barrese Clinics.

419. The Montana/Barrese Defendants used, or otherwise participated in, one or more of the Montana/Barrese Kickback Methods in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

420. Upon information and belief, at various times relevant to this litigation, the Defendant Bandys, Riotto, the Defendant Bandy Management Companies, the Defendant Bandy/Riotto Chiropractic Clinics, the Golden Acupuncture Defendants, Chi Acupuncture, the Law Firm Defendants and the Referee Provider Defendants used, or otherwise participated in, kickback methods and methods of generating cash similar to the Montana/Barrese Kickback Methods described herein in furtherance of the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and the Bandy Referee Provider Schemes.

421. Defendants Montana, Barrese, Gorodetsky and the other Montana/Barrese Defendants paid the kickback amounts that Defendant Anhuar Bandy paid to Defendant Neiman and the other Runner Defendants, and/or the amounts that were paid to induce certain of the Allstate Claimants to undergo treatment at Defendant

152

Chiropractic Centre of Elizabeth, directly from the accounts of the Defendant Montana/Barrese Chiropractic Clinics or from the accounts of other affiliated corporations owned or controlled by them including the accounts of Hanover Rehabilitation and Massimo Rehabilitation, and/or others associated with them, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, and/or from payments received by the Montana/Barrese Defendants as kickbacks directly from the Referee Provider Defendants and other providers with which they had kickback relationships, and/or indirectly through the Patient Broker Defendants, and/or from third parties, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50.

422.   Approximately eight months after their arrests by the OIFP for violating New Jersey's Runner Statute by paying kickbacks for patients to Confidential Witness C.W., Defendants Christopher Montana and Fernando Barrese each met with representatives of the OIFP in separate proffer sessions in an attempt to provide information to prosecutors in exchange for more lenient plea agreements and sentencing. These sessions, which are collectively referred to herein as the "Montana/Barrese Proffer Sessions," were tape-recorded by the OIFP with the knowledge and consent of Defendants Montana and Barrese and their respective criminal counsel, who were present during the sessions.

423.   In response to a subpoena served by the Allstate Plaintiffs in the *Lajara Litigation*, criminal defense counsel for Defendant Gorodetsky produced to Allstate's counsel copies of transcripts prepared by the OIFP of the Montana/Barrese Proffer

153

Sessions. The Bureau of Fraud Deterrence ("BFD") provided Allstate's counsel with the audio sessions of the proffers, which were provided to the BFD by the OIFP.

424.   During the Montana/Barrese Proffer Sessions, Defendants Montana and Barrese admitted to and provided OIFP representatives with information about numerous referral and kickback arrangements they had with personal injury attorneys and healthcare providers, including MRI facility owners, neurologists, pain management providers, as well as with owners of an ambulatory surgery center and a hospital, and regarding an attorney and a patient broker who acted as a conduit for kickbacks between them and several of the healthcare providers.

425.   Defendants Montana and Barrese had relationships with attorneys who paid them by check up front for narrative reports that Montana or Barrese wrote at the end of treatment in the form of a final narrative report (referred to herein as the "Advanced Report Fee Kickback Scheme").  Discussing an attorney unrelated to the Bandy Schemes, Defendant Montana admitted, "A lot of times…you really should get the report fee at the end.  When you do the report but she'll give you the report fee up front and she will cover your co-pay and deductible on every patient."

426.   The Advanced Report Fee Kickback Scheme was designed to provide the false appearance of legitimacy, while at all times increasing the immediate cash flow.

## Allegations Relating to the Bandy Attorney Kickback Scheme

427.   At all times relevant to this litigation, the Defendant Bandys and Defendant Riotto, acting in concert with each other and the Runner Defendants, have engaged in

154

kickback schemes with personal injury attorneys, law firms and related individuals, including Defendants Walker, Gallegos, Arzadi, Joworisak & Associates, Wishnic, Eugene S. Wishnic, P.C., Schenerman, the Schenerman Law Office, Yankowitz & Schenerman, and other attorneys and law firms and law firm employees unknown to Plaintiffs at this time, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50 (referred to collectively herein as the "Law Firm Defendants"), pursuant to which they have referred patients of the Defendant Bandy/Riotto Chiropractic Clinics, including certain of the Allstate Claimants, to the Law Firm Defendants in exchange for kickbacks in the form of cash, or in exchange for the referrals of the clients of the Law Firm Defendants on a one-for-one referral basis to avoid the need to pay cash kickbacks to the extent practicable, or on the basis of some other formula.

428.   Alternatively, upon information and belief, in some cases the Law Firm Defendants have referred patients, including certain of the Allstate Claimants, to the Defendant Bandy/Riotto Chiropractic Clinics upon the understanding and agreement with the Defendant Bandys, Defendant Riotto, John Doe 1-50 and/or John Roe 1-50 that they will cause the patients to be referred for further diagnostic testing or treatment to the Referee Provider Defendants designated by the Law Firm Defendant, who in turn will pay a kickback to the Law Firm Defendant for the referral.

429.   Alternatively, upon information and belief, in some cases the Law Firm Defendants have referred patients, including certain of the Allstate Claimants, to the Defendant Bandy/Riotto Chiropractic Clinics upon the understanding and agreement

with the Defendant Bandys, Defendants Riotto, John Doe 1-50 and/or John Roe 1-50, in exchange for promises by the Defendant Bandys, Riotto and/or the Defendant Bandy/Riotto Chiropractic Clinics that they will cause their clients to be referred in exchange for the agreement by the Defendant Bandys and/or Riotto to cause the proceeds of checks from the attorney trust accounts of the Defendant Law Firms to be paid to them for co-pays, deductibles or other unpaid medical bills to be paid back directly or indirectly to the Law Firm Defendants as kickbacks.

430.  The role played by the Law Firm Defendants, including Defendants Walker, Gallegos, Arzadi, the other Arzadi Law Firm Defendants, Wishnic, the other Wishnic Law Firm Defendants, Schenerman, the other Schenerman Law Firm Defendants, in furtherance of the Bandy Attorney Kickback Scheme and the other Bandy Schemes, pursuant to which they gave a kickback in money or in kind for the referrals of clients recruited by the Bandy Runners and referred to them for the purpose of making bodily injury claims against the Allstate Plaintiffs and other insurers was at all times consistent with Anhuar and Karim Bandy's prior statements to representatives of Allstate that a high volume chiropractic practice that uses runners cannot be profitably operated, at least in their estimation, unless kickbacks are received from lawyers and other health care providers to offset the initial cost of procuring patients through payments to runners.

*Kickbacks Paid by Defendants Alexandra Gallegos and David Walker, Esq. to the Defendant Bandys and Defendant KEKK Marketing*

431.  Defendants Alexandra Gallegos and David Walker, Esquire, have, at least since 2008, conspired with each other as well as with Defendants Anhuar and Karim

Bandy to pay unlawful kickbacks to the Defendant Bandys, either directly or through one or more of the Defendant Bandy Management Companies in exchange for either causing patients of the Defendant Bandy/Riotto Chiropractic Clinics, including certain of the Allstate Claimants, to be referred to Defendant Walker, and his paralegal and partner, Defendant Gallegos, for legal representation in connection with their bodily injury claims, and/or to allow Defendant Gallegos to sign up patients to retainer agreements on behalf of Defendant Walker at the offices of the Defendant Bandy/Riotto Chiropractic Clinics.

432. Plaintiffs' evidence of the Bandy Attorney Kickback Scheme includes admissions made to representatives of the Allstate Plaintiffs by Defendants Gallegos, Walker, Anhuar Bandy and Karim Bandy; the Gallegos/Walker Ledger, which is a log book that was kept by Defendant Gallegos documenting the source of hundreds of referrals to the law practices she has worked for; and financial records showing payments from Walker to Defendant KEKK Marketing, which is owned by Defendant Karim Bandy.

433. The Gallegos/Walker Ledger reflects that Defendants Walker and Gallegos began representing individuals who were referred to them by Defendant Anhuar Bandy in approximately late October or early November of 2008.

434. As Defendant Anhuar Bandy told representatives of Allstate, it was common for chiropractic clinic owners, including the Defendant Bandys, to receive a kickback of around $500.00 from attorneys in exchange for the referral of a patient to that attorney.

157

435.   Further, as Defendant Anhuar Bandy explained to representatives of Allstate in February, 2008, owners of chiropractic facilities who pay runners up to $2,000.00 per patient must finance those payments through kickback monies received from the referral of their chiropractic patients to other health care providers and professionals, such as MRI and neurodiagnostic testing providers, physical rehabilitation facilities and personal injury attorneys.

436.   Similarly, Defendants Gallegos and Walker admitted to representatives of Allstate that they conspired with each other and with Defendants Anhuar and Karim Bandy and others, to routinely make illicit payments to Defendants Anhuar and Karim Bandy in exchange for their referral of patients from the Defendant Bandy/Riotto Chiropractic Clinics to Defendant Walker's law practice.

437.   On July 23, 2012, Defendant Gallegos executed a sworn Certification in the matter of Allstate, et al. v. Lajara, et. al., Docket No. UNN-L-4091-08 (also referred to herein as the "Lajara Litigation") in which Gallegos was a party Defendant.

438.   On August 15, 2012, Defendant Walker also executed a sworn Certification as part of the Lajara Litigation.   Defendant Walker was also a party Defendant to that litigation.

439.   Defendant Alexandra Gallegos is a self-styled secretary/paralegal, and is not an attorney.

440.   Defendant Walker is an attorney licensed to practice law in the State of New Jersey.

158

441.   Defendant Gallegos swore that in 2000, before she began to work for Walker that she worked for a Union County attorney (referred to herein as the "Union County Attorney"). The Union County Attorney subsequently consented to disbarment following an investigation by the New Jersey Office of Attorney Ethics that revealed his trust account check book and record were in the possession of Gregorio Lajara, a non-licensee clinic owner who effectively controlled his law practice.   The Union County Attorney has since died.

442.   Defendant Gallegos acknowledged that while she worked for the Union County Attorney, she paid certain runners whom she identified between $500 to $1000 per person for the referral of auto accident claimants to that lawyer.

443.   The Union County Attorney also paid Lajara between 15 to 40% of the legal fee recovered on those cases that were settled by his office.

444.   In addition, Defendant Gallegos swore that she received 10% of the attorney's fee for every client she brought into the Union County Attorney's office.

445.   In 2003, Defendant Walker took over a portion of the Union County Attorney's files and Defendant Gallegos began to work in the same capacity for Defendant Walker.

446.   According to both Defendants Gallegos and Walker, they entered into an unlawful fee splitting arrangement pursuant to which Gallegos and Walker evenly split the law firm's expenses and also evenly split the legal fees generated by Defendant Walker's practice.   This fee-splitting arrangement at all times violated the rules of

professional responsibility governing the practice of law in New Jersey, specifically, R.P.C. 5.4.

447.    Thereafter, Defendants Walker and Gallegos both admitted to representatives of Allstate that they either paid, or caused the payment of, referral fees to several different individuals whom they identified as runners, as well as to Defendants Anhuar Bandy and/or Karim Bandy, in exchange for the referrals of patients to Walker's law practice.

448.    Further, at times, Defendant Gallegos acted as a runner herself and was paid a referral fee by Walker in exchange for her referral of clients to Walker's law practice.

449.    The Gallegos/Walker Ledger reflects that Defendant Anhuar Bandy began referring patients to Defendants Gallegos and Walker in late October or early November of 2008, by which time the Defendant Bandys were already planning to open Defendant True Healing and to begin executing the Bandy Schemes.

450.    One of the first Allstate Claimants who was referred to Defendants Walker and Gallegos by Defendant Anhuar Bandy in furtherance of the Bandy Attorney Kickback Scheme was Allstate Claimant J.N. 125291427-01, who was involved in an alleged automobile accident on November 19, 2008.  This Allstate Claimant began treating at Defendant True Healing, the certificate of formation for which was filed 5 days after that accident, on November 24, 2008.

*Walker's Direct Payments to Karim Bandy's Corporation, KEKK Marketing*

451.   Defendant Walker has admitted to representatives of Allstate that prior to 2010, Defendants Walker and Gallegos paid Defendant Anhuar Bandy a percentage of the settlements Walker obtained on behalf of his personal injury clients in cash, in exchange for Defendant Anhuar Bandy's referral of each of those clients to Walker's law practice.

452.   According to Walker, in, or about, early 2010, Defendant Walker learned from Gallegos that Defendant Anhuar Bandy wanted Defendant Walker's payments to be made to Defendant KEKK Marketing as a way of "legitimizing" the transfer of money from Defendant Walker's law practice to Defendant Anhuar Bandy and thereby making those payments appear to be "more of a business expense."

453.   At all times relevant to this litigation, Defendant KEKK Marketing has maintained an office at Anhuar and Karim Bandy's residence at 141 Crine Road, Colts Neck, New Jersey, and has been owned by Defendant Karim Bandy and/or Anhuar Bandy, and used by the Defendant Bandys in furtherance of the Bandy Schemes.

454.   Defendant Walker further stated that he understood from Gallegos that Defendant Anhuar Bandy wanted to use Defendant KEKK Marketing to give the appearance that the prior cash payments that Walker had previously made to Anhuar Bandy would "masquerade" as advertising and marketing services.

455.   To facilitate that deception, Gallegos told Walker that she and Anhuar Bandy intended to create fictitious invoices to explain the payments to KEKK Marketing.

456.   Despite that statement, Defendant Walker told representatives of Allstate that he never saw an invoice from Defendant KEKK Marketing for any marketing services of any kind.

457.   The Allstate Plaintiffs obtained the records of Defendant Walker's attorney business and attorney trust accounts, as well as his personal bank account pursuant to discovery in the *Lajara Litigation*.

458.   The available records reveal, inter alia, that on or about December 11, 2009, Defendant Walker wrote check No. 2360 from a personal account in the amount of $3,663.00 made payable to Defendant First Choice Management.   The check bore a memo notation of "Advertising."

459.   The available records reveal that multiple payments were made by Defendant Walker to Defendant KEKK Marketing beginning several weeks later in early 2010.

460.   Each of the following checks payable to KEKK Marketing contained the word "advertising" in their memo section and was drawn either from Defendant Walker's attorney business account or his personal account:

| Date of Check | Amount |
| --- | --- |
| February 2, 2010 | $1,002.00 |
| February 18, 2010 | $1,598.00 |
| April 5, 2010 | $2,850.00 |
| April 23, 2010 | $4,796.00 |
| May 13, 2010 | $3,394.00 |

| | |
|---|---|
| June 1, 2010 | $3,528.00 |
| June 8, 2010 | $2,397.00 |
| July 20, 2010 | $3,038.00 |
| August 3, 2010 | $2,487.00 |
| August 11, 2010 | $2,794.00 |
| August 18, 2010 | $3,332.00 |
| August 20, 2010 | $1,665.00 |
| September 3, 2010 | $3,643.00 |
| September 10, 2010 | $3,643.00 |
| September 21, 2010 | $3,364.00 |
| October 18, 2010 | $4,930.00 |
| October 18, 2010 | $  996.00 |
| November 5, 2010 | $1,600.00 |
| November 12, 2010 | $4,250.00 |
| November 19, 2010 | $3,000.00 |
| November 26, 2010 | $3,460.00 |
| November 30, 2010 | $1,332.00 |
| December 3, 2010 | $1,950.00 |
| December 10, 2010 | $2,665.00 |
| Total | $67,714.00 |

461.   The total sum paid by Defendant Walker to KEKK Marketing in the above-listed checks was $67,714.00 over an eleven-month period.

462.   Consistent with Walker's description of the payments to KEKK Marketing as a "masquerade," the varying amounts and times of the payments are not consistent with any commercially reasonable lawyer advertising activities such as website creation or maintenance, or television, radio, newspaper or magazine ads.

463.   These payments by Walker to KEKK Marketing and First Choice Management were kickbacks paid by Defendants Walker and Gallegos to the Defendant Bandys for the patients that were referred to them by the Defendant Runners pursuant to the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

*The Gallegos/Walker Ledger*

464.   As described above, dating back even before her relationship with the Union County Attorney and Walker, Gallegos maintained a ledger (referred to herein as the "Gallegos/Walker Ledger") that memorialized, among other things, the client's name and address, when the client was retained, the date of the client's accident or loss, the nature of the claim (whether arising from an auto accident, or some other tortious conduct), and most significantly, the person who referred the client to the law practice.

465.   Analysis of the Gallegos/Walker Ledger reveals more than a thousand referrals from individuals who Gallegos identified on the ledger, nearly all of whom were runners.

466    Significantly, the Gallegos/Walker Ledger reveals about seven hundred and eighty-seven entries between November 2008 and March 2012 that are followed by the initials "Anh" or "Anhuar" in the column that identified the referring "runner."

467.   On April 20, 2012, Defendant Walker admitted to Allstate representatives that Anhuar Bandy has come to his office periodically and when there, had spoken to Defendant Gallegos in Spanish, and that it was "safe to assume that money changed hands" at those meetings.

468.   During her deposition on February 24, 2014 in the *Lajara Litigation*, Defendant Gallegos testified that the initials "Anh" or the name "Anhuar" that she wrote in the Gallegos/Walker Ledger referred to patients referred by Defendant Anhuar Bandy to Defendant Walker's law practice.

469.   The first "Anh" or "Anhuar" entry was made either late October or early November of 2008, which was almost six months after Defendant Anhuar Bandy was paroled and several weeks before Defendant True Healing was formed.

470.   As detailed above, Defendant True Healing is located at 195 Livingston Avenue, New Brunswick, the same address as Defendant Precision Management. Defendant True Healing's paper owners were Defendants Johnson and Brown. Magazine subscriptions with Defendant Karim Bandy's name and home address were observed by Allstate's investigator in True Healing's waiting room.

471.   The overwhelming majority of Allstate Claimants identified as being listed in the Gallegos/Walker Ledger and followed by the initials "Anh" or "Anhuar" received chiropractic treatments at one of the Defendant Bandy/Riotto Chiropractic Clinics.

165

472.   Defendants Walker and Gallegos paid Defendant Anhuar Bandy, directly by cash or through checks written to KEKK Marketing or one of the other Defendant Marketing Companies, for each client listed on the Gallegos/Walker Ledger that is followed by the initials "Anh" or "Anhuar" in the column that identified the referring "runner."

473.   The individuals who were listed on the Gallegos/Walker Ledger with the initials "Anh" or "Anhuar" (these individuals are referred to herein collectively as the "Walker-Bandy Kickback Clients") were with the exception of a few who were solicited by Defendant Anhuar personally, all solicited and recruited by the Runner Defendants in furtherance of the Bandy Runner Scheme, and for which they were paid kickbacks by the Defendant Bandys, Riotto and/or by Defendant John Doe 1-50 directly, or indirectly through the Defendant Bandy Management Companies, while acting on their behalf.

474.   Upon information and belief, except for a few individuals who were solicited personally by Defendant Anhuar Bandy or runners working with him in the Elizabeth area before the Defendant Bandys opened Defendant Good Health Center, all of the Walker-Bandy Kickback Clients underwent treatment at one of the Defendant Bandy/Riotto Chiropractic Clinics from which the Defendant Bandys were able to profit, through the Defendant Bandy Management Companies, and be referred to the Referee Provider Defendants in exchange for kickbacks from which they would also profit in furtherance of the Bandy Schemes.

475.   Defendant Anhuar Bandy's initials were listed on the Gallegos/Walker Ledger next to the names of the Walker-Bandy Kickback Clients because Defendants

Walker and Gallegos owed the Defendant Bandys kickbacks for each of these clients he or they caused the Runner Defendants to refer to Defendants Walker and Gallegos, or that they allowed them to sign up at the offices of one of the Defendant Bandy/Riotto Chiropractic Clinics. Upon information and belief, these kickbacks were either in the amount of $500 per referral or a percentage of the recovery obtained by Defendants Walker and Gallegos, or a combination of both.

476. At all times relevant to this litigation, Defendants Gallegos and Walker knew that the Defendant Bandys paid runners, including the Runner Defendants, to recruit patients to treat at the Defendant Bandy/Riotto Chiropractic Clinics and therefore knew that the client referrals Defendants Gallegos and Walker received from the Defendant Bandys were the result of payments to runners for soliciting people to make claims for PIP benefits and for personal injury benefits in violation of N.J.S.A. 17:33A-4(e). By undertaking the representation of each such claimant and submitting claims to the Allstate Plaintiffs and other insurers on behalf of each such claimant, including certain of the Allstate Claimants, Defendants Gallegos and Walker benefited from a violation of the IFPA, and thereby violated N.J.S.A. 17:33A-4(c).

*Allegations Regarding the Role of the Arzadi Law Firm Defendants in Furtherance of the Bandy Attorney Kickback Scheme and the Bandy Runner Scheme*

477. Defendants Karim Arzadi, Esquire and Joworisak & Associates (also referred to collectively herein as the "Arzadi Law Firm Defendants") have a high-volume personal injury law practice, with offices located at 163 Market Street, Perth Amboy, New Jersey 08861; 103 Bayard Street, New Brunswick, New Jersey 08901; 639-41 St.



Georges Avenue, Roselle, New Jersey 07203; 257 Central Avenue, East Orange, New Jersey 07019; and 2322 Kennedy Boulevard, Jersey City, New Jersey 07304.

478. At all times relevant to this litigation, the Arzadi Law Firm Defendants have relied upon various advertising and marketing methods to promote their personal injury practice, including but not limited to the use of billboards, websites, and direct mail solicitations to individuals involved in recent automobile accidents as identified from police reports obtained from various police stations in New Jersey obtained pursuant to standing requests under New Jersey's common law and statutory open public records laws (collectively, "the OPRA Requests"). These advertising media are referred to collectively herein as the "Arzadi Client Advertising Methods."

479. The OPRA Requests for the police reports used to solicit and recruit Allstate Claimants and others who were involved in automobile accidents and who thereafter treated at one or more of the Defendant Bandy-Controlled Chiropractic Clinics or the Defendant Riotto Chiropractic Clinics, were made in the name of and/or paid for by the Arzadi Defendants and/or one or more of the other Law Firm Defendants, or John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50, in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

480. At times relevant to this litigation, Defendant Arzadi has obtained referrals of the Allstate Claimants and other personal injury clients by making kickbacks directly to runners, including certain of the Runner Defendants, and/or indirectly through payments to others, including the Defendant Bandys, Riotto and/or Defendants John

168

Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50, all in violation of Section 4(e) of the IFPA.

481. At all times relevant to this litigation, the Runner Defendants, acting in concert with the Defendant Bandys, Riotto, Arzadi and/or Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50 used police reports obtained through the OPRA Requests to identify individuals who had been involved in automobile accidents, and contacted them in person to solicit them to undergo treatment with one or more of the Defendant Bandy-Controlled Chiropractic Clinics or the Defendant Riotto Chiropractic Clinics, and to engage the Arzadi Defendants or the other Law Firm Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

482. At times relevant to this litigation, Defendant Arzadi has paid the kickbacks described, and defrayed the costs of the Arzadi Client Advertising Methods, in part from the proceeds of kickback moneys paid directly or indirectly to him by healthcare providers to whom he has caused Allstate Claimants and his other personal injury clients to be referred, and individuals or entities associated with them, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50.

483. Alternatively, or in addition, Defendant Arzadi has paid the kickbacks described, and defrayed the costs of the Arzadi Client Advertising Methods, in part from the proceeds of revenue lawfully received by real estate and other companies owned by Defendant Arzadi, including Defendant ABC Corp. 1-50, or from funds funneled through

169

Defendants ABC Corp. 1-50 by Defendant Bandys, Riotto, and/or Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50.

484.   Upon information and belief, at times relevant to this litigation, the Arzadi Law Firm Defendants have also knowingly obtained referrals of personal injury clients, including certain of the Allstate Claimants, who were recruited by the Defendant Runners on the part of the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics pursuant to the Bandy Schemes, and/or were allowed by the Defendant Bandys and Riotto to sign up the patients of the Defendant Bandy/Riotto Chiropractic Clinics, including certain of the Allstate Claimants, who had been recruited through the Bandy Runner Scheme, at the offices of those clinics.  In exchange for these referrals and for being able to sign up clients at the offices of the Defendant Bandy/Riotto Chiropractic Clinics, the Arzadi Law Firm Defendants, acting at the direction of Defendant Arzadi, gave "in kind" kickbacks in the form of reciprocal referrals to the Defendant Bandys, Riotto and the Defendant Bandy/Riotto Chiropractic Clinics of clients of the Arzadi Law Firm, many if not most of whom had engaged them as a result of one or more of the Arzadi Client Advertising Methods.

485.   Upon further information and belief, these referrals were made on either a one-for-one basis, meaning Defendant Arzadi referred one of his clients for treatment at one of the Defendant Bandy/Riotto Chiropractic Clinics as an in-kind kickback for each person that was referred to the Arzadi Law Firm Defendants or that the Arzadi Law Firm Defendants were allowed to sign up at the locations of the Defendant Bandy/Riotto Chiropractic Clinics, or on the basis of some other formula or arrangement agreed upon

170

by Defendant Arzadi with Defendants Anhuar Bandy, Karim Bandy and/or Riotto, and/or between Defendant Arzadi and Defendant John Doe 1-50, who was acting on behalf of Defendants Anhuar Bandy, Karim Bandy and/or Riotto.

486.   These mutual referrals were used by and between the Riotto and Bandy Defendants and Riotto and the Arzadi Law Firm Defendants as in-kind kickbacks in order to minimize the amount of cash needed to carry out the Bandy Attorney Kickback Scheme.  This arrangement of mutual referrals used as in-kind kickbacks is referred to herein as the "Bandy-Arzadi In-Kind Kickback Arrangement."

487.   It has at all times been an element of the Bandy-Arzadi In-Kind Kickback Arrangement that Defendant Arzadi has retained the right to direct that any of the clients of the Arzadi Law Defendants who were being treated by the Defendant Bandy/Riotto Chiropractic Clinics be referred by the Defendant Bandy Chiropractors or the Defendant Riotto Chiropractors to certain of the Referee Provider Defendants as designated by Defendant Arzadi, and further that Defendant Arzadi be able to retain any kickbacks paid by the Referee Provider Defendants in exchange for such referrals.

488.   At all times relevant to this litigation, the Arzadi Defendants have known that the Defendant Bandy-Controlled Chiropractic Clinics and the Defendant Riotto Chiropractic Clinics were unlawfully owned and/or controlled by the Defendant Bandys, and that the decision whether to refer the Allstate Claimants and other patients of these Defendant clinics to a Referee Provider Defendant was not being made by the chiropractor who purportedly owned these clinics, but rather was made by or at the

direction of Defendant Anhuar Bandy or Karim Bandy in furtherance of the Bandy Schemes.

489.   Upon further information and belief, Defendant Arzadi has either recouped, offset or shared the costs of the Arzadi Client Advertising Methods through contributions or payments made by or on behalf of the Arzadi Law Firm Defendants by certain of the Referee Provider Defendants either directly to Defendant Arzadi in cash, or indirectly to defray or offset a portion of the costs of the Arzadi Client Advertising Methods.   Alternatively, certain of the Referee Provider Defendants made payments to one or more of the Patient Broker Defendants, in exchange for which the Patient Broker Defendants caused individuals who were involved in automobile accidents or who otherwise had personal injury claims to be referred to the Arzadi Law Firm Defendants for representation.

490.   On October 21, 2011, Milagros C. Alvarez, Esq., a former associate attorney employed by Defendant Arzadi filed a lawsuit against Defendant Arzadi and provided a supporting certification in which she alleged that Defendant Arzadi received referrals from "runners" and signed-up clients at a chiropractor's office.   *See Alvarez v. Arzadi, et. al.*, Middlesex County Superior Court, Law Division, Docket No.: Mid-L-7469-11.

491.   Upon information and belief, the chiropractor's office referenced throughout the Alvarez lawsuit and certification was either that of Defendant Lakewood Chiropractic, or one of the other Defendant Bandy-Controlled Chiropractic Clinics.

172

492.  In her lawsuit, Alvarez stated that on or about August 26, 2011, a new client provided her with an "accident investigation card" from Defendant Rene Lacotera. *Id.* at paragraph 6.  According to the client, Defendant Lacotera had arranged for the chiropractic treatment and referral to Defendant Arzadi for legal services.  *Id.* at paragraph 7.

493.  Alvarez was alarmed and felt very uncomfortable because she perceived Defendant Lacotera to be "a runner".  *Id.* at paragraph 8.  On August 30, 2011, Alvarez and another attorney in the office, Karina Grunauer-Igla, by conference call, brought the matter to Defendant Arzadi's attention. *Id.* at paragraph 9.

494.  According to Alvarez, on the next day, August 31, 2011, Defendant Arzadi ordered Grunauer-Igla to go to the same chiropractic office to sign up clients.  *Id.* at paragraph 10.  Upon information and belief, as related in the Alvarez Certification, Grunauer-Igla refused to sign-up new clients because of the apparent involvement of runners in referring patients to that office. *Id.* at paragraph 11.

495.  According to Alvarez's account of this conversation, Defendant Arzadi acknowledged that Defendant Lacotera "was probably 'a runner' . . . . for the chiropractor's office and he would look into it." *Id.* at paragraph 14.  Defendant Arzadi initially advised Alvarez that the attorneys would not be required to do any further client signings at the chiropractor's office.  *Id.*  He subsequently changed his mind and instructed other attorneys and staff members to return to that office to sign up patients.

496.  In Alvarez's certification, she alleged that on September 2, 2011, Angelica Guzman, another attorney in Defendant Arzadi's office, ran an internet search on one of

173

the chiropractors where Guzman was expected to sign clients  *See Certification of Milagros Alvarez*, paragraph 21.   Guzman found a rating/review website where a blogger wrote:

> This chiropractor...works with a woman "Estafania" they offer money to accident victims to treat at their office.  The treatment is sub standard and illegal.   Beware Estefania claims to be an accident investigator and is only a runner offering hundreds of dollars in finder fees.. it is a matter of time before they will be in trouble.  *Id.*

497.   Upon information and belief, the "chiropractor" referred to in the foregoing web post and in Alvarez's certification was one of the Defendant chiropractors who was working for the Defendant Bandys, and "Estafania" was Defendant Estefania Frias.

498.   According to Alvarez's certification, Guzman informed her and Grunauer-Igla that she had witnessed Defendant Arzadi pay "runners".   *Id.* at paragraph 22. Alvarez further stated that it was her belief that if she refused to continue to sign clients generated from runners, she would be fired.  She was concerned, however, that if she continued to sign clients who were recruited by runners, she would lose her law license. *Id.* at 24.

499.   Alvarez alleged in her Complaint that on September 6, 2011, she was told that Defendant Arzadi contacted Guzman to sign-up new cases at the chiropractor's office, but apparently Guzman advised him that she did not feel comfortable doing so in light of the possible ethical issues.   *Id.* at paragraph 16.   According to Alvarez, Defendant Arzadi then sent another non-lawyer staff member to sign-up the clients.   *Id.* at paragraph 17.

174

500.   Alvarez alleged in her Complaint that after Grunauer-Igla and Guzman handed in their resignation letters, Defendant Arzadi tried to persuade Alvarez to stay because it would look bad if three attorneys left. *Id.* at paragraphs 19-21. Defendant Arzadi offered Alvarez an interest in the firm if she stayed, claiming that she would be a fool to pass up the opportunity and that she could "make a million dollars." *Id.* at paragraph 21. When Alvarez refused Defendant Arzadi's offer, he was upset and requested that she sign a Confidentiality Agreement, as well as an agreement not to contact her clients. *Id.* at paragraph 22. Defendant Arzadi also threatened that he would take action against her if she advised the clients of her whereabouts and their right to choose an attorney. *Id.* Thereafter, Alvarez was immediately escorted to her office by the office manager to get her things and leave. *Id.* at paragraph 23.

501.   In paragraph 3 of an October 24, 2011 certification, Arzadi stated:

3.     My law firm concentrates on Personal Injury and Workers Compensation matters. I get referrals from numerous sources, and run a high-volume practice. I have never employed a "runner" to obtain clients for my firm. Thus, I have never disciplined an employee for refusing to sign up clients referred by runners, nor have I ever stated to anyone that I have paid runners for referrals.

502.   On November 28, 2011, Alvarez filed a stipulation of dismissal without prejudice as to the 2011 Complaint with Docket No.: Mid-L-7469-11. On or about May 16, 2012, Alvarez, through new counsel, filed a second Complaint against Karim Arzadi, Esq. and Arzadi & Associates, mirroring the allegations contained in her earlier Complaint. *See Alvarez v. Arzadi, et. al.*, Middlesex County Superior Court, Law Division, Docket No.: Mid-L-3512-12. On or about July 16, 2012, Arzadi filed an Answer to the Second Complaint denying Alvarez's allegations.

175

503    Upon information and belief, in furtherance of Defendant Arzadi's participation in the Bandy Attorney Kickback Scheme, Defendant Arzadi paid the Runner Defendants directly for client referrals and/or engaged in the Bandy-Arzadi In-Kind Kickback Arrangement with the Defendant Bandys and Riotto as described herein through mutual referrals of patients and clients to and from the Defendant Bandy/Riotto Chiropractic Clinics, and/or received referrals through payments that were made directly to certain of the Patient Broker Defendants by the Arzadi Law Firm Defendants or on their behalf by certain of the Referee Provider Defendants in exchange for clients the Arzadi Law Firm Defendants caused to be made to them.

504.   Regardless of which arrangements these Defendants used, any and all kickback agreements between and among the Defendant Bandys, the Arzadi Law Firm Defendants, the Runner Defendants, the Patient Broker Defendants and the Referee Provider Defendants to use money or other consideration, including the reciprocal referrals of patients as described herein, to cause, induce or reward the referrals of clients/patients between the Arzadi Law Firm Defendants, the Defendant Bandy/Riotto Chiropractic Clinics and/or any of the Referee Provider Defendants violated Section 4(e) of the IFPA.

505.   At all times relevant to this litigation, Defendant Arzadi and the other Arzadi Law Firm Defendants knew that the Defendant Bandys paid runners, including the Runner Defendants, to recruit patients to treat at the Defendant Bandy/Riotto Chiropractic Clinics and therefore knew that the client referrals he and the other Arzadi Law Firm Defendants received from the Defendant Bandys were the result of payments

176

to runners for soliciting people to make claims for PIP benefits and for personal injury benefits in violation of N.J.S.A. 17:33A-4(e). By undertaking the representation of each such claimant and submitting claims to the Allstate Plaintiffs and other insurers on behalf of each such claimant, including certain of the Allstate Claimants, the Arzadi Law Firm Defendants knowingly benefited from a violation of the IFPA, and thereby violated N.J.S.A. 17:33A-4(c).

> *Defendant Karim Arzadi, Esq.'s Prior Relationship with Runner and Unlawful Lay Chiropractic Owner Gregorio Lajara*

506. Defendant Arzadi's professional involvement with runners who unlawfully owned or controlled chiropractic clinics was not limited to the Defendant Bandys. In or about 2006, Defendant Arzadi rented office space in a building he owned through Fisbo of New Jersey, LLC ("Fisbo") at 103 Bayard Street, New Brunswick, New Jersey to Gregorio Lajara, whom he knew to be a runner. 

507. Lajara opened and operated Absolute Chiropractic and later New Wave Chiropractic in that space. Although these entities were purportedly owned by licensed chiropractors, Defendant Arzadi at all times knew that the chiropractors were owners on paper only, and that Lajara was the *de facto* owner of these clinics and controlled where  their patients were referred for further treatment. Moreover, Defendant Arzadi did not collect rent from Lajara until approximately a year after he began operating the chiropractic clinics there.

508. At all times that Lajara operated these clinics, the Arzadi Defendants maintained a personal injury practice in the same building. Notwithstanding his 

177

knowledge that Lajara was a runner and used other runners to solicit patients, and unlawfully controlled these clinics. Defendant Arzadi referred his clients for treatment to these entities, and other chiropractic clinics unlawfully controlled by Lajara, including In-Line Chiropractic, and received referrals of clients from them.   Defendant Arzadi and Fisbo did not begin collecting rent from Lajara until approximately a year after Absolute Chiropractic began treating patients, and even then only collected rent sporadically.

509.   On April 13, 2016, at the conclusion of liability in the non-jury trial of Allstate, et al. v. Gregorio Lajara, et. al., Docket No. UNN-L-4091-08 (also referred to herein as the "Lajara Litigation"), the Honorable James Hely, J.S.C. found as to Gregorio Lajara:

> In this litigation, a defendant by the name of Gregorio Lajara has already had a default judgment on liability entered against him at (sic) his many companies. Mr. Lajara, under the guise of running a medical management company ran chiropractic offices, a medical management company, a medical device company, an acupuncture company and even a law office, even though Lajara was not a lawyer.

> As the beleaguered lawyer, Frank DeVito testified before he died the Lajara offices were built around getting allegedly injured persons into the Lajara controlled facilities to quote, "Treat, treat, treat," closed quote. Essentially, what Mr. Lajara did was to learn the PIP system. He had a company that allegedly provided management services to chiropractic offices. However, his method of operation was to simply hire a chiropractor to be the titular owner of the chiropractic office because Mr. Lajara could not legally own such a practice.

> In reality, the chiropractor was simply a tool or employee of Lajara. Lajara would get the chiropractors he hired to treat, treat, treat, and refer to the alleged patients for additional services such as MRIs, EMG testing, acupuncture and the obtaining of medical devices such as TENS units. Runners were used -- I'm sorry. Runners were paid by Lajara to bring cases to his various facilities and I do find that Lajara and his companies including the chiropractic offices were an organized conspiracy that violated the New Jersey Insurance Fraud Prevention Act.

178

510.   The paper owner of Absolute Chiropractic, Keith Lewandowski, D.C. (hereafter "Lewandowski") testified on January 14, 2016 in the trial of the *Lajara Litigation* that in 2006 Lajara approached him about being the owner of a chiropractic clinic in New Brunswick.   Thereafter, Lajara made the arrangements to open up the office on Bayard Street in New Brunswick and then opened in July 2006.  The clinic was named Absolute Chiropractic; and after some negotiating, they agreed that Lajara would receive 90% of the profits and Lewandowski would receive 10% of the profits. Lewandowski did not set any office policies and did not select the location of the office. Lewandowski confirmed that he did not sign the lease for the office and did not even know if there was a lease.  Lewandowski had no role in signing a lease or hiring any staff; and was not going to the office and providing treatment on a regular basis. Lewandowski admitted that Lajara ran the show.  Eventually, Lewandowski told Lajara he wanted to break it off and all of the patients were transitioned to Lajara's New Wave Chiropractic which replaced Absolute Chiropractic and was owned on paper by Michael Carlesimo (hereafter "Carlesimo").

511.   On January 15, 2016, Carlesimo, the paper owner of Lajara's In-Line Chiropractic and New Wave Chiropractic, testified in the *Lajara Litigation* that Karim Arzadi was one of the lawyers who referred patients to In-Line Chiropractic, which Carlesimo characterized as a "medical mill."

512.   Carlesimo further described a scheme whereby Lajara hired "K.H." who had worked for Arzadi and was friends with both Arzadi and Lajara, to work at In-Line Chiropractic for a couple weeks.

513.   According to Carlesimo's testimony, K.H. would often not come back to work after leaving for lunch.  There came a time in 2010 when Carlesimo found out there were checks issued from In-Line to K.H. even though she was no longer working there.  Carlesimo pre-signed checks and someone else filled out the rest including the payment information to K.H. without Carlesimo's knowledge.

514.   Discovery in the *Lajara Litigation* revealed that, in addition to In-Line Chiropractic, Lajara's other entities, including Medico Management and Union Collections, issued checks to K.H. purportedly for "payroll" from August 5, 2005 through May 2, 2010.  The first check was in the amount of $234.  Thereafter, all checks ranged in amounts between $724 and $768.  During certain months, three checks were issued to K.H.

515.   During discovery in the *Lajara Litigation*, long-time Lajara employee Elvia Bedoya (hereafter "Bedoya") also provided evidence about Arzadi, Lajara and K.H.   In her certification, Bedoya stated that Arzadi referred a large number of patients to Gregorio Lajara's clinics.  She described K.H. as Arzadi's girlfriend and stated that K.H. had worked at In-Line Chiropractic for one month when it first opened.  Bedoya stated that K.H. began dating Arzadi, and after that did not show up for work anymore.  Bedoya recalled issuing paychecks to K.H. and questioning why the checks were being issued since K.H. no longer worked at In-Line.  She also complained to Lajara that they were not getting paid, but the checks to K.H. always went out on time.

516.   Upon information and belief, the arrangement involving payments to K.H. for a no-show job as Carlesimo and Bedoya described, or alternatively payroll or other

checks written to K.H. and other phantom employees and cashed, constituted kickbacks paid by Lajara to Arzadi for referrals of clients of the Arzadi Defendants to one or more chiropractic clinics unlawfully controlled by Lajara. Upon information and belief, the Defendant Bandys have used similar arrangements to make kickbacks or other payments to Defendant Arzadi in exchange for referrals of clients of the Arzadi Defendants, including certain of the Allstate Claimants, in furtherance of the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme.

> *Allegations Regarding the Role of Defendants Wishnic and Eugene S. Wishnic, P.C. in Furtherance of the Bandy Attorney Kickback Scheme and the Bandy Runner Scheme*

517.   Defendants Wishnic and Eugene S. Wishnic, P.C. (also referred to both individually and collectively herein as the "Wishnic Law Firm Defendants") have a high-volume personal injury law practice, with offices located at 110 Bayard Street, 2nd Floor, New Brunswick, New Jersey 08901, and at 167 Main Street, Ridgefield Park, New Jersey 07660.

518.   Upon information and belief, at all times relevant to this litigation, the Wishnic Law Firm Defendants have relied upon various advertising and marketing methods to promote their personal injury practice, including but not limited to the use of billboards, websites and other forms of advertising, as well as direct mail solicitations to individuals involved in recent automobile accidents as identified from police reports obtained from various police stations in New Jersey obtained pursuant to standing requests under New Jersey's common law and statutory open public records laws.

181

These advertising media are referred to collectively herein as the "Wishnic Client Advertising Methods."

519.   Upon information and belief, at times relevant to this litigation, Defendant Wishnic has also obtained referrals of personal injury clients by making kickbacks directly to runners, including certain of the Runner Defendants, and/or indirectly through payments to others, including the Defendant Bandys, Riotto and/or Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50, all in violation of Section 4(e) of the IFPA.

520.   Upon information and belief, at all times relevant to this litigation, Defendant Wishnic has paid the kickbacks described, and defrayed the costs of the Wishnic Client Advertising Methods, in part from the proceeds of kickback moneys paid directly or indirectly to him by healthcare providers to whom he has caused his personal injury clients to be referred, and individuals or entities associated with them, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50.

521.   Upon information and belief, at times relevant to this litigation, the Wishnic Law Firm Defendants have also knowingly obtained referrals of personal injury clients, including certain of the Allstate Claimants, who were recruited by the Defendant Runners on the part of the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics pursuant to the Bandy Schemes, and/or were allowed by the Defendant Bandys and Riotto to sign up the patients of the Defendant Bandy/Riotto Chiropractic Clinics, including certain of the Allstate Claimants, who had been recruited through the Bandy Runner Scheme, at the offices of those clinics.  In exchange for

these referrals and for being able to sign up clients at the offices of the Defendant Bandy/Riotto Chiropractic Clinics, the Wishnic Law Firm Defendants, acting at the direction of Defendant Wishnic, gave "in kind" kickbacks in the form of reciprocal referrals to the Defendant Bandys, Riotto and the Defendant Bandy/Riotto Chiropractic Clinics of clients of the Wishnic Law Firm, many if not most of whom had engaged them as a result of one or more of the Wishnic Client Advertising Methods.

522.   Upon further information and belief, these referrals were made on either a one-for-one basis, meaning Defendant Wishnic referred one of his clients for treatment at one of the Defendant Bandy/Riotto Chiropractic Clinics as an in-kind kickback for each person that was referred to the Wishnic Law Firm Defendants or that the Wishnic Law Firm Defendants were allowed to sign up at the locations of the Defendant Bandy/Riotto Chiropractic Clinics, or on the basis of some other formula or arrangement agreed upon by Defendant Wishnic with Defendants Anhuar Bandy, Karim Bandy and/or Riotto, and/or between Defendant Wishnic and Defendant John Doe 1-50, who was acting on behalf of Defendants Anhuar Bandy, Karim Bandy and/or Riotto.

523.   These mutual referrals were used by and between the Riotto and Bandy Defendants and Riotto and the Wishnic Law Firm Defendants as in-kind kickbacks in order to minimize the amount of cash needed to carry out the Bandy Attorney Kickback Scheme. This arrangement of mutual referrals used as in-kind kickbacks is referred to herein as the "Bandy-Wishnic In-Kind Kickback Arrangement."

524.   It has at all times been an element of the Bandy-Wishnic In-Kind Kickback Arrangement that Defendant Wishnic has retained the right to direct that any of the

clients of the Wishnic Law Defendants who were being treated by the Defendant Bandy/Riotto Chiropractic Clinics be referred by the Defendant Bandy Chiropractors or the Defendant Riotto Chiropractors to certain of the Referee Provider Defendants as designated by Defendant Wishnic, and further that Defendant Wishnic be able to retain any kickbacks paid by Referee Provider Defendants in exchange for such referrals.

525.   Upon further information and belief, Defendant Wishnic has either recouped, offset or shared the costs of the Wishnic Client Advertising Methods through contributions or payments made by or on behalf of the Wishnic Law Firm Defendants by certain of the Referee Provider Defendants either directly to Defendant Wishnic in cash, or indirectly to defray or offset a portion of the costs of the Wishnic Client Advertising Methods. Alternatively, certain of the Referee Provider Defendants made payments to one or more of the Patient Broker Defendants, in exchange for which the Patient Broker Defendants caused individuals who were involved in automobile accidents or who otherwise had personal injury claims to be referred to the Wishnic Law Firm Defendants for representation.

526.   Alternatively, the Wishnic Law Firm Defendants, acting either directly or indirectly through other entities they owned and/or controlled, including Defendants ABC Corp. 1-50 and/or XYZ, P.C. 1-50, paid kickbacks to certain of the Runner Defendants for referrals of patients, including certain of the Allstate Claimants, or made payments of kickbacks to the Defendant Bandys in exchange for each patient they referred to the Wishnic Law Firm Defendants, or for each patient that the Wishnic Law Firm

184

Defendants were allowed to sign up at the offices of one of the Defendant Bandy-Controlled Chiropractic Clinics.

527.   The Runner Defendants who solicited and/or recruited patients, including certain of the Allstate Claimants, to retain the Wishnic Law Firm Defendants included Defendants Anali Rivera, John Doe 1-50 (a/k/a "Tony Washington") and John Doe 1-50. These Runner Defendants not only solicited individuals who had been involved in accidents to retain the Wishnic Law Firm Defendants, but as related by Ric Garces to Allstate SIU representative Matt Telliho on August 27, 2009, even offered to pay those individuals $500 each if they would switch from their representation by the Garces Law Firm to the Defendant Wishnic Law Firm, and $300 for each additional person they referred to them.

528.   At all times relevant to this litigation, Defendant Wishnic and the other Wishnic Law Firm Defendants knew that the Defendant Bandys paid runners, including the Runner Defendants, to recruit patients to treat at the Defendant Bandy/Riotto Chiropractic Clinics and therefore knew that the client referrals he and the other Wishnic Law Firm Defendants received from the Defendant Bandys were the result of payments to runners for soliciting people to make claims for PIP benefits and for personal injury benefits in violation of N.J.S.A. 17:33A-4(e).  By undertaking the representation of each such claimant and submitting claims to the Allstate Plaintiffs and other insurers on behalf of each such claimant, including certain of the Allstate Claimants, the Wishnic Law Firm Defendants knowingly benefited from a violation of the IFPA, and thereby violated N.J.S.A. 17:33A-4(c).

185

*Allegations Regarding the Role of Defendant Schenerman and the Schenerman
Law Firm Defendants in the Bandy Attorney Kickback Scheme and
Other Provider Kickback Schemes*

529.   At various times relevant to this litigation, Defendant Brad S. Schenerman,

Esquire, has been engaged in paying the Defendant Bandys, Defendant Riotto and/or

the Montana/Barrese Defendants kickbacks for client referrals in furtherance of the

Bandy Runner Scheme.

530.   In his July 7, 2015 plea allocution, Defendant Anhuar Bandy testified that

Defendant Schenerman paid him and/or his brother for clients referred to Schenerman's

law practice from the Defendant Bandy-Controlled Chiropractic Clinics.   Defendant

Karim Bandy also testified in his July 7, 2015 plea allocution that Defendant

Schenerman paid one of his marketing or management companies for patients to be

referred to Schenerman's law office.

531.   Defendant Schenerman has also participated in referral and kickback

schemes involving other healthcare providers.   These other healthcare providers

included Scott Greenberg, D.C., who was arrested by agents of the OIFP on July 27,

2011, on the same day that Defendants Montana and Barrese were arrested, for paying

runners for patients, and who subsequently pleaded guilty to, *inter alia*, healthcare

claims fraud.

*Defendant Schenerman's Role in the Greenberg Schemes*

532. Defendant Schenerman was one of a number of other lawyers and law firms with whom Greenberg had kickback and referral relationships. These kickback relationships involved either the payment of cash kickbacks or in-kind kickbacks in the form of "one-for-one" referral relationships of a patient of the Greenberg Defendants to the lawyer in exchange for a referral of a client of the lawyer to be treated by one of the Greenberg Defendants.

533. The undercover tapes between OIFP Confidential Witness C.W. and Greenberg revealed that beginning in the spring of 2010, Defendant Schenerman participated in a mail solicitation kickback scheme that Defendant Greenberg had set up through two individuals that Greenberg was working with, "Russell" and "Alex," and through which Greenberg subsidized the cost of developing direct mail solicitation packages that would be sent out in the names of multiple law firms to individuals who had been involved in automobile accidents.

534. As Greenberg explained during one of his taped conversations with C.W., the participating lawyers would have to agree to pay approximately $1,000 a month to Russell and Alex as a cover to make the relationship appear to be a legitimate expense, but that the amount paid would be credited against the amount the lawyer would owe him for each client referral the participating lawyers received through the scheme. Greenberg emphasized that as part of the deal, the lawyer also had to agree to refer all of their clients to Greenberg's clinics.

535.   Greenberg explained that the more packages they sent to an accident victim from lawyers participating in this scheme, the greater the odds the person would choose one of the participating lawyers, and that Greenberg and the clinics he operated would get that person as a patient.

536.   Greenberg told C.W. that the cost to him of setting up each lawyer to participate in the scheme was about $12,000, but that it was a "a great investment" for Greenberg: "Think about it. . . . I get two cases. It pays for itself. . . . You know what I mean? Just like with Brad. We had five cases last week. It just . . . got started. I'm done. . . . If, if it doesn't work out I'm already ahead of the game." Greenberg's reference to "Brad," was a reference to Defendant Schenerman.

*Defendant Schenerman's Role with the Montana/Barrese Element of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme*

537.   Between February of 2010 and late summer of 2010, Defendant Schenerman represented at least 6 Allstate claimants who were patients of Defendant Chiropractic Centre of Elizabeth.

538.   Upon further information and belief, prior to representing these and other patients of Defendant Chiropractic Centre of Elizabeth in 2010, Defendant Schenerman had not previously represented a client who treated at Defendant Chiropractic Centre of Elizabeth since 2008. The initial dates of treatment for several of these Allstate Claimants at Defendant Chiropractic Centre of Elizabeth coincide with the initial treatment dates at Chiropractic Centre of Elizabeth of a flurry of Allstate Claimants who were represented by Defendant Walker, and who are listed on the Gallegos/Walker Ledger as having been referred by Defendant Anhuar Bandy.

539.   This flurry of patients also coincided with the time that Allstate Claimant Z.M. 171630312-01, as described above, was solicited by Defendants Anhuar Bandy and Bernardo Neiman (a/k/a "Benny"), referred to Defendants Walker and Gallegos, and offered money by them to begin treating at Defendant Chiropractic Centre of Elizabeth.

540.   The Allstate Claimants and others who were patients of Defendant Chiropractic Centre of Elizabeth and who were represented at about that time by Defendant Schenerman were solicited by Defendant Bandy and/or one or more of the Runner Defendants in furtherance of the Bandy Runner Scheme, and referred to Defendant Schenerman by Defendant Anhuar Bandy in exchange for kickbacks paid by Defendant Schenerman and the Montana/Barrese Defendants in furtherance of both the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

541.   Once the Defendant Bandys opened Defendant Good Health Center in Elizabeth in or about the end of November 2010, the Allstate Claimants for whom the Schenerman Law Firm Defendants had paid kickbacks to Defendant Anhuar Bandy in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme were mostly patients of Defendant Good Health Center.

542.   At all times relevant to this litigation, Defendant Schenerman and the other Schenerman Law Firm Defendants knew that the Defendant Bandys paid runners, including the Runner Defendants, to recruit patients to treat at the Defendant Bandy/Riotto Chiropractic Clinics and therefore knew that the client referrals he and the other Schenerman Law Firm Defendants received from the Defendant Bandys were the

result of payments to runners for soliciting people to make claims for PIP benefits and for personal injury benefits in violation of N.J.S.A. 17:33A-4(e).   By undertaking the representation of each such claimant and submitting claims to the Allstate Plaintiffs and other insurers on behalf of each such claimant, including certain of the Allstate Claimants, the Schenerman Law Firm Defendants knowingly benefited from violations of the IFPA, and thereby violated N.J.S.A. 17:33A-4(c).

> *Allegations Regarding the Mechanics of Cross-Referrals and Other Changes in Client Representation Between the Law Firm Defendants in Furtherance of the Bandy Attorney Kickback Scheme and the Bandy Runner Scheme*

543.   At various times relevant to this litigation, it was an element of the Bandy Attorney Kickback Scheme that when one of the Law Firm Defendants determined they had a conflict of interest representing a client that the Defendant Bandys had caused to be referred to them in exchange for a kickback in furtherance of the Bandy Attorney Kickback Scheme, Defendant Anhuar Bandy would cause that client to be referred to one of the other Law Firm Defendants and vice versa.

544.   In such cases the Law Firm Defendant who gave up the client due to a conflict would receive a "credit" from Defendant Anhuar Bandy for the amount of the kickback they had paid Defendant Bandy for that referral, and the Law Firm Defendant who received the client would pay the Defendant Bandys a kickback for the referral.

545.   Transfers of representation of clients between the Schenerman Law Firm Defendants and Defendants Gallegos and Walker and *vice versa* due to conflicts and for other reasons were particularly common during the course of the Bandy Attorney Kickback Scheme.   Such transfers were at all times made in consultation with

190

Defendant Anhuar Bandy, and upon information and belief, without offering their clients a meaningful opportunity to choose their own counsel to replace the conflicted Law Firm Defendant.

546.   The mechanics of how Defendant Anhuar Bandy and the Law Firm Defendants resolved client conflicts in the context of the Bandy Attorney Kickback Scheme are illustrated by a 4-car chain collision accident that occurred in Perth Amboy on July 24, 2010.   According to the police report, Vehicle #1, which was the lead car, was driven by Allstate Claimant D.R. 174011569-01.   Vehicle #3 was driven by Allstate Claimant C.V. 173616863-01.   Both of these claimants are listed on the Gallegos/Walker Ledger as having been referred by Defendant Anhuar Bandy. Defendant Gallegos and/or Walker at some point realized they would have a conflict representing Claimant C.V. 173616863-01, in light of their representation of Claimant D.R. 174011569-01, in the same accident, and the Gallegos/Walker Ledger was marked to note that this matter was closed due to a conflict.   Claimant C.V. 173616863-01 was then referred to Defendant Schenerman by Defendant Anhuar Bandy in exchange for a kickback.

547.   Another example of how the Defendant Bandys assigned the Allstate Claimants recruited through the Bandy Runner Scheme to the Law Firm Defendants through the Bandy Attorney Kickback Scheme is Allstate Claim No. 188507297, which arose from a January 8, 2011 automobile accident (the "January 8, 2011 Accident"), and in which there were four occupants in the same car, one of whom was a minor.   All four claimants underwent treatment at Defendant Good Health Center, and the three

adult passengers were referred for virtually the identical series of procedures, including acupuncture treatment with Defendant Golden Flower, EMG/NCV testing by Defendant MLS Medical, and pain management procedures performed by Midland Anesthesia and Pain Management at Meadowlands Hospital. Two of the adults received MRIs at Third State Radiology.

548.   All three of the adults were represented by either Defendants Walker and Gallegos or Defendant Schenerman, or both. Two of the claimants, Allstate Claimant J.P. 188507297-01, who was the driver, and Allstate Claimant J.A. 188507297-13, a passenger, were referred to Advanced Balance and James Morales, M.D., who submitted HICF invoices to the Allstate Plaintiffs for these two claimants on the same date, March 25, 2011. On the HICF for Claimant J.P. 188507297-01, the claimant's address is listed as "c/o Brad Schenerman." On the HICF for Claimant J.A. 188507297-13, the claimant's address is listed as "c/o David Walker." Seventeen months later, Advanced Balance and Morales sent Allstate a HICF dated August 2, 2012, but this one now listed the same Claimant J.P's address as "c/o David Walker." The Gallegos/Walker Ledger lists Claimant J.A. 188507297-13 under a variation of his name as having been referred by Defendant Anhuar Bandy.

549.   Upon information and belief, these Allstate Claimants were referred to Defendants Walker, Gallegos and the Schenerman Law Firm Defendants originally in exchange for kickbacks in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

192

550   The representation of these Allstate Claimants was later transferred between Defendants Schenerman and Walker and Gallegos at the direction, or with the consent of Defendant Anhuar Bandy, and without offering these Allstate Claimants a meaningful opportunity to choose their own counsel to replace the withdrawing Law Firm Defendant.

551.   In some cases, the representation of clients who had been recruited and referred to one Law Firm Defendant pursuant to the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme were transferred to another Law Firm Defendant due to the actions of Defendant Runners.

552.   An example of such a scenario is illustrated by a lawsuit that Defendant Arzadi filed against Defendant Walker on November 1, 2013, in which Defendant Arzadi sought to recover costs and legal fees associated with three clients who initially retained the Arzadi Law Firm Defendants to represent them relating to motor vehicle accidents, but subsequently changed their representation to Walker.   See Arzadi v. Walker, Middlesex County Superior Court, Law Division, Docket No.: Mid-L-6922-13.  Along with the lawsuit, the Arzadi Law Firm Defendants filed a notice of an Order to Show Cause scheduled for January 14, 2014.  The parties settled the suit before this return date.

553.   Upon information and belief, Runner Defendant John Doe 1-50 initially referred these three claimants, A.A., J.A. and I.R. to the Arzadi Law Firm Defendants; and also referred each claimant for treatment with one of the Defendant Bandy/Riotto Chiropractic Clinics, after which two of the claimants received testing and/or treatment with certain of the Referee Provider Defendants.

193

554.   Also, upon further information and belief, after the Arzadi Law Firm Defendants had negotiated a settlement of the claims of these claimants with the insurer for the defendants in the underlying bodily injury claims, Runner Defendant John Doe 1-50 sought payment of a portion of the settlement award, or sought to have the award disbursed to the claimants pursuant to instructions the Arzadi Law Firm Defendants were unwilling to follow.   As a result, Defendant Runner John Doe 1-50 pulled the three cases from the Arzadi Law Firm Defendants and brought them to a more accommodating lawyer, specifically Defendant Walker and his paralegal, Defendant Gallegos, who complied with the wishes of Defendant Runner John Doe 1-50.

*Allegations Regarding the Roles of the Bandy Law Firm Defendants in Furtherance of the Bandy Provider Kickback Scheme*

555.   At all times relevant to this litigation, it has been an element of the Bandy Attorney Kickback Scheme that in addition to giving kickbacks to the Bandy Defendants in money and/or in kind for the referrals of clients that were recruited by the Bandy Runner Defendants, the Law Firm Defendants also took additional actions that assisted the Defendant Bandys and the other Defendants herein in furtherance of the other Bandy Schemes.

556.   Upon information and belief each of the Law Firm Defendants encouraged the clients they received through the Bandy Attorney Kickback Scheme to undergo any treatments, testing or other procedures that were recommended by the Defendant Bandy/Riotto Chiropractors and the Referee Provider Defendants because they at all times understood that the Bandy Schemes were interrelated, and the ability of the

194

Defendant Bandys to generate new prospective clients for the Law Firm Defendants through the Bandy Runner Scheme depended upon the Defendant Bandys' ability to profit from the healthcare services rendered by the Defendant Bandy/Riotto Chiropractic Clinics and through the kickbacks the Defendant Bandys received directly or indirectly from the Referee Provider Defendants.

557.   It was at all times an element of their participation in the Bandy Attorney Kickback Schemes and the other Bandy Schemes, that the Law Firm Defendants would induce the patients of the Defendant Bandy/Riotto Chiropractic Clinics, including the Allstate Claimants, to undergo the treatments, testing and other procedures that were recommended by advising them that the more such services they underwent, the more likely insurers would be willing to pay a settlement to resolve their bodily injury claim, and the higher any such settlement would be.  The Law Firm Defendants would give this advice to the Allstate Claimants and other patients of the Defendant Bandy/Riotto Chiropractic Clinics and the Referee Provider Defendants with the knowledge that they were conspiring in and assisting themselves and the other Defendants in furtherance of the Bandy Schemes.

558.   Upon information and belief, it was at all times an element of their participation in the Bandy Attorney Kickback Schemes and the other Bandy Schemes that the Law Firm Defendants would on occasion "hold" certain of the Allstate Claimants and other clients in furtherance of the Bandy Schemes.  This means that even when the client did not have a claim of liability for bodily injury that was reasonably likely to succeed the Law Firm Defendants would knowingly either fail to inform the client of that

195

fact, or would affirmatively mislead them regarding the likelihood of their success on their bodily injury claim, so that they would continue to undergo treatments, testing and/or other procedures with the Defendant Bandy/Riotto Chiropractic Clinics and/or the Referee Provider Defendants, so that those other Defendants would continue to earn revenue in furtherance of the Bandy Schemes.



### Allegations Regarding the Bandy Provider Kickback Scheme

559.   The Bandy Provider Kickback Scheme has at all times relevant to this litigation been inter-related with, and an integral part of, the other Bandy Schemes, and the kickbacks the Bandys received from the Golden Acupuncture Defendants, the MLS Medical Defendants and the other Referee Provider Defendants have at all times been used by the Defendant Bandys, Riotto and the other Defendants herein in furtherance of the Bandy Schemes.



560.   Plaintiffs allege that Defendants Chi Acupuncture, Johnson and the Golden Acupuncture Defendants participated in the Bandy Provider Kickback Scheme, pursuant to which they paid kickbacks to the Defendant Bandys, Defendant Riotto and the Defendant Bandy/Riotto Chiropractic Clinics, either directly or through the Defendant Bandy Management Companies, or by making payments to third parties to defray other costs of the Bandy Schemes, in exchange for the referrals of patients, including Allstate Claimants, from the Defendant Bandy/Riotto Chiropractic Clinics. This element of the Bandy Provider Kickback Scheme is referred to as the "Bandy Acupuncture Fee-Splitting Scheme," which includes the Golden Acupuncture Fee-

196

Splitting Scheme and the Chi Acupuncture Fee-Splitting Scheme. These allegations are set forth in the Seventh through Ninth Counts.

561. The Allstate Plaintiffs allege that the MLS Medical Defendants participated in the Bandy Provider Kickback Scheme, pursuant to which the MLS Medical Defendants paid kickbacks to the Defendant Bandys, Defendant Riotto and the Defendant Bandy/Riotto Chiropractic Clinics, either directly or through the Defendant Bandy Management Companies, or by making payments to third parties that defrayed other costs of the Bandy Schemes, in exchange for the referrals of patients, including Allstate Claimants, from the Defendant Bandy/Riotto Chiropractic Clinics. This element of the Bandy Provider Kickback Scheme is referred to as the "Bandy-MLS Medical Kickback Scheme." These allegations, along with allegations that the MLS Medical Defendants participated in kickback schemes with the Chiropractic Physicians Group Defendants and other MLS Medical Referring Defendants who are unknown to Plaintiffs at this time, are set forth in the Eleventh through Thirteenth Counts.

562. Plaintiffs allege that the Other Referee Provider Defendants, who are either unknown to Plaintiffs at this time, or who already have been named or are anticipated to be named by Plaintiffs in other litigations as set forth in the Allstate Plaintiffs' R. 4:5-1 Certification have participated in the Bandy Provider Kickback Scheme, pursuant to which the Other Referee Provider Defendants paid kickbacks to the Defendant Bandys, Defendant Riotto and the Defendant Bandy/Riotto Chiropractic Clinics, either directly or through the Defendant Bandy Management Companies, through payments to the Patient Broker Defendants, or by making payments to third

parties that defrayed other costs of the Bandy Schemes, in exchange for the referrals of patients, including Allstate Claimants, from the Defendant Bandy/Riotto Chiropractic Clinics or from the Other Referring Defendants.   This element of the Bandy Provider Kickback Scheme is referred to as the "Bandy-Other Referee Provider Kickback Scheme."   These allegations, along with allegations that the Other Referee Provider Defendants participated in kickback schemes with the Other Referring Defendants who are unknown to Plaintiffs at this time, are set forth in the Fourteenth through Sixteenth Counts.

*Background of the Bandy Provider Kickback Schemes*

563.   As described above, on February 20, 2008, while Defendant Anhuar Bandy was still incarcerated, he explained in detail to representatives of Allstate that to be successful the economic model for large-volume automobile insurance fraud networks -- in which runners were paid up to $2,000.00 or more per patient  -- could not be financed from the revenue generated solely from chiropractic services, because of the relatively narrow profit margins that can be generated from such services under New Jersey's PIP fee schedule.   The meeting at which Defendant Anhuar Bandy made these statements to Allstate's representatives is referred to herein as the "February 20, 2008 Anhuar Bandy Meeting."

564.   Defendant Anhuar Bandy further explained to Allstate's representatives in the course of the February 20, 2008 Anhuar Bandy Meeting that the owners of such clinics must instead recoup the upfront costs of payments to runners through kickback monies received in exchange for the referral of those purchased chiropractic patients to

198

other health care providers and professionals, such as MRI, neurodiagnostic testing and physical rehabilitation facilities and to personal injury attorneys.

565.   Defendant Anhuar Bandy also explained to Allstate's representatives during the February 20, 2008 Anhuar Bandy Meeting that the owners of the chiropractic clinics participating in high volume automobile injury fraud network schemes often rely upon individuals he described as "kickback brokers" to act as middlemen to facilitate and disguise the transfer of money from MRI, neurodiagnostic testing, physical rehabilitation and other facilities to the owners of chiropractic clinics in exchange for the referral of patients to those other healthcare providers.  Plaintiffs refer herein to these middlemen as "patient brokers."

### The Golden Acupuncture Scheme

566.   Upon information and belief, Defendant Anhuar Bandy met Defendants Lipshitz and Roytman through Defendants Montana and Barrese when he was working as a runner for Defendant Chiropractic Centre of Elizabeth, which Defendants Montana and Barrese owned.

567.   In early July 2009, Allstate received a letter from Defendant Roytman written on the letterhead of Defendant Chiropractic Centre of Elizabeth stating that Dart Acupuncture would no longer be providing acupuncture services to its patients, and that henceforth it would be billing for acupuncture services rendered by Roytman in its own name.

568.   In or about April or May of 2010, the Defendant Bandys were planning to expand the Bandy Concealed Ownership Scheme and the other Bandy Schemes and in

furtherance thereof formed Defendants Eclipse Chiropractic on May 2, 2010 and Chiropractic Spine Center on May 4, 2010.

569. At or about that same time, the Defendant Bandys entered into an arrangement with Defendants Roytman and Lipshitz, pursuant to which Roytman and Lipshitz formed Defendant Golden Lotus Acupuncture on May 11, 2010 in furtherance of the Bandy Concealed Ownership Scheme and the Bandy Provider Kickback Scheme. This arrangement is referred to herein as the "Golden Acupuncture Scheme." As used in this Complaint the term, "Golden Acupuncture Scheme," encompasses two distinct but related schemes, which Plaintiffs allege herein in the alternative: First, the Defendant Bandys at all times controlled the Defendant Golden Acupuncture Entities in furtherance of the Bandy Concealed Ownership Scheme, and were its *de facto* owners, while Defendants Lipshitz and Roytman were merely the "paper owners" of the Defendant Golden Acupuncture Entities. This element of the Golden Acupuncture Scheme is referred to herein as the Golden Acupuncture Concealed Ownership Scheme, and Plaintiffs' allegations relating thereto are set forth in the First through Third Counts, below.

570. Alternatively, Plaintiffs allege as the second element of the Golden Acupuncture Scheme that at all times since the formation of the Defendant Golden Acupuncture Entities, Defendants Lipshitz and Roytman engaged in a massive unlawful fee-splitting scheme with the Defendant Bandys pursuant to which they effectively paid the Defendant Bandys for patient referrals from the Defendant Bandy/Riotto Chiropractic Clinics in exchange for kickbacks paid under the guise of payments for

ostensibly legitimate services provided by one or more of the Defendant Bandy Management Companies. This latter element of the Golden Acupuncture Scheme is referred to herein as the "Golden Acupuncture Fee-Splitting Scheme." The Plaintiffs' allegations relating thereto and to the Chi Acupuncture Fee-Splitting Scheme are set forth in the Seventh through Ninth Counts, below.

571.   It was at all times the purpose and object of the Golden Acupuncture Concealed Ownership Scheme and the intent of Defendants Roytman, Lipshitz and the Bandys, that Defendant Golden Lotus Acupuncture would appear to be owned by Defendant Roytman, but would, in fact, effectively be controlled by the Defendant Bandys and would provide acupuncture services solely for the Defendant Bandy/Riotto Chiropractic Clinics.

572.   Over the following weeks and months Allstate began receiving bills for acupuncture services rendered in the name of Defendant Golden Lotus Acupuncture for claimants who were being treated at Defendants Eclipse Chiropractic, Chiropractic Spine Center, Wellspring Rehabilitation and True Healing and Wellness, and later at others including Defendant Lakewood Chiropractic Center.

573.   At the time of the formation of Defendant Golden Lotus, the Defendant Bandys already controlled and were unlawfully profiting from acupuncture services rendered by Defendant Chi Acupuncture, which was in the name of its paper owner, Defendant Monica Johnson.

574.   The Defendant Bandys would not have caused or allowed patients of Defendants Eclipse Chiropractic, Chiropractic Spine Center, Lakewood Chiropractic,

201

Wellspring Rehabilitation and True Healing and Wellness to be referred for acupuncture services to be performed by Defendants Roytman, Lipshitz and/or the other Defendant Acupuncture Professionals and billed in the name of Defendant Golden Lotus unless they could also unlawfully profit from those services through the Golden Acupuncture Scheme.

575.   Upon information and belief, notwithstanding that Defendant Roytman purportedly owned Defendant Golden Lotus Acupuncture, she continued working at Defendant Chiropractic Centre of Elizabeth throughout at least December of 2010.

576.   Upon information and belief, although Defendant Roytman was the purported owner of Defendant Golden Lotus Acupuncture, Defendant Lipshitz served for a period as its president and was at all times authorized to, and did in fact, act on its behalf.

577.   Upon information and belief, it was at all times since the formation of Defendant Golden Lotus an object and purpose of the Golden Acupuncture Scheme that in exchange for the patient referrals Defendant Golden Lotus received from Defendants Eclipse Chiropractic, Chiropractic Spine Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Wellspring Rehabilitation and True Healing and Wellness that Defendants Roytman and Lipshitz would pay the bulk of the profits they earned from those services to the Defendant Bandys, either because the Defendant Bandys effectively owned and controlled Defendant Golden Lotus in furtherance of the Golden Acupuncture Concealed Ownership Scheme, or alternatively, as kickbacks pursuant to the Golden Acupuncture Fee-Splitting Scheme.

578.   Upon information and belief, it was also at all times after the formation of Defendant Golden Lotus an element of the Golden Acupuncture Scheme that the revenue owed to the Defendant Bandys would be paid to the Defendant Bandys directly to them in cash and/or indirectly to them by checks made payable to one or more of the Defendant Bandy Management Companies under the guise of payments for rent, management, billing and collection services, or some other seemingly legitimate services, but which payments were in fact at all times known and understood by these Defendants to be either kickbacks for patient referrals owed pursuant to the Golden Acupuncture Fee-Splitting Scheme, or the share of the profits of Defendant Golden Lotus owed to the Defendant Bandys because they were the *de facto* owners of and/or otherwise in control of Defendant Golden Lotus in accordance with the Golden Acupuncture Concealed Ownership Scheme.

579.   Not coincidentally, at about the same time the Defendant Bandys entered into these discussions with Defendants Roytman and Lipshitz to form Golden Lotus, they entered into kickback and referral relationships with the Referee Provider Defendants, several of which already had referral relationships with the Montana/Barrese Defendants.

580.   Beginning in or about late 2010, the Defendant Bandys entered into an agreement with Defendant Riotto, pursuant to which Defendants Riotto and Riotto Family Chiropractic agreed to participate in and assist the Bandy Concealed Ownership Scheme, the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and the Bandy Provider Kickback Scheme, and at which time certain of the Runner Defendants,

including Defendants Hughes and John Doe 1-50, began soliciting and recruiting individuals involved in accidents to undergo treatment at the office of Defendant Riotto Family Chiropractic at 521-523 Broad Street, Trenton, New Jersey.

581.   In consideration for allowing Defendants Riotto and Riotto Family Chiropractic to participate in and obtain patient referrals through, or as otherwise part of, the Bandy Runner Scheme, Defendant Riotto agreed with the Defendant Bandys and Defendants Lipshitz and Roytman, to begin causing patients of Defendant Riotto Family Chiropractic, including certain of the Allstate Claimants, to be referred for acupuncture services to be performed in the name of Defendant Golden Flower Acupuncture, which Defendants Lipshitz and/or Roytman caused to be formed on January 10, 2011 in furtherance of the Golden Acupuncture Scheme.

582.   It was at all times the intent of Defendants Roytman, Lipshitz and the Bandys that Defendant Golden Flower Acupuncture would appear to be owned by Defendant Lipshitz, but would, in fact, effectively be controlled by the Defendant Bandys and/or Defendant Riotto and would provide acupuncture services in furtherance of the Golden Acupuncture Scheme solely for chiropractic clinics controlled by the Defendant Bandys and/or Defendant Riotto.

583.   At the same time that Defendant Riotto began causing patients of Defendant Riotto Family Chiropractic, including certain of the Allstate Claimants to be referred for acupuncture services to be billed in the name of Defendant Golden Flower Acupuncture, the Defendant Bandys and/or John Doe 1-50, began causing patients of Defendant Good Health Center to be referred for acupuncture services to be billed in

204

the name of Defendant Golden Flower Acupuncture in furtherance of the Golden Acupuncture Scheme.

584    Indeed, the Defendant Bandys, Riotto, Riotto Family Chiropractic, Lipshitz, Roytman and Golden Flower Acupuncture were in such a hurry to begin billing insurers for acupuncture services performed on patients of Defendants Riotto Family Chiropractic and Good Health Chiropractic, they billed Allstate in the name of Defendant Golden Flower Acupuncture for services that were rendered on certain of the Allstate Claimants before the January 10, 2011 date that Defendant Golden Flower was formed.

585.    Upon information and belief, it was at all times after the formation of Defendant Golden Flower Acupuncture an element of the Golden Acupuncture Scheme that in exchange for the patient referrals Defendants Golden Flower, Lipshitz and Roytman received from Defendants Riotto Family Chiropractic, Good Health Chiropractic and Pennsauken Chiropractic that Defendants Roytman, Lipshitz and Golden Flower Acupuncture would pay the bulk of the profits they earned from those services to the Defendant Bandys and/or Riotto, either in furtherance of the Golden Acupuncture Concealed Ownership Scheme because the Defendant Bandys and/or Riotto effectively owned and controlled Defendant Golden Flower, or alternatively, as kickbacks for the patient referrals in furtherance of the Golden Acupuncture Fee-Splitting Scheme.

586.    Upon information and belief, it was also at all times after the formation of Defendant Golden Flower an element of the Golden Acupuncture Scheme that the revenue owed to the Defendant Bandys and/or Riotto by Defendants Roytman, Lipshitz

205

and Golden Flower would be paid by them to Defendants Riotto Family Chiropractic, Good Health Chiropractic and Pennsauken Chiropractic and/or to one or more of the Defendant Bandy Management Companies under the guise of payments for rent, management, billing and collection services, employee leasing services, or some other services, but which payments were in fact at all times known and understood by these Defendants to be either kickbacks for patient referrals owed pursuant to the Golden Acupuncture Fee-Splitting Scheme, or the share of the profits of Defendant Golden Flower owed to the Defendant Bandys and/or Riotto pursuant to the Golden Acupuncture Concealed Ownership Scheme, because the Defendant Bandys were the *de facto* owners of Defendant Golden Flower.

587.   Upon information and belief, it has at all times since the formation of Defendant Golden Lotus been an element of the Golden Acupuncture Scheme that one of the ways that Defendants Roytman, Lipshitz and Golden Lotus would pay the share of revenue or kickbacks they owed to the Defendant Bandys pursuant to the Golden Acupuncture Scheme would be by paying other costs and expenses of the Defendant Bandy/Riotto Chiropractic Clinics and/or of the Defendant Bandy Management Companies in operating Defendants Eclipse Chiropractic, Chiropractic Spine Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Wellspring Rehabilitation and/or True Healing and Wellness.

588.   Similarly, upon information and belief, it has at all times since the formation of Defendant Golden Flower been an element of the Golden Acupuncture Scheme that one of the ways Defendants Roytman, Lipshitz and Golden Lotus would

206

pay the share of revenue or kickbacks they owed to the Defendant Bandys and/or Riotto would be by paying other costs and expenses of the Defendant Bandy/Riotto Chiropractic Clinics and/or of the Defendant Bandy Management Companies in operating Defendants Good Health Center, Riotto Family Chiropractic, Lakewood Chiropractic, Pennsauken Chiropractic and Millennium Chiropractic.

589. For example, on or about August 7, 2012, Defendant Lipshitz signed a three-year lease on behalf of Defendant Golden Lotus Acupuncture for the premises known as 5824 Westfield Avenue, Pennsauken, New Jersey, which was used by Defendant Pennsauken Chiropractic and the Bandy Defendants and the Golden Acupuncture Defendants in furtherance of the Bandy Schemes. These premises are referred to herein as the "Pennsauken Chiropractic Office Location."

590. Defendant Estefania Frias, who is a licensed real estate agent, acted as a real estate agent and received a commission in connection with this lease transaction. Defendant Estefania Frias engaged in this transaction in furtherance of the Golden Acupuncture Schemes and the other Bandy Schemes.

591. Despite the fact that Defendant Lipshitz signed the lease on behalf of Defendant Golden Lotus, the premises bore no outward signage, or gave any other indication, that either Defendant Golden Lotus or Defendant Golden Flower did business at the Pennsauken Chiropractic Office Location.

592. Upon information and belief, the lease payments made by Defendants Golden Lotus, Golden Flower, Lipshitz and/or Roytman in connection with the Pennsauken Chiropractic Office Location, as well as other payments they made toward

the operating costs of the Defendant Bandy/Riotto Chiropractic Clinics and/or the Defendant Bandy Management Companies were made in payment of the kickbacks they owed to the Defendant Bandys and/or Riotto for patient referrals in furtherance of the Golden Acupuncture Fee-Splitting Scheme, and/or for their share of the revenue of Defendants Golden Lotus or Golden Flower that Defendants Roytman and Lipshitz had agreed to pay the Defendant Bandys as the *de facto* owners of Defendant Golden Lotus, and Defendants Bandys and/or Riotto as the *de facto* owners of Defendant Golden Flower, pursuant to the Golden Acupuncture Concealed Ownership Scheme.

593. Upon information and belief, on occasion the kickbacks owed by Defendant Riotto to the Defendant Bandys for patients, including certain of the Allstate Claimants, they paid the Runner Defendants to solicit and recruit to treat at Defendant Riotto Family Chiropractic, were offset by kickbacks that the Defendant Bandys would otherwise have owed Defendant Riotto for causing patients of Defendant Riotto Family Chiropractic to be referred for acupuncture services rendered in the name of Defendant Golden Flower Acupuncture.

### The MLS Medical Kickback Scheme

594. Sometime in late 2008 or early 2009, Defendants Mark Schwartz, D.O. and Anthony Riotto, D.C. began discussing the enormous profits that could be made from providing diagnostic testing to No Fault insurance patients in New Jersey.

595. Not content to form a single practice to provide diagnostic testing, Defendants Schwartz and Riotto, envisioned creating a framework that would enable them, acting in concert with others they knew, to set up a series of diagnostic testing

practices in New Jersey from which they could profit by paying kickbacks to providers for referring patients for electrodiagnostic and other testing.

596.   In furtherance of that plan, Defendants Schwartz and Riotto caused Turn Key Neurodiagnostic Services, LLC to be formed in New Jersey on January 11, 2009. Both Defendants Schwartz and Riotto were members of this entity.

597.   Shortly after forming this entity, Defendants Riotto and Schwartz set their plan in motion and began to seek sources of patient referrals in New Jersey.

598.   Upon information and belief, at about that time Defendant Riotto introduced Defendants MLS Medical and Schwartz to Defendants Kenneth Gross, D.C. and Michele Dubnoff, D.C., who were the owners of Defendant Chiropractic Physicians Group (collectively referred to herein as the "Chiropractic Physicians Group Defendants").

599.   Defendants Riotto and Gross had known each other since at least September of 2005, when they formed Hackensack Rehabilitation Associates, LLP together.

600.   Although Defendant MLS Medical Group had been formed by Defendant Schwartz in New Jersey on August 15, 2006, Defendant Schwartz did not begin performing electrodiagnostic testing on PIP patients through that entity until February or early March of 2009.  Upon information and belief, the Chiropractic Physicians Group Defendants were the first of the MLS Medical Referring Defendants to begin referring patients to Defendants MLS Medical and Schwartz for electrodiagnostic testing.

209

601. The first Allstate Claimant to be referred to Defendants Schwartz and MLS Medical was Allstate Claimant C.V. 117546309-01 on March 4, 2009. Numerous other referrals from the Chiropractic Physicians Defendants and by other MLS Medical Referring Defendants to Defendants MLS Medical and Schwartz soon followed.

602. Upon information and belief, each of these referrals of patients by the MLS Medical Referring Defendants was made in exchange for payments of kickbacks either made directly to them or in payments of expenses to third-parties on their behalf by the MLS Medical Defendants, or through one or more of the Patient Broker Defendants by Defendants MLS Medical, Schwartz, Riotto and/or John Doe 1-50, or through one or more other kickback methods unknown to Plaintiffs at this time.

603. Under New Jersey's regulations governing the practice of medicine, the component of electrodiagnostic testing known as an electromyography ("EMG") must be performed by a plenary licensed physician, such as a medical doctor or doctor of osteopathy. Nerve Conduction Velocity ("NCV") testing, which unlike EMG testing does not involve the insertion of needles in a patient, may be performed by a non-licensee technician, under the supervision of a plenary licensed physician. The plenary licensed physician must interpret the test results.

604. Because Defendant Riotto is a chiropractor, he could not lawfully perform electrodiagnostic testing, or be a member or shareholder of a medical practice that provided only electrodiagnostic testing. See N.J.S.A. 45:9-5.2(a); N.J.S.A. 45:9-14.5 c(1); N.J.A.C. 13:44E-3.3; and N.J.A.C. 13:44E-2.15.

210

605.   Even if Defendant Riotto could somehow lawfully have been an owner or member of Defendant MLS Medical he would have been barred by the Codey Law, N.J.S.A. 45:9-22.4, et seq., from referring patients of Defendant Riotto Family Chiropractic to Defendant MLS Medical.

606.   In the wake of the early success of their plans to provide electrodiagnostic testing services through MLS Medical to PIP patients in New Jersey, Defendants Schwartz and Riotto caused Florida attorney Jeffrey McCann, Esquire, to form two limited liability companies in Florida on June 29, 2009:  Defendant MSAR, LLC (also referred to herein as "MSAR"), which was owned by Defendants Schwartz and Riotto, and Medical Holdings, LLC (also referred to herein as "Medical Holdings"), which was formed in the name of Defendants Riotto and Kimberly Gill.

607.   Upon information and belief, Defendants Schwartz and Riotto caused Defendant MSAR to be formed for the purpose of concealing the interests of Defendant Riotto in Defendant MLS Medical, and of funneling a share of the revenue therein to Defendant Riotto representing his share of the profits in Defendant MLS Medical, or alternatively for Defendant Riotto's use in paying kickbacks to the MLS Medical Referring Defendants.

608.   Upon information and belief, Medical Holdings, LLC (also referred to herein as "Medical Holdings"), which was owned by Defendants Riotto and Kimberly Gill was formed for a similar purpose, namely to assist in funneling a portion of the revenue earned by Defendants Schwartz and MLS Medical with Defendant Riotto, and for the

211

use of the MLS Medical Defendants in forming other electrodiagnostic testing and other diagnostic practices in New Jersey from which they could unlawfully profit.

609.   Defendant Schwartz caused Defendant MLS EDX Medical Group, LLC to be formed in New Jersey on July 17, 2009.  At the time of its formation, only Defendant Schwartz was a member.

610.   Defendant Riotto began causing patients of Riotto Family Chiropractic to be referred to Defendant MLS Medical for electrodiagnostic testing in the Spring of 2010.

611.   The first Allstate Claimant that Defendant Riotto caused to be referred to Defendant MLS Medical from Defendant Riotto Family Chiropractic was Allstate Claimant J.M. 155902596-01, who underwent electrodiagnostic testing on April 9, 2010.

612.   Upon information and belief, the reason that Defendant Riotto did not begin causing patients of Defendant Riotto Family Chiropractic to be referred to Defendant MLS Medical for electrodiagnostic testing is that he was concerned that his financial interest in Defendant MLS Medical through Defendant MSAR and Medical Holdings would be discovered by insurance company Special Investigation Units.

613.   Upon information and belief, by the summer of 2010, the volume of referrals to Defendant MLS Medical was so great that Defendant Schwartz caused a certificate of amendment for Defendant MLS EDX Medical Group to be filed in New Jersey on August 17, 2010 adding 4 new members to MLS EDX, all of whom are listed with Florida addresses.  The new members were Defendants Perry Scott (a/k/a "Perry Scott Lipson")(referred to herein as "Scott"), who was formerly a resident of Marlboro,

212

New Jersey, Kimberly Gill and Brett Liquori, who are all listed with the address of 9471 West McNabb Road, Tamarac, Florida 33321, and Defendant Lisa Ember, who is listed at the same address as Defendant Schwartz, at 18945 Concerto Drive, Boca Raton, Florida 33498.

614.   At or about that same time, on August 16, 2010, Defendant Perry Scott formed a number of Florida entities, three of which used either identical names of Defendant Schwartz's entities or variations thereof. These include Defendants MLS Medical Group, LLC (referred to herein as "MLS Medical Group/Florida") and MLS EDX Medical Group, LLC (referred to herein as "MLS EDX Medical/Florida"), as well as Neuro Diagnostic Associates, LLC (referred to herein as "Neuro Diagnostic Associates/Florida"), all using Defendant Scott's West McNabb Road, Tamarac, Florida address.

615.   At about that same time, the MLS Medical Defendants began causing checks from the Allstate Plaintiffs and other insurers for procedures purportedly performed in the name of Defendant MLS Medical on New Jersey PIP patients, including certain of the Allstate Claimants, to be deposited into the Wachovia Bank account of either Defendant MLS EDX Medical or Defendant MLS EDX Medical/Florida. These checks included, *inter alia,* Allstate Check No. 670488825 dated August 18, 2010 in the amount of $2,174.47 and which was deposited into Wachovia Bank Account #XXXXXXXXX9430 of Defendant MLS EDX Medical Group on August 24, 2010 and Allstate Check No. 6704888824 dated August 18, 2010 in the amount of $3,397.55 and

213

which was deposited into Wachovia Bank Account #XXXXXXXXX9430 of Defendant MLS EDX Medical Group on August 24, 2010.

616.    Upon information and belief, these and other payments were diverted by Defendants Schwartz and MLS Medical to the Wachovia Bank account of either Defendant MLS EDX Medical or Defendant MLS EDX Medical/Florida, and thereafter to the accounts of the other MLS Defendants, including the account of Defendant MSAR, as well as Medical Holdings, by Defendants Riotto, Scott, Gill, Liquori and/or Ember to facilitate the payment of kickbacks to the MLS Medical Referring Defendants, including the Defendant Bandys and Riotto, in furtherance of the Defendant MLS Medical Kickback Scheme and/or to share revenue with individuals who held a concealed interest in Defendant MLS Medical, including upon information and belief, Defendants Riotto, Scott, Gill, Liquori, Ember, John Doe 1-50 and/or John Roe 1-50.

617.    Upon information and belief, in addition to paying kickbacks to the Defendant MLS Medical Referring Defendants in the form of cash that was generated using the proceeds of checks paid by insurers, including the Allstate Plaintiffs, and from other sources, the MLS Medical Defendants also paid a portion of the kickbacks owed to certain of the Defendant MLS Medical Referring Defendants under the guise of paying to rent space in the offices of the MLS Medical Referring Defendants for the use of MLS Medical employees while performing examinations and administering the EMG/NCV tests.

618.    Upon further information and belief, there were never any written lease agreements between Defendant MLS Medical and any of the MLS Medical Referring

214

Defendants, and the amounts paid purportedly as rent varied from month to month depending upon the number of patients that were examined and/or tested each month.

619.   These purported rent payments were at all times understood by and between the MLS Medical Defendants and the MLS Medical Referring Defendants to be kickbacks paid in exchange for the referrals of patients, including the Allstate Claimants.

*Defendants Gross and/or Dubnoff Introduces the Defendant Bandys
to the MLS Medical Defendants*

620.   Defendant Gross has known Defendant Anhuar Bandy for more than a decade.   Following the 2002 Bandy Indictment, Defendant Gross purchased or otherwise took over several chiropractic clinics that Bandy had previously controlled.

621.   Upon information and belief, sometime in or about late 2010, Defendants Gross and/or Dubnoff introduced Defendants Anhuar Bandy and/or Karim Bandy to James R. Morales, M.D. ("Morales"), with whom they had formed Advanced Balance & Wellness LLC ("Advanced Balance") and assisted and urged the Defendant Bandys to cause patients of the Bandy-Controlled Chiropractic Clinics to be referred to Morales and Advanced Balance in furtherance of the Bandy Provider Kickback Scheme and what the Allstate Plaintiffs refer to as the Advanced Balance Kickback Scheme. Morales and Advanced Balance provided their first service to an Allstate Claimant on November 24, 2010, and both of those claimants were patients of Defendant Chiropractic Spine Center.  As set forth in the Allstate Plaintiffs' R. 4:5-1 Certification, the Allstate Plaintiffs' allegations against Morales, Advanced Balance, the Bandy Defendants and the Chiropractic Physicians Group Defendants and others relating to the Advanced Balance Kickback Scheme will be set forth in separate litigation.

215

622.   At or about the time that Defendants Gross and/or Dubnoff introduced Morales to the Defendant Bandys in November of 2010, the Defendant Bandys were causing patients of the Defendant Bandy-Controlled Chiropractic Clinics to be referred to Raphael Osheroff, M.D. for electrodiagnostic testing, which upon information and belief was in exchange for kickbacks paid to the Defendant Bandys by Defendants John Doe 1-50 and/or John Roe 1-50 either directly or through the Patient Broker Defendants.  Dr. Osheroff passed away in or about March of 2012.

623.   Upon information and belief, sometime in late 2010 or early 2011 Defendants Gross and/or Dubnoff introduced Defendants Schwartz and/or Riotto to Defendants Anhuar Bandy and/or Karim Bandy for the purpose of assisting and urging the MLS Medical Defendants to participate in the Bandy Provider Kickback Scheme and of assisting and urging the Bandy Defendants to participate in the MLS Medical Kickback Scheme.

624.   The last patient of the Bandy-Controlled Chiropractic Clinics for which the Allstate Plaintiffs received a bill for services rendered by Dr. Osheroff was Allstate Claimant J.G. 171237688-04, for electrodiagnostic testing allegedly performed on January 5, 2011.

625.   The Defendant Bandys began causing patients of the Defendant Bandy-Controlled Chiropractic Clinics to be referred for electrodiagnostic testing to Defendants Schwartz and MLS Medical beginning in early 2011, at or about the time that Defendant Riotto and the Defendant Bandys began working together in furtherance of the Bandy Schemes.

216

626. The first Allstate Claimant that the Defendant Bandys caused to be referred to Defendant MLS Medical was Claimant D.S. 173272782-03, who was a patient of Defendant True Healing and Wellness and underwent electrodiagnostic testing on February 2, 2011, in furtherance of the Bandy-MLS Medical Kickback Scheme and the broader MLS Medical Kickback Scheme.

*MLS Medical Fraudulent Billing and Record Scheme*

627. In addition to paying kickbacks for every patient referral they received as part of the MLS Medical Kickback Scheme, the MLS Medical Defendants engaged in a massive scheme to submit fraudulent pre-certification requests, testing results, bills and other medical reports that were designed to maximize the number of patients on whom they could perform electrodiagnostic testing and the amount of money they could obtain from the Allstate Plaintiffs and other insurers. This scheme is referred to herein as the "MLS Medical Fraudulent Billing and Record Scheme." The MLS Medical Fraudulent Billing and Record Scheme and the MLS Medical Kickback Scheme are sometimes collectively referred to herein as the "MLS Medical Schemes." They are the subject of the Eleventh through Thirteenth Counts of this Complaint.

628. Pursuant to the MLS Medical Fraudulent Billing and Record Scheme, the MLS Medical Defendants:

    a. submitted bills and records to the Allstate Plaintiffs and other insurers for electrodiagnostic testing that was performed fraudulently, incompetently, that had no clinical value and/or that was medically unnecessary as defined by the regulations of the Board of Medical

Examiners and/or the regulations governing No Fault insurance in New Jersey.

b. submitted reports and findings which made false findings of radiculopathies and other positive findings that were designed to enhance the value of the personal injury cases of the Allstate Claimants and to justify further treatment by Other Referee Provider Defendants;

c. submitted bills for electrodiagnostic tests that were not performed in accordance with the requirements of the CPT Codes that were used;

d. performed and billed the Allstate Plaintiffs for unnecessary tests on every Allstate Claimant;

e. misrepresented the complaints of Allstate Claimants in pre-certification requests in order to mislead the Allstate Plaintiffs into believing that electrodiagnostic testing was medically necessary;

f. billed for examinations as if they were performed by Defendant Schwartz that were never performed or were performed by someone other than Defendant Schwartz;

g. billed the Allstate Plaintiffs in the name of Defendant MLS Medical for medical services when Defendant MLS Medical was owned in part by one or more non-licensees; to wit, Defendants Ember, Scott, Gill and/or Liquori;

h.  billed the Allstate Plaintiffs in the name of Defendant MLS Medical for electrodiagnostic testing performed on Allstate Claimants who were patients of Defendants Riotto Family Chiropractic and Millennium Chiropractic without disclosing that Defendant Riotto had a financial interest in Defendant MLS Medical;

i.  falsely represented in Box 17 of the HCFA bills that the Allstate Claimants were referred for the electrodiagnostic testing by Defendant Schwartz, when the referrals were in each case made by the Defendant Bandy/Riotto Chiropractors, John Roe 1-50, and/or by non-licensees on their behalf; and

j.  falsely represented in Box 32 of the HCFA bills that the electrodiagnostic testing on Allstate Claimants was performed at the MLS Medical Kinderkamack Road Office when in fact in each case it was performed at the offices of the Defendant Bandy/Riotto Chiropractic Clinics, or of the other MLS Medical Referring Defendants from which the client was referred.

The Allstate Plaintiffs' Payments of PIP Benefits to Defendants
on Behalf of the Allstate PIP Claimants

| Provider Defendants | Dates of Service Range at Issue | Amounts Paid by the Allstate Plaintiffs |
|---|---|---|
| Chi Acupuncture | All Claimants 1/1/2009 to present | $130,967.76 |
| Chiropractic Spine Center | All Claimants 5/4/2010 to present | $144,282.68 |
| Chiropractic Centre of Elizabeth | Certain Claimants | $618,394.36 |
| Chiropractic Physicians Group | Certain Claimants | $237,907.97 |
| Eclipse Chiropractic Center | All Claimants 5/2/2010 to present | $157,744.97 |
| Elmora Wellness Center | All Claimants 7/22/2013 to present | $6,611.45 |
| Golden Flower Acupuncture | All Claimants 1/10/2011 to present | $311,148.74 |
| Golden Lotus Acupuncture | All Claimants 5/11/2010 to present | $251,228.86 |
| Good Health Center | All Claimants 10/11/2010 to present | $246,902.00 |
| Lakewood Chiropractic Center | All Claimants 4/19/2011 to present | $ 44,974.44 |
| Liberty Chiropractic Center | All Claimants 2/7/2012 to present | $  5,413.72 |
| Millenium Chiropractic | All Claimants 10/3/2012 to present | $  9,637.79 |
| MLS Medical Group | All Claimants 1/1/2009 to present | $539,170.03 |
| New Century Chiropractic | All Claimants 10/20/2009 to present | $  4,934.37 |
| Pennsauken Chiropractic | All Claimants 9/26/2012 to present | $  3,573.66 |
| Platinum Chiropractic | All Claimants 6/26/2013 to present | $ 11,731.14 |
| Riotto Family Chiropractic | All Claimants 1/1/2009 to present | $ 95,621.51 |
| True Healing and Wellness Center | All Claimants 1/1/2009 to present | $757,398.32 |
| Wellspring Rehabilitation Center | All Claimants 1/1/2009 to present | $137,987.99 |

The Allstate Plaintiffs' Payments of Liability Claims for Alleged Bodily Injuries to Allstate BI Claimants Related to the Bandy Schemes

629    To date, as a result of and pursuant to the Bandy Schemes, an unknown number of Allstate BI Claimants, through one or more of the Law Firm Defendants, have submitted claims to the Allstate Plaintiffs in which they have claimed to have incurred bodily injuries and other damages arising from an automobile accident as the result of: (1) the negligence of an individual insured by the Allstate Plaintiffs and who have made so-called "third-party claims" against the casualty or other liability coverage afforded under a policy of insurance issued by the Allstate Plaintiffs; (2) the negligence of an individual having no insurance coverage or lower insurance coverage limits giving rise to a claim for so-called "first-party claims" for Uninsured Motorist Coverage ("UM") or Underinsured Motorist Coverage ("UIM") afforded under a policy of insurance issued by the Allstate Plaintiffs.  The Plaintiffs are unable to identify with specificity the identities of the Allstate BI Claimants and the amounts paid by the Allstate Plaintiffs pursuant to those claims until discovery in this litigation is completed.

FIRST COUNT

(Declaratory Judgment – Bandy Concealed Ownership Scheme and Golden Acupuncture Concealed Ownership Scheme -- Unlawful Practice Structure and Violation of the Corporate Practice of Medicine Doctrine, N.J.A.C. 13:44E-2.15 and N.J.A.C. 13:35-6.16 – Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus; Golden Flower; Lipshitz; Roytman; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

630.  Plaintiffs repeat and restate the allegations contained in the preceding paragraphs and the allegations contained in the succeeding paragraphs and Counts, and incorporate the same herein as if set forth at length.

631.  As detailed above, the Defendant Bandys, Brown and Roth have an admitted history dating back to the Prior Bandy Schemes of conspiring to facilitate the unlawful and surreptitious ownership and control of chiropractic clinics, by placing them in the names of "paper owners" when at all times those chiropractic clinics were owned and/or controlled by the Defendant Bandys.

632.  Defendant Johnson has also admitted to acting as the "paper owner" of chiropractic clinics on behalf of other non-licensees prior to her involvement in the Bandy-Controlled Ownership Scheme and the other Bandy Schemes with the Defendant Bandys.

633.  At all times relevant to this litigation, the purported ownership of Defendant True Healing and Wellness, initially since its formation on November 24, 2008 by

222

Defendant Johnson, and subsequently by Defendant Brown beginning some time in 2009, was a sham, knowingly engaged in by Defendants Johnson and Brown in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

634.   At all times relevant to this litigation, the purported ownership of Defendant Chi Acupuncture by Defendant Johnson from the time of its formation on August 4, 2008, was a sham knowingly engaged in by Defendant Johnson in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

635.   Defendant Johnson's purported ownership interest in Defendant True Healing and Wellness was purportedly conveyed to Defendant Brown some time in 2009 in furtherance of the Bandy Schemes because the Defendant Bandys and Johnson realized that so long as Defendant Johnson purportedly owned both Defendant True Healing and Wellness and Defendant Chi Acupuncture, she could not refer any patients of Defendant True Healing and Wellness to Defendant Chi Acupuncture without violating the self-referral prohibitions of N.J.S.A. 45:9-22 (referred to herein as "the Codey Law").

636.   Upon information and belief, the purported transfer of the interest of Defendant Johnson in Defendant True Healing and Wellness to Defendant Brown was also a sham, and was not accompanied by any genuine payment of consideration, or

223

allocation or accounting of profits and losses, accounts receivables and payables, or assets and liabilities, as would occur in connection with a *bona fide* transfer of an ownership interest in a legitimate operating entity.

637. Instead, the transfer of Defendant Johnson's purported interest in Defendant True Healing and Wellness to Defendant Brown, and the preparation of the documents by Defendant John Doe 1-50 and/or John Roe 1-50 that were signed by Defendants Johnson and Brown for the purpose of giving the false and misleading appearance that a legitimate arms-length transfer occurred, was done in concert with and at the urging of the Defendant Bandys, John Doe 1-50 and/or John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

638. At all times relevant to this litigation, the purported ownership of Defendant Wellspring Rehabilitation by Defendant Brown from the time of its formation on December 4, 2008, was a sham, knowingly engaged in by Defendant Brown in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

639. At all times relevant to this litigation, the purported ownership of Defendant New Century Chiropractic by Defendant Brown from the time of its formation on October 2, 2009 was a sham, knowingly engaged in by Defendant Brown in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time,

including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

640.   At all times relevant to this litigation, the purported ownership of Defendant Eclipse Chiropractic by Defendant Formisano from the time of its formation on May 2, 2010, was a sham, knowingly engaged in by Defendant Formisano in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

641.   At all times relevant to this litigation, the purported ownership of Defendant Chiropractic Spine Center by Defendant Formisano from the time of its formation on May 4, 2010, was a sham, knowingly engaged in by Defendant Formisano in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

642.   At all times relevant to this litigation, the purported ownership of Defendant Elmora Wellness by Defendant Stark from the time of its formation on July 22, 2013, was a sham, knowingly engaged in by Defendant Stark in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

643.   At all times relevant to this litigation, the purported ownership of Defendant Good Health Center by Defendant Roth from the time of its formation on October 11,

2010, was a sham, knowingly engaged in by Defendant Roth in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

644.   At all times relevant to this litigation, the purported ownership of Defendant Lakewood Chiropractic Center by Defendant Formisano from the time of its formation on April 19, 2011, was a sham, knowingly engaged in by Defendant Formisano in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

645.   At all times relevant to this litigation, the purported ownership of Defendant Liberty Chiropractic Center by Defendant Formisano from the time of its formation on February 7, 2012, was a sham, knowingly engaged in by Defendant Formisano in concert with the Defendant Bandys and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

646.   At all times relevant to this litigation, the purported ownership of Defendant Pennsauken Chiropractic Center by Defendant Formisano from the time of its formation on September 26, 2012, was a sham, knowingly engaged in by Defendant Formisano in concert with the Defendant Bandys and others, both named herein and unknown to

Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

647.    At all times relevant to this litigation, the purported ownership of Defendant Golden Lotus Acupuncture by Defendants Lipshitz and/or Roytman from the time of its formation on May 11, 2010, was a sham, knowingly engaged in by Defendants Lipshitz and/or Roytman in concert with the Defendant Bandys and the Defendant Acupuncture Professionals, and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

648.    At all times relevant to this litigation, the purported ownership of Defendant Golden Flower Acupuncture by Defendants Lipshitz and/or Roytman from the time of its formation on January 10, 2011, was a sham, knowingly engaged in by Defendants Lipshitz and/or Roytman in concert with the Defendant Bandys, Riotto, and others, both named herein and unknown to Plaintiffs at this time, including Defendants John Doe 1-50 and John Roe 1-50, in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

649.    The Defendant Bandys exercised *de facto* ownership and control of the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, both directly and through the Defendant Bandy Management Companies, including without limitation, Defendants KEKK Marketing, Precision Management, First Choice Management, Karlaly, Karkis, VIP

Management, 243 Livingston Avenue Associates, Quality Management, Palmer Hills Holdings, Sorfam and ABC Corp. 1-50, by funnelling away from the accounts of the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, and to one or more of the Defendant Bandy Management Companies substantially all of the net revenue received by the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture for the healthcare services that were billed in their respective names, under the guise of providing ostensibly legitimate services, such as management services, non-professional employee leasing services, leases and/or subleases of offices and/or equipment, marketing and advertising services, billing and collection services, transportation services, and other similar services, however denominated.

650.   At all times relevant to this litigation, it was an element of the Bandy Concealed Ownership Scheme that the Defendant Bandys would exercise control over the Defendant Bandy-Controlled Chiropractic Clinics by causing substantially all of the revenue received by those entities, net of the amounts needed to pay the salaries of the Defendant Bandy/Riotto Chiropractors and any additional agreed upon amounts that were paid to Defendants Johnson, Brown, Formisano, Roth, Riotto, Stark and/or John Roe 1-50, in exchange for their agreements to pose as the paper owners of these Defendants, to be paid over to the Defendant Bandy Management Companies.

651.   At all times relevant to this litigation, it was an element of the Bandy Concealed Ownership Scheme that the Defendant Bandys would exercise control over

228

the Defendant Golden Acupuncture Entities by causing substantially all of the revenue received by those entities, net of the amounts needed to pay the salaries of the Defendant Acupuncture Professionals who provided the services that were billed in the name of the Defendant Golden Acupuncture Entities, including Defendants John Roe 1-50, and the agreed upon amounts that were paid to Defendants Lipshitz and/or Roytman in exchange for their agreements to pose as the paper owners of the Defendant Golden Acupuncture Entities, to be paid over to the Defendant Bandy Management Companies in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

652.    At all times relevant to this litigation, it was an element of the Bandy Concealed Ownership Scheme that the Defendant Bandys would exercise control over Defendant Chi Acupuncture by causing substantially all of the revenue received by that entity, net of the amounts needed to pay the salaries of the Defendant Acupuncture Professionals who provided the services that were billed in the name of Defendant Chi Acupuncture, including Defendants John Roe 1-50, and the agreed upon amounts that were paid to Defendant Johnson in exchange for her agreement to pose as the paper owner of Defendant Chi Acupuncture, to be paid over to the Defendant Bandy Management Companies in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

653.    One of the purposes and effects of causing these payments to be made to the Defendant Bandy Management Companies was to restrict the net revenues of the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture

229

Entities and Defendant Chi Acupuncture in such a way that the Defendant Bandy/Riolto Chiropractors, Lipshitz, Roytman and Johnson had neither the financial incentive nor the means to attempt to exercise any meaningful control over the entities they purportedly owned even if they wanted to. An equally important purpose for these transactions was to facilitate the ability of the Defendant Bandys to use a substantial portion of this revenue to pay kickbacks by check or in cash to the Runner Defendants and provide them with additional money to induce those involved in automobile accidents to begin treating at one of the Defendant Bandy-Controlled Chiropractic Clinics and to retain one of the Law Firm Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

654. At all times relevant to this litigation and from the time of the formation of the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, the Defendant Bandys used similar if not identical methods to exercise *de facto* ownership of and control over the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, as they used to control the Defendant Bandy-Controlled Chiropractic Clinics; namely, by funneling nearly all of the revenue received by these entities net of amounts paid to the acupuncturists and an agreed upon amount paid to Defendants Lipshitz and/or Roytman for posing as the owners of the Golden Acupuncture Entities and to Defendant Johnson for posing as the owner of Defendant Chi Acupuncture, through payments to one or more of the Defendant Bandy Management Companies in payment for seemingly legitimate services or purposes.

655.   At all times relevant to this litigation, it was an element of the Bandy Concealed Ownership Scheme that the Defendant Bandys exercised *de facto* ownership and control over the Defendant Bandy-Controlled Chiropractic Clinics by controlling the flow of patients that were treated at each clinic.   Each of the Defendant Bandy/Riotto Chiropractors who acted as a paper owner at all times knew that if he or she were to attempt to exercise genuine ownership or control over one of the Defendant Bandy-Controlled Chiropractic Clinics the Defendant Bandys would simply cut off the supply of patients to that clinic by directing the Runner Defendants to refer the patients they recruited to one of the Defendant Bandy-Controlled Chiropractic Clinics that was owned by a more cooperative paper owner.

656.   At all times relevant to this litigation, it was an element of the Bandy Concealed Ownership Scheme that the Defendant Bandys exercised *de facto* ownership and control over the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture by controlling the flow of patients of the Defendant Bandy-Controlled Chiropractic Clinics that were referred to them.

657.   Defendants Lipshitz and Roytman at all times knew that if either of them were to attempt to exercise genuine ownership or control over either of the Defendant Golden Acupuncture Entities the Defendant Bandys would simply cut off the supply of patient referrals to the Defendant Golden Acupuncture Entities.

658.   Defendant Johnson at all times knew that if she were to attempt to exercise genuine ownership or control over Defendant Chi Acupuncture the Defendant

231

Bandys would simply cut off the supply of patient referrals to Defendant Chi Acupuncture.

659.   The Defendant Bandys also exercised ownership and *de facto* control over the Defendant Bandy-Controlled Chiropractic Clinics through the non-professional staff assigned to each of the clinics, including Defendant Anali Rivera in the case of Defendants New Century Chiropractic and subsequently, Eclipse Chiropractic, and the office managers of each of the other Defendant Bandy-Controlled Chiropractic Clinics, including Defendants John Doe 1-50, all of whose salaries were paid by Defendant First Choice Management and/or one of the other Defendant Bandy Management Companies.  Defendant Anali Rivera and these other non-professional staff members who knowingly operated the Defendant Bandy-Controlled Chiropractic Clinics in furtherance of one or more of the Bandy Schemes are referred to herein as the "Bandy Clinic Staff Defendants."

660.   The Defendant Bandys also exercised *de facto* ownership and control over the Defendant Bandy-Controlled Chiropractic Clinics through the Defendant Bandy/Riotto Chiropractor Defendants, Defendants Anali Rivera and the other Bandy Clinic Staff Defendants by communicating to and through them instructions regarding the operation of the Defendant Bandy-Controlled Chiropractic Clinics in furtherance of the Bandy Schemes, including advising them which of the Law Firm Defendants should be allowed to sign up patients as clients in the offices of the Defendant clinics and/or to which of the Law Firm Defendants patients should otherwise be referred in furtherance of the Bandy Attorney Kickback Scheme, and directing when and to which of the

232

Referee Provider Defendants the patients of the clinics should be referred for additional healthcare services and/or diagnostic testing in furtherance of the Bandy Provider Kickback Scheme.

661.    The Defendant Bandys also exercised *de facto* ownership and control over the Defendant Bandy-Controlled Chiropractic Clinics through the Defendant Bandy/Riotto Chiropractors by communicating to and through them instructions regarding every aspect of the operation of the Defendant Bandy-Controlled Chiropractic Clinics in furtherance of the Bandy Schemes, including without limitation, advising them what services should be rendered and with what frequency, which of the Law Firm Defendants should be allowed to sign up patients as clients in the offices of the clinics and/or to which of the Law Firm Defendants patients should otherwise be referred in furtherance of the Bandy Attorney Kickback Scheme, and designating when and to which of the Referee Provider Defendants the patients of the clinics should be referred for additional healthcare services and/or diagnostic testing in furtherance of the Bandy Provider Kickback Scheme.

662.    Upon information and belief, Defendants Lipshitz, Riotto, Anali Rivera and John Roe 1-50, at various times relevant to this litigation provided additional assistance to the Defendant Bandys in carrying out and executing the Bandy Concealed Ownership Scheme by assisting in the hiring and supervision of chiropractic, acupuncture and non-professional staff and the management and operation of the clinics and entities under the supervision and direction of the Defendant Bandys and in furtherance of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

663.   The Defendant Bandy/Riotto Chiropractors, including Defendants Stark, Baer and/or John Roe 1-50, and Defendant Formisano, both prior to and during the time he became a "paper owner" of certain of the Defendant Bandy-Controlled Chiropractic Clinics, facilitated the operation and execution of the Bandy Concealed Ownership Scheme by willingly and knowingly following the instructions of the Defendant Bandys and providing chiropractic services at the Defendant Bandy-Controlled Chiropractic Clinics while at all times knowing that the purported chiropractor owner of each such clinic was not in fact a *bona fide* owner and that each of the clinics was under the *de facto* ownership and control of the Defendant Bandys.

664.   The Defendant Acupuncture Professionals, including Defendants Lipshitz, Roytman, Johnson and John Roe 1-50, facilitated the operation and execution of the Bandy Concealed Ownership Scheme by willingly and knowingly following the instructions of the Defendant Bandys and the Bandy Clinic Staff Defendants, providing acupuncture services in the name of the Defendant Golden Acupuncture Entities and/or Defendant Chi Acupuncture at the Defendant Bandy-Controlled Chiropractic Clinics while at all times knowing that the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture were under the *de facto* ownership and control of the Defendant Bandys.

665.   The practice structures of the Defendant Bandy-Controlled Chiropractic Clinics, the Golden Acupuncture Entities and Defendant Chi Acupuncture as utilized by the Defendant Bandys, Defendants Brown, Johnson, Formisano, Roth, Stark, Lipshitz, Roytman, Riotto, Johnson and/or John Roe 1-50, to execute, manage and carry out the

234

Bandy Concealed Ownership Scheme, violated the "corporate practice of medicine doctrine" and are prohibited by the regulations adopted by the Board of Chiropractic Examiners as set forth in N.J.A.C. §13:44E-2.15, all of which prohibit non-licensees from owning or otherwise controlling, limited liability companies that provide chiropractic services.

666.   Each and every report submitted to the Allstate Plaintiffs that was prepared by, and/or relied upon by, the Defendant Acupuncture Entities and/or the Defendant Acupuncture Professionals that listed the Defendant Bandy/Riotto Chiropractors or chiropractors John Roe 1-50 as the acupuncture referral source for the Allstate Claimant was a knowingly false misrepresentation.   The Defendant Bandy/Riotto Chiropractors, Defendant Acupuncture Entities and Defendant Acupuncture Professionals knew that each and every acupuncture referral was not made by the chiropractor, but in actuality was unlawfully made by non-licensees, the Bandy Defendants and/or John Doe 1-50, in exchange for a kickback.   Any and all referrals for acupuncture were not made based upon medical necessity, but rather because all referrals were mandated by non-licensees, the Bandy Defendants and/or John Doe, 1-50.

667.   The Defendant Bandy/Riotto Chiropractors, Defendant Acupuncture Entities and Defendant Acupuncture Professionals knowingly concealed the true referral source because they knew the Bandy Defendants and/or John Doe, 1-50 were non-licensees, not legally permitted to make the referrals, and not legally permitted to fee split or engage in a kickback relationship for patient referrals.   The Defendant

235

Bandy/Riotto Chiropractors, Defendant Acupuncture Entities and Defendant Acupuncture Professionals also knew that if they identified the Bandy Defendants and/or John Doe, 1-50 as the true referral source on any report or record, they would be revealing their participation in the fraudulent schemes that are the subject of this Complaint; and all bills would not be paid by insurance companies such as the Allstate Plaintiffs.

668.   PIP insurers such as the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. §39:6A-1, *et seq.*, to make any payments for PIP medical expense benefits that were not provided in accordance with applicable regulations and statutes governing the provision of those services.

669.   Because the chiropractic services that were allegedly provided to the Allstate Claimants and to the patients of other insurers in the name of the Defendant Bandy-Controlled Chiropractic Clinics by the Defendant Bandy/Riotto Chiropractors, and the acupuncture services that were allegedly provided to the Allstate Claimants and to the patients of other insurers in the name of the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture by the Defendant Acupuncture Professionals were all rendered pursuant to an unlawful practice structure, and in violation of the Corporate Practice of Medicine Doctrine, and applicable regulations governing the provision of healthcare services in New Jersey, including without limitation N.J.A.C. 13:44E-2.15 and N.J.A.C. 13:35-6.16, the Allstate Plaintiffs have no obligation to make any payments to the Defendants herein for services allegedly provided to the Allstate Claimants and/or billed to the Allstate Plaintiffs by the Defendants identified herein.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus; Golden Flower; Lipshitz; Roytman; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; as follows:

a. Declaring that the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. 39:6A-1, *et seq.*, to make any payments of PIP medical services benefits to any of the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture on behalf of any of the Allstate Claimants as a result of the unlawful practice structures utilized by these Defendants in furtherance of the Bandy Concealed Ownership Scheme;

b. Temporarily and permanently enjoining the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities Defendants, Defendant Chi Acupuncture, the Defendant Bandy/Riotto Chiropractors and the Defendant Acupuncture Professionals from providing or purporting to provide PIP healthcare services pursuant to the unlawful practice structures identified herein;

c. Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

d. Granting Plaintiffs such additional relief as the Court shall deem just and equitable.

237

SECOND COUNT



(Unjust Enrichment – Bandy Concealed Ownership Scheme and Golden Acupuncture Concealed Ownership Scheme – Unlawful Practice Structure and Violation of the Corporate Practice of Medicine Doctrine, N.J.A.C. 13:44E-2.15 and N.J.A.C. 13:35-6.16 – Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus; Golden Flower; Lipshitz; Roytman; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

670.   The Plaintiffs repeat and restate the allegations in all preceding paragraphs and Counts and the succeeding paragraphs and Counts and incorporate the same herein as if set forth at length.

671.   Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Rivera; the Bandy Clinic Staff Defendants; Chiropractic Spine Center; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century Chiropractic Center; Pennsauken Chiropractic Center; True Healing and Wellness Center; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus Acupuncture; Golden Flower Acupuncture; Lipshitz; Roytman; KEKK Marketing; Precision Management Associates; Karkis; First Choice Management; VIP Management; Karlaly; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; Sorfam; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have directly or indirectly received substantial sums from the Allstate Plaintiffs in payment of PIP healthcare expense

238

benefits for alleged chiropractic, acupuncture and/or other healthcare services allegedly rendered to the Allstate Claimants in the names of the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, which services were rendered pursuant to an unlawful practice structure in furtherance of the Bandy Concealed Ownership Scheme as described herein.

672.   Allstate Plaintiffs made these payments to the aforementioned Defendants in the erroneous, but good faith, belief that the alleged PIP healthcare services provided by these Defendants were rendered in accordance with applicable statutes and administrative regulations governing the provision of healthcare services in New Jersey and therefore were compensable under the No-Fault Law when, in fact, they were not.

673.   Because the PIP healthcare services allegedly rendered by the aforementioned Defendants were not rendered in accordance with applicable statutes, administrative regulations and court decisions governing the provision of healthcare services in New Jersey, and were otherwise rendered pursuant to unlawful practice structures, the healthcare services allegedly rendered by the aforementioned Defendants to the Allstate Claimants and others were not compensable under the No Fault Law.

674.   Accordingly, the aforementioned Defendants are not entitled to any of the amounts received from the Allstate Plaintiffs in payment of PIP healthcare services benefits in connection with the alleged services rendered to the Allstate Claimants as a result of the unlawful practice structures utilized by these Defendants.

675.   The aforementioned Defendants have been unjustly enriched and are obligated to disgorge to the Allstate Plaintiffs all amounts that they have received from the Allstate Plaintiffs as a result of the unlawful practice structures they utilized in furtherance of the Bandy Concealed Ownership Scheme.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus; Golden Flower; Lipshitz; Roytman; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50, as follows:

a.   Ordering these Defendants to disgorge any and all sums paid to them directly or indirectly by the Allstate Plaintiffs on behalf of the Allstate Claimants in payment of bills submitted in the names of the Defendant Bandy-Controlled Chiropractic Clinics, the Golden Acupuncture Entities and Defendant Chi Acupuncture;

b.   Imposing a constructive trust and equitable lien on the assets of these Defendants until such time as these Defendants have disgorged all sums paid to them directly or indirectly by the Allstate Plaintiffs;

c.   Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

d.   Granting the Plaintiffs such other relief as the Court shall deem just and equitable.

240

THIRD COUNT

(Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1, *et seq.*; Bandy Concealed Ownership Scheme and Golden Acupuncture Concealed Ownership Scheme -- Unlawful Practice Structure; Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic;  New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus; Golden Flower; Lipshitz; Roytman; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Bandy Clinic Staff Defendants; Rivera; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); the Referee Provider Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

676.   Plaintiffs repeat and restate the allegations contained in all of the prior paragraphs and Counts, and the succeeding paragraphs and Counts and incorporate the same herein as if set forth herein at length.

677.   Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine Center; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century Chiropractic Center; Pennsauken Chiropractic Center; True Healing and Wellness Center; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus Acupuncture; Golden Flower Acupuncture; Lipshitz; Roytman; KEKK Marketing; Precision Management Associates; Karkis; First Choice Management; VIP Management; Karlaly; 243 Livingston Avenue Associates; Quality Management; Palmer

Hills Holdings; Sorfam; Montana; Barrese; Gorodetsky; the Bandy Clinic Staff Defendants; the Runner Defendants; the Law Firm Defendants, John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have engaged in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the payment of PIP healthcare benefits to Defendants and others for chiropractic, acupuncture and other healthcare services that have been provided and billed in the name of the Defendant Bandy-Controlled Chiropractic Clinics, the Golden Acupuncture Entities, and Defendant Chi Acupuncture, pursuant to an unlawful practice structure in furtherance of the Bandy Concealed Ownership Scheme.

678.   By submitting, or causing the submission of, bills, medical records and reports to the Allstate Plaintiffs and others for services that they allegedly rendered to the Allstate Claimants, the aforementioned Defendants impliedly represented, among other things, that the services were performed by and in the names of the Defendant Bandy-Controlled Chiropractic Clinics, the Golden Acupuncture Entities and Defendant Chi Acupuncture in accordance with all applicable statutes and administrative regulations; and that the services were performed through entities that were owned and operated through lawful practice structures.

679.   The aforementioned Defendants have engaged in an ongoing conspiracy to represent to the Allstate Plaintiffs and others that they provided chiropractic, acupuncture and other healthcare services through lawful practice structures when, in fact, the appearances presented by these Defendants were at all times a sham designed to mislead and defraud the Allstate Plaintiffs and other insurers, and all

242

alleged services rendered by these Defendants to the Allstate Claimants were provided through unlawful practice structures.

680.   The Defendants named and otherwise identified in this Count have knowingly engaged in a conspiracy to misrepresent, conceal, and/or mislead the Allstate Plaintiffs regarding the unlawful practice structures utilized by the Defendant Bandy-Controlled Chiropractic Clinics, the Golden Acupuncture Entities and Defendant Chi Acupuncture, and the purported ownership of these Defendants by Defendants Johnson, Brown, Formisano, Roth, Stark and John Roe 1-50, Defendants Lipshitz and/or Roytman and Defendant Johnson, respectively, were at all times a sham, and that these entities were in fact at all times owned and controlled by the Defendant Bandys.

681.   It was at all times an element of the Bandy Concealed Ownership Scheme that as a condition of their participation in these schemes, in addition to agreeing to allow the Defendant Bandys to control the Defendant Bandy-Controlled Chiropractic Clinics and paying over substantially all of their revenue to the Defendant Bandys and the Defendant Bandy Management Companies, the Defendant Bandy/Riotto Chiropractors and the Bandy Clinic Staff Defendants were also required and did in fact refer the Allstate Claimants and the other patients of the Defendant Bandy-Controlled Chiropractic Clinics to the Law Firm Defendants, the Defendant Golden Acupuncture Entities, Defendant Chi Acupuncture, the Acupuncture Provider Defendants, the MLS Medical Defendants, the Other Referee Provider Defendants, Defendants John Roe 1-50 and XYZ, P.C. 1-50, as designated by the Defendant Bandys.

243

682. The aforementioned Defendants, and others, have conspired, assisted and urged each other to engage in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the payment of PIP medical benefits by the Allstate Plaintiffs to the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Chi Acupuncture, for healthcare services that were not rendered pursuant to and in accordance with lawful practice structures.

683. Under the IFPA, a "person" or "practitioner" as defined by N.J.S.A. §17:33A-3, violates N.J.S.A. 17:33A-4(a) if he, or she:

    1. Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

    2. Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

    3. Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to

(a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

684.   The bills, medical records and reports that the Defendant Bandys, the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Golden Acupuncture Entities, Defendants Riotto, Lipshitz, Roytman, Johnson, Chi Acupuncture, the Defendant Bandy Management Companies and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, and/or XYZ, P.C. 1-50, acting in concert with and with the assistance of the Bandy Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-5, caused to be prepared and submitted to the Allstate Plaintiffs in support of their claims for the payment of PIP healthcare expense benefits allegedly rendered to the Allstate Claimants and others in the names of one or more of the Defendant Bandy-Controlled Chiropractic Clinics, the Golden Acupuncture Entities and Chi Acupuncture in furtherance of the Bandy Concealed Ownership Scheme, all constituted "statements" within the meaning of IFPA Section 4(a).

685.   The aforementioned Defendants had actual knowledge that the statements, relative to, but not limited to, the unlawful practice structures utilized by the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, were fraudulent, false and/or misleading.

686.   Each submission of bills, medical records, correspondence or other documents by or in the names of any of the Defendant Bandy-Controlled Chiropractic

Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture constituted a separate violation of Section 4 of the IFPA.

687.   By knowingly concealing and failing to disclose the actual facts and circumstances concerning the *de facto* ownership and control that the Defendant Bandys exercised over the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, and actively attempting to mislead or defraud the Allstate Plaintiffs and others into believing that these Defendants were lawfully owned by Defendants Johnson, Brown, Formisano, Roth, Stark and John Roe 1-50; Defendants Lipshitz and/or Roytman; and by Defendant Johnson, respectively, in furtherance of the Bandy Concealed Ownership Scheme, each of the Defendants identified herein violated Section 4(a)(3) of the IFPA.

688.   A "person" or "practitioner" violates N.J.S.A. 17:33A4(b) of the IFPA, if he or she "knowingly assists, conspires with or urges any person or practitioner to violate any provisions of this act."

689.   A "person" or "practitioner" violates N.J.S.A. 17:33A4(c) of the IFPA if, "due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act."

690.   The Defendant Bandys, the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Golden Acupuncture Entities, Defendants Riotto, Lipshitz, Roytman, Johnson, Chi Acupuncture, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp.

246

1-50, and/or XYZ, P.C. 1-50, conspired with and urged and assisted each other to commit the violations of IFPA described herein.

691.   Upon information and belief, Defendants Montana, Barrese, Gorodetsky and Chiropractic Centre of Elizabeth assisted and conspired with the Defendant Bandys in furtherance of the Bandy-Controlled Ownership Scheme by, *inter alia,* introducing the Defendant Bandys to Defendants Lipshitz and/or Roytman, and by allowing Defendants Roytman and/or Lipshitz to pose as the paper owner or owners of Defendant Golden Lotus Acupuncture while Defendant Roytman was still providing acupuncture services in the name of Defendant Chiropractic Centre of Elizabeth and other Defendant Montana/Barrese Chiropractic Clinics, and for knowingly allowing the offices of Chiropractic Centre of Elizabeth to be used by Defendants Golden Lotus in furtherance of the Bandy Concealed Ownership Scheme and the Golden Acupuncture Schemes as described herein.



692.   The Runner Defendants assisted and conspired with the Defendant Bandys, the Defendant Bandy/Riotto Chiropractors, the Defendant Golden Acupuncture Entities, Defendants Riotto, Lipshitz, Roytman, Johnson, Chi Acupuncture, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy Concealed Ownership Scheme, by recruiting a large percentage of the patients, including a large percentage of the Allstate Claimants, to undergo treatment with these Defendants in exchange for kickbacks paid

to them by the Defendant Bandys and/or Riotto directly or indirectly through the Defendant Bandy Management Companies.

693.   The Law Firm Defendants assisted and conspired with the Defendant Bandys, the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Golden Acupuncture Entities, Defendants Riotto, Lipshitz, Roytman, Johnson, Chi Acupuncture, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, and/or XYZ, P.C. 1-50 in furtherance of the Bandy Concealed Ownership Scheme, by paying kickbacks to the Defendant Bandys directly or indirectly through the Defendant Bandy Management Companies for client referrals and/or by making in-kind kickbacks in the form of the reciprocal referrals of clients they obtained independently and/or through their own use of runners in exchange for referrals to them of patients of the Defendant Bandy-Controlled Chiropractic Clinics clients by the Defendant Bandys.

694.   The Law Firm Defendants also assisted and conspired with the Defendant Bandys, the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Golden Acupuncture Entities, Defendants Riotto, Lipshitz, Roytman, Johnson, Chi Acupuncture, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, and/or XYZ, P.C. 1-50 in furtherance of the Bandy Concealed Ownership Scheme, by *inter alia* leading certain of their clients, including certain of the Allstate Claimants, to believe they

248

had valid bodily injury claims the value of which would be enhanced by undergoing treatment at the Defendant Bandy-Controlled Chiropractic Clinics, the Golden Acupuncture Entities and/or Defendant Chi Acupuncture, as well as by the Referee Provider Defendants, and thereby encouraging them to continue to undergo treatment regardless of whether it was necessary, and as a result of the assistance and urging of these Law Firm Defendants, the Defendant Bandys, the Defendant Bandy Management Companies, Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, and Defendants Golden Acupuncture Entities, Lipshitz, Roytman, Johnson, Chi Acupuncture, and the Referee Provider Defendants would receive additional revenue from the Allstate Plaintiffs and as a result of the Bandy Concealed Ownership Scheme and the other Bandy Schemes.

695.   The Referee Provider Defendants assisted and conspired with the Defendant Bandys, the Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Golden Acupuncture Entities, Defendants Riotto, Lipshitz, Roytman, Johnson, Chi Acupuncture, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, by paying kickbacks to the Defendant Bandys directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making kickbacks indirectly through one or more of the Patient Broker Defendants.

696.   The Runner Defendants, the Law Firm Defendants, the Acupuncture Provider Defendants, and the Referee Provider Defendants at all times knew that the

Defendant Bandys were the *de facto* owners of and controlled the Bandy-Controlled Chiropractic Clinics because they at all times dealt with the Defendant Bandys directly and/or through the Patient Broker Defendants when causing patients, including the Allstate Claimants to be referred to or from the Defendant Bandy-Controlled Chiropractic Clinics.

697.   As a result of the conspiracy, assistance and/or urging of each of the Defendants named herein, these Defendants knowingly benefitted, directly or indirectly, from the proceeds derived from the violations of the IFPA described herein, and thereby violated Section 4(c) of the IFPA.

698.   Through their repeated violations of the IFPA as described herein, these Defendants have engaged in a "pattern" of violating the IFPA and as a result of which these Defendants are jointly and severally liable to the Allstate Plaintiffs for treble damages.

WHEREFORE, the Plaintiffs demand judgment against Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus; Golden Flower; Lipshitz; Roytman; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Bandy Clinic Staff Defendants; Rivera; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth;

250

Walker; Gallegos; Arzadi, Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); the Referee Provider Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; jointly and severally, as follows:

    a. Declaring that during all times relevant hereto these Defendants have violated N.J.S.A. 17:33A-4(a)(1), (2),(3), (4)(b) and (4)(c);

    b. Declaring that during all times relevant hereto these Defendants intentionally and knowingly engaged in a "pattern" of violating N.J.S.A. 17:33A-4(a)(1), (2),(3), (4)(b) and (4)(c) as defined by the IFPA;

    c. Staying all arbitration proceedings and Superior Court actions that have been filed by or on behalf of these Defendants;

    d. Vacating all arbitration awards and judgments that have been entered against the Allstate Plaintiffs and in favor of these Defendants;

    e. Staying the enforcement of all arbitration awards and judgments that have been obtained against the Allstate Plaintiffs and in favor of these Defendants;

    f. Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all PIP healthcare benefits the Allstate Plaintiffs paid in connection with the claims of the Allstate PIP Claimants for services allegedly rendered;

    g. Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all damages the Allstate Plaintiffs paid by way of settlement or

award in connection with the claims of the Allstate BI Claimants;

h. Awarding the Allstate Plaintiffs all of their costs of investigation, arbitration and litigation, as well as attorneys' fees incurred and to be incurred in connection therewith and this litigation;

i. Awarding the Allstate Plaintiffs treble damages, consisting of three times their compensatory damages, including costs of investigation, costs of suit and attorneys' fees incurred and to be incurred, jointly and severally against these Defendants pursuant to Section 7(b) of the IFPA;

j. Awarding the Allstate Plaintiffs punitive damages against these Defendants to punish the Defendants for their malicious, willful or wanton conduct and to deter the Defendants from similar wrongful conduct in the future;

k. Awarding Commissioner civil penalties against each Defendant in an amount up to $5,000.00 for the first offense, in an amount up to $10,000.00 for the second offense, and in an amount up to $15,000.00 for each subsequent offense pursuant to N.J.S.A. 17:33A-5(b);

l. Awarding Commissioner costs and attorneys' fees pursuant to N.J.S.A. 17:33A-5(b);

m. Assessing, against each Defendant, a statutory surcharge pursuant to N.J.S.A. 17:33A-5.1;

n. Suspending each Defendant's New Jersey driving privileges for a period of one year pursuant to N.J.S.A. 39:6A-15; and

o. Granting the Plaintiffs such additional relief as the Court may deem just and equitable.

FOURTH COUNT

(Declaratory Judgment – Defendant Bandy Chiropractic Fee-Splitting Scheme – Violation of the Anti-Kickback Provisions of N.J.A.C. 13:44E-2.6 – Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Riotto Family Chiropractic; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Millennium Chiropractic; Platinum Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

699.   Plaintiffs repeat and restate the allegations contained in the preceding paragraphs and the allegations contained in the succeeding paragraphs and Counts, and incorporate the same herein as if set forth at length.

700.   At all times relevant to this litigation and since the formation of Defendant True Healing and Wellness, the Defendant Bandys have engaged in the Bandy Chiropractic Fee-Splitting Scheme as described above and herein.

701.   Pursuant to, and in furtherance of, the Bandy Chiropractic Fee-Splitting Scheme, at all times since their formation, the Defendant Bandy/Riotto Chiropractors who served as paper owners of the Bandy-Controlled Chiropractic Clinics, including Defendants Brown, Johnson, Roth, Formisano, Stark, and John Roe 1-50, have caused substantially all of the revenue received by Defendants Chiropractic Spine Center, Eclipse Chiropractic Center, Elmora Wellness, Lakewood Chiropractic, Liberty Chiropractic, Good Health Center, New Century Chiropractic, Pennsauken Chiropractic, Wellspring Rehabilitation and/or True Healing and Wellness, net of the amounts needed to pay the salaries of the Defendant Bandy/Riotto Chiropractors and the amounts

253

agreed upon by the Defendant Bandys that were paid to the paper owners of the foregoing Defendant clinics (referred to herein as "substantially all of the net revenue") to be paid over to the Defendant Bandys and/or the Defendant Bandy Management Companies in exchange for the referrals of patients the Defendant Bandys and the Defendant Bandy Runners caused to be made to the Defendant Bandy-Controlled Chiropractic Clinics pursuant to the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

702.   Pursuant to and in furtherance of the Bandy Chiropractic Fee-Splitting Scheme, at all times since on or about January 1, 2011 in the case of Defendant Riotto Family Chiropractic, since the formation of Defendant Millennium Chiropractic on October 3, 2012, and since the formation of Platinum Chiropractic on June 26, 2013, Defendants Riotto, Baer and/or John Roe 1-50 have caused substantially all of the net revenue received by the Defendant Riotto Chiropractic Clinics, net of the amounts needed to pay the salaries of the Defendant Bandy/Riotto Chiropractors who provided services at those clinics and Defendants Riotto, Baer and/or John Roe 1-50 to serve as their purported owners, to be paid over to the Defendant Bandys, the Defendant Bandy Management Companies, Defendants John Doe 1-50 and/or ABC Corp. 1-50 in exchange for the referrals of patients, including the Allstate Claimants, the Defendant Bandys and the Defendant Bandy Runners caused to be made to the Defendant Riotto Chiropractic Clinics in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

703.   Although the foregoing payments to the Defendant Bandy Management Companies were made under the guise of being in payment for ostensibly legitimate

services, such as management services, non-professional employee leasing services, leases and/or subleases of offices and/or equipment, marketing and advertising services, billing and collection services, transportation services, and other similar services, it was at all times known and understood by the Defendants Brown, Johnson, Roth, Formisano, Stark, Riotto, Baer and John Roe 1-50, and by the Defendant Bandys and John Roe 1-50, that these payments were in fact being paid over in whole or in part as kickbacks to the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 in exchange for the referrals of patients, including the Allstate Claimants, who the Defendant Bandys caused to be made to the Defendant Bandy/Riotto Chiropractic Clinics through the Defendant Bandy Runner Scheme and the Defendant Bandy Attorney Kickback Scheme.

704.   In addition to payments to the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50, it was at various times an element of the Bandy Chiropractic Fee-Splitting Scheme that Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark and John Roe 1-50, would cause or allow payments to be made from the accounts of Defendants Chiropractic Spine Center, Eclipse Chiropractic Center, Elmora Wellness, Lakewood Chiropractic, Liberty Chiropractic, Good Health Center, Millennium Chiropractic, Platinum Chiropractic, New Century Chiropractic, Pennsauken Chiropractic, Riotto Family Chiropractic, Wellspring Rehabilitation and/or True Healing and Wellness to the Defendant Bandys, John Doe 1-50 and/or ABC Corp. 1-50, either directly in the form of cash, or in the form of checks paid indirectly to the Defendant Bandys, John Doe 1-50 and/or ABC Corp. 1-50, by making payments to others on

255

behalf of, or that otherwise offset or effectively reduced the expenses of, the Defendant Bandys, the Defendant Bandy Management Companies, Defendants John Doe 1-50, ABC Corp. 1-50 and/or certain of the Runner Defendants in furtherance of one or more of the Bandy Schemes.

705. At all times relevant to the Bandy Chiropractic Fee-Splitting Scheme, Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark, John Roe 1-50 and/or John Doe 1-50, who had signatory authority over the checking accounts of the Defendant Bandy/Riotto Chiropractic Clinics and who executed checks or otherwise authorized transfers from those accounts payable to or for the benefit of the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50, knew that the amounts being paid were far in excess of the reasonable value of any legitimate services the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 were actually providing to their clinics.

706. At all times relevant to the Bandy Chiropractic Fee-Splitting Scheme, Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark, John Roe 1-50 and/or John Doe 1-50, each knew that the amounts they were paying or causing to be paid to the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 in excess of that reasonable value were being paid as kickbacks or referral fees in exchange for causing patients to be referred to their respective Defendant Bandy/Riotto Chiropractic Clinics in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

707   At all times relevant to the Bandy Chiropractic Fee-Splitting Scheme, Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark and John Roe 1-50, the Bandy Clinic Staff Defendants and the Riotto Clinic Staff Defendants, knew that a portion of the funds that were being paid over to the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 from the accounts of the Defendant Bandy/Riotto Chiropractic Clinics in furtherance of the Bandy Chiropractic Fee-Splitting Scheme were being used by the Defendant Bandys, Riotto, John Roe 1-50 and/or ABC Corp. 1-50 to pay the Runner Defendants to solicit patients on behalf of the Bandy/Riotto Chiropractic Clinics in furtherance of the Bandy Runner Scheme.

708.   At all times relevant to the Bandy Chiropractic Fee-Splitting Scheme, the Defendant Bandy/Riotto Chiropractors were assisted by certain of the Bandy Clinic Staff Defendants and the Riotto Clinic Staff Defendants, who they caused or allowed to make the payments described herein or otherwise facilitated the transfers of moneys between the accounts of the Defendant Bandy/Riotto Chiropractic Clinics and the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 in furtherance of this scheme.

709.   Each and every one of the Allstate Claimants who allegedly received treatment at one or more of the Defendant Bandy/Riotto Chiropractic Clinics underwent that treatment as a result of the actions and conduct of the Defendants herein in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

257

710    As chiropractors, Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark and/or John Roe 1-50 were at all times relevant to this litigation subject to the regulations of the New Jersey Board of Chiropractic Examiners, including the anti-kickback provisions of N.J.A.C. 13:44E-2.6.

711.    N.J.A.C. 13:44E-2.6 provides the following: "It shall be professional misconduct for a licensee to pay, or to receive from any person any fee or other form of compensation for the referral of a patient.  This section shall not prohibit the division of fees among licensees engaged in a *bona fide* employment, partnership or corporate relationship for the delivery of professional services."

712.    At no time relevant to this litigation were the Defendant Bandys, Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 ever engaged in a *bona fide* corporate or other relationship with the Defendant Bandy/Riotto Chiropractors for the delivery of professional services.

713.    At all times relevant to the Bandy Chiropractic Fee-Splitting Scheme, the payments made directly by Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark and/or John Roe 1-50, to the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50, or indirectly by the Bandy Clinic Staff Defendants or the Riotto Clinic Staff Defendants to the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 in exchange for patient referrals in furtherance of the Bandy Chiropractic Fee-Splitting Scheme violated N.J.A.C. 13:44E-2.6.

714.   Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark and/or John Roe 1-50, the Bandy Clinic Staff Defendants and the Riotto Clinic Staff Defendants, facilitated the operation and execution of the Bandy Chiropractic Fee-Splitting Scheme by willingly and knowingly following the instructions of each other and the Defendant Bandys, Defendant Riotto, John Doe 1-50, ABC Corp. 1-50, in connection with the payments made from the accounts of the Defendant Bandy/Riotto Chiropractic Clinics in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

715.   PIP insurers such as the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. §39:6A-1, et seq., to make any payments for PIP medical expense benefits that were not provided in accordance with applicable regulations and statutes governing the provision of those services.

716.   Because the chiropractic services that were allegedly provided to the Allstate Claimants and to the patients of other insurers in the name of the Defendant Bandy/Riotto Chiropractic Clinics were all rendered in violation of the applicable regulations governing the provision of healthcare services in New Jersey, including without limitation N.J.A.C. 13:44E-2.6, the Allstate Plaintiffs have no obligation to make any payments to the Defendants herein for services allegedly provided to the Allstate Claimants and/or billed to the Allstate Plaintiffs by the Defendants identified herein.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Riotto Family Chiropractic; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century

Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Millennium Chiropractic; Platinum Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; as follows:

a. Declaring that the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. 39:6A-1, et seq., to make any payments of PIP medical services benefits to any of the Defendant Bandy/Riotto Chiropractic Clinics as a result of the kickbacks or referral fees paid directly or indirectly by Defendants Brown, Johnson, Roth, Formisano, Riotto, Baer, Stark and John Roe 1-50 in furtherance of the Bandy Chiropractic Fee-Splitting Scheme;

b. Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

c. Granting Plaintiffs such additional relief as the Court shall deem just and equitable.

FIFTH COUNT

(Unjust Enrichment – Bandy Chiropractic Fee-Splitting Scheme -- Violation of N.J.A.C. 13:44E-2.6 – Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Riotto Family Chiropractic; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Millennium Chiropractic; Platinum Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

717.   The Plaintiffs repeat and restate the allegations in all preceding paragraphs and Counts and the succeeding paragraphs and Counts and incorporate the same herein as if set forth at length.

718.   Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Baer; Roth; Stark; Chiropractic Spine Center; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century Chiropractic Center; Pennsauken Chiropractic Center; True Healing and Wellness Center; Wellspring Rehabilitation; Riotto Family Chiropractic; Millennium Chiropractic; Platinum Chiropractic; KEKK Marketing; Precision Management Associates; Karkis; First Choice Management; VIP Management; Karlaly; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; Sorfam; the Bandy Clinic Staff Defendants; the Riotto Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have directly or indirectly received substantial sums from the Allstate Plaintiffs in payment of PIP healthcare expense benefits for chiropractic services allegedly rendered to the Allstate

261

Claimants in the names of the Defendant Bandy/Riotto Chiropractic Clinics, which services were at all times rendered in furtherance of the Bandy Chiropractic Fee-Splitting Scheme in violation of N.J.A.C.13:44E-2.6, as described herein.

719.   The Allstate Plaintiffs made these payments to the aforementioned Defendants in the erroneous, but good faith, belief that the alleged PIP healthcare services provided by these Defendants were rendered in accordance with applicable statutes and administrative regulations governing the provision of healthcare services in New Jersey and therefore were compensable under the No-Fault Law when, in fact, they were not.

720.   Because the PIP healthcare services allegedly rendered by the aforementioned Defendants were not rendered in accordance with applicable statutes, administrative regulations and court decisions governing the provision of healthcare services in New Jersey, the healthcare services allegedly rendered by the aforementioned Defendants to the Allstate Claimants and others were not compensable under the No Fault Law.

721.   Accordingly, the aforementioned Defendants are not entitled to any of the amounts received from the Allstate Plaintiffs in payment of PIP healthcare services benefits in connection with alleged services rendered to the Allstate Claimants and others as a result of the violations of the applicable statutes and administrative regulations, including without limitation N.J.A.C. 13:44E-2.6, that were engaged in by these Defendants pursuant to and in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

722.   The aforementioned Defendants have been unjustly enriched and are obligated to disgorge to the Allstate Plaintiffs all amounts that they have received from the Allstate Plaintiffs in connection with each of the Allstate Claimants as a result of their participation in the Bandy Chiropractic Fee-Splitting Scheme.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Riotto Family Chiropractic; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Millennium Chiropractic; Platinum Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50, as follows:

    a.    Ordering these Defendants to disgorge any and all sums paid to them directly or indirectly by the Allstate Plaintiffs on behalf of the Allstate Claimants in payment of bills submitted in the names of the Defendant Bandy/Riotto Chiropractic Clinics;

    b.    Imposing a constructive trust and equitable lien on the assets of these Defendants until such time as these Defendants have disgorged all sums paid to them directly or indirectly by the Allstate Plaintiffs;

    c.    Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

    d.    Granting the Plaintiffs such other relief as the Court shall deem just and equitable.

263

SIXTH COUNT

(Violation of N.J.S.A. 17:33A-1, et seq. - Bandy Chiropractic Fee-Splitting Scheme
- Violation of N.J.A.C. 13:44E-2.6 — Defendants Anhuar Bandy; Karim Bandy;
Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Riotto Family
Chiropractic; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good
Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century
Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation;
Millennium Chiropractic; Platinum Chiropractic; KEKK Marketing; Precision
Management; Karkis; First Choice Management; VIP Management; Karlaly;
Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills
Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants;
Rivera; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman;
Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law
Firm; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth; the
Runner Defendants; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes;
Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50
(a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50
(a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a
"Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); the
Referee Provider Defendants; Golden Lotus; Golden Flower; Lipshitz; Roytman;
Chi Acupuncture; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C.
1-50)

723.   Plaintiffs repeat and restate the allegations contained in all of the prior

paragraphs and Counts, and the succeeding paragraphs and Counts and incorporate

the same herein as if set forth at length.

724.   Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown;

Johnson; Roth; Stark; Baer; Chiropractic Spine Center; Eclipse Chiropractic; Elmora

Wellness; Good Health Center; Lakewood Chiropractic Center; Liberty Chiropractic

Center; New Century Chiropractic Center; Pennsauken Chiropractic Center; True

Healing and Wellness Center; Wellspring Rehabilitation; Millennium Chiropractic;

Platinum Chiropractic; Riotto Family Chiropractic; Chi Acupuncture; Golden Lotus

Acupuncture; Golden Flower Acupuncture; Lipshitz; Roytman; KEKK Marketing;

264

Precision Management Associates; Karkis, First Choice Management; VIP Management; Karlaly, 243 Livingston Avenue Associates, Quality Management; Palmer Hills Holdings; Sorfam; the Bandy Clinic Staff Defendants; the Riotto Clinic Staff Defendants; the Runner Defendants; the Law Firm Defendants; the Referee Provider Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have engaged in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the payment of PIP healthcare benefits to Defendants and others for chiropractic services that have been provided and billed in the name of the Defendant Bandy/Riotto Chiropractic Clinics in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

725.   By submitting, or causing the submission of each and every bill, medical record and report to the Allstate Plaintiffs and others for services that they allegedly rendered to the Allstate Claimants, the aforementioned Defendants impliedly represented, among other things, that the services were performed by and in the names of the Defendant Bandy/Riotto Chiropractic Clinics, in accordance with all applicable statutes and administrative regulations, when in fact at all times relevant to this litigation Defendants Johnson, Brown, Formisano, Roth, Riotto, Baer, Stark and John Roe 1-50, were engaged in the Bandy Chiropractic Fee-Splitting Scheme with the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50 in violation of N.J.A.C. 13:44E-2.6.

726.   The aforementioned Defendants have engaged in an ongoing conspiracy to represent to the Allstate Plaintiffs and others that they provided chiropractic services

in accordance with all applicable laws and regulations when, in fact, they at all times knew that was untrue.

727.   The aforementioned Defendants and the other Defendants identified in this Count have engaged in a conspiracy to conceal from, fail to disclose to, and otherwise mislead the Allstate Plaintiffs and other insurers regarding their participation in the Bandy Chiropractic Fee-Splitting Scheme.

728.   The aforementioned Defendants, and others, have conspired, assisted and urged each other to engage in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the Allstate Plaintiffs to make payments of PIP healthcare benefits to the Defendant Bandy/Riotto Chiropractic Clinics for services that were rendered to the Allstate Claimants pursuant to and in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

729.   Under the IFPA, a "person" or "practitioner" as defined by N.J.S.A. §17:33A-3, violates N.J.S.A. 17:33A-4(a) if he, or she:

1.   Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

2.   Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claims for

payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

3.    Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

730.    The bills, medical records and reports that the Defendant Bandy/Riotto Chiropractic Clinics; Defendants Johnson, Brown, Formisano, Roth, Riotto, Baer, Stark and John Roe 1-50, the Defendant Bandys, the Defendant Bandy Management Companies, acting in concert with and/or with the assistance of the other Defendant Bandy/Riotto Chiropractors, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, caused  to be prepared and submitted to the Allstate Plaintiffs in support of their claims for the payment of PIP healthcare expense benefits allegedly rendered to the Allstate Claimants and others in the names of one or more of the Defendant Bandy/Riotto Chiropractic Clinics, all constituted "statements" within the meaning of IFPA Section 4(a).

731.    Each submission of bills, medical records, correspondence or other documents by or in the names of any of the Defendant Bandy-Controlled Chiropractic Clinics constituted a separate violation of Section 4(a) of the IFPA.

732.   By knowingly concealing and otherwise failing to disclose their participation in the Bandy Chiropractic Fee-Splitting Scheme, as described herein, and that Defendants Johnson, Brown, Formisano, Roth, Riotto, Baer, Stark and John Roe 1-50, had paid over substantially all of the net revenue of the Defendant Bandy/Riotto Chiropractic Clinics as described herein to the Defendant Bandys and the Defendant Bandy Management Companies in exchange for causing the Allstate Claimants and the other patients to be referred for chiropractic services in violation of N.J.A.C. 13:44E-2.6, these Defendants violated Section 4(a)(3) of the IFPA.

733.   Section 4(e) of the IFPA provides in relevant part the following:

e.    A person or practitioner violates this act if, for pecuniary gain, for himself or another, he directly or indirectly solicits any person or practitioner to . . . to make a claim for personal injury protection benefits pursuant to P.L.1972, c.70 (C.39:6A-1 et seq.); provided, however, that this subsection shall not apply to any conduct otherwise permitted by law or by rule of the Supreme Court.

734.   By paying over substantially all of the net revenue of the Defendant Bandy/Riotto Chiropractic Clinics as described herein to the Defendant Bandys and the Defendant Bandy Management Companies in exchange for causing the Allstate Claimants and the other patients to be referred for chiropractic services pursuant to the Bandy Chiropractic Fee-Splitting Scheme, the Defendant Bandy/Riotto Chiropractic Clinics and Defendants Johnson, Brown, Formisano, Roth, Riotto, Baer, Stark and John Roe 1-50, directly or indirectly solicited the Allstate Claimants and those other patients

268

"to make a claim for personal injury protection benefits" under the No Fault Law in violation of Section 4(e) of the IFPA.

735. A "person" or "practitioner" violates N.J.S.A. 17:33A4(b) of the IFPA, if he or she "knowingly assists, conspires with or urges any person or practitioner to violate any provisions of this act."

736. It was at all times an element of both the Bandy Concealed Ownership Scheme and the Bandy/Riotto Chiropractic Fee-Splitting Scheme that as a condition of their participation in these schemes, in addition to allowing the Defendant Bandys to control the Defendant Bandy-Controlled Chiropractic Clinics and paying over substantially all of the net revenue received by the Defendant Bandy/Riotto Chiropractic Clinics to the Defendant Bandys, the Defendant Bandy Management Companies, John Doe 1-50 and/or ABC Corp. 1-50, the Defendant Bandy/Riotto Chiropractors were also required to and did in fact refer the Allstate Claimants and the other patients of the Defendant Bandy/Riotto Chiropractic Clinics to the Law Firm Defendants, the Defendant Golden Acupuncture Entities, Defendant Chi Acupuncture, the Acupuncture Provider Defendants, the MLS Medical Defendants, the Other Referee Provider Defendants, and Defendants John Roe 1-50 and XYZ, P.C. 1-50, as designated by the Defendant Bandys, John Doe 1-50 and/or ABC Corp. 1-50.

737. The Defendant Bandys, Defendant Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Bandy Runner Defendants, the Law Firm Defendants, the Referee

269

Provider Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, conspired with and urged and assisted each other to commit the violations of the IFPA described herein.

738.   The Runner Defendants assisted and conspired with the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy/Riotto Chiropractic Fee-Splitting Scheme by recruiting a large percentage of the patients, including a large percentage of the Allstate Claimants, in exchange for kickbacks paid to them by the Defendant Bandys and/or Riotto directly or indirectly through the Defendant Bandy Management Companies, and for causing patients to undergo treatment at the Defendant Bandy/Riotto Chiropractic Clinics.

739.   The Law Firm Defendants assisted and conspired with the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy/Riotto Chiropractic Fee-Splitting Scheme, by paying kickbacks to the Defendant Bandys directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making in-kind kickbacks in the form of the referrals of clients they obtained independently and/or through their own use

270

of runners in exchange for referrals to them of patients of the Defendant Bandy/Riotto Chiropractic Clinics by the Defendant Bandys and/or Defendant Riotto.

740.    The Law Firm Defendants also assisted and conspired with the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy/Riotto Chiropractic Fee-Splitting Scheme, by leading certain of their clients, including certain of the Allstate Claimants, to believe they had valid bodily injury claims that would be enhanced by undergoing treatment at the Defendant Bandy/Riotto Chiropractic Clinics, the Golden Acupuncture Entities and/or Defendant Chi Acupuncture, as well as by the Referee Provider Defendants, and thereby encouraging them to continue to undergo treatment regardless of whether it was necessary, and as a result of the assistance and urging of these Law Firm Defendants, the Defendant Bandys, the Defendant Bandy Management Companies, Defendant Bandy-Controlled Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, and Defendants Golden Acupuncture Entities, Lipshitz, Roytman, Johnson, Chi Acupuncture, and the Referee Provider Defendants would receive additional revenue from the Allstate Plaintiffs and as a result of the Bandy/Riotto Chiropractic Fee-Splitting Scheme and the other Bandy Schemes.

741.    The Referee Provider Defendants assisted and conspired with the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy

Clinic Staff Defendants, the Riotto Clinic Staff Defendants and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, by paying kickbacks to the Defendant Bandys, John Doe 1-50 and/or ABC Corp. 1-50 directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making kickbacks indirectly through one or more of the Patient Broker Defendants, who in turn gave kickbacks to the Defendant Bandys either in money or in kind by causing additional patients to be referred to the Defendant Bandy/Riotto Chiropractic Clinics.

742.   The Runner Defendants, the Law Firm Defendants, Acupuncture Provider Defendants, and the Referee Provider Defendants at all times knew that the Defendant Bandys were the *de facto* owners of and controlled the Defendant Bandy/Riotto Chiropractic Clinics and/or were receiving substantially all of the net revenue received by the Defendant Bandy/Riotto Chiropractic Clinics because they at all times dealt with the Defendant Bandys directly or through the Patient Broker Defendants when causing patients, including the Allstate Claimants to be referred to or from the Defendant Bandy/Riotto Chiropractic Clinics.

743.   At various times relevant hereto, Defendants Montana, Barrese, Gorodetsky and John Doe 1-50 (collectively, the "Montana/Barrese Defendants"), have each participated in, knowingly conspired with, and knowingly benefitted from the Bandy Schemes by directly and/or indirectly paying kickbacks for patient referrals, through one or more of the Defendant Bandys, the Patient Broker Defendants and/or the Runner Defendants, including Defendants Bernardo ("Benny") Neiman and Sergio C. Moreno, and have unlawfully fee split, and/or conspired to unlawfully fee split, in violation of

272

N.J.A.C. 13.44E-2.6 and the IFPA, and have engaged in a "pattern," as defined by the IFPA, of fee splitting and/or conspiring to unlawfully fee split and soliciting for pecuniary gain individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to make claims for personal injury protection benefits by undergoing treatment at Defendant Chiropractic Centre of Elizabeth and Defendant XYZ, P.C. 1-50 in violation of Sections 4(b), (c) and (e) of the IFPA. Each submission of bills, medical records, reports, correspondence or other documents by the Montana/Barrese Defendants for treatment rendered to Allstate Claimants in furtherance of the Bandy Schemes also constituted a separate violation of Section 4(a) of the IFPA.

744. A "person" or "practitioner" violates N.J.S.A. 17:33A4(c) of the IFPA if, "due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act."

745. As a result of the conspiracy, assistance and/or urging of each of the Defendants named herein, these Defendants knowingly benefitted, directly or indirectly, from the proceeds derived from the violations of the IFPA described herein, and thereby violated Section 4(c) of the IFPA.

746. Through their repeated violations of the IFPA as described herein, these Defendants have engaged in a "pattern" of violating the IFPA and as a result of which these Defendants are jointly and severally liable to the Allstate Plaintiffs for treble damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Anhuar Bandy, Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Riotto Family Chiropractic; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Millennium Chiropractic; Platinum Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth; the Runner Defendants; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); the Referee Provider Defendants; Golden Lotus; Golden Flower; Lipshitz; Roytman; Chi Acupuncture; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; jointly and severally, as follows:

a.   Declaring that during all times relevant hereto these Defendants have violated N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

b.   Declaring that during all times relevant hereto these Defendants intentionally and knowingly engaged in a pattern of violating N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

274

c.     Staying all arbitration proceedings and Superior Court actions that have been filed by or on behalf of these Defendants;

d.     Vacating all arbitration awards and judgments that have been entered against the Allstate Plaintiffs and in favor of these Defendants;

e.     Staying the enforcement of all arbitration awards and judgments that have been obtained against the Allstate Plaintiffs and in favor of these Defendants;

f.     Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all PIP healthcare expense benefits the Allstate Plaintiffs paid in connection with the claims of the Allstate PIP Claimants for services allegedly rendered;

g.     Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all damages the Allstate Plaintiffs paid by way of settlement or award in connection with the claims of the Allstate BI Claimants;

h.     Awarding the Allstate Plaintiffs all of their costs of investigation, arbitration and litigation, as well as attorneys' fees incurred and to be incurred in connection therewith and this litigation;

i.     Awarding the Allstate Plaintiffs treble damages, consisting of three times their compensatory damages, including costs of investigation, costs of suit and attorneys' fees incurred and to be incurred, jointly and severally against these Defendants pursuant to Section 7(b) of the IFPA;

j.     Awarding the Allstate Plaintiffs punitive damages against these Defendants to punish the Defendants for their malicious, willful or wanton conduct and to deter the Defendants from similar wrongful conduct in the future;

k.     Awarding Commissioner civil penalties against each Defendant in an amount up to $5,000.00 for the first offense, in an amount up to $10,000.00 for the second offense, and in an amount up to $15,000.00 for each subsequent offense pursuant to N.J.S.A. 17:33A-5(b);

l.     Awarding Commissioner costs and attorneys' fees pursuant to N.J.S.A. 17:33A-5(b);

275

m.   Assessing, against each Defendant, a statutory surcharge pursuant to N.J.S.A. 17:33A-5.1;

n.   Suspending each Defendant's New Jersey driving privileges for a period of one year pursuant to N.J.S.A. 39:6A-15; and

o.   Granting the Plaintiffs such additional relief as the Court may deem just and equitable.

## SEVENTH COUNT

(Declaratory Judgment — the Bandy Acupuncture Fee-Splitting Scheme — Defendants Golden Lotus; Golden Flower; Lipshitz; Roytman; Johnson; Chi Acupuncture; the Acupuncture Provider Defendants; Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Roth; Stark; Chiropractic Spine; Eclipse Chiropractic; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; the Defendant Acupuncture Professionals; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

747.   Plaintiffs repeat and restate the allegations contained in the preceding paragraphs and the allegations contained in the succeeding paragraphs and Counts, and incorporate the same herein as if set forth at length.

748.   As used herein, the term "Bandy Acupuncture Fee-Splitting Scheme" encompasses two separate but similar schemes: The Chi Acupuncture Fee-Splitting Scheme and the Golden Acupuncture Fee-Splitting Scheme.

749.   The Chi Acupuncture Fee-Splitting Scheme began in or about mid-March of 2009 when Defendants Karim Bandy and/or Anhuar Bandy, acting in concert with and with the assistance of Defendant Brown, began causing patients of Defendant True Healing and Wellness, including certain of the Allstate Claimants, to be referred to Defendants Johnson and Chi Acupuncture for acupuncture services.

276

750. At all times during the course of the Chi Acupuncture Fee-Splitting Scheme, Defendants Johnson and Chi Acupuncture were required as a condition of those referrals, to pay over substantially all of the revenue they received for performing these acupuncture services, net of the amounts needed to pay the salaries of the Acupuncture Provider Defendants who provided those services, to the Defendant Bandys and/or the Defendant Bandy Management Companies in exchange for the referrals of patients, including the Allstate Claimants, the Defendant Bandys and the Defendant Bandy Runners caused to be made to Defendants Johnson and Chi Acupuncture from Defendant True Healing and Wellness in furtherance of the Bandy Chiropractic Fee-Splitting Scheme.

751. Although the foregoing payments to the Defendant Bandy Management Companies were made under the guise that they were in payment of ostensibly legitimate services, such as management services, non-professional employee leasing services, leases and/or subleases of offices and/or equipment, marketing and advertising services, billing and collection services, transportation services, and other similar services, it was at all times known and understood by Defendant Johnson and the Defendant Bandys that these payments were in fact being paid over in whole or in part as kickbacks to the Defendant Bandys and/or the Defendant Bandy Management Companies in exchange for causing the referrals of patients of Defendant True Healing and Wellness, including the Allstate Claimants, to Defendant Chi Acupuncture for acupuncture services. These payments are collectively referred to herein as the "Chi Acupuncture Kickback Methods."

752.   In addition to payments either directly to the Defendant Bandys or indirectly to them through the Defendant Bandy Management Companies, the Chi Acupuncture Kickback Methods included payments that Defendants Johnson and Chi Acupuncture would make to others on behalf of, or that otherwise offset or effectively reduced the expenses of, the Defendant Bandys, the Defendant Bandy Management Companies and/or certain of the Runner Defendants in furtherance of one or more of the Bandy Schemes.

753.   Pursuant to the Golden Acupuncture Fee-Splitting Scheme, at all times since the formation of Defendant Golden Lotus Acupuncture in May of 2010, the Defendant Bandys caused the patients of certain of the Defendant Bandy-Controlled Chiropractic Clinics, including Defendants Chiropractic Spine Center, Eclipse Chiropractic Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Wellspring Rehabilitation and True Healing and Wellness to be referred to Defendant Golden Lotus Acupuncture for acupuncture services.  In exchange for each of these referrals, Defendants Lipshitz, Roytman and Golden Lotus Acupuncture have paid kickbacks to the Defendant Bandys either directly or indirectly through payments made to one or more of the Defendant Bandy Management Companies and/or through one or more of the other kickback methods as described herein. These kickback methods are collectively referred to herein as the "Golden Acupuncture Kickback Methods."

754.   At all times since the formation of Defendant Golden Flower Acupuncture in January of 2011 it has been a component of the Golden Acupuncture Fee-Splitting

Scheme that the Defendant Bandys and Riotto have caused the patients of Defendant Riotto Family Chiropractic and certain of the Defendant Bandy-Controlled Chiropractic Clinics, including Defendants Good Health Center and Pennsauken Chiropractic and XYZ, P.C. 1-50 to be referred to Defendant Golden Flower Acupuncture for acupuncture services. In exchange for each of these referrals, Defendants Lipshitz, Roytman and Golden Flower Acupuncture have paid kickbacks to the Defendant Bandys either directly or indirectly through one or more of the "Golden Acupuncture Kickback Methods."

755. The Golden Acupuncture Kickback Methods included those payments described in the Thirteenth Count of the 2014 Bandy Indictment, wherein the OIFP alleged that Defendant Lipshitz caused more than $500,000 to be paid to Defendant KEKK Marketing as kickbacks for referrals of patients by the Defendant Bandys for acupuncture services.

756. These and all other payments made by Defendants Lipshitz, Roytman and/or the Golden Acupuncture Entities to the Defendant Bandys either directly in the form of cash, or in the form of checks paid indirectly to the Defendant Bandys through one or more of the Defendant Bandy Management Companies under the guise of payments for ostensibly legitimate services were at all times known and understood by the Defendant Bandys, the Defendant Bandy Management Companies, Defendants Lipshitz, Roytman and the Golden Acupuncture Entities to be kickbacks paid for causing the referrals of patients of Defendants Chiropractic Spine Center, Eclipse Chiropractic Center, Lakewood Chiropractic, Good Health Center, New Century Chiropractic,

279

Wellspring Rehabilitation, True Healing and Wellness, Pennsauken Chiropractic, Riotto Family Chiropractic and XYZ, P.C. 1-50 to the Defendant Golden Acupuncture Entities in furtherance of the Golden Acupuncture Fee-Splitting Scheme.

757.   In addition to direct payments to the Defendant Bandys and indirect payments to the Defendant Bandy Management Companies, the Golden Acupuncture Kickback Methods included payments that Defendants Lipshitz, Roytman and the Golden Acupuncture Entities made to others on behalf of, or that otherwise offset or effectively reduced the expenses of, the Defendant Bandys, Defendant Riotto, the Defendant Bandy Management Companies and/or the Defendant Bandy/Riotto Chiropractic Clinics.

758.   An example of such an expense that was paid for by Defendants Lipshitz and/or the Golden Acupuncture Entities on behalf of the Defendant Bandys and/or the Bandy Management Companies is the payment of the lease obligations undertaken by Defendant Lipshitz beginning in 2012 for the Pennsauken Chiropractic Office Location.

759.   The regulations of the New Jersey Acupuncture Examining Board in effect at all times relevant to this litigation, at N.J.A.C. 13:35-9.11, specified the conditions under which patients may be referred for acupuncture services.

760.   For example, prior to the April, 2014 Amendment to the Administrative Code, N.J.A.C. 13:35-9.11(a) provided that a "certified acupuncturist may perform initial acupuncture treatment only on presentation by the patient of a referral by or diagnosis from a licensed physician. The referring or diagnosing physician shall provide to the treating acupuncturist a diagnosis and preevaluation of the patient."

761.   Pursuant to, and in accordance with, the Chi Acupuncture Fee-Splitting Scheme, the Defendant Bandys trained Defendant Brown and the Defendant Bandy/Riotto Chiropractors and the Bandy Clinic Staff Defendants who worked at Defendant True Healing and Wellness to refer each and every Allstate Claimant and any other patient who was willing to undergo acupuncture treatment to Defendants Chi Acupuncture and Johnson, in furtherance of the Chi Acupuncture Fee-Splitting Scheme.

762.   Pursuant to, and in accordance with, the Golden Acupuncture Fee-Splitting Scheme, the Defendant Bandys trained Defendants Brown, Formisano and the Defendant Bandy/Riotto Chiropractors and the Bandy Clinic Staff Defendants who worked at Defendants Chiropractic Spine Center, Eclipse Chiropractic Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Wellspring Rehabilitation, True Healing and Wellness, and XYZ, P.C. 1-50 to refer each and every Allstate Claimant and any other patients who were willing to undergo acupuncture services to Defendant Golden Lotus Acupuncture following the patient's twelfth chiropractic treatment date.

763.   Pursuant to, and in accordance with, the Golden Acupuncture Fee-Splitting Scheme, the Defendant Bandys and Riotto trained Defendants Formisano, Roth, the Defendant Bandy/Riotto Chiropractors and the Riotto Clinic Staff Defendants who worked at Defendants Good Health Center, Pennsauken Chiropractic, Riotto Family Chiropractic and XYZ, P.C. 1-50 to refer each and every Allstate Claimant and other patients who were willing to undergo acupuncture services to Defendant Golden Flower Acupuncture following the patient's twelfth chiropractic treatment date.

281

764. Upon information and belief, none of the Defendant Bandy/Riotto Chiropractors who provided chiropractic services at Defendant True Healing and Wellness performed any independent assessment or conducted any kind of individualized diagnosis or preevaluation for any of the patients that were referred from the Defendant True Healing and Wellness to Defendant Chi Acupuncture.

765. Upon information and belief, none of the Defendant Bandy/Riotto Chiropractors performed any independent assessment or conducted any kind of individualized diagnosis or preevaluation for any of the patients that were referred from the Defendant Bandy/Riotto Chiropractic Clinics to the Golden Acupuncture Entities.

766. Each and every one of the Allstate Claimants who received acupuncture services that were billed in the name of Defendant Chi Acupuncture were referred in violation of N.J.A.C. 13:35-9.11 and in exchange for a kickback paid to the Defendant Bandys and/or the Defendant Bandy Management Companies by Defendants Chi Acupuncture, Johnson and/or John Doe 1-50 while acting on their behalf, using one of the Chi Acupuncture Kickback Methods in furtherance of the Chi Acupuncture Fee-Splitting Scheme.

767. Each and every one of the Allstate Claimants who received acupuncture services that were billed in the name of one or more of the Defendant Golden Acupuncture Entities were referred in violation of N.J.A.C. 13:35-9.11 and in exchange for a kickback paid to the Defendant Bandys and/or the Defendant Bandy Management Companies by Defendants Lipshitz, Roytman and/or the Defendant Golden

Acupuncture Entities using one or more of the Golden Acupuncture Kickback Methods in furtherance of the Golden Acupuncture Fee-Splitting Scheme.

768.   The referrals of the patients of Defendant True Healing and Wellness by Defendant Brown or the other Defendant Bandy/Riotto Chiropractors to Defendant Chi Acupuncture for acupuncture services in exchange for kickbacks paid by Defendant Johnson using the Chi Acupuncture Kickback Methods pursuant to the Chi Acupuncture Fee-Splitting Scheme at all times violated N.J.A.C. 13:44E-2.6, which provides the following: "It shall be professional misconduct for a licensee to pay, or to receive from any person any fee or other form of compensation for the referral of a patient. This section shall not prohibit the division of fees among licensees engaged in a *bona fide* employment, partnership or corporate relationship for the delivery of professional services."

769.   The referrals of the patients of Defendants Chiropractic Spine Center, Eclipse Chiropractic Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Wellspring Rehabilitation, True Healing and Wellness, and XYZ, P.C. 1-50 by Defendants Brown, Formisano or the other Defendant Bandy/Riotto Chiropractors to Defendant Golden Lotus Acupuncture for acupuncture services in exchange for kickbacks paid by Defendants Lipshitz and/or Roytman using the Golden Acupuncture Kickback Methods pursuant to the Golden Acupuncture Fee-Splitting Scheme at all times violated N.J.A.C. 13:44E-2.6.

770.   The referrals of the patients of Defendants Riotto Family Chiropractic, Pennsauken Chiropractic, Good Health Center and XYZ, P.C. 1-50 by Defendants

283

Riotto, Roth, and/or the other Defendant Bandy/Riotto Chiropractors to Defendant Golden Flower Acupuncture for acupuncture services in exchange for kickbacks paid by Defendants Lipshitz and/or Roytman using the Golden Acupuncture Kickback Methods pursuant to the Golden Acupuncture Fee-Splitting Scheme at all times violated N.J.A.C. 13:44E-2.6.

771.   Acupuncture is a "health care service" as defined by N.J.A.C. 13:35-6.17(a)1, the anti-kickback regulations of the Board of Medical Examiners.

772.   Defendants Lipshitz, Roytman and Johnson are "practitioners" as defined by N.J.A.C. 13:35-6.17(a)4, and are licensees who are subject to these and other regulations of the Board of Medical Examiners, as well as the regulations of the Acupuncture Examining Board.

773.   N.J.A.C. 13:35-6.17(c) provides the following:

> A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: . . . making or receiving a referral to or from another for professional services.

774.   The payments made by Defendants Johnson and Chi Acupuncture to the Defendant Bandys and/or the Defendant Bandy Management Companies or by means

284

of any of the other Chi Acupuncture Kickback Methods in furtherance of the Chi Acupuncture Fee-Splitting Scheme violated N.J.A.C. 13:35-6.17(c).

775.   The payments made by Defendants Lipshitz, Roytman and the Golden Acupuncture Entities to the Defendant Bandys and/or the Defendant Bandy Management Companies or by means of any of the other Golden Acupuncture Kickback Methods in furtherance of the Golden Acupuncture Fee-Splitting Scheme violated N.J.A.C. 13:35-6.17(c).

776.   Defendants Johnson, Roth and John Roe 1-50 each participated in the Chi Acupuncture Fee-Splitting Scheme by allowing their names to be used as the source of the diagnosis and/or referral of each patient, including the Allstate Claimants, to Defendant Chi Acupuncture on the invoices and records prepared by Defendant Chi Acupuncture that were submitted to the Allstate Plaintiffs in furtherance of the Chi Acupuncture Fee-Splitting Scheme.

777.   Defendants Formisano, Brown, Roth, Riotto and John Roe 1-50 each participated in the Golden Acupuncture Fee-Splitting Scheme by allowing their names to be used as the source of the diagnosis and/or referral of each patient, including the Allstate Claimants, to the Defendant Golden Acupuncture Entities on the invoices and records prepared by the Golden Acupuncture Defendants that were submitted to the Allstate Plaintiffs in furtherance of the Golden Acupuncture Fee-Splitting Scheme.

778.   Defendants Brown, Johnson, John Doe 1-50 and John Roe 1-50, at various times relevant to this litigation provided additional assistance to the Defendant Bandys in carrying out and executing the Chi Acupuncture Fee-Splitting Scheme by

assisting in the hiring and supervision of the acupuncture and non-professional staff and the management and operation of this entity under the supervision and direction of the Defendant Bandys and in furtherance of the Chi Acupuncture Fee-Splitting Scheme.

779.   Defendants Brown, Formisano, Roth, Lipshitz, Roytman, Riotto, Anali Rivera and John Roe 1-50, at various times relevant to this litigation provided additional assistance to the Defendant Bandys in carrying out and executing the Golden Acupuncture Fee-Splitting Scheme by assisting in the hiring and supervision of acupuncture and non-professional staff and the management and operation of these entities under the supervision and direction of the Defendant Bandys and in furtherance of the Golden Acupuncture Fee-Splitting Scheme.

780.   The Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Defendant Riotto Chiropractors and the Defendant Bandy/Riotto Chiropractors including John Roe 1-50, facilitated the operation and execution of the Chi Acupuncture Fee-Splitting Scheme and/or the Golden Acupuncture Fee-Splitting Scheme by willingly and knowingly following the instructions of the Defendant Bandys, Defendant Riotto, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants and/or Defendant Lipshitz in connection with the referrals of their patients, including the Allstate Claimants, for acupuncture services by Defendant Chi Acupuncture and/or the Defendant Golden Acupuncture Entities.

781.   Defendants Johnson and John Roe 1-50, facilitated the operation and execution of the Chi Acupuncture Fee-Splitting Scheme by willingly and knowingly following the instructions of the Defendant Bandys, Defendant Roth and the Bandy

Clinic Staff Defendants and by providing acupuncture services to the patients of Defendant True Healing and Wellness and billing the Allstate Plaintiffs and other insurers for same in the name of Defendant Chi Acupuncture while at all times knowing that the Allstate Claimants and other patients of Defendant True Healing and Wellness had been referred to Defendant Chi Acupuncture in exchange for kickbacks given in furtherance of the Chi Acupuncture Fee-Splitting Scheme.

782.   The Defendant Acupuncture Professionals, including Defendants Lipshitz, Roytman, and John Roe 1-50, facilitated the operation and execution of the Golden Acupuncture Fee-Splitting Scheme by willingly and knowingly following the instructions of the Defendant Bandys, Defendant Riotto, the Bandy Clinic Staff Defendants and the Riotto Clinic Staff Defendants and by providing acupuncture services to the patients of Defendants Chiropractic Spine Center, Eclipse Chiropractic Center, Good Health Center, Lakewood Chiropractic, Liberty Chiropractic, New Century Chiropractic, Pennsauken Chiropractic, Riotto Family Chiropractic, Wellspring Rehabilitation, True Healing and Wellness, and XYZ, P.C. 1-50, and billing the Allstate Plaintiffs and other insurers for same in the name of the Defendant Golden Acupuncture Entities while at all times knowing that the patients had been referred to the Defendant Golden Acupuncture Entities in exchange for kickbacks given in furtherance of the Golden Acupuncture Fee-Splitting Scheme.

783.   PIP insurers such as the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. §39:6A-1, *et seq.*, to make any payments for PIP medical expense benefits

that were not provided in accordance with applicable regulations and statutes governing the provision of those services.

784.   Because the referrals of the Allstate Claimants and the patients of other insurers by the Defendant Bandy/Riotto Chiropractors, with the assistance of the Bandy Clinic Staff Defendants and the Riotto Clinic Staff Defendants to Defendant Chi Acupuncture and the Golden Acupuncture Entities for acupuncture services did not comply with N.J.A.C. 13:35-9.11, the acupuncture services allegedly rendered to the Allstate Claimants in the names of Defendant Chi Acupuncture and the Defendant Golden Acupuncture Entities were all rendered in violation of the applicable regulations governing the provision of healthcare services in New Jersey, and the Allstate Plaintiffs have no obligation to make any payments to the Defendants herein for those services.

785.   Because the acupuncture services that were allegedly provided to the Allstate Claimants and to the patients of other insurers in the name of Defendant Chi Acupuncture and the Defendant Golden Acupuncture Entities by the Acupuncture Provider Defendants were all rendered in violation of applicable regulations governing the provision of healthcare services in New Jersey, including without limitation N.J.A.C. 13:44E-2.6 and N.J.A.C. 13:35-6.17(c), the Allstate Plaintiffs have no obligation to make any payments to the Defendants herein for services allegedly provided to the Allstate Claimants and/or billed to the Allstate Plaintiffs by the Defendants identified herein.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Golden Lotus; Golden Flower; Lipshitz; Roytman; Johnson; Chi Acupuncture; the Acupuncture Provider Defendants; Anhuar Bandy; Karim Bandy; Riotto; Formisano;

Brown, Roth; Stark; Chiropractic Spine; Eclipse Chiropractic; Good Health Center;
Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken
Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; KEKK
Marketing; Precision Management; Karkis; First Choice Management; VIP
Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality
Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic
Staff Defendants; Rivera; the Defendant Acupuncture Professionals; John Doe 1-50;
John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; as follows:

a.   Declaring that the Allstate Plaintiffs have no obligation pursuant to
     N.J.S.A. 39:6A-1, et seq., to make any payments of PIP healthcare
     services benefits to Defendant Chi Acupuncture or the Defendant
     Golden Acupuncture Entities on behalf of any of the Allstate
     Claimants as a result of the kickbacks paid to the Defendant
     Bandys and the Defendant Bandy Management Companies by
     Defendants Johnson and Chi Acupuncture in furtherance of the Chi
     Acupuncture Fee-Splitting Scheme and by Defendants Lipshitz,
     Roytman and the Golden Acupuncture Entities in furtherance of the
     Golden Acupuncture Fee-Splitting Scheme;

b.   Awarding the Allstate Plaintiffs their reasonable attorneys' fees,
     costs of investigation and costs of suit; and

c.   Granting Plaintiffs such additional relief as the Court shall deem
     just.

EIGHTH COUNT

(Unjust Enrichment – the Bandy Acupuncture Fee-Splitting Scheme - Defendants Golden Lotus; Golden Flower; Lipshitz; Roytman; Johnson; Chi Acupuncture; the Acupuncture Provider Defendants; Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Roth; Stark; Chiropractic Spine; Eclipse Chiropractic; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlafy; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; the Defendant Acupuncture Professionals; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

786.    The Plaintiffs repeat and restate the allegations in all preceding paragraphs and Counts, and in the succeeding paragraphs and Counts, and incorporate the same herein as if set forth at length.

787.    Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Chiropractic Spine Center; Eclipse Chiropractic; Good Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century Chiropractic Center; Pennsauken Chiropractic Center; True Healing and Wellness Center; Wellspring Rehabilitation; Riotto Family Chiropractic; Golden Lotus Acupuncture; Golden Flower Acupuncture; Lipshitz; Roytman; Chi Acupuncture; the Acupuncture Provider Defendants; KEKK Marketing; Precision Management Associates; Karkis; First Choice Management; VIP Management; Karlafy; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; Sorfam; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have directly or indirectly received substantial sums from the Allstate Plaintiffs in payment of PIP healthcare expense benefits for alleged acupuncture and services allegedly rendered to

290

the Allstate Claimants in the names of the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, which services were rendered pursuant to violations of applicable regulations, including N.J.A.C. 13.44E-2.6; N.J.A.C. 13:35-6.17(c) and N.J.A.C. 13:35-9.11, in furtherance of the Bandy Acupuncture Fee-Splitting Scheme as described herein.

788.   The Allstate Plaintiffs made these payments to the aforementioned Defendants in the erroneous, but good faith, belief that the alleged PIP healthcare services provided by these Defendants were rendered in accordance with applicable statutes and administrative regulations governing the provision of health care services in New Jersey and therefore were compensable under the No-Fault Law when, in fact, they were not.

789.   Because the PIP healthcare services allegedly rendered by the aforementioned Defendants were not rendered in accordance with applicable statutes, administrative regulations and court decisions governing the provision of healthcare services in New Jersey, the healthcare services allegedly rendered by the aforementioned Defendants to the Allstate Claimants and others were not compensable under the No Fault Law.

790.   Accordingly, the aforementioned Defendants are not entitled to any of the amounts received from the Allstate Plaintiffs in payment of PIP healthcare services benefits in connection with alleged services rendered to the Allstate Claimants and others as a result of the unlawful practice structures utilized by these Defendants.

291

791.   The aforementioned Defendants have been unjustly enriched and are obligated to disgorge to the Allstate Plaintiffs all amounts that they have received from the Allstate Plaintiffs as a result of the unlawful referrals and kickbacks utilized in furtherance of the Chi Acupuncture Fee-Splitting Scheme and the Golden Acupuncture Fee-Splitting Scheme.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Golden Lotus; Golden Flower; Lipshitz; Roytman; Johnson; Chi Acupuncture; the Acupuncture Provider Defendants; Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Roth; Stark; Chiropractic Spine; Eclipse Chiropractic; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; the Defendant Acupuncture Professionals; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50, as follows:

   a. Ordering these Defendants to disgorge any and all sums paid to them directly or indirectly by the Allstate Plaintiffs on behalf of the Allstate Claimants in payment of bills submitted in the names of the Defendant Acupuncture Entities;

   b. Imposing a constructive trust and equitable lien on the assets of these Defendants until such time as these Defendants have disgorged all sums paid to them directly or indirectly by the Allstate Plaintiffs;

   c. Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

d.  Granting the Plaintiffs such other relief as the Court shall deem just and equitable.

## NINTH COUNT

(Violation of N.J.S.A. 17:33A-1, *et seq.* (the "IFPA") the Bandy Acupuncture Fee-Splitting Scheme - Defendants Golden Lotus; Golden Flower; Lipshitz; Roytman; Johnson; Chi Acupuncture; the Acupuncture Provider Defendants; Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Roth; Stark; Chiropractic Spine; Eclipse Chiropractic; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; the Defendant Acupuncture Professionals; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); the Referee Provider Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

792.  The Plaintiffs repeat and restate the allegations in all preceding paragraphs and Counts, and in the succeeding paragraphs and Counts, and incorporate the same herein as if set forth at length.

793.  Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Chiropractic Spine Center; Eclipse Chiropractic; Good Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century Chiropractic Center; Pennsauken Chiropractic Center; True Healing and Wellness Center; Wellspring Rehabilitation; Chi Acupuncture; Golden Lotus Acupuncture; Golden Flower Acupuncture; Lipshitz; Roytman; the Bandy Clinic Staff Defendants; the Riotto

293

Clinic Staff Defendants; KEKK Marketing; Precision Management Associates; Karkis; First Choice Management; VIP Management; Karlaly; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; Sorfam; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth; the Runner Defendants; the Law Firm Defendants; the Referee Provider Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have engaged in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the payment of PIP healthcare benefits for acupuncture services that have been provided and billed in the name of the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture, pursuant to the Bandy Acupuncture Fee-Splitting Scheme as described above and herein.

794. By submitting, or causing the submission of, bills, medical records and reports to the Allstate Plaintiffs and others for services that they allegedly rendered to the Allstate Claimants, the aforementioned Defendants impliedly represented, among other things, that the referrals were properly made by the Defendant Bandy/Riotto Chiropractors and the acupuncture services prescribed were performed by and in the names of the Defendant Golden Acupuncture Entities and Defendant Chi Acupuncture in accordance with all applicable statutes and administrative regulations, when in fact at various times relevant to this litigation Defendants Johnson, Lipshitz, Roytman and John Roe 1-50, were engaged in the Bandy Acupuncture Fee-Splitting Scheme with the Defendant Bandys and the Defendant Bandy Management Companies in violation of N.J.A.C. 13:44E-2.6 and N.J.A.C. 13:35-6.17(c).

294

795.   The aforementioned Defendants have engaged in an ongoing conspiracy to represent to the Allstate Plaintiffs and others that they provided acupuncture services in accordance with all applicable laws and regulations when, in fact, they at all times knew that was untrue.

796.   The aforementioned Defendants and the other Defendants identified in this Count have engaged in a conspiracy to conceal from, fail to disclose to, and otherwise mislead the Allstate Plaintiffs and other insurers regarding their participation in the Bandy Acupuncture Fee-Splitting Scheme.

797.   The aforementioned Defendants, and others, have conspired, assisted and urged each other to engage in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the Allstate Plaintiffs to make payments of PIP healthcare benefits to Defendant Chi Acupuncture and the Defendant Golden Acupuncture Entities that were rendered to the Allstate Claimants pursuant to and in furtherance of the Bandy Acupuncture Fee-Splitting Scheme.

798.   Under the IFPA, a "person" or "practitioner" as defined by N.J.S.A. §17:33A-3, violates N.J.S.A. 17:33A-4(a) if he, or she:

1.   Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

295

2.    Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

3.    Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

799.    The bills, medical records, reports, correspondence and other documents that Defendants Chi Acupuncture and Johnson and Defendants Lipshitz, Roytman and the Golden Acupuncture Entities and the other Acupuncture Provider Defendants, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandys and the Defendant Bandy Management Companies, acting in concert with and/or with the assistance of the other Defendant Bandy/Riotto Chiropractic Clinics, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, caused to be prepared and submitted to the Allstate Plaintiffs in support of the referrals and claims for the payment of PIP healthcare expense benefits allegedly rendered to the Allstate Claimants and others in the names of Defendants Chi Acupuncture, Golden Lotus Acupuncture and Golden Flower Acupuncture, all constituted "statements" within the meaning of IFPA Section 4(a).

800. Each submission of bills, medical records, reports, correspondence or other documents by or in the names of Defendant Chi Acupuncture and the Defendant Golden Acupuncture Entities constituted a separate violation of Section 4(a) of the IFPA.

801. By knowingly concealing and otherwise failing to disclose their participation in the Chi Acupuncture Fee-Splitting Scheme, as described herein, and that Defendants Johnson and Chi Acupuncture had paid over substantially all of the net revenue of Defendant Chi Acupuncture using one or more of the Chi Acupuncture Kickback Methods as described herein to the Defendant Bandys and the Defendant Bandy Management Companies in exchange for causing the Allstate Claimants and the other patients of Defendant True Healing and Wellness to be referred for acupuncture services in violation of N.J.A.C. 13:35-6.17(c), these Defendants violated Section 4(a)(3) of the IFPA.

802. By knowingly concealing and otherwise failing to disclose their participation in the Golden Acupuncture Fee-Splitting Scheme, as described herein, and that Defendants Lipshitz, Roytman and the Golden Acupuncture Entities had paid over substantially all of the net revenue of the Defendant Golden Acupuncture Entities using one or more of the Golden Acupuncture Kickback Methods as described herein to the Defendant Bandys and the Defendant Bandy Management Companies in exchange for causing the Allstate Claimants and the other patients of the Defendant Bandy/Riotto Chiropractic Clinics to be referred for acupuncture services in violation of N.J.A.C. 13:35-6.17(c), these Defendants violated Section 4(a)(3) of the IFPA.

297

803.   Section 4(e) of the IFPA provides in relevant part the following:

    e.   A person or practitioner violates this act if, for pecuniary gain, for himself or another, he directly or indirectly solicits any person or practitioner to . . . to make a claim for personal injury protection benefits pursuant to P.L.1972, c.70 (C.39:6A-1 et seq.); provided, however, that this subsection shall not apply to any conduct otherwise permitted by law or by rule of the Supreme Court.

804.   By paying over substantially all of the net revenue of Defendant Chi Acupuncture and the Golden Acupuncture Entities as described herein to the Defendant Bandys and the Defendant Bandy Management Companies in exchange for causing the Allstate Claimants and the other patients of the Defendant Bandy/Riotto Chiropractic Clinics to be referred for acupuncture services pursuant to the Bandy Acupuncture Fee-Splitting Scheme, Defendants Chi Acupuncture, the Golden Acupuncture Entities, Johnson, Lipshitz, Roytman and John Roe 1-50, indirectly solicited the Allstate Claimants and those other patients "to make a claim for personal injury protection benefits" under the No Fault Law in violation of Section 4(e) of the IFPA.

805.   A "person" or "practitioner" violates N.J.S.A. 17:33A4(b) of the IFPA, if he or she "knowingly assists, conspires with or urges any person or practitioner to violate any provisions of this act."

806.   The Defendant Bandys, Defendant Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff

298

Defendants and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, conspired with and urged and assisted each other to commit the violations of the IFPA described herein.

807.   Upon information and belief, Defendants Montana, Barrese, Gorodetsky and Chiropractic Centre of Elizabeth assisted and conspired with the Defendant Bandys in furtherance of the Bandy Acupuncture Fee-Splitting Scheme by, *inter alia,* introducing the Defendant Bandys to Defendants Lipshitz and/or Roytman, and by allowing Defendants Roytman and/or Lipshitz to pose as the paper owner or owners of Defendant Golden Lotus Acupuncture while Defendant Roytman was still providing acupuncture services in the name of Defendant Chiropractic Centre of Elizabeth and other Defendant Montana/Barrese Chiropractic Clinics, and for knowingly allowing the offices of Chiropractic Centre of Elizabeth to be used by Defendants Golden Lotus in furtherance of the Bandy Acupuncture Fee-Splitting Scheme as described herein.

808.   The Runner Defendants assisted and/or conspired with Defendants Johnson, Chi Acupuncture, Lipshitz, Roytman, the Golden Acupuncture Entities, the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy Acupuncture Fee-Splitting Scheme by recruiting a large percentage of the patients, including a large percentage of the Allstate Claimants, in exchange for kickbacks paid to them by the Defendant Bandys and/or Riotto directly or indirectly through the Defendant Bandy

Management Companies, and for causing patients to undergo treatment at the Defendant Bandy/Riotto Chiropractic Clinics, where most of these patients were then referred to Defendant Chi Acupuncture and/or the Defendant Golden Acupuncture Entities.

809.  The Law Firm Defendants assisted and/or conspired with Defendants Johnson, Chi Acupuncture, Lipshitz, Roytman, the Golden Acupuncture Entities, the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Defendant Acupuncture Professionals and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy Acupuncture Fee-Splitting Scheme, by paying kickbacks to the Defendant Bandys directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making in-kind kickbacks in the form of the referrals of clients they obtained independently and/or through their own use of runners in exchange for referrals to them of patients of the Defendant Bandy/Riotto Chiropractic Clinics clients by the Defendant Bandys and/or Defendant Riotto.

810.  The Law Firm Defendants also assisted and conspired with Defendants Johnson, Chi Acupuncture, Lipshitz, Roytman, the Golden Acupuncture Entities, the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy Acupuncture

300

Fee-Splitting Scheme, by leading certain of their clients, including certain of the Allstate Claimants, to believe they had valid bodily injury claims that would be enhanced by undergoing treatment at the Defendant Bandy/Riotto Chiropractic Clinics, the Golden Acupuncture Entities and/or Defendant Chi Acupuncture, and they knowingly benefited from the scheme because the revenue generated by the Defendant Bandys from acupuncture services through the Bandy Acupuncture Fee-Splitting Scheme was used in part by the Defendant Bandys to pay kickbacks to the Runner Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

811.   The Law Firm Defendants encouraged the Allstate Claimants and other patients of the Defendant Acupuncture Professionals to continue to undergo treatment regardless of whether it was necessary, and as a result of the assistance and urging of these Law Firm Defendants, the Defendant Bandys, the Defendant Bandy Management Companies, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, and Defendants Golden Acupuncture Entities, Lipshitz, Roytman, Johnson, Chi Acupuncture, and the Referee Provider Defendants would receive additional revenue from the Allstate Plaintiffs as a result of the Bandy Acupuncture Fee-Splitting Scheme and the other Bandy Schemes.

812.   The Referee Provider Defendants assisted and conspired with Defendants Johnson, Chi Acupuncture, Lipshitz, Roytman, the Golden Acupuncture Entities, the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John

Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, by paying kickbacks to the Defendant Bandys directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making kickbacks indirectly through one or more of the Patient Broker Defendants, who in turn gave kickbacks to the Defendant Bandys either in money or in-kind by causing additional patients to be referred to the Bandy/Riotto Chiropractic Clinics.  These moneys and the revenue generated as a result of in-kind referrals were used to pay kickbacks to the Runner Defendants for patient referrals in furtherance of the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and the other Bandy Schemes.

813.   The Runner Defendants, the Law Firm Defendants, Acupuncture Provider Defendants, and the Referee Provider Defendants at all times knew that the Defendant Bandys were receiving substantially all of the net revenue received by Defendants Chi Acupuncture and the Golden Acupuncture Entities because they at all times dealt with the Defendant Bandys directly or through the Patient Broker Defendants when causing patients, including the Allstate Claimants to be referred to or from the Defendant Bandy/Riotto Chiropractic Clinics.

814.   A "person" or "practitioner" violates N.J.S.A. 17:33A4(c) of the IFPA if, "due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act."

815.   As a result of the conspiracy, assistance and/or urging of each of the Defendants named herein, these Defendants knowingly benefitted, directly or indirectly,

from the proceeds derived from the violations of the IFPA described herein, and thereby violated Section 4(c) of the IFPA.

816.   Through their repeated violations of the IFPA as described herein, these Defendants have engaged in a "pattern" of violating the IFPA and as a result of which these Defendants are jointly and severally liable to the Allstate Plaintiffs for treble damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Golden Lotus; Golden Flower; Lipshitz; Roytman; Johnson; Chi Acupuncture; the Acupuncture Provider Defendants; Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Roth; Stark; Chiropractic Spine; Eclipse Chiropractic; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Rivera; the Defendant Acupuncture Professionals; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea");

John Doe 1-50 (a/k/a "Tano"); the Referee Provider Defendants; John Doe 1-50, John

Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; jointly and severally, as follows:

a. Declaring that during all times relevant hereto these Defendants have violated N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

b. Declaring that during all times relevant hereto these Defendants intentionally and knowingly engaged in a pattern of violating N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

c. Staying all arbitration proceedings and Superior Court actions that have been filed by or on behalf of these Defendants;

d. Vacating all arbitration awards and judgments that have been entered against the Allstate Plaintiffs and in favor of these Defendants;

e. Staying the enforcement of all arbitration awards and judgments that have been obtained against the Allstate Plaintiffs and in favor of these Defendants;

f. Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all PIP healthcare expense benefits the Allstate Plaintiffs paid in connection with the claims of the Allstate PIP Claimants for services allegedly rendered;

g. Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all damages the Allstate Plaintiffs paid by way of settlement or award in connection with the claims of the Allstate BI Claimants;

h. Awarding the Allstate Plaintiffs all of their costs of investigation, arbitration and litigation, as well as attorneys' fees incurred and to be incurred in connection therewith and this litigation;

i. Awarding the Allstate Plaintiffs treble damages, consisting of three times their compensatory damages, including costs of investigation, costs of suit and attorneys' fees incurred and to be incurred, jointly and severally against these Defendants pursuant to Section 7(b) of the IFPA;

j. Awarding the Allstate Plaintiffs punitive damages against these Defendants to punish the Defendants for their malicious, willful or

304

wanton conduct and to deter the Defendants from similar wrongful conduct in the future;

k.   Awarding Commissioner civil penalties against each Defendant in an amount up to $5,000.00 for the first offense, in an amount up to $10,000.00 for the second offense, and in an amount up to $15,000.00 for each subsequent offense pursuant to N.J.S.A. 17:33A-5(b);

l.   Awarding Commissioner costs and attorneys' fees pursuant to N.J.S.A. 17:33A-5(b);

m.   Assessing, against each Defendant, a statutory surcharge pursuant to N.J.S.A. 17:33A-5.1;

n.   Suspending each Defendant's New Jersey driving privileges for a period of one year pursuant to N.J.S.A. 39:6A-15; and

o.   Granting the Plaintiffs such additional relief as the Court may deem just and equitable.

305

TENTH COUNT

(The Bandy Runner Scheme and the Bandy Attorney Kickback Scheme –
Violations of the IFPA - Payments to "Runners" for Referring Claimants to
Defendant Bandy/Riotto Chiropractic Clinics and/or the Law Firm Defendants:
Defendants Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman;
Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law
Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez;
Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a
"Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a
"Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a
"Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); Anhuar
Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer;
Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center;
Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic;
Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family
Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic
Staff Defendants; the Bandy Clinic Staff Defendants; Montana; Barrese;
Gorodetsky; Chiropractic Centre of Elizabeth; Chiropractic Center of Newark;
Chiropractic Center of Jersey City; Wallington Chiropractic; Massimo
Chiropractic; Massimo Rehabilitation; Hanover Chiropractic; Hanover
Rehabilitation; the Referee Provider Defendants; the Other Referee Provider
Defendants; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX
Medical/Florida; MSAR; Schwartz; Ember; Scott; Liquori; Gill; the Patient Broker
Defendants; the Check Casher Defendants; the Referring Defendants; the MLS
Medical Referring Defendants; Golden Lotus; Golden Flower; Lipshitz; Roytman;
Chi Acupuncture; KEKK Marketing; Precision Management; Karkis; First Choice
Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue
Associates; Quality Management Services; Palmer Hills Holdings; John Doe 1-50;
John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

817.    Plaintiffs repeat and restate the allegations contained in the foregoing

paragraphs and Counts, and in the paragraphs and Counts that follow, and incorporate

the same herein as if set forth at length.

818.    Section 4(e) of the IFPA provides the following:

A person or practitioner violates this act if, for pecuniary gain, for himself
or another, he directly or indirectly solicits any person or practitioner to
engage, employ or retain either himself or any other person to manage,
adjust or prosecute any claim or cause of action, against any person, for

damages for negligence, or, for pecuniary gain, for himself or another, directly or indirectly solicits other persons to bring causes of action to recover damages for personal injuries or death, or for pecuniary gain, for himself or another, directly or indirectly solicits other persons to make a claim for personal injury protection benefits pursuant to P.L.1972, c.70 (C.39:6A-1et seq.); provided, however, that this subsection shall not apply to any conduct otherwise permitted by law or by rule of the Supreme Court.

819.   With few if any exceptions, every Allstate Claimant and every other patient who underwent treatment at any of the Defendant Bandy/Riotto Chiropractic Clinics was solicited pursuant to the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme in violation of Section 4(e) of the IFPA.

820.   At all times relevant to this litigation, the Runner Defendants were promised kickback payments ranging from $1,000 to $1,500 or more by the Defendant Bandys and/or Riotto for each Allstate Claimant or other patient they solicited and successfully recruited to undergo treatment at one of the Defendant Bandy/Riotto Chiropractic Clinics.

821.   It was at various times also an element of the Bandy Runner Scheme and the other Bandy Schemes, that the Defendant Bandys and/or Riotto provided the Runner Defendants with additional funds to give to prospective patients either in cash or in the form of other consideration in order to induce them to undergo treatment at one of the Defendant Bandy/Riotto Chiropractic Clinics.

822.   These amounts were often doled out by the Runner Defendants to the patients, including certain of the Allstate Claimants, over two or more weeks in order to induce the patients to continue treating at the Defendant Bandy/Riotto Chiropractic

307

Clinic long enough to enable the Bandy Defendants and/or Defendant Riotto to generate sufficient bills to recoup the amounts paid to the Runner Defendants.

823.   Each and every occasion on which one of the Runner Defendants, while acting in furtherance of the Bandy Runner Scheme, solicited an Allstate Claimant or any other patient or prospective patient, regardless of whether the person subsequently treated at one of the Defendant Bandy/Riotto Chiropractic Clinics, constituted a violation of Section 4(e) of the IFPA.

824.   In the case of each and every Allstate Claimant and every other patient of the Defendant Bandy/Riotto Chiropractic Clinics who was recruited by one of the Runner Defendants pursuant to the Bandy Runner Scheme, or who walked-in to one of the clinics to be treated but did not have legal representation, Defendants Anhuar Bandy, Karim Bandy, Riotto and/or John Doe 1-50, would cause that person to be referred to one of the Law Firm Defendants to make a claim for bodily injury damages against the Allstate Plaintiffs or other insurers in exchange for a kickback in the form of money or "in kind" in furtherance of the Bandy Attorney Kickback Scheme and in violation of Section 4(e).

825.   In exchange for each and every referral the Law Firm Defendants received through the solicitation efforts of the Runner Defendants and/or otherwise at the direction of Defendants Anhuar Bandy, Karim Bandy, Riotto and/or John Doe 1-50, including clients they signed up at the offices of the Defendant Bandy/Riotto Chiropractic Clinics, the Law Firm Defendants gave a kickback to the Defendant Bandys and/or Riotto either in the form of cash in the amount of between $500 and $1,000 per

client, or "in kind" in the form of a reciprocal referral of a client for treatment at the Defendant Bandy/Riotto Chiropractic Clinics that the Law Firm Defendants had obtained from other sources, including through the use of one or more of the attorney advertising methods described herein.

826.   Through their payments to the Defendant Runners for each person they recruited, Defendants Anhuar Bandy, Karim Bandy, Riotto and/or John Doe 1-50 indirectly solicited each and every Allstate PIP Claimant and other patient/client the Runner Defendants caused to be referred to one of the Defendant Bandy/Riotto Chiropractic Clinics, and violated Section 4(e) of the IFPA with respect to each such Allstate Claimant and other patient/client.

827.   The Law Firm Defendants violated Section 4(e) of the IFPA with respect to each referral of an Allstate Claimant or other patient of the Defendant Bandy/Riotto Chiropractic Clinics they received in exchange for a kickback in the form of money or "in kind" as described herein pursuant to the Bandy Attorney Kickback Scheme.

828.   Defendants Anhuar Bandy, Karim Bandy, Riotto and John Doe 1-50 violated Section 4(e) of the IFPA with respect to each Allstate Claimant or other patient of the Defendant Bandy/Riotto Chiropractic Clinics they caused to be referred to one of the Law Firm Defendants in exchange for a kickback in the form of money or "in kind" as described herein pursuant to the Bandy Attorney Kickback Scheme, and for each referral of a client of the Law Firm Defendants to the Defendant Bandy/Riotto Chiropractic Clinics they received pursuant to the Bandy Attorney Kickback Scheme.

829. The actions of Defendants Anhuar Bandy, Karim Bandy, Riotto, the Runner Defendants, the Law Firm Defendants, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50 directly or indirectly soliciting the Allstate Claimants and the other patients to make claims for PIP benefits and bodily injury damages in furtherance of the Bandy Runner Scheme and/or the Bandy Attorney Kickback Scheme were at all times engaged in for "personal gain" within the meaning of Section 4(e) of the Fraud Act.

830. Section 3 of the IFPA defines "pattern" to mean "five or more related violations" of N.J.S.A. 17:33A-1, et seq., and further provides that "[v]iolations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating [the Act]."

831. At all times relevant hereto, the Runner Defendants, including Defendants Estefania Frias; Lilian Frias; Lacotera; Hughes; Anali Rivera; Marta Perez; Huaman; Bernardo (a/k/a "Benny") Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); John Doe 1-50, ABC Corp. 1-50, and XYZ, P.C. 1-50 (referred to collectively herein as the "Runner Defendants"), have for pecuniary gain each engaged in a "pattern," as defined by the IFPA, of directly or indirectly soliciting individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to make claims for personal injury protection benefits by undergoing treatment at Defendants Riotto Family Chiropractic,

310

Elmora Wellness, Platinum Chiropractic, Chiropractic Spine, Eclipse Chiropractic, Good Health Center, Lakewood Chiropractic, Liberty Chiropractic, Millennium Chiropractic, New Century Chiropractic, Pennsauken Chiropractic, True Healing, Wellspring Rehabilitation, Chiropractic Centre of Elizabeth, ABC Corp. 1-50 and/or XYZ, P.C. 1-50, in furtherance of the Bandy Runner Scheme as described herein and in violation of Section 4(e) of the IFPA.

832.   The Defendant Bandys, Defendant Riotto and John Doe 1-50, both directly and indirectly through the Runner Defendants, have for pecuniary gain each engaged in a "pattern," as defined by the IFPA, of soliciting individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to make claims for personal injury protection benefits by undergoing treatment at Defendants Riotto Family Chiropractic, Chiropractic Spine, Elmora Wellness, Platinum Chiropractic, Eclipse Chiropractic, Good Health Center, Lakewood Chiropractic, Liberty Chiropractic, Millennium Chiropractic, New Century Chiropractic, Pennsauken Chiropractic, True Healing, Wellspring Rehabilitation, Chiropractic Centre of Elizabeth, ABC Corp. 1-50 and/or XYZ, P.C. 1-50, in furtherance of the Bandy Runner Scheme as described herein and in violation of Section 4(e) of the IFPA.

833.   At various times relevant hereto, Defendants Montana, Barrese, Gorodetsky and John Doe 1-50 (collectively, the "Montana/Barrese Defendants"), have each participated in the Defendant Bandy Runner Scheme by directly and/or indirectly, through one or more of the Defendant Bandys, the Patient Broker Defendants and/or the Runner Defendants, including Defendants Bernardo ("Benny") Neiman and Sergio

C. Moreno, engaging in a "pattern," as defined by the IFPA, of soliciting for pecuniary gain individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to make claims for personal injury protection benefits by undergoing treatment at Defendant Chiropractic Centre of Elizabeth and Defendant XYZ, P.C. 1-50 in furtherance of the Bandy Runner Scheme as described herein and in violation of Section 4(e) of the IFPA.

834.   At various times relevant to this litigation, the Defendant Bandys, Riotto and/or John Doe 1-50, paid the Runner Defendants for each Allstate Claimant and other patients they unlawfully solicited and recruited in furtherance of the Bandy Runner Scheme either directly in cash, or indirectly through checks drawn on the accounts of the Defendant Bandy Management Companies, the Defendant Bandy/Riotto Chiropractic Clinics and/or ABC Corp. 1-50.

835.   At all times relevant hereto, the source of the money used by the Defendant Bandys, Riotto and/or John Doe 1-50, to pay the Runner Defendants for soliciting and recruiting patients, including the Allstate Claimants, to treat at the Defendant Bandy/Riotto Chiropractic Clinics, was money paid by the Allstate Plaintiffs and other insurers by check payable to the Bandy/Riotto Chiropractic Clinics, and kickbacks received directly from the Law Firm Defendants, Acupuncture Defendants and the Referee Provider Defendants, including the MLS Medical Defendants, or indirectly from them through the Defendant Patient Brokers.  At all times relevant hereto, the Defendant Bandys, Riotto and/or John Doe 1-50, used one or more of the Bandy Kickback Methods in paying the Runner Defendants for each patient they

successfully recruited, including in some cases, additional amounts to be given to the patient to encourage them to undergo treatments.

836.   At all times relevant hereto, the source of the money used by Defendants Montana, Barrese, and Gorodetsky to pay Defendant Anhuar Bandy and/or the Runner Defendants for soliciting and recruiting patients, including the Allstate Claimants, to treat at Defendant Chiropractic Centre of Elizabeth, was money paid by the Allstate Plaintiffs and other insurers by check payable to the Defendant Montana/Barrese Chiropractic Clinics, and kickbacks received directly from the lawyers and referee providers with whom the Montana/Barrese Defendants had their own kickback relationships.  At all times relevant hereto, Defendants Montana, Barrese and Gorodetsky used one or more of the Montana/Barrese Kickback Methods, including conspiring with one or more of the Check Casher Defendants, in paying Defendant Anhuar Bandy and/or the Runner Defendants for each patient they successfully recruited to treat at Defendant Chiropractic Centre of Elizabeth, including in some cases, additional amounts to be given to the patients to encourage them to undergo treatments.

837.   The Runner Defendants have also at various times engaged in a "pattern" of soliciting individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to engage one or more of the Law Firm Defendants, including but not limited to Defendants Walker, Gallegos, Arzadi and the other Arzadi Law Firm Defendants, Wishnic and the other Wishnic Law Firm Defendants, Schenerman and the other Schenerman Law Firm Defendants and Defendants John Roe 1-50 and/or XYZ, P.C. 1-50, to "manage, adjust or prosecute any claim or cause of

313

action . . . for damages for negligence . . . or to bring causes of action to recover damages for personal injuries" in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme, as described herein, and in violation of Section 4(e) of the IFPA.

838. The Defendant Bandys, Riotto and Defendants Montana, Barrese, Gorodetsky, John Doe 1-50 and John Roe 1-50, both directly and indirectly through each other and/or the Runner Defendants, have engaged in a "pattern," as defined by the IFPA, of directly or indirectly soliciting individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to engage one or more of the Law Firm Defendants, including but not limited to Defendants Walker, Gallegos, Arzadi and the Arzadi Law Firm Defendants, Wishnic and the Wishnic Law Firm Defendants, Schenerman and the Schenerman Law Firm Defendants and Defendants John Roe 1-50 and/or XYZ, P.C. 1-50, to "manage, adjust or prosecute any claim or cause of action . . . for damages for negligence . . . or to bring causes of action to recover damages for personal injuries" in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme, as described herein, in violation of Section 4(e) of the IFPA.

839. The Law Firm Defendants, either directly or indirectly through the Defendant Bandys, Riotto, Montana, Barrese, Gorodetsky, and/or the Runner Defendants, have each engaged in a "pattern," as defined by the IFPA, of soliciting individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to engage one or more of the Law Firm Defendants, including but

314

not limited to Defendants Walker, Gallegos, Arzadi and the Arzadi Law Firm Defendants, Wishnic and the Wishnic Law Firm Defendants, Schenerman and the Schenerman Law Firm Defendants and Defendants John Roe 1-50 and/or XYZ, P.C. 1-50, to "manage, adjust or prosecute any claim or cause of action. . . for damages for negligence . . . or to bring causes of action to recover damages for personal injuries" in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme, as described herein, in violation of Section 4(e) of the IFPA.

840.   The Law Firm Defendants, including but not limited to Defendants Walker, Gallegos, Arzadi and the Arzadi Law Firm Defendants, Wishnic and the Wishnic Law Firm Defendants, Schenerman and the Schenerman Law Firm Defendants and Defendants John Roe 1-50 and/or XYZ, P.C. 1-50, either directly or indirectly through the Defendant Bandys, Riotto, Montana, Barrese, Gorodetsky, and/or the Runner Defendants, have each engaged in a "pattern," as defined by the IFPA, of soliciting individuals who have been involved in automobile accidents, including certain of the Allstate Claimants, to make claims for personal injury protection benefits by undergoing treatment at one or more of the Defendant Bandy/Riotto Chiropractic Clinics in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme, as described herein, in violation of Section 4(e) of the IFPA.

841.   At all times relevant hereto the Law Firm Defendants knew that the Defendant Bandys and Riotto were engaged in paying the Defendant Runners for recruiting patients in violation of Section 4(e) of the IFPA, and that the new clients the Law Firm Defendants signed up at the offices of the Defendant Bandy/Riotto

315

Chiropractic Clinics, or otherwise received as referrals in exchange for kickbacks they paid directly or indirectly to the Defendant Bandys and/or Riotto, or that they received as referrals from the Defendant Bandys and Riotto pursuant to "in kind" kickbacks in the form of reciprocal referrals, had all been solicited and recruited pursuant to the Bandy Runner Scheme in violation of Section 4(e) of the IFPA.

842. At all times relevant to this litigation, Defendants Lipshitz, Roytman, Johnson, the Golden Acupuncture Entities, Chi Acupuncture, Schwartz, the Referee Provider Defendants, including the MLS Medical Defendants, knew that most, if not all of the Allstate Claimants and other patients they received as referrals from the Defendant Bandy/Riotto Chiropractic Clinics had been solicited by the Runner Defendants in furtherance of the Bandy Runner Scheme and in violation of Section 4(e) of the Fraud Act and knew that the kickback payments they were making directly or indirectly to the Defendant Bandys and Riotto were being used in furtherance of the Bandy Runner Scheme, and the other Bandy Schemes.

843. Upon information and belief, Defendants Walker, Gallegos, Arzadi and the Arzadi Law Firm Defendants, Wishnic and the Wishnic Law Firm Defendants, Schenerman and the Schenerman Law Firm Defendants and Defendants John Roe 1-50 and/or XYZ, P.C. 1-50 paid the kickback amounts owed pursuant to the Bandy Attorney Kickback Scheme using funds from their attorney business accounts, their attorney trust accounts, and/or from the accounts of affiliated entities owned or controlled by the Law Firm Defendants and/or by others associated with them, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50. Upon

316

further information and belief, in the case of certain of the Law Firm Defendants, they paid kickbacks using funds paid directly or indirectly to them by certain of the Referee Provider Defendants.

844.   By paying kickbacks to the Defendant Bandys and/or Defendants Riotto and John Doe 1-50, directly or through the Defendant Bandy Management Companies, Defendant Chi Acupuncture, the Golden Acupuncture Entities, the MLS Medical Defendants and the Other Referee Provider Defendants, knowingly conspired with and assisted the other Defendants named herein to engage in the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme in violation of Section 4(e) of the IFPA.

845.   As a result of the conspiracy, assistance and/or urging of each other, and the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy Management Companies, the Montana/Barrese Defendants, the Law Firm Defendants, Defendant Chi Acupuncture, the Golden Acupuncture Defendants, the MLS Medical Defendants and the Other Referee Provider Defendants, knowingly benefitted, directly or indirectly, from the proceeds derived from the violations of the Fraud Act described herein, and thereby violated Section 4(c) of the Fraud Act.

846.   The Defendant Bandys, Defendant Riotto, Defendants Riotto Family Chiropractic, the Defendant Bandy/Riotto Chiropractors, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, Chiropractic Spine, Eclipse Chiropractic, Elmora Chiropractic, Good Health Center, Lakewood Chiropractic, Liberty Chiropractic, Millennium Chiropractic, New Century Chiropractic, Pennsauken Chiropractic, Platinum Chiropractic, True Healing, Wellspring Rehabilitation, Lipshitz, Roytman, the Golden

Acupuncture Entities, Johnson, Chi Acupuncture, Montana, Barrese, Gorodetsky, Chiropractic Centre of Elizabeth, Chiropractic Center of Jersey City, Chiropractic Center of Newark, Wallington Chiropractic, Massimo Chiropractic, Massimo Rehabilitation, Hanover Rehabilitation, Hanover Chiropractic, Defendants Walker, Gallegos, Arzadi and the Arzadi Law Firm Defendants, Wishnic and the Wishnic Law Firm Defendants, Schenerman and the Schenerman Law Firm Defendants, Defendants KEKK Marketing, Precision Management, Karkis, First Choice Management, VIP Management, Karlaly, 243 Livingston Avenue Associates, Quality Management, Palmer Hills Holdings, Sorfam, Defendants Cesar Huaman, Estefania Frias, Lilian Frias, Lacotera, Hughes, Anali Rivera, Marta Perez, Bernardo (a/k/a "Benny") Neiman, Moreno, John Doe 1-50 (a/k/a "Gabriel"), John Doe 1-50 (a/k/a "Rakeisha"), John Doe 1-50 (a/k/a "Jaxson Washington"), John Doe 1-50 (a/k/a "Tony Hernandez"), John Doe 1-50 (a/k/a "Elizabeth"), John Doe 1-50 (a/k/a "Yolanda"), John Doe 1-50 (a/k/a "Corea"), John Doe 1-50 (a/k/a "Tano"), John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, and XYZ, P.C. 1-50, have each knowingly assisted, conspired with and/or urged each other in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme and in committing the violations of Section 4(e) of the IFPA as described herein, and have thereby violated N.J.S.A. 17:33A-4(b) of the Fraud Act.

847. As a result of the conspiracy, assistance and/or urging of each other, these Defendants knowingly benefitted, directly or indirectly, from the proceeds derived from the violations of the Fraud Act described herein, and thereby violated Section 4(c) of the Fraud Act.

318

848.   By paying kickbacks to the Defendant Bandys and/or Defendants Riotto and John Doe 1-50, directly or indirectly through the Defendant Bandy Management Companies, Defendant Chi Acupuncture, the Golden Acupuncture Entities, the MLS Medical Defendants and the Other Referee Provider Defendants, knowingly conspired with and assisted the other Defendants named herein to engage in the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme in violation of Section 4(e) of the IFPA.

849.   As a result of the conspiracy, assistance and/or urging of each other, and the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Defendant Bandy Management Companies, the Montana/Barrese Defendants, the Law Firm Defendants, the Runner Defendants, Defendant Chi Acupuncture, the Golden Acupuncture Defendants, the MLS Medical Defendants, the Referee Provider Defendants, the Other Referee Provider Defendants, the Check Casher Defendants, and the Patient Broker Defendants, knowingly benefitted, directly or indirectly, from the proceeds derived from the violations of the Fraud Act described herein, and thereby violated Section 4(c) of the Fraud Act.

850.   By submitting, or causing the submission of, bills, medical records and reports to the Allstate Plaintiffs and others for services that were allegedly rendered to the Allstate Claimants, the aforementioned Defendants impliedly represented, among other things, that the referrals were properly made by the Defendant Bandy/Riotto Chiropractors or the Montana/Barrese Defendants and the services prescribed were

319

performed in accordance with all applicable statutes and administrative regulations, and that the aforementioned Defendants lawfully obtained the referrals of Allstate Claimants when in fact at all times relevant to this litigation these Defendants were engaged in the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

851.   The aforementioned Defendants have engaged in an ongoing conspiracy to represent to the Allstate Plaintiffs and others that they lawfully procured the Allstate Claimants and/or provided services in accordance with all applicable laws and regulations when, in fact, they at all times knew that was untrue.

852.   The aforementioned Defendants and the other Defendants identified in this Count have engaged in a conspiracy to conceal from, fail to disclose to, and otherwise mislead the Allstate Plaintiffs and other insurers regarding their participation in the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

853.   The aforementioned Defendants, and others, have conspired, assisted and urged each other to engage in continuing fraudulent schemes designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the Allstate Plaintiffs to make payments of PIP healthcare benefits for services rendered to the Allstate PIP Claimants and/or to make payments of third-party or first-party claims brought on behalf of the Allstate BI Claimants when the treatment, claims and/or lawsuits resulted from the Defendants' participation in the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme.

854.   Under the IFPA, a "person" or "practitioner" as defined by N.J.S.A. §17:33A-3, violates N.J.S.A. 17:33A-4(a) if he, or she:

320

1.   Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

2.   Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

3.   Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

855.   The bills, medical records, reports, correspondence and other documents that the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Defendant Bandy Management Companies, the Montana/Barrese Defendants, the Law Firm Defendants, Defendant Chi Acupuncture, the Golden Acupuncture Defendants, the MLS Medical Defendants, the Referee Provider Defendants, the Other Referee Provider Defendants, John Doe 1-50, John

321

Roe 1-50, ABC Corp. 1-50, and XYZ, P.C. 1-50, acting in concert with and/or with the assistance of the other Defendants herein, caused to be prepared and submitted to the Allstate Plaintiffs in support of the referrals and claims made by the Allstate PIP Claimants and/or the Allstate BI Claimants all constituted "statements" within the meaning of IFPA Section 4(a).

856.   Each submission of bills, medical records, reports, correspondence or other documents by these Defendants constituted a separate violation of Section 4(a) of the IFPA.

857.   By knowingly concealing and otherwise failing to disclose their participation in the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme, as described herein, these Defendants violated Section 4(a)(3) of the IFPA.

858.   Through their repeated violations of the IFPA as described herein, these Defendants have engaged in a "pattern" of violating the IFPA and as a result of which these Defendants are jointly and severally liable to the Allstate Plaintiffs for treble damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe

322

1-50 (a/k/a "Tano"); Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Montana; Barrese; Gorodetsky; Chiropractic Centre of Elizabeth; Chiropractic Center of Newark; Chiropractic Center of Jersey City; Wallington Chiropractic; Massimo Chiropractic; Massimo Rehabilitation; Hanover Chiropractic; Hanover Rehabilitation; the Referee Provider Defendants; the Other Referee Provider Defendants; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Schwartz; Ember; Scott; Liquori; Gill; the Patient Broker Defendants; the Check Casher Defendants; the Referring Defendants; the MLS Medical Referring Defendants; Golden Lotus; Golden Flower; Lipshitz; Roytman; Chi Acupuncture; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; jointly and severally, as follows:

a.   Declaring that during all times relevant hereto these Defendants have violated N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

b.   Declaring that during all times relevant hereto these Defendants intentionally and knowingly engaged in a pattern of violating N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

c.   Staying all arbitration proceedings and Superior Court actions that have been filed by or on behalf of these Defendants;

d.   Vacating all arbitration awards and judgments that have been entered against the Allstate Plaintiffs and in favor of these Defendants;

e.   Staying the enforcement of all arbitration awards and judgments that have been obtained against the Allstate Plaintiffs and in favor of these Defendants;

f.   Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all PIP healthcare expense benefits the Allstate Plaintiffs paid in connection with the claims of the Allstate PIP Claimants for services allegedly rendered;

g.   Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all damages the Allstate Plaintiffs paid by way of settlement or award in connection with the claims of the Allstate BI Claimants;

h.   Awarding the Allstate Plaintiffs all of their costs of investigation, arbitration and litigation, as well as attorneys' fees incurred and to be incurred in connection therewith and this litigation;

i.   Awarding the Allstate Plaintiffs treble damages, consisting of three times their compensatory damages, including costs of investigation, costs of suit and attorneys' fees incurred and to be incurred, jointly and severally against these Defendants pursuant to Section 7(b) of the IFPA;

j.   Awarding the Allstate Plaintiffs punitive damages against these Defendants to punish the Defendants for their malicious, willful or wanton conduct and to deter the Defendants from similar wrongful conduct in the future;

k.   Awarding Commissioner civil penalties against each Defendant in an amount up to $5,000.00 for the first offense, in an amount up to $10,000.00 for the second offense, and in an amount up to $15,000.00 for each subsequent offense pursuant to N.J.S.A. 17:33A-5(b);

l.   Awarding Commissioner costs and attorneys' fees pursuant to N.J.S.A. 17:33A-5(b);

324

m.   Assessing, against each Defendant, a statutory surcharge pursuant to N.J.S.A. 17:33A-5.1;

n.   Suspending each Defendant's New Jersey driving privileges for a period of one year pursuant to N.J.S.A. 39:6A-15; and

o.   Granting the Plaintiffs such additional relief as the Court may deem just and equitable.

## ELEVENTH COUNT

(Declaratory Judgment – MLS Medical Kickback Scheme and the MLS Medical Fraudulent Billing and Record Scheme - Diagnostic Testing and Billing for Services that Are Not Medically Necessary and/or Rendered in Violation of the No Fault Statute and Regulations; Kickbacks in Violation of N.J.A.C. 13:35-6.17 and 13:44E-2.6; Referrals for Diagnostic Testing in Violation of N.J.A.C. 13:44E-3.9; Violations of N.J.A.C. 13:35-6.16 Pertaining to Practice Structure; Self-Referrals in Violation of N.J.S.A. 45:9-22.5, et seq.; Defendants Schwartz; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Ember; Scott; Liquori; Gill; Riotto; Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Chiropractic Physicians Group, Gross, Dubnoff, and the other MLS Medical Referring Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

859.   Plaintiffs repeat and restate the allegations contained in the preceding paragraphs and Counts and the paragraph and Counts that follow, and incorporate the same herein as if set forth at length.

*Applicable Laws and Regulations Governing the Performance*
*of Diagnostic Testing and Billing for Same Under the No Fault Statute*

860.   New Jersey's No Fault Statute, N.J.S.A. 39:6a-2(m), defines the term "medically necessary" as meaning the following:

the treatment is consistent with the symptoms or diagnosis, and

325

treatment of the injury (1) is not primarily for the convenience of the injured person or provider, (2) is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and (3) does not involve unnecessary diagnostic testing.

861.   New Jersey's No Fault regulations, N.J.A.C. 11:3-4.2 define the term "clinically supported" to mean the following:

"a healthcare provider prior to selecting, performing or ordering the administration of a treatment or diagnostic test has:

1. personally examined the patient to ensure that the proper medical indications exist to justify ordering the treatment or test;

2. physically examined the patient including making an assessment of any current and/or historical subjective complaints, observations, objective findings, neurological indications, and physical tests;

3. considered any and all previously performed tests that relate to the injury and the results and which are relevant to the proposed treatment                    or                    test;                    and

4. Recorded and documented these observations, positive and negative findings and conclusions on the patient's medical records."

862.   New Jersey's No Fault regulations, N.J.A.C. 11:3-4.2, define the term "diagnostic test" to mean the following:

"medical    service    or    procedure    utilizing    bio-mechanical, neurological, neurodiagnostic, radiological, vascular or any means other than bio-analysis, intended to assist in establishing a medical, dental, physical therapy, chiropractic or physiological diagnosis for the purpose of recommending or developing a course of treatment

326

for the tested patient to be implemented by the treating practitioner or by the consultant."

863.   The regulations promulgated by the New Jersey State Board of Medical Examiners, N.J.A.C. 13:35-2.6(c), provide that, "no practitioner shall bill for any diagnostic tests which failed to yield data of sufficient clinical value in the development, evaluation or implementation of a treatment plan."

864.   Additionally, the Medical Board's regulations, N.J.A.C. 13:35-2.6(p), provide that a bill issued for diagnostic testing shall not include any charges for any test that lacks clinical value, that was not performed in a manner consistent with its regulations, and/or where the testing results are incomplete or not diagnostic due to inadequate equipment or technique.

865.   Additionally, the Medical Board's regulations, N.J.A.C. 13:35-6.11(b), provide that a "licensee of the Board of Medical Examiners shall not charge an excessive fee for services."

866.   In order to qualify for No Fault reimbursement, any healthcare service authorized by the No Fault act, must comply with any significant qualifying requirements of law that bear upon the rendition of the service including, but not limited to, the above cited regulations.

867.   Defendants MLS Medical Group and Schwartz failed to perform the electrodiagnostic testing upon the Allstate Claimants in accordance with the above mentioned statutes and/or regulations.

868. The testing performed by Defendants MLS Medical Group and/or Schwartz was not medically necessary because it was not performed in accordance with standards of good practice and professional treatment protocols.

869. Defendants MLS Medical Group and Schwartz used a set protocol approach rather than a dynamic approach for the selection of muscles for EMG testing.

870. Recognized standards of good practice require that each EMG study must be individualized to the patient, based on the provider's specific differential diagnosis and should be modified as more information is gathered. Testing the same muscles regardless of a patient's particular symptoms and clinical findings can lead to an incorrect diagnosis and therefore result in recommending the wrong treatment for a patient. The applicable standard of care requires testing the muscles needed in each case to make an accurate diagnosis. The practice used by Defendants MLS Medical Group and Schwartz on the Allstate Claimants of selecting the limb muscles for EMG testing based upon a set protocol, rather than choosing muscles based upon a clinical hypothesis for each patient, fails to meet the applicable standard of care.

871. The American Association of Neuromuscular and Electrodiagnostic Medicine (AANEM) is a nationally recognized professional organization dedicated to the advancement of neuromuscular, musculoskeletal, and electrodiagnostic medicine. It has over 5,000 members primarily neurologists and physiatrists. Its goal is to increase the quality of patient care, specifically of those patients with disorders of the central and peripheral nervous systems, the neuromuscular junction, and skeletal muscle, by

328

contributing to steady improvement in the methods of diagnosing and treating patients with muscle and nerve disorders.

872. The AANEM published a paper entitled, "Recommended Policy for Electrodiagnostic Medicine."

873. The American Academy of Neurology has endorsed the AANEM's paper entitled, "Recommended Policy for Electrodiagnostic Medicine."

874. The American Academy of Physical Medicine & Rehabilitation has endorsed the AANEM's paper entitled, "Recommended Policy for Electrodiagnostic Medicine."

875. The AANEM's paper entitled, "Recommended Policy for Electrodiagnostic Medicine" sets forth standards of good practice and professional treatment protocols, which are required to be followed for electrodiagnostic testing, to be "medically necessary" as described in N.J.S.A. 39:6A-2(m).

876. In its paper entitled, "Recommended Policy for Electrodiagnostic Medicine," the AANEM states the following:

> there is no single universally accepted specific protocol or set of procedures employed for each diagnostic category. Instead, the electrodiagnostic testing consultant must continually reassess the findings encountered during the performance of the electrodiagnostic testing; this new information may require modification of the initial study design to include other unplanned procedures and may require consideration of different alternative diagnostic possibilities. The electrodiagnostic testing evaluation is not just a standard "test" like an electrocardiogram (EKG). EKG testing involves only recording techniques performed by a set protocol and is routinely delegated to non-physician technical personnel for later interpretation by the physician. The electrodiagnostic testing consultant does not "read" needle EMGs; he or she is integrally involved in performing a detailed study.

Electrodiagnostic testing studies are individually designed by the electrodiagnostic testing consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained. The accuracy of needle EMG testing is very dependent on the skill of the examiner. The diagnostic interpretation of the needle EMG examination takes place during the performance of the test.

*The Electrodiagnostic Testing Billed By the MLS Medical Defendants*
*Is Not Reimbursable Under the No Fault Law*

877.   Defendant Schwartz did not select the muscles and/or nerves for testing based on the patient's actual symptoms or findings.   Instead, Defendant Schwartz performed electrodiagnostic testing by using a set protocol approach to testing muscles and nerves in contravention of the AANEM's guideline above.

878.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of muscles for upper limb EMG studies consisting of the deltoid, biceps, and triceps muscles on the following Allstate Claimants: M.C. 180420291-04; A.G. 225733880-04; R.G. 227991353-01; M.M. 222996098-03; M.M. 233361724-01; R.P. 224817668-01 and A.R. 187758073-01.

879.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of muscles for upper limb EMG studies consisting of the deltoid, biceps, triceps and first dorsal interosseus muscles on the following Allstate Claimants: D.A. 203700983-04; C.A. 197510258-06; W.D. 196331938-04; P.G. 184658250-04; L.L. 211644562-03; and D.M. 190778217-01.

880.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of muscles for upper limb EMG studies consisting of the deltoid, biceps, triceps, flexor carpi unlaris, flexor

330

carpi radialis and brachioradialis muscles on the following Allstate Claimants: J.A. 178292694-01; J.A. 188507297-13; P.B. 193382561-01; F.F. 187704903-01; J.P. 188507297-01; F.R. 207942749-01; J.R. 233963933-03; A.S. 163939895-04; N.S. 163939895-01; A.S. 216211896-03; and D.S. 173272782-03.

881.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of muscles for lower limb EMG studies consisting of the anterior tibial and gastrocnemius muscles on the following Allstate Claimants: M.C. 180420291-04; R.G. 227991353-01; M.M. 22996098-03; M.M. 233361724-01; and A.R. 187758073-01.

882.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of muscles for lower limb EMG studies consisting of the anterior tibial, extensor hallucis longus, and gastrocnemius muscles on the following Allstate Claimants: J.A. 178292694-01;  J.A. 188507297-13; A.S. 163939895-04; N.S. 163939895-01; and D.S. 173272782-03.

883.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of muscles for lower limb EMG studies consisting of the vastus medialis, medial gastrocnemius, peroneus long, and anterior tibial muscles on the following Allstate Claimants: D.A. 203700983-04; C.A. 197510258-06; W.D. 196331938-04; P.G. 184658250-04; L.L. 211644562-03; D.M. 190778217-01; and R.P. 224817668-01.

884.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of nerves for upper limb

nerve conduction studies consisting of the bilateral median motor nerve, bilateral ulnar motor nerve, bilateral median sensory nerve, bilateral ulnar sensory nerve and bilateral radial sensory nerve for the following Allstate Claimants: J.A. 178292694-01; J.A. 188507297-13; D.A. 203700983-04; C.A. 197510258-06; W.D. 196331938-04; F.F. 187704903-01; P.G. 184658250-04; L.L. 211644562-03; J.M. 230599218-01; I.M. 219246188-01; D.M. 190778217-01; J.P. 188507297-01; D.P. 173815705-01; F.R. 207942749-01; A.S. 163939895-04; N.S. 163939895-01; and D.S. 173272782-03.

885.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of nerves for upper limb nerve conduction studies consisting of the bilateral median motor nerve, bilateral ulnar motor nerve, bilateral radial motor nerve, bilateral median sensory nerve, bilateral ulnar sensory nerve and bilateral radial sensory nerve for the following Allstate Claimants: P.B. 193382561-01; M.C. 180420291-04; J.D. 212405252-03; A.G. 225733880-04; R.G. 227991353-01; M.M. 22996098-03; M.M. 233361724-01; R.P. 224817668-01; J.R. 233963933-03; A.R. 187758073-01; and A.S. 216211896-03.

886.   For example, and without limitation, regardless of the patient's actual symptoms or findings, Defendant Schwartz used a set protocol of nerves for lower limb nerve conduction studies consisting of the bilateral peroneal motor nerve, bilateral tibial motor nerve, bilateral sural sensory nerve, and bilateral superficial peroneal nerve for the following Allstate Claimants: J.A. 178292694-01; J.A. 188507297-13; P.B. 193382561-01; M.C. 180420291-04; F.F. 187704903-01; A.G. 225733880-04; P.G. 184658250-04; R.G. 227991353-01; M.M. 22996098-03; M.M. 233361724-01; D.M.

190778217-01; J.P. 188507297-01; D.P. 173815705-01; R.P. 224817668-01; F.R. 207942749-01; J.R. 233963933-03; A.R. 187758073-01; A.S. 163939895-04; N.S. 163939895-01; A.S. 216211896-03; and D.S. 173272782-03.

887.    Because the electrodiagnostic testing performed on the Allstate Claimants by Defendants MLS Medical Group and Schwartz was rendered using a set protocol approach, and the results of this testing were not diagnostic, Defendants MLS Medical Group and Schwartz were barred from billing for those tests by N.J.A.C. 13:35-2.6.

888.    One of the clinical objectives of electrodiagnostic testing is to define the specific nerve root level at which a radiculopathy is present, if at all. Defendants MLS Medical Group and Schwartz failed to extend the EMG sampling to a sufficient number of limb muscles to be able to make an accurate diagnosis of radiculopathy.

889.    In diagnosing a radiculopathy, Defendant Schwartz failed to extend his electrodiagnostic study to sample a sufficient number of limb muscles in order to establish an accurate diagnosis by defining the radiculopathy to the correct level. As a result, when he diagnosed an Allstate Claimant as having a radiculopathy, he diagnosed the claimant as having a radiculopathy at two or more nerve root levels and, thereby, over-diagnosed the Allstate Claimants as suffering from multi-level radiculopathy.

890.    Moreover, in performing electrodiagnostic testing, Defendants MLS Medical Group and/or Schwartz, over utilized F-wave testing. F-wave testing is of limited usefulness when testing a patient for radiculopathy. Despite this, Defendants

MLS Medical Group and Schwartz performed F-wave testing on all or virtually all of the Allstate Claimants.

891.   Moreover, during each F-wave test that is performed, it is necessary that the testing physician or assistant perform a minimum of ten supramaximal stimulations upon the patient to obtain accurate F latency values.  Recognizing this, the description of CPT 95903 expressly requires that a minimum of ten F-wave stimulations must be performed in order to use this billing code.

892.   Defendants MLS Medical Group and Schwartz failed to perform a minimum of ten supramaximal stimulations upon any of the Allstate Claimants despite the fact that they billed the Allstate Plaintiffs for this testing with respect to each of the Allstate Claimants using CPT Code 95903.

893.   Moreover, Defendants MLS Medical Group and Schwartz also failed to accurately determine the F-wave latencies.

894.   For example, and without limitation, in the upper and lower limb F-wave testing of Allstate Claimant J.P. 188507297-01, for five of the eight motor nerves tested, Defendant Schwartz reported F-wave latencies in the related data table for F-wave tests despite the fact that no F-wave was actually present in the waveforms.  Despite their absence, Defendant Schwartz placed a vertical cursor line and put a latency for each nerve in the data table and further reported that all F-waves were within normal limits.  Additionally, although the waveform for the left ulnar nerve shows only a single F-wave, Defendant Schwartz reported an F-wave latency even though a single F-wave response cannot give an accurate latency reading.  Further, Defendant Schwartz inaccurately

reported the F-wave latency as to the left ulnar nerve by placing the vertical cursor line after the actual F-wave shown in the waveform.

895.   Moreover, during nerve conduction velocity testing, the length of time that it takes for an electrical impulse to travel from the two different points at which a nerve is stimulated (a proximal location and a distal location) to a recording electrode is noted. The distance between the proximal and distal stimulation points is measured by the electrodiagnostician and manually entered into the EMG testing machine.   The EMG testing machine then calculates the motor nerve conduction velocity.   The motor nerve velocity is calculated in milliseconds per centimeters.

896.   In the nerve conduction studies on a number of Allstate Claimants, Defendants MLS Medical and Schwartz failed to accurately measure the distance used to calculate the motor nerve conduction velocities.

897.   For example, and without limitation, in the upper and lower limb studies of Allstate Claimant D.M. 190778217-01, the distances reported for each motor nerve studied is the same from side to side.   Specifically, Defendant Schwartz reported a distance of 23.5 cm for the left and right median motor nerve, 30.0 cm for the left and right peroneal motor nerve, 40.0 cm for the left and right tibial motor nerve and 24.5 cm for the left and right ulnar motor nerve.

898.   For example and without limitation, the distances noted in the NCV testing reports are also identical side to side on at least one pair of NCV distance measurements on Allstate Claimants J.A. 178292694-01; D.A. 203700983-04; C.A.

335

197510258-06; M.C. 180420291-04; W.D. 196331938-04; J.D. 212405252-03; A.G. 225733880-04; P.G. 184658250-04; R.G. 227991353-01; and L.L. 211644562-03.

899. The failure to accurately make the measurements as described above renders the test results unreliable and demonstrates that the testing was not performed in accordance with standards of good practice and professional treatment protocols.

900. Defendants MLS Medical Group and Schwartz also did not interpret the test results in accordance with accepted standards of good practice and professional treatment protocols.

901. For example, and without limitation, Defendants MLS Medical Group and Schwartz made math errors in the testing reports submitted.

902. For example, and without limitation, in the upper and lower limb NCV testing allegedly performed on Allstate Claimant J.M. 230599218-01, there are math errors in the calculations of nerve conduction velocities of the left median motor nerve, right median motor nerve, left ulnar motor nerve, and right peroneal motor nerve. Modern electrodiagnostic testing equipment automatically calculates the nerve conduction velocity from the data obtained. The physician performing the testing only needs to input the distance in centimeters.

903. Having math errors in the calculation of nerve conduction velocity is below the standard of care and constitutes a misrepresentation of the data.

904. For example, and without limitation, in the upper and lower limb sensory nerve tests of Allstate Claimant A.S. 216211896-03, the given normal values were mathematically incompatible with the given normal value for nerve conduction velocity

336

at the given standard distance. Defendant Schwartz reported for the median sensory nerve a Normal Latency of <3.6m/s, and a Normal Velocity of >45m/s at a standard distance of 14 cm. If accurately calculated, the correct values for the median sensory nerve at a standard distance of 14 cm are Normal Latency of <3.6 m/s and Normal Velocity of 38.9 m/s.

905.   Moreover, Defendants MLS Medical Group and Schwartz failed to interpret the nerve conduction studies they performed at the standard of care.

906.   For example, and without limitation, in the upper and lower limb studies of Allstate Claimant A.S. 163939895-04, Defendant Schwartz reported very high sensory nerve conductions that do not actually occur in clinical practice. For both the left and right radial sensory nerves, Defendant Schwartz reported a velocity of 111.1m/s where the normal velocity is noted as >45m/s. Similarly, for the left superficial peroneal sensory nerve, Defendant Schwartz reported a velocity of 155.6m/s, where the normal velocity is >40m/s. For the right superficial peroneal sensory nerve, Defendant Schwartz reported a velocity of 107.7m/s, where the normal velocity is >40m/s. For the left sural sensory nerve, Defendant Schwartz reported a velocity of 155.6m/s, where the normal velocity is >40m/s. For the right sural sensory nerve, Defendant Schwartz reported a velocity of 140.0m/s, where the normal velocity is >40m/s. Although the conduction velocities reported by Defendant Schwartz are significantly above normal values, Defendant Schwartz reported that all nerve conduction studies were "within normal limits."

337

907.   By failing to identify these unusually high nerve conduction velocity values, Defendant Schwartz's interpretation of the nerve conduction studies fell below the standards of good practice and professional treatment protocols.

908.   For example, and without limitation, in the upper limb studies of Allstate Claimant J.A. 188507297-13, Defendant Schwartz reported unusually high nerve conduction velocities in the right radial and right ulnar sensory nerves.   Defendant Schwartz reported a conduction velocity of 111.1m/s for the right radial sensory nerve and a velocity of 116.7m/s for the right ulnar sensory nerve.   Although the normal velocity for each nerve is listed as >45m/s, Defendant Schwartz reported that all nerve conduction studies were within normal limits.

909.   By failing to identify these unusually high nerve conduction velocity values, Defendant Schwartz's interpretation of the nerve conduction studies fell below the standards of good practice and professional treatment protocols.

910.   Moreover, Defendants MLS Medical Group and Schwartz failed to diagnose nerve conduction blocks where indicated by the testing results.

911.   A nerve conduction block is the failure of an action potential to propagate normally throughout the length of a nerve fiber (known as the axon) and is a potentially very serious medical issue.   A conduction block is present where an electrical impulse which is traveling down a nerve fiber, suddenly stops because the nerve fiber beyond that point could not conduct the impulse.   A clear indication of a nerve conduction block is where the proximal stimulation produces a response which is markedly lower than the response produced by the distal stimulation.   Nerve conduction blocks are an important

338

pathological finding and the standard of care requires that all conduction blocks must be cited and taken into account in the interpretation of the study. Further, failure to diagnose and identify a nerve conduction block in an NCS does not meet the basic criteria for the use of CPT codes for NCV studies.

912. In several of the nerve conduction studies allegedly performed by Defendant Schwartz, he did not cite or diagnostically explain a marked drop in the proximal versus distal response to nerve stimulations indicating the presence of a nerve conduction block.

913. For example, and without limitation, in the right peroneal motor nerve study of Allstate Claimant L.L. 211644562-03, Defendant Schwartz reported an amplitude of 11.8mV in response to the distal stimulation at the knee, and an amplitude of 3.5mV in response to the proximal stimulation at the ankle. Although the distal response was three times greater than the proximal response, Defendant Schwartz did not mention that a conduction block was present or incorporate the finding into his diagnoses. Nor did Defendant Schwartz document why he ignored this potentially important finding.

914. By failing to either rule out conduction blocks or include the potentially serious conditions that cause conduction blocks in his diagnosis, the testing allegedly performed by Defendant Schwartz fell below standards of good practice and professional treatment protocols. Additionally, by billing for these studies in which he failed to identify, interpret and report a nerve conduction block, Defendant Schwartz misrepresented the services allegedly rendered.

339

915. Moreover, Defendants MLS Medical Group and Schwartz over-diagnosed radiculopathy.

916. According to a 2009 peer-reviewed study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D. and Lawrence Spitz, M.D., published in Muscle & Nerve, the official journal of the AANEM, the occurrence of radiculopathies in motor vehicle accident victims is relatively rare, affecting, at most, only 19% of accident victims.

917. In contrast, Defendants MLS Medical Group and/or Schwartz falsely diagnosed radiculopathies in the vast majority of Allstate Claimants who received electrodiagnostic testing from MLS Medical Group and/or Schwartz. All or virtually all of the patients who underwent electrodiagnostic testing were diagnosed as suffering from cervical and/or lumbar radiculopathy.

918. Additionally, Defendant Schwartz diagnosed multilevel radiculopathies and bilateral radiculopathies far more frequently than peer-reviewed studies suggest such polyradiculopathies should occur in motor vehicle accident victims.

919. For example, Defendants MLS Medical Group and/or Schwartz diagnosed Allstate Claimant D.S. 173272782-03 as suffering from a radiculopathy at a total of 10 nerve root levels.

920. Moreover, Defendants MLS Medical Group and Schwartz failed to cite motor nerve conduction tests with significantly higher amplitude of the evoked response proximally than distally.

340

921.   When a motor nerve is stimulated at two different sites (e.g., at the wrist and the elbow), the resulting amplitudes of the evoked responses are normally approximately equal.

922.   Yet, in several of the nerve conduction studies performed by Defendant Schwartz, he reported evoked responses to the proximal stimulations which were significantly greater than the evoked responses to the distal stimulation.

923.   With the exception of rare cases of anomalous innervation, there are no known clinical scenarios (normal or pathological) in which the distal evoked response is significantly lower than the response on proximal stimulation.  The occurrence of such a difference in amplitudes represents either an obvious error in technique, which should have been resolved by Defendant Schwartz before finishing the testing, or a misrepresentation of the actual data.

924.   For example, and without limitation, in the right tibial motor nerve study of Allstate Claimant L.L. 211644562-03, Defendant Schwartz reported the evoked response to proximal stimulation as 10.5mV, more than twice as high as the evoked response to the distal stimulation at the ankle, which he reported at 3.9mV.  Yet, Defendant Schwartz reported the right tibial nerve study to be normal and did not note this abnormality in his final interpretation or its impact on the final diagnosis.

925.   Defendants MLS Medical Group and Schwartz also made diagnoses that were not compatible with the H-Reflex data.

926.   For example, and without limitation, in lower limb NCV studies, Defendant Schwartz made diagnoses that either did not take H-reflex studies into account or were

341

contrary to them. Failure to account for the H-reflex findings can result in the wrong diagnosis being made, and could result in incorrect treatment being selected. Failure to recognize and report H-reflex findings is below the standard of care.

927. In the lower limb study of Allstate Claimant I.M. 219246188-01, Defendant Schwartz reported a diagnosis of right L5/S1 radiculopathies. This diagnosis included right S1 radiculopathy, which should have made the H-reflex latency longer on the right side than on the left. However, the H-reflex latencies reportedly showed that the left H-reflex was actually 1.26 m/sec longer than the latency reported for the right H-reflex. Further, Defendant Schwartz reported that the H-reflex latencies were within normal limits, which is incompatible with the given diagnosis of right S1 radiculopathy.

928. By failing to recognize and report these findings, the testing allegedly performed by Defendant Schwartz on Allstate Claimant I.M. 219246188-01 fell below standards of good practice and professional treatment protocols.

929. Moreover, MLS Medical Group, LLC and Schwartz inappropriately made root specific diagnoses of radiculopathy based solely on abnormalities found in the paraspinal muscles.

930. The exact level of a radiculopathy cannot be determined based solely on the presence of abnormalities in the paraspinal muscles.

931. For example and without limitation, in the upper and lower limb studies of Allstate Claimant N.S. 163939895-01, Defendant Schwartz diagnosed bilateral C6/7 and bilateral L5/S1 purely on the basis of paraspinal muscle findings.

932.   For example and without limitation, Defendants MLS Medical Group and Schwartz similarly diagnosed the following Allstate Claimants as suffering from root specific radiculopathy based solely on abnormalities allegedly found in the paraspinal muscles:  J.A.   178292694-01;   J.A.   188507297-13;   P.B.   193382561-01;   M.C. 180420291-04;  J.D.  212405252-03;  F.F.  187704903-01;  R.G.  227991353-01;  M.M. 22996098-03;   J.P.   188507297-01;   D.P.   173815705-01;   R.P.   224817668-01;   F.R. 207942749-01; A.R. 187758073-01; A.S. 163939895-04; and D.S. 173272782-03.

933.   Defendants MLS Medical Group and/or Schwartz performed excessive and/or unnecessary testing upon the Allstate Claimants and billed the Allstate Plaintiffs for same.

934.   Standards of good practice and professional treatment protocols provide that the number of nerves tested should be the minimum necessary to address the clinical issue.

935.   As set forth in the CPT Assistant which is published by the American Medical Association, the author of the CPT Codes, the maximum number of nerve conduction studies needed to reach a final diagnosis of radiculopathy for 90% of patients is 3 motor nerve studies, with or without F-waves, and 2 sensory nerve studies for an upper limb study.  For lower limb studies, a maximum of 2 H-reflex tests are also permitted.  In cases where more studies are necessary, the physician should be able to identify the specific circumstances warranting the additional studies and document them in his or her final report.

936. In its paper entitled, "Recommended Policy for Electrodiagnostic Testing," the AANEM sets forth the same policy regarding the maximum number of tests needed to diagnose a radiculopathy.

937. Overutilization of nerve conduction studies is a violation of the CPT guidelines and falls below standards of good practice and professional treatment protocols.

938. For example, and without limitation, in the case of Allstate Claimant J.M. 230599218-01, Defendant Schwartz reported a diagnosis of radiculopathy bilaterally at C5/6 and bilaterally at L5/S1.

939. Pursuant to the above CPT and AANEM guidelines, the maximum number of nerve conduction studies needed to reach the diagnosis of radiculopathy in this patient, and in 90% of all patients with a diagnosis of radiculopathy who undergo electrodiagnostic testing, is 3 motor nerve studies, and 2 sensory nerve studies for the upper limb study, and 3 motor nerve studies, 2 sensory nerve studies and 2 H-reflex tests for the lower limb study, for a total of 12 nerve conduction studies.

940. Contrary to the CPT and AANEM guidelines, Defendant Schwartz performed 10 upper limb nerve conduction studies, 12 lower limb nerve conduction studies, as well as 8 F-wave tests and 2 H-reflex tests, for a total of 32 nerve tests on Allstate Claimant J.M. 230599218-01.

941. Although Defendant Schwartz performed far more studies than recommended, he did not identify any circumstances justifying the need for the additional studies in his testing report on J.M. 230599218-01.

344

942.   Moreover, Defendants MLS Medical Group and Schwartz over-utilized F-Wave tests.

943.   While F-wave tests are occasionally performed in studies of suspected radiculopathy, the usefulness of the testing is very limited in that regard. First, as most muscles are innervated by multiple nerve roots, a normal F-wave can occur and be normal in latency even if one of the nerve roots to the muscle is affected by radiculopathy. As such, a patient's F-wave study may be normal, when, in fact, a radiculopathy is present. Additionally, the F-wave test is a motor nerve study, as is the EMG study. Therefore, an electrodiagnostic study for radiculopathy would only rarely merit performing an F-wave study since the standard EMG testing would suffice, except in rare cases. As such, the F-wave does not add anything to the diagnosis of radiculopathy that cannot be determined from EMG testing. Further, although F-wave studies may be abnormal in cases of neuropathies, the standard motor and sensory nerve conduction studies are typically sufficient to make that diagnosis.

944.   Defendant Schwartz used the F-wave test as a part of his standard protocol of studies regardless of the patient's symptoms or suspected diagnosis.

945.   Indeed, Defendant Schwartz performed F-wave testing on every one of the Allstate Claimants.

946.   Defendants MLS Medical and Schwartz also grossly over-utilized H-Reflex tests.

947.   The H-reflex test may be used to find evidence of unilateral S1 radiculopathy. A latency difference of 2.0 m/sec or more between the two sides

345

indicates a problem in the slower side's H-reflex arc, with S1 radiculopathy being the most frequent cause. Although H-reflex testing at the S1 level may be useful in diagnosing unilateral S1 radiculopathy, it is not medically necessary to perform H-reflex testing in every lower limb electrodiagnostic study, as the standard EMG and NCV testing are typically more than adequate to diagnose unilateral S1 radiculopathy.

948.   Nevertheless, Defendant Schwartz performed H-reflex tests on every one of the Allstate Claimants to whom Defendant Schwartz performed lower limb studies.

949.   H-reflex testing was clearly a part of Defendant Schwartz's standard protocol of studies, as there was no attempt to determine whether or not H-reflex testing was needed for any of the Allstate Claimants.

950.   The electrodiagnostic testing performed by Defendants MLS Medical Group and Schwartz was not clinically supported.

951.   The electrodiagnostic testing allegedly performed by Defendants MLS Medical Group and Schwartz and billed to the Allstate Plaintiffs by the MLS Medical Defendants was not performed in order to obtain an accurate diagnosis or to recommend or develop a course of treatment.

*The MLS Medical Defendants Billed for Electrodiagnostic*
*Testing They Did Not Perform As Described in the CPT Codes Used*

952.   The MLS Medical Defendants billed for more motor nerve F-wave testing than was actually performed on all or virtually all of the Allstate Claimants.

953.   For example, and without limitation, in the upper and lower limb studies of Allstate Claimant D.S. 173272782-03, Defendant Schwartz performed eight motor nerve tests, and performed F-wave tests on six of the motor nerves that were tested.

346

Although Defendant Schwartz only performed eight total motor nerve studies, and six F-wave tests, he billed the Allstate Plaintiffs for 10 motor nerve studies with F-waves under CPT code 95903. The correct billing for this patient would have been six units of CPT 95903 (motor nerve study with F-wave) and two units of CPT 95900 (motor nerve study without F-wave).

954. Moreover, Defendants MLS Medical Group and Schwartz billed for full EMG studies when only partial studies were actually done.

955. In order to bill for a complete EMG study using the CPT Codes authored by the AMA (Codes 95860, 95861, 95863 and 96864) a minimum of five limb muscles, or four limb muscles plus paraspinal muscles must be tested per study. For purposes of billing, paraspinal muscles count as a single muscle.

956. Although Defendants MLS Medical Group and Schwartz did not test a sufficient number of limb muscles to qualify as a complete EMG study as defined by the AMA, they frequently billed the Allstate Plaintiffs for complete EMG studies.

957. For example, and without limitation, in the upper and lower limb studies of Allstate Claimant A.R. 187758073-01, Defendant Schwartz tested three upper limb muscles, two lower limb muscles and paraspinal muscles. Yet, the MLS Medical Defendants billed the Allstate Plaintiffs for four full limbs of EMG testing when, in fact, only limited EMG tests were performed.

958. By testing fewer than the required number of muscles, it was virtually impossible for Defendant Schwartz to have determined whether a radiculopathy was present and therefore this testing did not meet the standard of care.

959.   Further, by billing for complete EMG studies when, in fact, fewer studies were performed than required by the CPT codes applicable to EMG testing, the MLS Medical Defendants misrepresented the services rendered.

960.   The MLS Medical Defendants also billed the Allstate Plaintiffs for four-limb EMG studies when only two-limb EMG studies were actually done.

961.   For example, and without limitation, on Allstate Claimant A.G. 225733880-04, the MLS Medical Defendants billed the Allstate Plaintiffs for EMG testing by using CPT Code 95864. The use of this CPT Code indicates that EMG testing was performed on 4 limbs. However, a review of the related testing report demonstrates that EMG testing was performed on only A.G.'s two upper limbs. Moreover, EMG testing was only performed on three muscles in each limb. Thus, the EMG testing should have been billed under CPT Code 95870, the Code for partial EMG testing.

*The Electrodiagnostic Testing Allegedly Performed by the MLS Medical Defendants Played No Genuine Role in the Treatment the Allstate Claimants Received*

962.   The electrodiagnostic testing performed by Defendants MLS Medical Group and Schwartz did not play any genuine role in the treatment or care of the Allstate Claimants.

963.   The initial examination reports of Defendants MLS Medical Group and Schwartz represented that the electrodiagnostic testing was necessary to determine whether a patient suffered radiculopathies, neuropathies, carpal tunnel syndrome, or brachial plexopathies. The reports further represented that if the electrodiagnostic testing demonstrated radiculopathies, the patient would be recommended for pain management and epidural injections and that if neuropathies or carpal tunnel syndrome

were indicated, the patient would be referred to an orthopedic surgeon. The reports stated that if there were evidence of brachial plexopathies, then conservative treatment should be continued but modified to accommodate the patient's new diagnosis and other diagnostic testing will be ordered. Additionally, the reports represented that if the electrodiagnostic studies were normal, but radiculopathy could not be ruled out, then the patient would have to be reevaluated to determine whether the clinical presentation of radiculopathy should be treated aggressively or continue with conservative treatment.

964. The majority of the Allstate Claimants who underwent electrodiagnostic testing performed by Defendants MLS Medical Group and/or Schwartz were diagnosed with radiculopathy.

965. However, despite these purported findings, Defendants MLS Medical Group and Schwartz did not refer any of the Allstate Claimants they diagnosed with radiculopathies for pain management or epidural injections.

966. Further, Defendant Schwartz diagnosed many of the Allstate Claimants patients with carpal tunnel syndrome. Yet, Defendant Schwartz did not refer any of the Allstate Claimants he diagnosed with carpal tunnel syndrome to orthopedic surgeons.

967. Similarly, Defendant Schwartz did not recommend or suggest how conservative treatment should be modified for the Allstate Claimants he diagnosed with brachial plexopathies.

968. For the Allstate Claimants with normal electrodiagnostic studies, but for whom radiculopathy could not be definitively ruled out, Defendant Schwartz did not

reevaluate any of these Allstate Claimants to determine whether to continue conservative treatment or proceed with more aggressive treatment.

969.  Once the electrodiagnostic testing was completed, neither Defendant MLS Medical Group nor Defendant Schwartz had any further involvement in the care and treatment of any of the Allstate Claimants.

970.  For the reasons stated above, the electrodiagnostic testing allegedly performed by Defendants MLS Medical Group and/or Schwartz lacked clinical value and therefore could not aid in the development of a course of treatment for the Allstate Claimants, and in fact was not used in connection with the course of treatment administered to the Allstate Claimants.

971.  Indeed in numerous cases, the electrodiagnostic testing purportedly performed by Defendants MLS Medical Group and Schwartz occurred either after the patient had already undergone pain management procedures and had completed treatment, or many months before they would undergo any further treatment. For example, and without limitation, Claimants A.S. 163939895-04 and N.S. 163939895-01, who were both involved in the same March 25, 2010 automobile accident, were purportedly both examined by Defendant Schwartz on March 2, 2011 and were both referred for electrodiagnostic testing that was allegedly performed on March 16, 2011. Both the exam and testing occurred after these claimants had concluded treating with all other providers in connection with this accident, and neither treated again with any other provider in connection with this claim.

350

972   Similarly, Claimant M.C. 180420291-04 purportedly underwent electrodiagnostic testing by Defendants MLS Medical Group and Schwartz on July 28, 2011, more than a month after Claimant M.C. had stopped treating at Defendant Chiropractic Spine Center, and 11 months before Claimant M.C. would see another physician.

973.   The electrodiagnostic testing allegedly performed by Defendants MLS Medical Group and Schwartz was not performed in accordance with the applicable No Fault regulations and/or the regulations of the New Jersey State Board of Medical Examiners.

974.   Upon information and belief, the electrodiagnostic testing performed upon the Allstate Claimants and billed by the MLS Medical Defendants was not performed by a properly qualified individual as required by the regulations of the Board of Medical Examiners, N.J.A.C. 13:35-2.6(b), which provide that a practitioner who administers a diagnostic test must be qualified to do so:

> "A practitioner who identifies a need for a patient to undergo a diagnostic test:
>> 1. Is authorized, if consistent with the practitioner's scope of practice, to perform the diagnostic test, for which a specific CPT code is assigned and for which a fee shall be charged, upon the attainment of education and supervised training in the pertinent test."

975.   According to information that Defendant Schwartz provided to the New Jersey Division of Consumer Affairs, Defendant Schwartz's scope of practice is in the field of family medicine not in pain management and rehabilitation or neurology.

976.   Upon information and belief, Defendant Schwartz has no or insufficient education and training in the field of electrodiagnostic testing to comply with the requirements of N.J.A.C. 13.35-2.6(b).

977.   Defendant Schwartz was not qualified to perform the electrodiagnostic testing that was purportedly performed on the Allstate Claimants by Defendant Schwartz and billed to the Allstate Plaintiffs in the name of Defendant MLS Medical Group.

*Defendants MLS Medical Group and Schwartz Submitted False Reports to the Allstate Plaintiffs Ascribing Complaints to the Allstate Claimants That They Did Not Have*

978.   N.J.A.C. 13:35-2.6(c)2 specifically provides that a practitioner may bill for certain diagnostic tests "which can yield data of sufficient clinical value in the development evaluation or implementation of a plan of treatment, when clinically supported, subject to the limitations relating to timing, frequency and manner as follows: ii.  Needle electromyography (needle EMG) when used in the evaluation and diagnosis of neuropathies and radicular syndrome where clinically supported findings reveal a loss of sensation, numbness or tingling." [Emphasis added]

979.   Defendant Schwartz and the MLS Defendants submitted reports to the Allstate Plaintiffs in support of his requests for pre-certification approval for the electrodiagnostic testing in which he described complaints that the Allstate Claimants did not actually have.  In some cases, Defendant Schwartz made nearly identical findings as to injuries involving Allstate Claimants who were involved in the same accident.  The Allstate Plaintiffs set forth the following examples of false and misleading statements in the invoices and reports that the MLS Medical Defendants submitted to

352

the Allstate Plaintiffs. Defendant Schwartz and the MLS Medical Defendants fabricated the subjective complaints of these and other Allstate Claimants in order to create a false clinical basis for prescribing electrodiagnostic testing for which they could bill the Allstate Plaintiffs under N.J.A.C. 13:35-2.6(c), and for which they, the Defendant Bandys and Defendant Bandy Management Companies could profit.

*Allstate Claimant C.A. 204354039-04*

980.   Allstate Claimant C.A. 204354039-04 was involved in a motor vehicle accident on May 14, 2011 and was eventually referred to Defendant MLS Medical Group. Defendant Schwartz purportedly saw Allstate Claimant C.A. on November 16, 2011 for an initial consultation and physical examination. In his examination report, Defendant Schwartz stated that Allstate Claimant C.A. 204354039-04 had neck pain radiating into his right mid-upper arm, and low back pain that radiated down his right leg to the foot. Based on this purported physical examination and Allstate Claimant C.A.'s alleged complaints, Defendant Schwartz recommended that Allstate Claimant C.A. undergo bilateral upper and lower limb NCV and EMG testing, which he allegedly performed on November 28, 2011. On November 30, 2011, the MLS Medical Defendants submitted bills to the Allstate Plaintiffs for a November 16, 2011 consultation and the November 28, 2011 electrodiagnostic testing.

981.   On January 14, 2013, Allstate Claimant C.A. 204354039-04 appeared for an EUO, during which he testified that he only saw Defendant Schwartz on one occasion for testing which involved needles and electricity. Allstate Claimant C.A. specifically denied receiving any sort of physical examination prior to the

353

commencement of the electrodiagnostic testing. Furthermore, Allstate Claimant C.A. 204354039-04 testified that, contrary to Defendant Schwartz's report, he only had pain in his lower back as a result of the May 14, 2011 accident.

*Allstate Claimant H.D. 234165966-01*

982.   Allstate Claimant H.D. 234165966-01 was involved in a motor vehicle accident on February 3, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on February 15, 2012 and electrodiagnostic testing on March 7, 2012 at the business office of MLS Medical Group, LLC, 128 Kinderkamack Road, Park Ridge, New Jersey.

983.   At her July 17, 2012 EUO, Allstate Claimant H.D. 234165966-01 testified that the testing was done on a single day at the office of her chiropractor, True Healing & Wellness, 195 Livingston Avenue, New Brunswick, NJ.

984.   During her July 17, 2012 EUO Allstate Claimant H.D. 234165966-01 testified that shortly after the accident she had pain in her neck, shoulders, lower back and hips. Later, she was asked again about her pain, and she testified about the pain in her neck, arms, back and hips. She stated that the pain (not "pins and needles") in her arms extended down to her hands and fingers. In addition to those pain complaints, she stated that at times she had pain in her right leg down to her knee and sometimes right foot cramps. She denied feeling a pins and needles sensation. Further, she explained that her left knee pain was due to ligament or tendon damage that she sustained in her prior December 2010 motor vehicle accident.

354

985.   In contrast, in the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that Allstate Claimant H.D. 234165966-01 had neck pain that traveled down her left and right arms to the fingers.  However, he also reported that Allstate Claimant H.D. had low back pain that radiated down her left leg to the bottom of her left foot with numbness and tingling.  Defendant Schwartz further reported that Allstate Claimant H.D. had a diminished reflex of her left patella, and had decreased sensation in the L5-S1 distribution of her left leg.

*Allstate Claimant J.B. 189127798-08*

986.   Allstate Claimant J.B. 189127798-08 was involved in a motor vehicle accident on January 7, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on April 20, 2011 and electrodiagnostic testing on Allstate Claimant J.B. on May 4, 2011.  At his February 24, 2012 EUO, Allstate Claimant J.B. 189127798-08 testified that the testing was done on a single day, and he saw the doctor who performed the testing for a subsequent visit to discuss the results of the testing.  He denied seeing the doctor who performed the testing for any additional visit, and he specifically denied receiving a physical examination from him.

987.   Allstate Claimant J.B. 189127798-08 also testified at his EUO that as a result of the accident he had pain in his neck that occasionally traveled down his left arm, and he had pain in his lower back.  He was asked if his lower back pain traveled or

stayed only in the low back, and he testified that it stayed. He was later asked if he had any problems with his feet, ankles, knees or upper legs, and he testified that he did not.

988.   In the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that Allstate Claimant J.B.'s low back pain radiated to his left mid-thigh as well as paresthesia, numbness and/or tingling down to his left mid-thigh. He also reported that he had decreased strength in his left anterior tibialis (the muscle located near the shin that assists in moving the ankle and foot), left gastrocnemius (the calf muscle that assists in flexing the foot), and the left extensor hallucis longus (the muscle that assists in moving the foot and big toe). Defendant Schwartz further reported that Allstate Claimant J.B. 189127798-08 had diminished reflexes at his left triceps and left patella, and had decreased sensation in the L5-S1 distribution of his left leg.

*Allstate Claimant A.S. 216211896-03*

989.   Allstate Claimant A.S. 216211896-03 was involved in a motor vehicle accident on August 19, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on December 1, 2011 and electrodiagnostic testing on January 18, 2012. At her November 15, 2012 EUO, Allstate Claimant A.S. 216211896-03 testified that within a few weeks after the accident she sought treatment from a chiropractor for pain in her neck that traveled down her right arm to just above the elbow, and low back pain. She denied any other pain, and she denied any other problems with her right arm. She was asked again about her physical complaints, and she testified to the same pain

356

in her neck that traveled down her right arm to just above the elbow, and low back pain. Later, she again denied having any other pain or problems from the accident other than the neck pain that traveled down her right arm to just above the elbow, and low back pain. She specifically denied having any problems with her legs or feet.

990.   In the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that Allstate Claimant A.S. 216211896-03 had low back pain that radiated posteriorly down her right mid-thigh as well as paresthesia, numbness and/or tingling down to her right mid-thigh. He also reported that she had decreased strength in her right anterior tibialis (the muscle located near the shin that assists in moving the ankle and foot) and her right gastrocnemius (the calf muscle that assists in flexing the foot). Defendant Schwartz further reported that she had decreased sensation in the L4-L5 distribution of her right leg.

*Allstate Claimant M.V. 237014717-09*

991.   Allstate Claimant M.V. 237014717-09 was involved in a motor vehicle accident on March 4, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant M.V. on May 10, 2012 and electrodiagnostic testing on May 31, 2012. At his November 7, 2012 EUO, Allstate Claimant M.V. 237014717-09 testified that shortly after the accident he had pain and tightness in his mid and lower back. He stated that after a few weeks he also felt pain in his neck and shoulder blades. Later, he was asked again about his pain or problems from the

357

accident, and he testified about the pain in his mid and lower back, neck, and shoulder blades. He also referenced hip pain that lasted approximately two weeks. He denied having any pain in his legs or arms.

992. In the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that Allstate Claimant M.V. 237014717-09 had low back pain that radiated anteriorly down to his right mid-thigh with numbness and tingling. The doctor also reported that he had decreased strength in his right anterior tibialis (the muscle located near the shin that assists in moving the ankle and foot), a diminished reflex of the right patella, and had decreased sensation in the L4-L5 distribution of his right leg.

*Allstate Claimant P.B. 193382561-01*

993. Allstate Claimant P.B. 193382561-01 was involved in a motor vehicle accident on February 25, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant P.B. on May 26, 2011 and electrodiagnostic testing on June 16, 2011. At her February 23, 2012 EUO, Allstate Claimant P.B. 193382561-01 testified that as a result of the accident she had pain in her neck/upper back, right shoulder, and right hip, and she occasionally had headaches. She later identified her accident-related injuries as pain in her neck, right shoulder, low back, and right hip. She denied any pain or problems with her left shoulder, arm, or hand and denied any problems with her right hand or lower arm. Her upper extremity pain was in her right shoulder only, and it was slowly disappearing. She denied any

358

numbness in the shoulder, and she denied having any problems picking things up or holding onto them with her hands. In addition, she denied any feet or ankle problems. She also denied any problems with her lower legs, knees, and left thigh/upper leg. She further denied any numbness in her legs, and she denied having any problems with her legs giving out or being unable to stand or walk. She also confirmed that her lower back pain was different and separate from the pain in her right hip.

994.   In the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that the neck pain of Allstate Claimant P.B. 193382561-01 radiated to the right elbow along with numbness and tingling to the right elbow. He also reported diminished grip strength of the right hand (including dropping things and difficulty in picking things up) and decreased strength of the right biceps and brachioradialis. Additionally, he reported a diminished right biceps reflex and decreased sensation at the C5-C6 distribution. Regarding her lower back, Dr. Schwartz reported that the low back pain of Allstate Claimant P.B. 193382561-01 radiated into her left and right mid-thigh as well as numbness and tingling down to her left and right mid-thigh. He also reported that she had decreased strength in her left and right gastrocnemius (the calf muscle that assists in flexing the foot) and extensor hallucis longus (the muscle that assists in moving the foot and big toe). Defendant Schwartz further reported that she had decreased sensation in the L5-S1 distribution of both her left and right legs.

*Allstate Claimant R.P. 224817668-01*

995.   Allstate Claimant R.P. 224817668-01 was involved in a motor vehicle accident on November 4, 2011.  The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant R.P. 224817668-01 on December 8, 2011 and performed electrodiagnostic testing on December 22, 2011. At her October 11, 2012 Examination Under Oath, Allstate Claimant R.P. 224817668-01 testified that as a result of the accident she had pain in her neck that traveled down her right arm.  She also had pain in her lower back and right leg weakness and numbness primarily around the knee.

996.   In the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that the low back pain of Allstate Claimant R.P. 224817668-01 radiated to both her right and left mid-thigh along with paresthesia, numbness and/or tingling down to both her right and left mid-thigh.  He also reported that she had decreased strength in her right and left anterior tibialis (the muscle located near the shin that assists in moving the ankle and foot) and gastrocnemius (the calf muscle that assists in flexing the foot). Defendant Schwartz further reported that she had decreased sensation in the L4-L5 distribution of both her right and left leg.

*Allstate Claimant A.D. 253951347-04*

997.   Allstate Claimant A.D. 253951347-04 was involved in a motor vehicle accident on July 27, 2012.  The MLS Medical Defendants submitted bills and medical

360

records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant A.D. on September 27, 2012 and performed electrodiagnostic testing on October 11, 2012. At his December 21, 2012 Examination Under Oath, Allstate Claimant A.D. 253951347-04 testified that the testing was done on a single day, and he did not see the doctor who performed the testing on any other day before or after the day of the testing.

998.    During the December 21, 2012 EUO of Allstate Claimant A.D. 253951347-04, he testified that after the accident he had pain in his shoulders and lower back, but his main area of concern was the two fingers on his left hand that were cut and bleeding.  (He received stitches in both fingers at Robert Wood Johnson Hospital, and he returned to the hospital four days later for additional treatment to his left pointer finger.)  Later, he was asked again about his pain or problems from the accident, and he testified to numbness in the finger of his left hand, pain in his lower back, and "a little bit" of neck pain.  He denied having any pain or problems with his arms, legs, or feet.

999.    In the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that Allstate Claimant A.D. 253951347-04 had neck pain that radiated down his left mid-upper arm, as well as decreased strength in his left hand and biceps, and decreased sensation in the C5 distribution of his left arm.  Defendants Schwartz also reported that Allstate Claimant A.D. 253951347-04 had low back pain that radiated anteriorly down to his left mid-thigh.  The doctor also reported that Allstate Claimant A.D. 253951347-04 had decreased strength in his left anterior tibialis (the muscle located near the shin that

361

assists in moving the ankle and foot), a diminished reflex of the left patella, and had decreased sensation in the L5 distribution of his left leg.

*Allstate Claimant A.C. 253951347-05*

1000. Allstate Claimant A.C. 253951347-05 was involved in a motor vehicle accident on July 27, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant A.C. 253951347-05 on August 16, 2012 and performed electrodiagnostic testing on August 30, 2012. At his December 21, 2012 EUO, Allstate Claimant A.C. 253951347-05 testified that the testing was done on a single day, and he did not see the doctor who performed the testing on any other day before or after the day of the testing.

1001. During the December 21, 2012 EUO of Allstate Claimant A.C. 253951347-05, he testified that within a few days after the accident he had pain in his neck and lower back, but no other pain. Later, he was asked again about his pain or problems from the accident, and he testified primarily about the pain in his low back, but also described pain in his neck. He denied having any pain or problems with his legs, arms, or hands.

1002. In the Preauthorization Request for Electrodiagnostic Studies the MLS Medical Defendants submitted to the Allstate Plaintiffs, Defendant Schwartz reported that Allstate Claimant A.C. 253951347-05 had neck pain that radiated down his right mid-upper arm, as well as decreased strength in his right hand and biceps, and decreased sensation in the C5 distribution of his right arm. Defendant Schwartz also

362

reported that Allstate Claimant A.C. 253951347-05 had low back pain that radiated posteriorly down to both mid-thighs. The doctor also reported that Allstate Claimant A.C. 253951347-05 had decreased strength in his bilateral anterior tibialis (the muscle located near the shin that assists in moving the ankle and foot), a diminished reflex of the left patella, and had decreased sensation in the L5 distribution of his right leg.

*Defendants MLS Medical Group and Schwartz Falsely Billed the Allstate Plaintiffs for Comprehensive Physical Examinations that Either Did Not Occur or Were Not Performed By Defendant Schwartz*

1003. Defendants Schwartz and the MLS Medical Defendants referred multiple Allstate Claimants for electrodiagnostic testing based upon the results of a comprehensive physical examination he allegedly performed which, in fact, was either not performed at all, or was not performed by Defendant Schwartz as represented on the bills and medical reports and other records and documents submitted to the Allstate Plaintiffs in furtherance of the MLS Medical Schemes.

*Allstate Claimant C.A. 204354039-04*

1004. Allstate Claimant C.A. 204354039-04 was involved in a motor vehicle accident on May 14, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant C.A. on November 16, 2011 and performed electrodiagnostic testing on November 28, 2011. At his January 14, 2013 EUO, Allstate Claimant C.A. 204354039-04 testified that the testing was done on a single day, and he did not see the doctor who performed the testing on any other day before or after the

day of the testing.   He also stated he received the testing only and not a physical examination.

### Allstate Claimant G.A. 241374339-03

1005.  Allstate Claimant G.A. 241374339-03 was involved in a motor vehicle accident on April 3, 2012.  The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Schwartz performed a new patient examination on April 19, 2012 and electrodiagnostic testing on May 3, 2012.  At her September 14, 2012 EUO, Allstate Claimant G.A. 241374339-03 testified that the testing was done on one day, and she did not see the doctor who performed the testing more than one time.

### Allstate Claimant A.L. 251723797-03

1006.  Allstate Claimant A.L. 251723797-03 was involved in a motor vehicle accident on June 27, 2012.  The MLS Medical Group Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on October 3, 2012 and electrodiagnostic testing on October 18, 2012.  At his April 26, 2013 EUO, Allstate Claimant A.L. 251723797-03 testified that he saw the doctor only one time as a patient, and the testing was done on that day.  He did not see the doctor as a patient on any other day before or after the day of the testing.  He did observe the doctor in the office on several occasions testing other patients.

364

*Allstate Claimant J.H. 244169918-03*

1007. Allstate Claimant J.H. 244169918-03 was involved in a motor vehicle accident on March 18, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant J.H. on July 12, 2012 and electrodiagnostic testing on July 26, 2012.   At his February 13, 2013 EUO, Allstate Claimant J.H. 244169918-03 testified that the testing was done on a single day, and he did not see the doctor who performed the testing on any other day before or after the day of the testing.  He also stated he received the testing only and not a physical examination.

*Allstate Claimant A.C. 253951347-05*

1008. Allstate Claimant A.C. 253951347-05 was involved in a motor vehicle accident on July 27, 2012.  The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on Allstate Claimant A.C. on August 16, 2012 and electrodiagnostic testing on August 30, 2012.   At his December 21, 2012 EUO, Allstate Claimant A.C. 253951347-05 testified that the testing was done on a single day, and he did not see the doctor who performed the testing on any other day before or after the day of the testing.

*Allstate Claimant A.D. 253951347-04*

1009. Allstate Claimant A.D. 253951347-04 was involved in a motor vehicle accident on July 27, 2012.  The MLS Medical Defendants submitted bills and medical records to Allstate representing that Defendant Schwartz performed a new patient

365

examination on Allstate Claimant A.D. on September 27, 2012 and electrodiagnostic testing on October 11, 2012. At his December 21, 2012 EUO, Allstate Claimant A.D. 253951347-04 testified that the testing was done on a single day, and he did not see the doctor who performed the testing on any other day before or after the day of the testing.

*Allstate Claimant J.B. 189127798-08*

1010. Allstate Claimant J.B. 189127798-08 was involved in a motor vehicle accident on January 7, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on April 20, 2011 and electrodiagnostic testing on May 4, 2011. At his February 24, 2012 EUO, Allstate Claimant J.B. 189127798-08 testified that the testing was done on a single day, and he saw the doctor who performed the testing for a subsequent visit to discuss the results of the testing. He denied seeing the doctor who performed the testing for any additional visit, and he specifically denied receiving a physical examination from him.

*Allstate Claimant J.S. 240519355-03*

1011. Allstate Claimant J.S. 240519355-03 was involved in a motor vehicle accident on March 26, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Schwartz performed a new patient examination on June 7, 2012 and electrodiagnostic testing on June 21, 2012. At his October 22, 2012 Examination Under Oath, Allstate Claimant J.S. 240519355-03

366

testified that the testing was done on a single visit, and he did not see the doctor who performed the testing more than one time.

*Allstate Claimant C.P. 249183286-03*

1012. Allstate Claimant C.P. 249183286-03 was involved in a motor vehicle accident on June 17, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on July 19, 2012 and electrodiagnostic testing on August 2, 2012. At his September 24, 2012 Examination Under Oath, Allstate Claimant C.P. 249183286-03 testified that the testing was done on a single visit, and he did not see the doctors who performed the testing on any other day as their patient.

*Allstate Claimant J.M. 209937480-03*

1013. Allstate Claimant J.M. 209937480-03 was involved in a motor vehicle accident on August 6, 2010. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Schwartz performed a new patient examination on October 4, 2011 and electrodiagnostic testing on Allstate Claimant J.M. 209937480-03 on October 11, 2011. At his April 3, 2012 Examination Under Oath, Allstate Claimant J.M. 209937480-03 testified that the testing was done on a single day and he did not see the doctors who performed the testing after that day. He specifically denied receiving a medical examination from the doctors prior to the testing.

1014. In the event these and other examinations that were billed to the Allstate Plaintiffs but not performed by Defendant Schwartz were in fact performed by Defendants John Doe 1-50 and/or John Roe 1-50, the MLS Medical Defendants

367

submitted bills, reports and medical records to the Allstate Plaintiffs and other insurers falsely representing that the examinations were performed by Defendant Schwartz in furtherance of the MLS Medical Fraudulent Billing and Record Scheme in order to conceal from the Allstate Plaintiffs the identity of Defendants John Doe 1-50 and/or John Roe 1-50, who actually performed the examinations. Upon information and belief, the MLS Medical Defendants made these misrepresentations in order to facilitate the element of the MLS Medical Fraudulent Billing and Record Scheme pursuant to which the MLS Medical Defendants falsified the complaints of the Allstate Claimants and their other patients in the medical records and in the records and other documents they submitted in support of pre-certification requests in order to mislead the Allstate Plaintiffs into believing there was a clinical justification for performing electrodiagnostic testing so that the Allstate Plaintiffs would grant pre-certification, and the invoices for electrodiagnostic testing subsequently submitted by the MLS Medical Defendants would be paid by the Allstate Plaintiffs.

*Defendants MLS Medical Group and Schwartz Submitted Invoices to the Allstate Plaintiffs that Misrepresented the Locations Where the Patient Examinations and Electrodiagnostic Testing Were Performed*

1015. In connection with most of the invoices and other records submitted to the Allstate Plaintiffs relating to examinations and electrodiagnostic testing they allegedly performed on the Allstate Claimants, the MLS Medical Defendants misrepresented the location where the examinations and testing were performed as having been at the MLS Medical Kinderkamack Road Office, when in fact the services were at all times rendered at the locations of the Referring Defendant. Examples of such invoices follow.

368

*Allstate Claimant C.A. 204354039-04*

1016. Allstate Claimant C.A. 204354039-04 was involved in a motor vehicle accident on May 14, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on November 16, 2011 and electrodiagnostic testing on November 28, 2011 at the MLS Medical Kinderkamack Road Office. At his January 14, 2013 Examination Under Oath, Allstate Claimant C.A. 204354039-04 testified that the testing was done on a single day at the office of his chiropractor, Defendant Eclipse Chiropractic, 120 Depot Park, Plainfield, NJ.

*Allstate Claimant H.D. 234165966-01*

1017. Allstate Claimant H.D. 234165966-01 was involved in a motor vehicle accident on February 3, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on February 15, 2012 and electrodiagnostic testing on March 7, 2012 at the MLS Medical Kinderkamack Road Office. At her July 17, 2012 Examination Under Oath, Allstate Claimant H.D. 234165966-01 testified that the testing was done on a single day at the office of her chiropractor, Defendant True Healing & Wellness, 195 Livingston Avenue, New Brunswick, NJ.

*Allstate Claimant A.C. 253951347-05*

1018. Allstate Claimant A.C. 253951347-05 was involved in a motor vehicle accident on July 27, 2012. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new

369

patient examination on August 16, 2012 and electrodiagnostic testing on August 30, 2012 at the MLS Medical Kinderkamack Road Office.   At his December 21, 2012 Examination Under Oath, Allstate Claimant A.C. 253951347-05 testified that the testing was done on a single day at the office of his chiropractor, Defendant True Healing & Wellness, 195 Livingston Avenue, New Brunswick, NJ.

### Allstate Claimant J.B. 189127798-08

1019. Allstate Claimant J.B. 189127798-08 was involved in a motor vehicle accident on January 7, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on April 20, 2011 and electrodiagnostic testing on May 4, 2011 at the MLS Medical Kinderkamack Road Office. At his February 24, 2012 EUO, Allstate Claimant J.B. 189127798-08 testified that the testing was done on a single day at the office of his chiropractor, Defendant True Healing & Wellness, 195 Livingston Avenue, New Brunswick, NJ.

### Allstate Claimant M.T. 214803884-03

1020. Allstate Claimant M.T. 214803884-03 was involved in a motor vehicle accident on August 8, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on October 25, 2011 and electrodiagnostic testing on December 12, 2011 at the MLS Medical Kinderkamack Road Office. At her April 18, 2013 Examination Under Oath, Allstate Claimant M.T. 214803884-03 testified that the testing was done on

a single day at the office of her chiropractor, Defendant True Healing & Wellness, 195 Livingston Avenue, New Brunswick, NJ.

*Allstate Claimant A.S. 216211896-03*

1021. Allstate Claimant A.S. 216211896-03 was involved in a motor vehicle accident on August 19, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on December 1, 2011 and electrodiagnostic testing on January 18, 2012 at the MLS Medical Kinderkamack Road Office. At her November 15, 2012 Examination Under Oath, Allstate Claimant A.S. 216211896-03 testified that the testing was done on a single day at the office of her chiropractor, Defendant True Healing & Wellness, 195 Livingston Avenue, New Brunswick, NJ.

*Allstate Claimant P.B. 193382561-01*

1022. Allstate Claimant P.B. 193382561-01 was involved in a motor vehicle accident on February 25, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on May 26, 2011 and electrodiagnostic testing on June 16, 2011 at the MLS Medical Kinderkamack Road Office. At her February 23, 2012 Examination Under Oath, Allstate Claimant P.B. 193382561-01 testified that the testing was done on a single day at the office of her chiropractor, Defendant Good Health Center, 701 Newark Avenue, Elizabeth, NJ.

371

*Allstate Claimant E.V. 175005339-03*

1023. Allstate Claimant E.V. 175005339-03 was involved in a motor vehicle accident on August 6, 2010. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on January 20, 2011 and electrodiagnostic testing on February 3, 2011 at the MLS Medical Kinderkamack Road Office. At his February 16, 2012 Examination Under Oath, Allstate Claimant E.V. 175005339-03 testified that the testing was done on a single day at the office of his chiropractor, Defendant Chiropractic Spine Center, 278 Hobart Street, Perth Amboy, NJ.

*Allstate Claimant J.M. 209937480-03*

1024. Allstate Claimant J.M. 209937480-03 was involved in a motor vehicle accident on August 6, 2010. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz performed a new patient examination on October 4, 2011 and electrodiagnostic testing on J.M. 209937480-03 on October 11, 2011 at the MLS Medical Kinderkamack Road Office. At his April 3, 2012 Examination Under Oath, Allstate Claimant J.M. 209937480-03 testified that the testing was done on a single day at the office of his chiropractor, Defendant Chiropractic Spine Center, 278 Hobart Street, Perth Amboy, NJ.

*Allstate Claimant R.P. 224817668-01*

1025. Allstate Claimant R.P. 224817668-01 was involved in a motor vehicle accident on November 4, 2011. The MLS Medical Defendants submitted bills and medical records to the Allstate Plaintiffs representing that Defendant Schwartz

372

performed a new patient examination on December 8, 2011 and electrodiagnostic testing on December 22, 2011 at the MLS Medical Kinderkamack Road Office. At her October 11, 2012 Examination Under Oath, Allstate Claimant R.P. 224817668-01 testified that the testing was done on a single visit at the office of her chiropractor, Defendant Good Health Center, 701 Newark Avenue, Elizabeth, NJ.

*Each and Every Referral of an Allstate Claimant by the Referring Defendants to the Defendants Schwartz and MLS Medical Violated N.J.A.C. 13:44E-3.9*

1026. The regulations of the Board of Chiropractors, N.J.A.C. 13:44E-3.9, prohibit chiropractors from referring a patient to another practitioner "at the same premises or at any space within or outside of the office or building, parking lot or other area in any mobile premises in the environs of the office or building," unless inter alia, the "other practitioner is a *bona fide* partner, fellow shareholder of a professional service corporation . . . or a regularly salaried practitioner-employee of the chiropractic physician requesting the performance of a diagnostic test."

1027. Contrary to the false statements set forth in Box 32 on HCFAs submitted to the Allstate Plaintiffs by the MLS Medical Defendants in connection with the electrodiagnostic testing purportedly performed by Defendants MLS Medical Group and Schwartz at the MLS Medical Kinderkamack Road Office, the electrodiagnostic testing was performed on each of the Allstate Claimants on the same premises as the chiropractor who was treating the claimant and who would have made the referral for the test, and therefore was made in violation of N.J.A.C. 13:44E-3.9.

1028. Each and every referral of an Allstate Claimant from the Defendant Bandy/Riotto Chiropractic Clinics by the Defendant Bandy/Riotto Chiropractors to

373

Defendants Schwartz and MLS Medical for electrodiagnostic testing was made in violation of N.J.A.C. 13:44E-3.9.

1029. Each and every referral of an Allstate Claimant from any of the other Referring Defendants by Defendants John Roe 1-50 to Defendants Schwartz and MLS Medical for electrodiagnostic testing was made in violation of N.J.A.C. 13:44E-3.9.

1030. The Allstate Plaintiffs have no obligation to pay for the electrodiagnostic testing allegedly performed by Defendants Schwartz and MLS Medical Group on any of the Allstate Claimants because each and every one was referred for that testing in violation of N.J.A.C. 13:44E-3.9.

*Each and Every Referral of an Allstate Claimant by the Referring Defendants to the Defendants Schwartz and MLS Medical Violated N.J.A.C. 13:35-6.17*

1031. The MLS Medical Defendants paid kickbacks directly or indirectly to each and every one of the MLS Medical Referring Defendants for each of the Allstate Claimants and other patients who were referred to them for examinations and/or electrodiagnostic testing.

1032. In exchange for each and every referral received to the MLS Medical Defendants from the Defendant Bandy/Riotto Chiropractic Clinics and/or the Defendant Bandy/Riotto Chiropractors, the MLS Medical Defendants paid kickbacks to the Defendant Bandys, John Doe 1-50 and/or John Roe 1-50 directly in the form of cash, or indirectly through the Defendant Bandy Management Companies under the guise of making payments for rent or in some other manner in furtherance of the MLS Medical Kickback Scheme.

374

1033. In exchange for each and every referral received to the MLS Medical Defendants from the other MLS Medical Referring Defendants, the MLS Medical Defendants paid kickbacks to the MLS Medical Referring Defendants, and/or to the Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50 either in the form of cash, under the guise of making payments for rent or in some other manner in furtherance of the MLS Medical Kickback Scheme.

1034. At all times relevant to this litigation, the MLS Medical Defendants and the MLS Medical Referring Defendants, including the Defendant Bandys, the Defendant Bandy Management Companies, Defendant Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, Defendants Chiropractic Physicians Group, Gross, Dubnoff, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, at all times knew that the payments or other consideration paid by the MLS Medical Defendants to or on behalf of the MLS Medical Referring Defendants were kickbacks being paid in exchange for the referrals of patients including the Allstate Claimants for electrodiagnostic testing and/or other healthcare services in violation of N.J.A.C. 13:35-6.17(c) and N.J.A.C. 13:44E-2.6.

*Self-Referrals in Violation of N.J.S.A. 45:9-22.5, et seq.*

1035. At all times relevant to this litigation, Defendant Riotto had a financial interest directly or indirectly in Defendant MLS Medical Group within the meaning of N.J.S.A. 45:9-22.5, et seq., through payments he regularly received from Defendants MLS Medical Group and Schwartz, directly and/or indirectly through his ownership

375

interests with Schwartz in Defendant MSAR and Turn Key Diagnostic Services and through his interest in Medical Holdings.

1036. As a result of the financial interests of Defendant Riotto in Defendant MLS Medical as described herein, each and every referral of an Allstate Claimant to Defendant MLS Medical Group and Defendant Schwartz by Defendants Riotto Family Chiropractic, Millennium Chiropractic and/or any of the other Defendant Bandy/Riotto Chiropractors while acting at the direction or under the supervision of Defendant Riotto, constituted an unlawful self-referral in violation of N.J.S.A. 45:9-22.5, N.J.A.C. 13:44E-2.6 and N.J.A.C. 13:35-6.17(a)2.

*Practice Structure Violations and/or Unlawful Fee-Splitting With Non-Licensees in Violation of N.J.A.C. 13:35-6.16 and N.J.A.C. 13:35-6.17(c)*

1037. From the formation of Defendant MLS Medical Group in 2006 until at least December of 2012, Defendant MLS Medical Group has been owned both in fact and as a matter of law by Defendant Schwartz jointly with Defendant Ember, who at all times relevant to this litigation has been a non-licensee, in violation of the practice structure requirements set forth in N.J.A.C. 13:35-6.16.

1038. At various times relevant to this litigation, Defendant Schwartz has also had other *de facto* unlicensed partners in Defendant MLS Medical Group, including in addition to Defendant Ember, Defendants Scott, Gill and Liquori as a result of their interests in Defendants MLS EDX Medical, MLS EDX Medical/Florida, MLS Medical Group/Florida, ABC Corp. 1-50, XYZ, P.C. 1-50, and Neuro Diagnostic Associates, Neuro Diagnostic Associates/Florida and Medical Holdings, in violation of N.J.A.C. 13:35-6.16.

376

1039. Alternatively, at various times relevant to this litigation, and at least at all times since August of 2010, Defendant Schwartz engaged in unlawful fee-splitting with Defendants Ember, Scott, Gill and Liquori through the diversion of funds payable to Defendant MLS Medical Group to Defendants MLS Medical Group/Florida, MLS EDX Medical and/or Defendant MLS EDX Medical/Florida or through transfers or payments between and/or among the MLS Medical Defendants in furtherance of the MLS Medical Kickback Scheme.

1040. PIP insurers such as the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. §39:6A-1, et seq., to make any payments for PIP medical expense benefits that were not provided in accordance with applicable regulations and statutes governing the provision of those services.

1041. Because the electrodiagnostic testing and other healthcare services purportedly performed on or provided to the Allstate Claimants and to the patients of other insurers in the name of Defendant MLS Medical Group and Defendant Schwartz were all rendered in violation of statutes and regulations governing the provision of healthcare services in New Jersey, including without limitation N.J.A.C. 13:44E-2.6, N.J.A.C. 13:44E-3.9, N.J.A.C. 13:35-2.6; N.J.A.C. 13:35-6.16, N.J.A.C. 13:35-6.17; N.J.S.A. 39:6a-2(m); N.J.A.C. 11:3-4.2 and N.J.S.A. 45:9-22.5, et seq., the Allstate Plaintiffs have no obligation to make any payments to the Defendants herein for services allegedly provided to the Allstate Claimants and/or billed to the Allstate Plaintiffs by the Defendants identified herein.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Schwartz; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Ember; Scott; Liquori; Gill; Riotto; Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Chiropractic Physicians Group; Gross; Dubnoff; the other MLS Medical Referring Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50:

a. Declaring that the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. 39:6A-1, et seq., to make any payments of PIP medical services benefits to Defendants MLS Medical or Schwartz on behalf of any of the Allstate Claimants as a result of the violations of the statutory and regulatory violations engaged in by the MLS Medical Defendants and the other Defendants named herein;

b. Temporarily and permanently enjoining Defendants Schwartz, MLS Medical Group and the other MLS Medical Defendants from providing electrodiagnostic testing or other healthcare services in violation of the statutes and regulations governing the practice of healthcare in New Jersey as described herein;

c. Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

d. Granting Plaintiffs such additional relief as the Court shall deem just and equitable.

378

TWELFTH COUNT

(Unjust Enrichment – MLS Medical Kickback Scheme and MLS Medical
Fraudulent Billing and Record Scheme - Diagnostic Testing and Billing for
Services that Are Not Medically Necessary and/or Rendered in Violation of the No
Fault Statute and Regulations; Kickbacks in Violation of N.J.A.C. 13:35-16.7 and
13:44E-2.6; Referrals for Diagnostic Testing in Violation of N.J.A.C. 13:44E-3.9;
Violations of N.J.A.C. 13:35-6.16 Pertaining to Practice Structure; Self-Referrals in
Violation of N.J.S.A. 45:9-22.5, et seq.; Defendants Schwartz; MLS Medical; MLS
Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Ember;
Scott; Liquori; Gill; Riotto; Anhuar Bandy; Karim Bandy; Formisano; Brown;
Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora
Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New
Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring
Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium
Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice
Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue
Associates; Quality Management Services; Palmer Hills Holdings; Chiropractic
Physicians Group, Gross, Dubnoff, and the other MLS Medical Referring
Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

1042. The Plaintiffs repeat and restate the allegations in all preceding
paragraphs and Counts, and in the succeeding paragraphs and Counts, and incorporate
the same herein as if set forth at length.

1043. Defendants Schwartz; MLS Medical Group, LLC; MLS Medical
Group/Florida; Riotto; Ember; Scott; Gill; Liquori; MLS EDX Medical; MLS EDX
Medical/Florida; MSAR; Defendants Anhuar Bandy; Karim Bandy; Formisano; Brown;
Johnson; Roth; Stark; Baer; Chiropractic Spine Center; Eclipse Chiropractic; Good
Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century
Chiropractic Center; Pennsauken Chiropractic Center; True Healing and Wellness
Center; Wellspring Rehabilitation; Millennium Chiropractic; Riotto Family Chiropractic;
KEKK Marketing; Precision Management Associates; Karkis; First Choice Management;
VIP Management; Karlaly; 243 Livingston Avenue Associates; Quality Management;

379

Palmer Hills Holdings; Sorfam; Chiropractic Physicians Group, Gross, Dubnoff, and the other MLS Medical Referring Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have directly or indirectly received substantial sums from the Allstate Plaintiffs in payment of PIP healthcare expense benefits for electrodiagnostic testing and other healthcare services allegedly rendered to the Allstate Claimants in the names of Defendants MLS Medical Group and Schwartz, which services were rendered in violation of the statutes and administrative regulations governing the provision of healthcare services in New Jersey, including without limitation N.J.A.C. 13:44E-2.6; N.J.A.C. 13:44E-3.9; N.J.A.C. 13:35-2.6; N.J.A.C. 13:35-6.16; N.J.A.C. 13:35-6.17; N.J.S.A. 39:6a-2(m); N.J.A.C. 11:3-4.2; and/or N.J.S.A. 45:9-22.5, et seq., in furtherance of the Bandy MLS Kickback Scheme as described herein.

1044. The Allstate Plaintiffs made these payments to the aforementioned Defendants in the erroneous, but good faith, belief that the alleged PIP healthcare services provided by these Defendants were rendered in accordance with applicable statutes and administrative regulations governing the provision of health care services in New Jersey and therefore were compensable under the No-Fault Law when, in fact, they were not.

1045. Because the PIP healthcare services allegedly rendered by the aforementioned Defendants were not rendered in accordance with applicable statutes, administrative regulations and court decisions governing the provision of health care services in New Jersey, the healthcare services allegedly rendered by the

aforementioned Defendants to the Allstate Claimants and others were not compensable under the No Fault Law.

1046.   Accordingly, the aforementioned Defendants are not entitled to any of the amounts received from the Allstate Plaintiffs in payment of PIP healthcare services benefits in connection with alleged services rendered to the Allstate Claimants and others as a result of the unlawful practice structures utilized by these Defendants.

1047.   The aforementioned Defendants have been unjustly enriched and are obligated to disgorge to the Allstate Plaintiffs all amounts that they have received from the Allstate Plaintiffs in payment for services purportedly rendered in the names of Defendants MLS Medical Group or Schwartz and as a result of the MLS Medical Kickback Scheme.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Schwartz; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Ember; Scott; Liquori; Gill; Riotto; Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Chiropractic Physicians Group,

Gross, Dubnoff, and the other MLS Medical Referring Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50, as follows:

a.   Ordering these Defendants to disgorge any and all sums paid to them directly or indirectly by the Allstate Plaintiffs on behalf of the Allstate Claimants in payment of bills submitted in the names of Defendants MLS Medical Group or Schwartz;

b.   Imposing a constructive trust and equitable lien on the assets of these Defendants until such time as these Defendants have disgorged all sums paid to them directly or indirectly by the Allstate Plaintiffs;

c.   Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

d.   Granting the Plaintiffs such other relief as the Court shall deem just and equitable.

THIRTEENTH COUNT

(Violation of N.J.S.A. 17:33A-1, et seq. (the "IFPA") the MLS Medical Kickback Scheme and MLS Medical Fraudulent Billing and Record Scheme -- Defendants Schwartz; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Ember; Scott; Liquori; Gill; Riotto; Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Chiropractic Physicians Group, Gross, Dubnoff, and the other MLS Medical Referring Defendants; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; the Patient Broker Defendants; the Other Referee Provider Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)



1048. The Plaintiffs[4] repeat and restate the allegations in all preceding paragraphs and Counts, and in the succeeding paragraphs and Counts, and incorporate the same herein as if set forth at length.

1049. Defendants Schwartz; MLS Medical Group, LLC; MLS Medical Group/Florida; Riotto; Ember; Scott; Gill; Liquori; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Defendants Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine Center; Eclipse Chiropractic; Good

---

[4] The Commissioner has settled his claims against Defendants Schwartz and MLS Medical Group, LLC, and does not seek relief against Defendants Schwartz, MLS Medical Group, LLC, MLS Medical/Florida, MLS EDX Medical, MLS EDX Medical/Florida, MSAR, Ember, Scott, Liquori, or Gill in this litigation.

Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center, New Century Chiropractic Center; Pennsauken Chiropractic Center; True Healing and Wellness Center; Wellspring Rehabilitation; Millennium Chiropractic; Riotto Family Chiropractic; KEKK Marketing; Precision Management Associates; Karkis; First Choice Management; VIP Management; Karlaly; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; Sorfam; Chiropractic Physicians Group, Gross, Dubnoff, and the other MLS Medical Referring Defendants; the Other Referee Provider Defendants; the Bandy Runner Defendants; Law Firm Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have engaged in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the payment of PIP healthcare benefits for electrodiagnostic testing and other healthcare services that have allegedly been provided and billed in the name of Defendants MLS Medical Group and Schwartz pursuant to the MLS Medical Schemes as described above and herein.

1050. By submitting, or causing the submission of, bills, medical records, requests for precertification and reports to the Allstate Plaintiffs and others for services that they allegedly rendered to the Allstate Claimants, the aforementioned Defendants impliedly represented, among other things, that the referrals were properly made by the MLS Medical Referring Defendants and electrodiagnostic testing and other healthcare services allegedly performed by Defendants MLS Medical and Schwartz were performed in accordance with all applicable statutes and administrative regulations, when in fact at various times relevant to this litigation the MLS Medical Defendants were

384

engaged in the MLS Medical Kickback Scheme with the Defendant Bandys, the Defendant Bandy Management Companies, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics, Chiropractic Physicians Group, Gross, Dubnoff, and the other MLS Medical Referring Defendants in violation of N.J.A.C. 13:44E-2.6 and N.J.A.C. 13:35-6.17(c), and were engaged in the MLS Medical Fraudulent Billing and Report Scheme with these Defendants and others, including the Defendant Law Firms and the Other Referee Provider Defendants in violation of N.J.A.C. 13:44E-2.6; N.J.A.C. 13:44E-3.9; N.J.A.C. 13:35-2.6; N.J.A.C. 13:35-6.16; N.J.A.C. 13:35-6.17; N.J.S.A. 39:6a-2(m); N.J.A.C. 11:3-4.2; and/or N.J.S.A. 45:9-22.5, et seq., and other applicable statutes and regulations.

1051. The MLS Medical Defendants have engaged in an ongoing conspiracy with the Defendant Bandys, the Defendant Bandy Management Companies, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics, and the other MLS Medical Referring Defendants to represent to the Allstate Plaintiffs and others that Defendants MLS Medical and Schwartz provided electrodiagnostic testing and other healthcare services in accordance with all applicable laws and regulations when, in fact, they at all times knew that was untrue.

1052. The aforementioned Defendants and the other Defendants identified in this Count have engaged in a conspiracy to conceal from, fail to disclose to, and otherwise mislead the Allstate Plaintiffs and other insurers regarding the existence of, and their participation in, the MLS Medical Schemes.

385

1053. The Defendants named in this Count, and others, have conspired, assisted and urged each other to engage in a continuing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the Allstate Plaintiffs to make payments of PIP healthcare benefits to Defendants MLS Medical Group, Schwartz and the other MLS Medical Defendants for services that were rendered to the Allstate Claimants pursuant to, and in furtherance of, the MLS Medical Schemes.

1054. Under the IFPA, a "person" or "practitioner" as defined by N.J.S.A. §17:33A-3, violates N.J.S.A. 17:33A-4(a) if he, or she:

1.  Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

2.  Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

3.  Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

1055. The bills, medical records, reports, correspondence and other documents that the MLS Medical Defendants, with the assistance of the MLS Medical Referring Defendants, caused to be prepared and submitted to the Allstate Plaintiffs in support of

386

the referrals and claims for the payment of PIP healthcare expense benefits allegedly rendered to the Allstate Claimants and others in the names of Defendants MLS Medical Group and Schwartz all constituted "statements" within the meaning of Section 4(a) of the IFPA.

1056.  Each submission of bills, medical records, reports, correspondence or other documents by or in the names of Defendants MLS Medical Group and/or Schwartz, or relating to a referral of any Allstate Claimant thereto constituted a separate violation of Section 4(a) of the IFPA.



1057.  By knowingly concealing and otherwise failing to disclose the existence of and their participation in the MLS Medical Schemes, and that the MLS Medical Defendants had paid kickbacks to or on behalf of the MLS Medical Referring Defendants either directly or through one or more of the Patient Broker Defendants as described herein in exchange for causing the Allstate Claimants and the other patients of the MLS Medical Referring Defendants to be referred for electrodiagnostic testing and other healthcare services in violation of N.J.A.C. 13:44E-2.6 and N.J.A.C. 13:35-6.17(c), and had submitted false and fraudulent bills, medical records, reports, correspondence and other documents in violation of N.J.A.C. 13:44E-2.6; N.J.A.C. 13:44E-3.9; N.J.A.C. 13:35-2.6; N.J.A.C. 13:35-6.16; N.J.A.C. 13:35-6.17; N.J.S.A. 39:6a-2(m); N.J.A.C. 11:3-4.2; and N.J.S.A. 45:9-22.5, et seq.; and other statutes and administrative regulations, these Defendants violated Section 4(a)(3) of the IFPA.

1058.  Section 4(e) of the IFPA provides in relevant part the following:

    e.      A person or practitioner violates this act if, for pecuniary gain, for
            himself or another, he directly or indirectly solicits any person or

practitioner to . . . to make a claim for personal injury protection
benefits pursuant to P.L.1972, c.70 (C.39:6A-1 et seq.), provided,
however, that this subsection shall not apply to any conduct
otherwise permitted by law or by rule of the Supreme Court.

1059. By paying kickbacks as described herein to the MLS Medical Referring

Defendants either directly or through one or more of the Patient Broker Defendants, in

exchange for causing the referrals of the Allstate Claimants for electrodiagnostic testing

or other services to be performed by Defendants MLS Medical Group or Schwartz, the

MLS Medical Defendants indirectly solicited the Allstate Claimants and those other

patients "to make a claim for personal injury protection benefits" under the No Fault Law

in violation of Section 4(e) of the IFPA.

1060. A "person" or "practitioner" violates N.J.S.A. 17:33A-4(b) of the IFPA, if he

or she "knowingly assists, conspires with or urges any person or practitioner to violate

any provisions of this act."

1061. The MLS Medical Defendants, the Defendant Bandys, the Defendant

Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the

Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the

Riotto Clinic Staff Defendants, together with John Doe 1-50, John Roe 1-50, ABC Corp.

1-50, XYZ, P.C. 1-50, and/or one or more of the Patient Broker Defendants, conspired

with and urged and assisted each other to commit the violations of the IFPA described

herein.

1062. The MLS Medical Defendants, together with John Doe 1-50, John Roe 1-

50, ABC Corp. 1-50, XYZ, P.C. 1-50 and/or one or more of the Patient Broker

388

Defendants, conspired with and urged and assisted each other to commit the violations of the IFPA described herein.

1063. The MLS Medical Defendants and the other MLS Medical Referring Defendants, together with John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 and/or one or more of the Patient Broker Defendants, conspired with and urged and assisted each other to commit the violations of the IFPA described herein.

1064. The Bandy Runner Defendants assisted and/or conspired with the MLS Medical Defendants in furtherance of the MLS Medical Schemes in general and the Bandy-MLS Medical Schemes in particular, by recruiting a large percentage of the patients, including a large percentage of the Allstate Claimants, in exchange for kickbacks paid to them by the Defendant Bandys and/or Riotto directly or indirectly through the Defendant Bandy Management Companies, and for causing patients to undergo treatment at the Defendant Bandy/Riotto Chiropractic Clinics, where most of these patients were then referred to Defendants MLS Medical Group and Schwartz.

1065. The Law Firm Defendants assisted and/or conspired with the MLS Medical Defendants in furtherance of the MLS Medical Schemes in general and the Bandy-MLS Medical Schemes in particular, by paying kickbacks to the Defendant Bandys and Defendant Riotto directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making in-kind kickbacks in the form of the referrals of clients they obtained independently and/or through their own use of runners in exchange for referrals to them of patients of the Defendant Bandy/Riotto Chiropractic Clinics by the Defendant Bandys and/or Defendant Riotto.

389

1066. The Law Firm Defendants also assisted and conspired with the MLS Medical Defendants, the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the MLS Medical Schemes in general and the Bandy-MLS Medical Schemes in particular, by leading certain of their clients, including certain of the Allstate Claimants, to believe they had valid bodily injury claims that would be enhanced by undergoing electrodiagnostic testing and receiving other healthcare services allegedly performed by the Defendants MLS Medical Group and Schwartz at the Defendant Bandy/Riotto Chiropractic Clinics, and the kickback revenue generated by the Defendant Bandys and Riotto from the services rendered through the Bandy-MLS Medical Kickback Scheme was used in part by the Defendant Bandys to pay kickbacks to the Runner Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Schemes.

1067. In addition to the referrals of Allstate Claimants and other clients they received through the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme, which were funded in part by the kickbacks paid by the MLS Medical Defendants to the Defendant Bandys, Defendant Riotto, and the Defendant Bandy Management Companies, the Law Firm Defendants also benefited from these schemes because the medical reports and diagnosis of radiculopathy Defendants MLS Medical Group and Schwartz would provide to each Allstate Claimant would enhance the value of their

390

bodily injury claim, as a result of which they and their clients, would receive additional revenue from the Allstate Plaintiffs or cause the Allstate Plaintiffs to incur additional attorney's fees and other costs defending against such claims.

1068. The Other Referee Provider Defendants assisted and conspired with the MLS Medical Defendants, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy-MLS Medical Schemes by paying kickbacks to the Defendant Bandys directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making kickbacks indirectly through one or more of the Patient Broker Defendants, who in turn gave kickbacks to the Defendant Bandys either in money or in-kind by causing additional patients to be referred to the Defendant Bandy/Riotto Chiropractic Clinics. These moneys and the revenue generated as a result of in-kind referrals were used to pay kickbacks to the Runner Defendants for patient referrals in furtherance of the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and the other Bandy Schemes, which referrals led to additional referrals to the Referee Provider Defendants.

1069. At all times relevant to this litigation, the Runner Defendants, the Law Firm Defendants, and the Referee Provider Defendants, including the MLS Medical Defendants, knew that the Defendant Bandys, Riotto and/or the Defendant Bandy Management Companies were receiving kickbacks from these Defendants directly or

391

through the Patient Broker Defendants when causing patients, including the Allstate Claimants to be referred to or from the Defendant Bandy/Riotto Chiropractic Clinics.

1070. A "person" or "practitioner" violates N.J.S.A. 17:33A-4(c) of the IFPA if, "due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act."

1071. As a result of the conspiracy, assistance and/or urging of each of the Defendants named herein, these Defendants all knowingly benefitted, directly or indirectly, from the proceeds derived from the violations of the IFPA described herein, and thereby violated Section 4(c) of the IFPA.

1072. Through their repeated violations of the IFPA as described herein, these Defendants have engaged in a "pattern" of violating the IFPA and as a result of which these Defendants are jointly and severally liable to the Allstate Plaintiffs for treble damages.

WHEREFORE, the Allstate Plaintiffs demand judgment against Defendants Schwartz; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Ember; Scott; Liquori; Gill; Riotto; Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates;

392

Quality Management Services; Palmer Hills Holdings; Chiropractic Physicians Group;
Gross, Dubnoff, and the other MLS Medical Referring Defendants; the Riotto Clinic Staff
Defendants; the Bandy Clinic Staff Defendants; Huaman; Estefania Frias; Lilian Frias;
Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel");
John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John
Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50
(a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); Walker;
Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office;
Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; the Patient Broker
Defendants; the Other Referee Provider Defendants; John Doe 1-50; John Roe 1-50;
ABC Corp. 1-50; and XYZ, P.C. 1-50; jointly and severally, as follows:

    a. Declaring that during all times relevant hereto these Defendants
       have violated N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and
       4(e);

    b. Declaring that during all times relevant hereto these Defendants
       intentionally and knowingly engaged in a pattern of violating
       N.J.S.A. 17:33A-4(a)(1), (2),(3), 4(b), 4(c) and 4(e);

    c. Staying all arbitration proceedings and Superior Court actions
       that have been filed by or on behalf of these Defendants;

    d. Vacating all arbitration awards and judgments that have been
       entered against the Allstate Plaintiffs and in favor of these
       Defendants;

    e. Staying the enforcement of all arbitration awards and judgments
       that have been obtained against the Allstate Plaintiffs and in
       favor of these Defendants;

    f. Awarding the Allstate Plaintiffs compensatory damages jointly
       and severally against these Defendants in an amount equal to
       all PIP healthcare expense benefits the Allstate Plaintiffs paid in

connection with the claims of the Allstate PIP Claimants for services allegedly rendered;

g.  Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all damages the Allstate Plaintiffs paid by way of settlement or award in connection with the claims of the Allstate BI Claimants;

h.  Awarding the Allstate Plaintiffs all of their costs of investigation, arbitration and litigation, as well as attorneys' fees incurred and to be incurred in connection therewith and this litigation;

i.  Awarding the Allstate Plaintiffs treble damages, consisting of three times their compensatory damages, including costs of investigation, costs of suit and attorneys' fees incurred and to be incurred, jointly and severally against these Defendants pursuant to Section 7(b) of the IFPA; and

j.  Awarding the Allstate Plaintiffs punitive damages against these Defendants to punish the Defendants for their malicious, willful or wanton conduct and to deter the Defendants from similar wrongful conduct in the future.

WHEREFORE, the Commissioner demands judgment against Defendants Riotto; Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Chiropractic Physicians Group, Gross, Dubnoff, and the other MLS Medical Referring Defendants; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John

Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a
"Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a
"Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe
1-50 (a/k/a "Tano"); Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman;
Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm;
the Patient Broker Defendants; the Other Referee Provider Defendants; John Doe 1-50;
John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50; jointly and severally, as follows:

a. Declaring that during all times relevant hereto these Defendants
   have violated N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and
   4(e);

b. Declaring that during all times relevant hereto these Defendants
   intentionally and knowingly engaged in a pattern of violating
   N.J.S.A. 17:33A-4(a)(1), (2),(3), 4(b), 4(c) and 4(e);

c. Awarding Commissioner civil penalties against each Defendant
   in an amount up to $5,000.00 for the first offense, in an amount
   up to $10,000.00 for the second offense, and in an amount up to
   $15,000.00 for each subsequent offense pursuant to N.J.S.A.
   17:33A-5(b);

d. Awarding Commissioner costs and attorneys' fees pursuant to
   N.J.S.A. 17:33A-5(b);

e. Assessing, against each Defendant, a statutory surcharge
   pursuant to N.J.S.A. 17:33A-5.1;

f. Suspending each Defendant's New Jersey driving privileges for
   a period of one year pursuant to N.J.S.A. 39:6A-15; and

g. Granting the Commissioner such additional relief as the Court
   may deem just and equitable.

FOURTEENTH COUNT

(Declaratory Judgment – Bandy-Other Referee Provider Kickback Schemes and the Other Referee Provider Kickback Schemes in Violation of N.J.A.C. 13:35-6.17 and 13:44E-2.6; the Other Referee Provider Defendants; the Other Referring Defendants; the Referring Defendants; the Patient Broker Defendants; Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); MLS Medical Referring Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

1073. Plaintiffs repeat and restate the allegations contained in the preceding paragraphs and Counts and the paragraphs and Counts that follow, and incorporate the same herein as if set forth at length.

*Allegations Relating to the*
*Bandy–Other Referee Provider Kickback Schemes*

1074. At all times relevant to this litigation, the Defendant Bandys, Riotto and/or John Doe 1-50, with the assistance of the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants and the Defendant Bandy Management Companies, and all while acting in furtherance of the Bandy Provider Kickback Scheme, caused the Allstate Claimants and other patients of the Defendant Bandy/Riotto Chiropractic Clinics to be

396

referred to one or more of the Other Referee Provider Defendants in exchange for kickbacks in violation of the statutes and regulations governing the provision of healthcare in, New Jersey. These Other Referee Provider Defendants are either unknown to Plaintiffs at this time, or have been or are anticipated to be named by Plaintiffs in separate litigation as set forth in the Allstate Plaintiffs' R. 4:5-1 Certification.

1075. At all times relevant to this litigation, the Other Referee Provider Defendants paid kickbacks to the Defendant Bandys, Riotto and/or John Doe 1-50, either directly or indirectly through one or more of the Defendant Bandy Management Companies, or through the Patient Broker Defendants, for causing Allstate Claimants and other patients of the Defendant Bandy/Riotto Chiropractic Clinics to be referred for healthcare services, including without limitation diagnostic testing, examinations, electrodiagnostic testing, pain management injections and invasive procedures, surgeries, durable medical equipment, pharmaceutical prescriptions (collectively referred to herein as the "Other Referee Provider Healthcare Services"), to be performed and/or provided by, and billed in the name of, the Other Referee Provider Defendants.

1076. Upon information and belief, in addition to giving kickbacks directly or indirectly to the Defendant Bandys, Riotto and/or John Doe 1-50 for causing patients of the Defendant Bandy/Riotto Chiropractic Clinics to be referred to them for Other Referee Provider Healthcare Services, the Other Referee Provider Defendants also gave kickbacks directly or indirectly to the other Referring Defendants, including Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and/or XYZ, P.C. 1-50 for

397

the referrals of patients, including Allstate Claimants, from providers other than the Defendant Bandy/Riotto Chiropractic Clinics. These other Referring Defendants are referred to collectively here as the "Other Referring Defendants."

1077. Each and every referral of an Allstate Claimant or other patient of the Defendant Bandy/Riotto Chiropractic Clinics to the Other Referee Provider Defendants was made in exchange for a kickback paid to them by the Other Referee Provider Defendants either directly, or indirectly through the Patient Broker Defendants, using one or more of the Bandy Kickback Methods described or otherwise referred to herein, in violation of N.J.A.C. 13:44E-2.6 and/or N.J.A.C. 13:35-6.17.

1078. Each and every referral of an Allstate Claimant or other patient of the Other Referring Defendants to the Other Referee Provider Defendants was made in exchange for a kickback paid to them by the Other Referee Provider Defendants either directly, or indirectly through the Patient Broker Defendants, using one or more of the kickback methods described or otherwise referred to herein, in violation of N.J.A.C. 13:44E-2.6 and/or N.J.A.C. 13:35-6.17.

*The Role of the Patient Broker Defendants in the
Other Referee Provider Kickback Schemes*

1079. Upon information and belief, the Patient Broker Defendants participated in the Other Referee Provider Kickback Schemes while acting under the guise of providing purportedly legitimate services such as marketing, consulting, management or other similar services, when in fact they operated as a middleman between the Other Referee Provider Defendants who were willing to pay kickbacks for referrals of patients and other individuals who were in a position to cause those referrals to be made, including

398

the Defendant Bandys, Riotto, John Doe 1-50 and/or the Other Referring Defendants. The Patient Broker Defendants served as conduits for the payment of those kickbacks.

1080. Upon further information and belief, the Patient Broker Defendants organized, facilitated, assisted and/or kept track of the exchanges of kickbacks between the Other Referee Provider Defendants and the Defendant Bandys, Riotto, John Doe 1-50 and/or the Other Referring Defendants that were in the form of "in kind" kickbacks, including the referrals of patients on a one-for-one or other formula basis.

1081. At times these "in kind" exchanges included schemes wherein the Patient Broker Defendants solicited and received payments from the Other Referee Provider Defendants under the guise of providing marketing or other seemingly legitimate services, and used a portion of those funds to finance solicitation efforts on behalf of personal injury attorneys or others associated with them, including Defendants John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and/or XYZ, P.C. 1-50, but on the condition that clients who were recruited pursuant to the scheme must be referred to the Defendant Bandys, Riotto and the Defendant Bandy/Riotto Chiropractic Clinics or to the Other Referring Defendants as directed by the Patient Broker Defendants.

*Other Non-Monetary Kickbacks*

1082. In addition to monetary kickbacks, it was at all times an element of the Other Referee Provider Kickback Schemes that the reports issued by the Other Referee Provider Defendants would recommend that the Allstate Claimant or other patient continue chiropractic or other treatment, and would also often recommend that the Allstate Claimant or other patient undergo additional procedures or treatments, which

399

were typically costly and often invasive

1083. These recommendations were designed and intended to further the Bandy Provider Kickback Scheme and/or the Other Referee Provider Kickback Schemes by rewarding the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics and/or the Other Referring Defendants for the patient referral by providing a medical justification for further chiropractic treatment. Similarly, the recommendation that the patient undergo further additional and costly procedures or treatments was designed and intended to reward the Patient Broker Defendant because this recommendation increased the likelihood the Allstate Claimants and other patients would undergo costly pain management procedures with pain management providers, surgeons and Ambulatory Surgery Centers who are also represented by the Patient Broker Defendants.

1084. The anti-kickback regulations of the Board of Medical Examiners governing medical doctors, N.J.A.C. 13:35-6.17(c), provide the following:

> A licensee shall not, directly or indirectly, give to or receive from  any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: . . . making or receiving a referral to or from another for professional services.

1085. The regulations of the Board of Chiropractic Examiners, N.J.A.C. 13:44E-2.6, similarly prohibit kickbacks:

> It shall be professional misconduct for a licensee to pay, or to receive from any person any fee or other form of compensation for the referral of a patient. This section shall not prohibit the division of fees among licensees engaged in a bona fide employment, partnership or

400

corporate relationship for the delivery of professional services.

1086. At all times relevant to this litigation, the Defendant Bandy/Riotto Chiropractors knew that the Defendant Bandys and/or Riotto either directed them to make referrals of the Allstate Claimants and the other patients of the Defendant Bandy/Riotto Chiropractic Clinics to the Other Referee Provider Defendants they designated, or directed the Bandy Clinic Staff Defendants and/or the Riotto Clinic Staff Defendants to make those referrals without the input of the Defendant Bandy/Riotto Chiropractors.

1087. At all times relevant to this litigation, the Other Referee Provider Defendants, the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractors, the Other Referring Defendants, including without limitation Defendants John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50 and the Patient Broker Defendants, knew that the payments or other consideration given to the Defendant Bandys, Riotto, John Doe 1-50 and/or the Other Referring Defendants by the Other Referee Provider Defendants, either directly or indirectly through one or more of the Patient Broker Defendants, were kickbacks given in exchange for the referrals of patients including the Allstate Claimants for undergoing the Other Referee Provider Healthcare Services in violation of N.J.A.C. 13:35-6.17(c) and N.J.A.C. 13:44E-2.6.

1088. PIP insurers such as the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. §39:6A-1, et seq., to make any payments for PIP medical expense benefits that were not provided in accordance with applicable regulations and statutes governing the provision of those services.

401

1089. Because Other Referee Provider Healthcare Services purportedly performed on or provided to the Allstate Claimants and to the patients of other insurers in the name of the Other Referee Provider Defendants were all rendered in violation of the anti-kickback provisions of N.J.A.C. 13:35-6.17(c) and/or N.J.A.C. 13:44E-2.6, the Allstate Plaintiffs have no obligation to make any payments to the Defendants herein for services allegedly provided to the Allstate Claimants and/or billed to the Allstate Plaintiffs by the Defendants identified herein.

WHEREFORE, the Allstate Plaintiffs demand judgment against the Other Referee Provider Defendants; the Other Referring Defendants; the Referring Defendants; the Patient Broker Defendants; Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony

Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John

Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); MLS Medical Referring

Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 as

follows:

a.   Declaring that the Allstate Plaintiffs have no obligation pursuant to N.J.S.A. 39:6A-1, et seq., to make any payments of PIP medical services benefits to the Other Referee Provider Defendants on behalf of any of the Allstate Claimants as a result of the violations of the statutory and regulatory violations engaged in by the Other Referee Provider Defendants and the other Defendants named herein;

b.   Temporarily and permanently enjoining the Other Referee Provider Defendants from providing Other Referee Provider Healthcare Services in violation of the statutes and regulations governing the practice of healthcare in New Jersey as described herein;

c.   Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

d.   Granting Plaintiffs such additional relief as the Court shall deem just and equitable.

FIFTEENTH COUNT

(Unjust Enrichment – Bandy-Other Referee Provider Kickback Schemes and the Other Referee Provider Kickback Schemes in Violation of N.J.A.C. 13:35-6.17 and 13:44E-2.6; the Other Referee Provider Defendants; the Other Referring Defendants; the Referring Defendants; the Patient Broker Defendants; Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); MLS Medical Referring Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

1090. The Plaintiffs repeat and restate the allegations in all preceding paragraphs and Counts, and in the succeeding paragraphs and Counts, and incorporate the same herein as if set forth at length.

1091. The Other Referee Provider Defendants; Defendants Anhuar Bandy; Karim Bandy; Formisano; Brown; Johnson; Roth; Stark; Baer; the Defendant Bandy/Riotto Chiropractors; Chiropractic Spine Center; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century Chiropractic Center; Pennsauken Chiropractic Center; Platinum Chiropractic; True Healing and Wellness Center; Wellspring Rehabilitation; Millennium Chiropractic; Riotto Family Chiropractic; KEKK Marketing; Precision Management

404

Associates, Karkis; First Choice Management; VIP Management; Karlaly, 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings, Sorfam; the Referring Defendants; the Other Referring Defendants; the Patient Broker Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have directly or indirectly received substantial sums from the Allstate Plaintiffs in payment of PIP healthcare expense benefits for Other Referee Provider Healthcare Services allegedly rendered to the Allstate Claimants in the name of the Other Referee Provider Defendants, which services were rendered in violation of the statutes and administrative regulations governing the provision of healthcare services in New Jersey in violation of N.J.A.C. 13:35-6.17 and N.J.A.C. 13:44E-2.6 in furtherance of the Bandy Provider Kickback Scheme and/or the Other Referee Provider Kickback Schemes as described herein.

1092. The Allstate Plaintiffs made these payments to the aforementioned Defendants in the erroneous, but good faith, belief that the alleged PIP healthcare services provided by these Defendants were rendered in accordance with applicable statutes and administrative regulations governing the provision of healthcare services in New Jersey and therefore were compensable under the No-Fault Law when, in fact, they were not.

1093. Because the PIP healthcare services allegedly rendered by the aforementioned Defendants were not rendered in accordance with applicable statutes, administrative regulations and court decisions governing the provision of healthcare services in New Jersey, the healthcare services allegedly rendered by the

405

aforementioned Defendants to the Allstate Claimants and others were not compensable under the No Fault Law.

1094.  Accordingly, the aforementioned Defendants are not entitled to any of the amounts received from the Allstate Plaintiffs in payment of PIP healthcare services benefits in connection with alleged services rendered to the Allstate Claimants and others as a result of the violations of the administrative regulations as described by these Defendants.

1095.  The aforementioned Defendants have been unjustly enriched and are obligated to disgorge to the Allstate Plaintiffs all amounts that they have received from the Allstate Plaintiffs in payment for services purportedly rendered in the name of the Other Referee Provider Defendants as a result of the Other Referee Provider Kickback Schemes.

WHEREFORE, the Allstate Plaintiffs demand judgment against the Other Referee Provider Defendants; the Other Referring Defendants; the Referring Defendants; the Patient Broker Defendants; Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management

Services; Palmer Hills Holdings; Walker; Gallegos; Arzadi; Joworisak & Associates;

Schenerman, Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic;

Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera;

Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a

"Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony

Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John

Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); MLS Medical Referring

Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 as

follows:

a.   Ordering these Defendants to disgorge any and all sums paid to them directly or indirectly by the Allstate Plaintiffs on behalf of the Allstate Claimants in payment of bills submitted in the names of the Other Referee Provider Defendants;

b.   Imposing a constructive trust and equitable lien on the assets of these Defendants until such time as these Defendants have disgorged all sums paid to them directly or indirectly by the Allstate Plaintiffs;

c.   Awarding the Allstate Plaintiffs their reasonable attorneys' fees, costs of investigation and costs of suit; and

d.   Granting the Plaintiffs such other relief as the Court shall deem just and equitable.

SIXTEENTH COUNT

(Violation of N.J.S.A. 17:33A-1, et seq. (the "IFPA") -- Bandy-Other Referee
Provider Kickback Schemes and the Other Referee Provider Kickback Schemes in
Violation of N.J.A.C. 13:35-6.17 and 13:44E-2.6; the Referee Provider Defendants;
the Other Referee Provider Defendants; the Other Referring Defendants; the
Referring Defendants; the Patient Broker Defendants; Defendants Anhuar Bandy;
Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer;
Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center;
Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic;
Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family
Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic
Staff Defendants; the Bandy Clinic Staff Defendants; KEKK Marketing; Precision
Management; Karkis; First Choice Management; VIP Management; Karlaly;
Sorfam; 243 Livingston Avenue Associates; Quality Management Services;
Palmer Hills Holdings; Walker; Gallegos; Arzadi; Joworisak & Associates;
Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic;
Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes;
Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50
(a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50
(a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a
"Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); MLS
Medical Referring Defendants; MLS Medical; MLS Medical/Florida; MLS EDX
Medical; MLS EDX Medical/Florida; MSAR; Schwartz; Ember; Scott; Liquori; Gill;
Golden Lotus; Golden Flower; Lipshitz; Roytman; Chi Acupuncture; John Doe 1-
50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50)

1096. The Plaintiffs repeat and restate the allegations in all preceding
paragraphs and Counts, and in the succeeding paragraphs and Counts, and incorporate
the same herein as if set forth at length.

1097. The Other Referee Provider Defendants; the Referee Provider
Defendants; the Referring Defendants; Defendants Anhuar Bandy; Karim Bandy; Riotto;
Formisano; Brown; Johnson; Roth; Stark; Baer; the Defendant Bandy/Riotto
Chiropractors; Chiropractic Spine Center; Eclipse Chiropractic; Elmora Wellness; Good
Health Center; Lakewood Chiropractic Center; Liberty Chiropractic Center; New Century

408

Chiropractic Center; Pennsauken Chiropractic Center; Platinum Chiropractic; True Healing and Wellness Center; Wellspring Rehabilitation; Millennium Chiropractic; Riotto Family Chiropractic; KEKK Marketing; Precision Management Associates; Karkis; First Choice Management; VIP Management; Karlaly; 243 Livingston Avenue Associates; Quality Management; Palmer Hills Holdings; Sorfam; MLS Medical Defendants; the Acupuncture Defendants; the Other Referring Defendants; the Patient Broker Defendants; the Law Firm Defendants; the Runner Defendants; John Doe 1-50; John Roe 1-50; ABC Corp. 1-50; and XYZ, P.C. 1-50 have engaged in a continuing and ongoing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the payment of PIP healthcare benefits for Other Referee Provider Healthcare Services that have allegedly been provided and billed in the name of the Other Referee Provider Defendants in furtherance of the Bandy Provider Kickback Scheme and the Other Bandy Schemes and/or the Other Referee Provider Kickback Schemes, as described herein.

1098. By submitting, or causing the submission of, bills, medical records, requests for precertification and reports to the Allstate Plaintiffs and others for services that they allegedly rendered to the Allstate Claimants, the aforementioned Defendants impliedly represented, among other things, that the Other Referee Provider Healthcare Services allegedly rendered to these Allstate Claimants were performed by the Other Referee Provider Defendants in accordance with all applicable statutes and administrative regulations, when in fact at various times relevant to this litigation the Other Referee Provider Defendants were engaged in the Bandy Provider Kickback

409

Scheme and/or the Other Referee Provider Kickback Schemes with the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Defendant Bandy Management Companies, the Other Referring Defendants, the Patient Broker Defendants, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, in violation of N.J.A.C. 13:35-6.17(c) and N.J.A.C. 13:44E-2.6 and other applicable statutes and regulations.

1099. The Other Referee Provider Defendants have engaged in an ongoing conspiracy with the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, the Defendant Bandy Management Companies, the Other Referring Defendants, the Patient Broker Defendants, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, to represent to the Allstate Plaintiffs and other insurers that the Other Referee Provider Defendants provided Other Referee Provider Healthcare Services in accordance with all applicable laws and regulations when, in fact, they at all times knew that was untrue.

1100. The aforementioned Defendants and the other Defendants identified in this and related Counts have engaged in a conspiracy to conceal from, fail to disclose to, and otherwise mislead the Allstate Plaintiffs and other insurers regarding the existence of and their participation in the Bandy Provider Kickback Scheme and the Other Referee Provider Kickback Schemes.

1101.   The Defendants named in this and related Counts, and others, have conspired, assisted and urged each other to engage in a continuing and ongoing fraudulent scheme that is designed to defraud the Allstate Plaintiffs as well as other insurers by inducing the Allstate Plaintiffs to make payments of PIP healthcare benefits to the Other Referee Provider Defendants for services that were rendered to the Allstate Claimants pursuant to and in furtherance of the Bandy Provider Kickback Scheme and the Other Referee Provider Kickback Schemes.

1102.   Under the IFPA, a "person" or "practitioner" as defined by N.J.S.A. §17:33A-3, violates N.J.S.A. 17:33A-4(a) if he, or she:

1.   Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

2.   Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

3.   Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

1103.   The bills, medical records, reports, correspondence and other documents that the Other Referee Provider Defendants, with the assistance of the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy/Riotto Chiropractic Clinics, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff

411

Defendants, the Defendant Bandy Management Companies, the Other Referring Defendants, the Patient Broker Defendants, John Doe 1-50, John Roe 1-50, ABC Corp. 1-50 and XYZ, P.C. 1-50, caused to be prepared and submitted to Allstate in support of the referrals and claims for the payment of PIP healthcare expense benefits allegedly rendered to the Allstate Claimants and others in the name of the Other Referee Provider Defendants all constituted "statements" within the meaning of Section 4(a) of the IFPA.

1104. Each submission of bills, medical records, reports, correspondence or other documents by or in the name of the Other Referee Provider Defendants relating to a referral of any Allstate Claimant thereto constituted a separate violation of Section 4(a) of the IFPA.

1105. By knowingly concealing and otherwise failing to disclose the existence of and their participation in the Bandy Provider Kickback Scheme and the Other Referee Provider Kickback Schemes, and that the Other Referee Provider Defendants had paid kickbacks to the Defendant Bandys, Riotto, the Defendant Bandy Management Companies, John Doe 1-50 and/or the Other Referring Defendants, either directly or through one or more of the Patient Broker Defendants, as described herein in exchange for causing the Allstate Claimants and the other patients to be referred to the Other Referee Provider Defendants for Other Referee Provider Healthcare Services in violation of N.J.A.C. 13:35-6.17(c) and N.J.A.C. 13:44E-2.6 and other statutes and administrative regulations, these Defendants violated Section 4(a)(3) of the IFPA.

1106. Section 4(e) of the IFPA provides in relevant part the following:

    e.    A person or practitioner violates this act if, for pecuniary gain, for himself or another, he directly or indirectly solicits any person or

practitioner to . . . to make a claim for personal injury protection benefits pursuant to P.L.1972, c.70 (C.39:6A-1 et seq.); provided, however, that this subsection shall not apply to any conduct otherwise permitted by law or by rule of the Supreme Court.

1107. By paying kickbacks as described herein to the Defendant Bandys, Riotto, the Defendant Bandy Management Companies, John Doe 1-50 and/or the Other Referring Defendants, either directly or through one or more of the Patient Broker Defendants, in exchange for causing the referrals of the Allstate Claimants for Other Referee Provider Healthcare Services to be performed by the Other Referee Provider Defendants, the Defendant Bandys, Riotto, John Doe 1-50 and the Other Referring Defendants, solicited the Allstate Claimants and those other patients "to make a claim for personal injury protection benefits" under the No Fault Law in violation of Section 4(e) of the IFPA.

1108. A "person" or "practitioner" violates N.J.S.A. 17:33A-4(b) of the IFPA, if he or she "knowingly assists, conspires with or urges any person or practitioner to violate any provisions of this act."

1109. The MLS Medical Defendants, the Defendant Bandys, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, together with John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50, and/or one or more of the Patient Broker Defendants, conspired with and urged and assisted each other to commit the violations of the IFPA described herein.

413

1110. The MLS Medical Defendants, together with John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 and/or one or more of the Patient Broker Defendants, conspired with and urged and assisted each other to commit the violations of the IFPA described herein.

1111. The MLS Medical Defendants and the other MLS Medical Referring Defendants, together with John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 and/or one or more of the Patient Broker Defendants, conspired with and urged and assisted each other to commit the violations of the IFPA described herein.

1112. The Bandy Runner Defendants assisted and/or conspired with the Other Referee Provider Defendants in furtherance of the Other Referee Provider Kickback Schemes in general and the Bandy-Other Referee Provider Kickback Schemes in particular, by recruiting a large percentage of the patients, including a large percentage of the Allstate Claimants, in exchange for kickbacks paid to them by the Defendant Bandys and/or Riotto directly or indirectly through the Defendant Bandy Management Companies, and for causing patients to undergo treatment at the Defendant Bandy/Riotto Chiropractic Clinics, where most of these patients were then referred to the Other Referee Provider Defendants.

1113. The Law Firm Defendants assisted and/or conspired with the Other Referee Provider Defendants in furtherance of the Other Referee Provider Kickback Schemes in general and the Bandy-Other Referee Provider Kickback Scheme in particular, by paying kickbacks to the Defendant Bandys and Defendant Riotto directly or indirectly through the Defendant Bandy Management Companies and/or the Patient

414

Broker Defendants, for patient referrals and/or by making in-kind kickbacks in the form of the referrals of clients they obtained independently and/or through their own use of runners or their respective advertising methods in exchange for referrals to them of patients of the Defendant Bandy/Riotto Chiropractic Clinics by the Defendant Bandys and/or Defendant Riotto.

1114. The Law Firm Defendants also assisted and conspired with the Other Referee Provider Defendants, the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, and XYZ, P.C. 1-50 in furtherance of the Other Referee Provider Kickback Schemes in general and the Bandy-Other Referee Provider Kickback Scheme in particular, by leading certain of their clients, including certain of the Allstate Claimants, to believe they had valid bodily injury claims that would be enhanced by undergoing the Other Referee Provider Healthcare Services allegedly performed by the Other Referee Provider Defendants at the Defendant Bandy/Riotto Chiropractic Clinics and the Other Referring Defendants, and the kickback revenue generated by the Defendant Bandys and Riotto from the services rendered through the Bandy-Other Referee Provider Kickback Scheme was used in part by the Defendant Bandys, Riotto and/or John Doe 1-50 to pay kickbacks to the Runner Defendants in furtherance of the Bandy Runner Scheme and the Bandy Attorney Kickback Schemes.

1115. In addition to the referrals of Allstate Claimants and other clients they received through the Bandy Runner Scheme and the Bandy Attorney Kickback Scheme, which were funded in part by the kickbacks paid by the Other Referee Provider Defendants to the Defendant Bandys, Defendant Riotto, and the Defendant Bandy Management Companies, the Law Firm Defendants also benefited from these schemes because the medical reports and diagnoses the Other Referee Provider Defendants provided to each Allstate Claimant would enhance the value of their clients' bodily injury claims, as a result of which they and their clients would receive larger settlement amounts from the Allstate Plaintiffs and other insurers or cause the Allstate Plaintiffs and other insurers to incur additional attorney fees and other costs defending against such claims.

1116. The Other Referee Provider Defendants assisted and conspired with the MLS Medical Defendants, the Acupuncture Defendants, the Defendant Bandys, Riotto, the Defendant Bandy/Riotto Chiropractic Clinics, the Defendant Bandy/Riotto Chiropractors, the Defendant Bandy Management Companies, the Bandy Clinic Staff Defendants, the Riotto Clinic Staff Defendants, and John Doe 1-50, John Roe 1-50, ABC Corp. 1-50, XYZ, P.C. 1-50 in furtherance of the Bandy-Other Referee Provider Kickback Scheme by paying kickbacks to the Defendant Bandys, Riotto and/or John Doe 1-50 directly or indirectly through the Defendant Bandy Management Companies for patient referrals and/or by making kickbacks indirectly through one or more of the Patient Broker Defendants, who in turn gave kickbacks to the Defendant Bandys, Riotto and/or John Doe 1-50 either in money or in-kind by causing additional patients to be

referred to the Bandy/Riotto Chiropractic Clinics. These moneys and the revenue generated as a result of in-kind referrals were used to pay kickbacks to the Runner Defendants for patient referrals in furtherance of the Bandy Runner Scheme, the Bandy Attorney Kickback Scheme and the other Bandy Schemes, which referrals led to additional referrals to the MLS Medical Defendants, the Acupuncture Defendants and the Other Referee Provider Defendants.

1117. At all times relevant to this litigation, the Runner Defendants, the Law Firm Defendants, the Acupuncture Defendants, the MLS Medical Defendants and the Other Referee Provider Defendants knew that the Defendant Bandys, Riotto and/or the Defendant Bandy Management Companies were receiving kickbacks from these other Defendants directly or through the Patient Broker Defendants when causing patients, including the Allstate Claimants to be referred to or from the Defendant Bandy/Riotto Chiropractic Clinics.



1118. A "person" or "practitioner" violates N.J.S.A. 17:33A-4(c) of the IFPA if, "due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act."

1119. As a result of the conspiracy, assistance and/or urging of each of the Defendants named herein, these Defendants all knowingly benefitted, directly or indirectly, from the proceeds derived from the violations of the IFPA described herein, and thereby violated Section 4(c) of the IFPA.



1120. Through their repeated violations of the IFPA as described herein, these Defendants have engaged in a "pattern" of violating the IFPA and as a result of which

417

these Defendants are jointly and severally liable to the Allstate Plaintiffs for treble damages.

WHEREFORE, Plaintiffs demand judgment against the Referee Provider Defendants; the Other Referee Provider Defendants; the Other Referring Defendants; the Referring Defendants; the Patient Broker Defendants; Defendants Anhuar Bandy; Karim Bandy; Riotto; Formisano; Brown; Johnson; Roth; Stark; Baer; Chiropractic Spine; Eclipse Chiropractic; Elmora Wellness; Good Health Center; Lakewood Chiropractic; Liberty Chiropractic; New Century Chiropractic; Pennsauken Chiropractic; True Healing; Wellspring Rehabilitation; Riotto Family Chiropractic; Platinum Chiropractic; Millenium Chiropractic; the Riotto Clinic Staff Defendants; the Bandy Clinic Staff Defendants; KEKK Marketing; Precision Management; Karkis; First Choice Management; VIP Management; Karlaly; Sorfam; 243 Livingston Avenue Associates; Quality Management Services; Palmer Hills Holdings; Walker; Gallegos; Arzadi; Joworisak & Associates; Schenerman; Schenerman Law Office; Yankowitz & Schenerman, LLC; Wishnic; Wishnic Law Firm; Huaman; Estefania Frias; Lilian Frias; Lacotera; Hughes; Rivera; Perez; Neiman; Moreno; John Doe 1-50 (a/k/a "Gabriel"); John Doe 1-50 (a/k/a "Rakeisha"); John Doe 1-50 (a/k/a "Jaxson Washington"); John Doe 1-50 (a/k/a "Tony Hernandez"); John Doe 1-50 (a/k/a "Elizabeth") John Doe 1-50 (a/k/a "Yolanda"); John Doe 1-50 (a/k/a "Corea"); John Doe 1-50 (a/k/a "Tano"); MLS Medical Referring Defendants; MLS Medical; MLS Medical/Florida; MLS EDX Medical; MLS EDX Medical/Florida; MSAR; Schwartz; Ember; Scott; Liquori; Gill; Golden Lotus;

Golden Flower; Lipshitz; Roytman; Chi Acupuncture; John Doe 1-50; John Roe 1-50;

ABC Corp 1-50; and XYZ, P.C. 1-50 as follows:

a. Declaring that during all times relevant hereto these Defendants have violated N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

b. Declaring that during all times relevant hereto these Defendants intentionally and knowingly engaged in a pattern of violating N.J.S.A. 17:33A-4(a)(1),(2),(3), 4(b), 4(c) and 4(e);

c. Staying all arbitration proceedings and Superior Court actions that have been filed by or on behalf of these Defendants;

d. Vacating all arbitration awards and judgments that have been entered against the Allstate Plaintiffs and in favor of these Defendants;

e. Staying the enforcement of all arbitration awards and judgments that have been obtained against the Allstate Plaintiffs and in favor of these Defendants;

f. Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all PIP healthcare expense benefits the Allstate Plaintiffs paid in connection with the claims of the Allstate PIP Claimants for services allegedly rendered;

g. Awarding the Allstate Plaintiffs compensatory damages jointly and severally against these Defendants in an amount equal to all damages the Allstate Plaintiffs paid by way of settlement or award in connection with the claims of the Allstate BI Claimants;

h. Awarding the Allstate Plaintiffs all of their costs of investigation, arbitration and litigation, as well as attorneys' fees incurred and to be incurred in connection therewith and this litigation;

i. Awarding the Allstate Plaintiffs treble damages, consisting of three times their compensatory damages, including costs of investigation, costs of suit and attorneys' fees incurred and to be incurred, jointly and severally against these Defendants pursuant to Section 7(b) of the IFPA;

419

j.     Awarding the Allstate Plaintiffs punitive damages against these Defendants to punish the Defendants for their malicious, willful or wanton conduct and to deter the Defendants from similar wrongful conduct in the future;

k.     Awarding Commissioner civil penalties against each Defendant in an amount up to $5,000.00 for the first offense, in an amount up to $10,000.00 for the second offense, and in an amount up to $15,000.00 for each subsequent offense pursuant to N.J.S.A. 17:33A-5(b);

l.     Awarding Commissioner costs and attorneys' fees pursuant to N.J.S.A. 17:33A-5(b);

m.     Assessing, against each Defendant, a statutory surcharge pursuant to N.J.S.A. 17:33A-5.1;

n.     Suspending each Defendant's New Jersey driving privileges for a period of one year pursuant to N.J.S.A. 39:6A-15; and

o.     Granting the Plaintiffs such additional relief as the Court may deem just and equitable.

## TRIAL COUNSEL DESIGNATION

The Allstate Plaintiffs hereby designate Michael A. Malia, Esquire, as Trial Counsel pursuant to R. 4:25-4.

The Commissioner hereby designates Richard Wegryn, Deputy Attorney General, as Trial Counsel pursuant to R. 4:25-4.

## CERTIFICATION OF COUNSEL FOR THE ALLSTATE PLAINTIFFS PURSUANT TO RULE 4:5-1

I hereby certify that to the best of my knowledge, information, and belief, the within matter is the subject of other actions pending in the Superior Court, and arbitration proceedings, as set forth on Exhibit A hereto.

420

In addition, the Allstate Plaintiffs anticipate that they will be bringing additional actions related to the matters at issue in this case, as follows:

1. Anticipated lawsuit against Defendants or non-parties: Third State Radiology, LLC; Oleksandr V. Golovchenko (a/k/a "Oleks Golo"); Arkadiy Z. Gitelman; Nationwide Medical Support, Inc.; Advanced Imaging Center, Inc.; Bella Korytny; Dimitri Ivanovski; Injured Magazine, LLC; Kenneth M. Gross, D.C.; Michelle Dubnoff, D.C.; Chiropractic Physicians Group, LLP; Ocean Wellness Center, LLC; James Morales, M.D.; Advanced Balance & Wellness, LLC; Maximum Management, LLC; James R. Morales, M.D., LLC d/b/a "Shore Sports Medicine"; Cash Flow Physician Services, LLC; James Hill; 3 D's Consulting, LLC; Christopher Montana, D.C.; Fernando Barrese, D.C.; Oleg Gorodetsky; Chiropractic Centre Of Elizabeth, LLC; Chiropractic Center Of Jersey City, LLC; Chiropractic Center Of Newark, LLC; Wallington Chiropractic Center, PC d/b/a Wallington Chiropractic & Rehabilitation Center; Massimo Rehabilitation Center, LLC; Massimo Chiropractic, LLC; Hanover Rehabilitation Center, LLC: Hanover Chiropractic, LLC; DOGO Marketing, Inc.; O&D Marketing, LLC; Broadway Management Group, LLC; Anhuar Bandy; Karim Bandy; Edward P. Formisano, D.C.; Louis S. Brown, D.C.; Gerald H. Roth, D.C.; Anthony Riotto, D.C.; Chiropractic Spine Center, LLC; Eclipse Chiropractic Center, LLC; Good Health Center, LLC; True Healing & Wellness Center, LLC; Wellspring Rehabilitation Center, LLC; Lakewood Chiropractic Center, LLC; Riotto Family Chiropractic, LLC; Sorfam